Toby L. Gerber (SBT 07813700)
Kristian W. Gluck (SBT 24038921)
Ryan E. Manns (SBT 24041391)
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

Berry D. Spears (SBT 18893300)
Anna Maria Mendez (SBT 24055960)
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Avenue, Suite 2400
Austin, TX 78701-3271
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

PROPOSED COUNSEL FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 09-31828 (BJH)** |
| **IDEARC INC.**, *et al.*, | § | |
| | § | **(Chapter 11)** |
| Debtors. | § | **(Joint Administration Requested)** |

## DEBTORS' EMERGENCY MOTION, PURSUANT TO 11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P. 4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF

**THE DEBTORS HAVE REQUESTED EMERGENCY CONSIDERATION OF THIS MOTION AND HAVE REQUESTED THAT A "FIRST DAY" HEARING BE HELD ON THIS MOTION AT THE COURT'S EARLIEST CONVENIENCE. IF THE COURT IN FACT SETS THIS MOTION FOR AN EMERGENCY "FIRST DAY" HEARING, ONLY YOUR ATTENDANCE AT THE HEARING IS NECESSARY TO PRESERVE YOUR RIGHTS. NO WRITTEN RESPONSE NEED BE FILED.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

COMES NOW Idearc Inc. ("<u>Idearc</u>") and its affiliated debtors and debtors-in-possession

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                      Page 1 of 20

(together with Idearc, the "Debtors")[1] and hereby file this Debtors' Motion, Pursuant to 11 U.S.C §§ 105, 361, 363, 506 and 552 and Fed. R. of Bankr. P. 4001(B), for an Interim and Final Order (I) Authorizing the Use of Cash Collateral (II) Finding that Secured Interests are Adequately Protected, and (III) Granting Related Relief (the "Motion") and in support thereof the Debtors respectfully show the following:

## PRELIMINARY STATEMENT

1.      Given the encumbrances upon substantially all of the Debtors' assets, the Debtors are unable to continue their business operations in chapter 11 absent some form of immediate relief from this Court. Approval of the use of the Debtors' assets that are or may become cash collateral of the Prepetition Lenders (as defined below) (the "Cash Collateral") is required to fund the Debtors' day-to-day operations. The Debtors' proposed use of Cash Collateral will enhance and preserve the value of the Debtors' assets, including the Prepetition Lenders' Collateral (as defined below), as a going concern for the benefit of the Debtors' estate and all of its creditors.

2.      Accordingly, the Debtors and the Agent (as defined below) seek, on an emergency basis, authorization of the interim use of Cash Collateral until such time as the Court holds a Final Hearing on the Motion (the "Interim Period") in accordance with the Debtors' rolling weekly cash forecast for the period ending April 24, 2009, a copy of which is annexed hereto as Exhibit 1 to the Interim Order (as defined below) (the "Interim Budget"), and on the terms set forth herein to, among other things, continue to maintain the Debtors as a going

---

[1]     In addition to Idearc, Inc., the following entities are debtors in these related cases: Idearc Information Services LLC, Idearc Media LLC, Idearc Media Services – East Inc., Idearc Media Services – West Inc., Idearc Media Sales – West Inc., Idearc Media Sales – East LLC, Idearc Media Sales – East Co., License Application Corporation, and Second License Application Corporation.

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                    Page 2 of 20

concern and to retain their ability to operate in the ordinary course of business. As set forth in more detail below, during the Interim Period the Debtors will use Cash Collateral in accordance with the Interim Budget and the Prepetition Lenders will be adequately protected by the Debtors' continuing maintenance and preservation of the Prepetition Lenders' Collateral for the benefit of all of the Prepetition Lenders and the additional grant of post-petition replacement liens and security interests on all of the Debtors' unencumbered assets or after acquired property to the extent of any diminution in value of the Prepetition Lenders' Collateral (other than actions under chapter 5 of the Bankruptcy Code).[2]

## JURISDICTION AND PROCEDURAL BACKGROUND

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion concerns the administration of the estate; and therefore, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      On March 31, 2009 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief (collectively, the "Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

---

[2] In compliance with General Order 2006-02 (Exhibit J and the comments thereto), the Attorney Checklist Concerning Motions and Orders Pertaining to Use of Cash Collateral and Post-Petition Financing (which are in excess of ten (10) pages) has been contemporaneously filed herewith.

**DEBTORS' EMERGENCY MOTION, PURSUANT TO**
**11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.**
**4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE**
**OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE**
**ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF**
**80370260.8**

**Page 3 of 20**

## STATEMENT OF FACTS

### A. The Debtors' Business Operations

7. The Debtors, with more than 125 years of experience in the print directory business, are one of the largest publishers of yellow pages directories in the United States, publishing their directories in more than 350 markets in thirty-four states across the United States and the District of Columbia. The Debtors are also one of the nation's leading online local search providers. As of the Petition Date, the Debtors employ approximately 6,100 employees comprised of sales employees, sales management and non-sales employees. In 2008, the Debtors generated revenues of approximately $2,973,000,000 primarily derived from their print product advertising sales and online media advertising sales.

8. Through their various companies, the Debtors manage and deliver print, online and wireless publishing and advertising services on multiple platforms including: yellow pages, white pages, magazines, online directory and search services, web site design and hosting services, direct mail and directory and information services for wireless subscribers. The Debtors' products include print yellow pages, print white pages, Superpages.com, Superpages Mobile, Switchboard.com, LocalSearch.com, and online local search resources.

9. In 2008, the Debtors published more than 1,200 distinct directory titles. These directories are designed to meet the advertising needs of local and national businesses and the information needs of consumers. The Debtors' multitude of advertising options enables them to create customized advertising programs that are responsive to specific customer needs. The Debtors' yellow pages and white pages directories are also efficient sources of information for consumers, featuring a comprehensive list of businesses in local markets.

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                                Page 4 of 20

10.     Superpages.com, the first online local search resource to offer advertisers both fixed-fee and performance-based product options, has evolved into a leading online product for traditional and non-traditional advertisers because of the Debtors' focus on delivering relevant content, supplying advanced technology and attracting increased traffic. Consumers conducted more than 23 billion network searches in 2008 using Superpages.com. With an increasing emphasis on the online market, the Debtors have entered into more than 250 distribution agreements with online search and other Internet sites to increase online traffic to extend the Debtors' advertisers' online reach. Many of these distribution agreements bring end-users directly into the Superpages.com network. Through this extensive distribution network, Superpages.com now has more than 20.9 million business listings and tens of millions of residential listings in the United States.

**B.    The Verizon Spin-off**

11.     Idearc was formed in 2006 as a Delaware corporation in anticipation of a spin-off of Verizon Communications Inc.'s ("Verizon") directory operations. The spin-off occurred on November 17, 2006 through a tax-free distribution by Verizon of its shares of Idearc common stock to Verizon's shareholders, who received one share of Idearc common stock for every twenty shares of Verizon common stock. In connection with the spin-off, Verizon transferred to Idearc all of Verizon's ownership interest in Verizon Information Services Inc. and other assets, liabilities, businesses and employees primarily related to Verizon's domestic print and internet yellow pages directories publishing operations (the "Contribution"). As a result of the spin-off, Idearc became an independent public company, although Idearc continues to have a number of significant commercial arrangements with Verizon. Idearc is the exclusive official publisher of Verizon print directories in the markets where Verizon is the incumbent local exchange carrier,

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                          Page 5 of 20

and Idearc uses the Verizon brand and logo in its print directories in both incumbent and expansion markets.

12. As part of the spin-off, Idearc incurred $9,115,000,000 of debt, comprised of senior unsecured notes in the amount of $2,850,000,000 and senior secured term loan facilities in an aggregate amount of $6,265,000,000, consisting of: (1) the tranche A term loan facility of $1,515,000,000 (the "Tranche A Facility"); (2) a tranche B term loan facility of $4,750,000,000 (the "Tranche B Facility"); and (3) a $250,000,000 revolving credit facility.

13. In exchange for the Contribution, Idearc: (1) issued to Verizon additional shares of Idearc common stock to be distributed to Verizon's stockholders pro rata in the spin-off; (2) issued to Verizon senior unsecured notes and a portion of the loan proceeds under the Tranche B Facility; and (3) transferred to Verizon approximately $2,400,000,000 in cash generated from the proceeds of the loans under the Tranche A Facility, and from the proceeds of the remaining portion of the loans under the Tranche B Facility.

## C. The Debtors' Prepetition Indebtedness

14. Idearc is indebted to a large syndicate of lenders in the aggregate outstanding principal amount of not less than $6,400,000,000 (plus accrued and unpaid interest) pursuant to a senior secured Credit Agreement (as amended, supplemented or otherwise modified, the "Senior Credit Facility"), dated as of November 17, 2006[3], among Idearc, the lenders from time to time parties thereto, and JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") for such lenders (collectively, the "Prepetition Lenders"). The Senior Credit Facility consists of: (1) a

---

[3] All such loans, financial accommodations and other amounts owing by the Debtors to the Agent and the Lenders under, or in connection with, the Credit Agreement and the other collateral and ancillary documentation executed in connection therewith (as amended, supplemented or otherwise modified, the "Loan Documents"), including the Debtors' obligations in respect of certain interest rate protection agreements, are referred to as the "Pre-Petition Obligations".

**DEBTORS' EMERGENCY MOTION, PURSUANT TO**
**11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.**
**4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE**
**OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE**
**ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF**
80370260.8

**Page 6 of 20**

Tranche A Term Loan Facility in the outstanding principal amount of $1,515,000,000; (2) a Tranche B Term Loan Facility in the outstanding principal amount of $4,655,000,000; and (3) a Revolving Credit Facility in the outstanding principal amount of $250,000,000 (the "Revolver"). The Senior Credit Facility is secured by substantially all of Idearc's present and after acquired assets (the "Prepetition Lenders' Collateral"), and is guaranteed on a secured basis by substantially all of Idearc's subsidiaries, including each of the Debtors herein.

15.     In order to hedge the variability in cash flows attributable to changes in the floating rate of interest under the Senior Credit Facility, Idearc entered into a series of interest rate swap agreements with certain financial institutions. Such interest rate swap agreements have notional amounts totaling approximately $5,510,000,000 as of the business day immediately preceding the Petition Date.[4] As of the business day immediately preceding the Petition Date, Idearc's estimated termination liability under the interest rate swap agreements was approximately $498,000,000. In addition, in order to lock in the benefit on Idearc's bank debt of the difference between one month and three month LIBOR through September 2010, Idearc entered a "basis swap" having a notional amount of $1,100,000,000 effective September 30, 2008. As of the business day immediately preceding the Petition Date, the estimated termination value in Idearc's favor under the basis swap was approximately $1,900,000. Idearc's obligations to the swap counterparties under the interest rate swap agreements are secured on a *pari passu* basis by the same collateral securing Idearc's obligations under the Senior Credit Facility.

16.     In addition to the Debtors' secured debt, Idearc also has issued $2,850,000,000 in senior unsecured notes. The senior unsecured notes, originally issued on or about November 17,

---

[4]     In addition, the Debtors entered into two forward swap transactions effective March 31, 2009 with notional amounts of approximately $1,700,000,000. Such forward swaps replace notional amount $1,710,000,000 of swaps that matured on March 31, 2009.

**DEBTORS' EMERGENCY MOTION, PURSUANT TO**
**11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.**
**4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE**
**OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE**
**ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF**
80370260.8                                                                                          **Page 7 of 20**

2006 in a private placement pursuant to Rule 144A and Regulation S under the Securities Act of 1933, as amended (the "Securities Act"), were exchanged in the second quarter of 2007 for an equal principal amount of a new issue of senior unsecured notes registered under the Securities Act. The senior unsecured notes are structurally subordinated to Idearc's obligations under the Senior Credit Facility to the extent of the value of the assets securing such indebtedness. Additionally, the senior unsecured notes are guaranteed by substantially all of Idearc's subsidiaries.

**D.     Events Leading to the Commencement of the Debtors' Chapter 11 Cases**

17.     The prolonged economic downturn facing the United States economy has adversely affected the Debtors' businesses given that substantially all of their net revenues are derived from the sale of advertising. Expenditures by advertising companies are particularly sensitive to economic conditions and tend to decline in a recession or economic uncertainty. Moreover, the Debtors' economic hardships have been compounded by slowed growth in the economy as a result of declining business and consumer confidence.

18.     The Debtors' operations have also been adversely impacted by the highly competitive directory advertising industry in the United States. The Debtors compete with many different advertising media, including newspapers, radio, television, the internet, billboards, direct mail, telemarketing and other yellow pages directory publishers. The Debtors compete with Yellowbook in the majority of their markets, and to a lesser extent AT&T, R.H. Donnelley and White Publishing. This competition has adversely affected the Debtors' financial performance on cost per reference, quality, features, usage leadership and distribution.

19.     Declining use of print yellow page directories has also adversely affected the Debtors' businesses. Overall references to print yellow pages directories in the United States

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                              Page 8 of 20

declined from 14.5 billion in 2005 to 13.4 billion in 2007. This decline can be attributed to increased use of Internet search providers, particularly in business-to-business and retail categories, as well as the proliferation of very large retail stores for which consumers and businesses may not reference the yellow pages.

20.     The combination of these economic and financial events has significantly impaired the Debtors' liquidity and ability to perform in the future and significantly decreased their financial leverage, making it necessary and appropriate for the Debtors to commence these bankruptcy cases in order to maximize the value of their assets for the benefit of creditors and other constituencies under chapter 11 of the Bankruptcy Code.

## RELIEF REQUESTED

21.     The Debtors respectfully request the entry of an interim order, substantially in the form of Exhibit "A" hereto (the "Interim Order"), pending entry of a final order (the "Final Order"), (i) authorizing the immediate use of Cash Collateral, (ii) finding that the Debtors' Prepetition Lenders' interests, or that of any other party which is purportedly secured, are adequately protected; (iii) granting related relief and (iv) scheduling a final hearing on the Motion within twenty-one (21) days of entry of the Interim Order (the "Final Hearing"). The Debtors also seek entry of any other orders necessary to grant the relief requested.

## BASIS FOR RELIEF

### A.     The Debtors' Use Of Cash Collateral Is Appropriate Under Current Circumstances And Should Be Authorized.

22.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or court approval. Specifically, section 363(c)(2) states in pertinent part:

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                    Page 9 of 20

> The trustee [or debtor in possession] may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

> Section 363(a) of the Bankruptcy Code defines "cash collateral" as:

> [C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property … subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title[.].

11 U.S.C. § 363(a).

23. Additionally, section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property … proposed to be used, sold, or leased, by the trustee [or debtor in possession], the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in section 361 of the Bankruptcy Code and include, but are not limited to: (i) lump sum or periodic cash payments to the extent that such use will result in a decrease in value of such entity's interest in the property; (ii) provisions for additional or replacement liens to the extent that the use of the property will cause a decrease in the value of such entity's interest in property; and (iii) such other relief as will result in the realization by the entity of the indubitable equivalent of such entity's interest in property. *See* 11 U.S.C. § 361.

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8

Page 10 of 20

24.     Furthermore, pursuant to section 105(a) of the Bankruptcy Code, this "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

25.     The Court should authorize the Debtors to use Cash Collateral, whether existing as of the Petition Date or arising thereafter based on the conversion of existing non-cash collateral into cash.  A copy of the Interim Budget is attached hereto as Exhibit 1 and to the Interim Order.  On or before April 15, 2009, the Debtors shall provide a budget to the Agent, in form and substance reasonably satisfactory to the Agent, covering a 13-week forward looking period.  Such budget will become the "Budget" for the purposes of the Interim Order and the Final Order.  It is essential to the continued operation of the Debtors that they obtain authority to use Cash Collateral to fund payroll and other operating needs, including the costs of administration of the Cases.  Currently, the Debtors have little or no available cash or assets that are not subject to the Prepetition Lenders' liens and security interests.

26.     If the Debtors are permitted to use Cash Collateral to fund ongoing business operations and administration of these Cases, the Debtors will preserve the value of the Debtors' assets as a going concern.   Thus, the Debtors can continue to operate their businesses successfully, but only if they are allowed to use Cash Collateral in the course of their day-to-day operations.  Without such use, the detrimental result to the estates will be rapid and ultimately disastrous, given the nature of the Debtors' businesses.  Access to Cash Collateral is crucial to the Debtors' ability to avoid immediate and irreparable harm to the estates, creditors, and ongoing businesses during the Interim Period.

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                                              Page 11 of 20

B.     **The Prepetition Lenders are Adequately Protected**

27.     Adequate Protection under the Bankruptcy Code is designed to protect the secured lenders from diminution in the value of their interest in the collateral as a result of the debtor's proposed use or disposition of such collateral.  The legislative history of section 361 of the Bankruptcy Code makes clear that bankruptcy courts are given broad authority and flexibility in deciding what constitutes adequate protection on a case-by-case basis.  Specifically, the legislative history provides:

> This section specifies the means by which adequate protection may be provided. It does not require the court to provide it.  To do so would place the court in an administrative role.  Instead, the trustee or debtor in possession will provide or propose a protective method.  If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate.  The purpose of this section is to illustrate means by which it may be provided and to define the contours of the concept.

H.R. Rep. No. 95-595, at 338, 95th Cong., 1st Sess. (1977); *see Resolution Trust Corp. v. Swedeland Dev. Group, Inc.* (*In re Swedeland Dev. Group, Inc.*), 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *MBank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1396-1397 (10th Cir. 1987) (stating that courts consider adequate protection as a flexible concept that is to be decided on a case-by-case basis); *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[A] judicial determination of… adequate protection is a question of fact rooted in measurements of value and the credibility of witnesses.");  *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) (stating that adequate protection should be determined on a case-by-case basis); *In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995), *aff'd*, 117 F.3d 1413 (4th Cir. 1997) (adequate protection is a flexible concept to be determined on a case-by-case basis).

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                                          Page 12 of 20

28.     As stated, the principal purpose of adequate protection is to safeguard the interest of the secured creditor in the particular collateral against diminution in the value of such interest. *See In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (noting that all forms of adequate protection are designed to protect secured creditors from diminution in the value of their collateral); *In re WPRV-TV, Inc.*, 102 B.R. 228, 230 (Bankr. E.D. Okla. 1988) ("[A]dequate protection is granted to compensate the creditor for any decrease in value which may result from the retention of property by the debtor."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (focus is on protection of the secured creditor from diminution in the value of its collateral during reorganization process).

29.     Nevertheless, the "[c]ourt is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980). The interest to be protected by virtue of the adequate protection requirement is the lesser of the value of the debt or the value of assets securing the debt. *See In re Alycan Interstate Corp.*, 12 B.R. 803, 808 (Bankr. D. Utah 1981) ("[T]he 'interest in property' entitled to protection is not measured by the amount of the debt but by the value of the lien"); *see also* 11 U.S.C. § 506.

(1)     *The Prepetition Lenders Interest Are Adequately Protected By the Proposed Adequate Protection Payment and by the Debtor's Continued Operation of Its Businesses and Expenditures of Cash*

30.     The agreement reached between the Debtors, the Agent and the Steering Committee of Prepetition Lenders includes a provision for the Debtors to pay the Prepetition Lenders $250 million (the "Proposed Adequate Protection Payment") within two (2) business days of this Court's authorization of same. The Debtors submit that the Proposed Adequate Protection Payment is justified because: (1) the present amount of Cash Collateral greatly

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                                    Page 13 of 20

exceeds the Debtors' operating requirements; and (2) in October 2008, the Debtors' borrowed approximately $250,000,000 from the Revolver even though, at the time of the drawdown, the Debtors' cash balance exceeded $300,000,000. Accordingly, the Debtors are able and willing to make this adequate protection payment and believe it is appropriate under the facts and circumstances of these bankruptcy cases.

31. Another form of adequate protection of the Prepetition Lenders' Collateral is the Debtors' proposed use of the Cash Collateral to fund day-to-day operations and administrative expenses incurred in maintaining and preserving the Prepetition Lenders' Collateral. Indeed, as detailed in the Affidavit of Samuel D. Jones in Support of Chapter 11 Petitions and First Day Motions (the "Jones Affidavit"), filed contemporaneously herewith, without such use, the Debtors will be unable to maintain the business as a going concern.

32. As an additional form of adequate protection, the Debtors seek authority to, within 20 days of submission of invoices therefor (which invoices shall also be delivered to the United States Trustee and to the Committee, and shall contain a summary description of services rendered and a listing of hours of service by professional for the time period covered thereby), to pay all reasonable fees and expenses incurred by the Agent (including, without limitation, the administration fees payable to the Agent under the Credit Agreement, and the reasonable fees and expenses of Chilmark Partners LLC or any successor or other financial advisors to the Agent, and Simpson Thacher & Bartlett LLP and Vinson & Elkins L.L.P., or any successor or other outside counsel advising the Agent), in each case, in connection with matters relating to the Credit Agreement and the other Loan Documents, or the enforcement and protection of the rights and interests of the Agent and the Prepetition Lenders in these Cases.

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8

Page 14 of 20

33. Courts have held that adequate protection may be demonstrated by a showing that the going concern value of the Debtors is preserved by the Debtors' continuing operations and use of cash collateral. *See, e.g., In re Snowshoe Co., Inc.* 789 F.2d 1085, 1087-89 (4th Cir. 1986) (trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operations); *In re Wrecclesham Grange, Inc*., 221 B.R. 978, 980-981 (Bankr. M.D. Fla. 1997) (one fact that the debtor can show to establish adequate protection is that a good prospect for a reorganization exists); *In re Constable Plaza Assocs., L.P*., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (debtor entitled to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral); *In re T.H.B. Corp*., 85 B.R. 192, 195 (Bankr. D. Mass. 1988)("[T]he stream of cash collateral will likely remain at an approximate even level over a sustained period with new proceeds replacing old. The constant nature of this stream gives the [bank] protection for [their] cash collateral."); *In re Beker Indus. Corp*., 58 B.R. 725, 738 (Bankr. S.D.N.Y. 1986) (finding that the equities lay heavily with a chapter 11 debtor which had good prospects for successful reorganization).

34. In stark contrast to a going concern, in a liquidation scenario, the value of the Prepetition Lenders Collateral will, without doubt, be severely and negatively impacted. Accordingly, expenditures of cash collateral to preserve and maintain the underlying property provide additional adequate protection to a secured creditor. *See e.g., In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56-57 (Bankr. N.D.N.Y. 1992) (finding secured creditor's interest in collateral adequately protected when cash collateral applied to normal operating and maintenance expenditures on collateral property). Thus, it is essential to the maintenance of the Prepetition Lenders' Collateral that the Debtors' operations are maintained as a going concern.

**DEBTORS' EMERGENCY MOTION, PURSUANT TO**
**11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.**
**4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE**
**OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE**
**ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF**
**80370260.8**                                                                 **Page 15 of 20**

35. Without the ability to use Cash Collateral, the Debtors will be forced to liquidate their assets and they will lose the real opportunity to preserve value not only for the Prepetition Lenders, but potentially for the Debtors' other stakeholders as well. Because the value of the Debtors' assets following a shutdown of their operations is undoubtedly significantly less than their value as a going concern, all creditors bear a substantial risk that recoveries will be substantially less in the event of a distressed liquidation as compared with the continued operation of the businesses as a going concern. Moreover, the use of Cash Collateral in the preservation of assets will further enhance the overall value of the ongoing enterprise and allow the Debtors to continue to generate cash during the pendency of these bankruptcy cases. If the Debtors are precluded from maintaining and utilizing their assets, or if the Debtors are forced to effect a fire-sale liquidation of their facilities, no creditor – secured or unsecured – will benefit. *See e.g., In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (*citing In re Grant Board of Philadelphia, Inc.*, 71 B.R. 376, 386-89 (Bankr. E.D. Pa. 1991), *aff'd.* 75 B.R. 819 (E.D. Pa. 1987), and *In re Alyucan Interstate Corp.*, 12 B.R. 803, 809-12 (Bankr. D. Utah 1981)).

36. Accordingly, the interests of the Prepetition Lenders (as well as those of the Debtors' other creditors and parties in interest) will be best served by permitting the Debtors' continued use of Cash Collateral.

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                                 Page 16 of 20

(2)     *The Prepetition Lenders Are Adequately Protected By The Grant Of Replacement Liens*

37.     The Debtors anticipate that Cash Collateral generally will be used at approximately the rate that income is generated.  Thus, for this Interim Period, new cash and cash-generating assets will become available for replacement liens at roughly the same rate that, and to the extent that, the Prepetition Lenders' Cash Collateral is utilized.  *See, e.g., MBank Dallas, N.A. v. O'Connor* (*In re O'Connor*), 808 F.2d 1393, 1398 (10th Cir. 1987); *In re Wrecclesham Grange, Inc.,* 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997) (noting that a replacement lien of equal value on postpetition rents is adequate protection); *In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) (continued lien on debtors' crops, livestock and equipment resulted in an increase rather than a decrease in collateral, and debtors were granted authority to use cash collateral to meet operating expenses during chapter 11 proceedings).  Adequate protection to the Prepetition Lenders can be provided by the Debtors' Proposed Adequate Protection Payment and maintained through the grant of post-petition replacement liens and security interests in all property, assets and interests in property of the Debtors solely to the extent of any diminution of the value of the Prepetition Lenders' Collateral (other than actions under chapter 5 of the Bankruptcy Code), whether existing on the Petition Date or acquired or arising thereafter, which replacement liens and security interests shall be junior only to (a) all valid, enforceable and perfected prior liens in existence as of the Petition Date or duly perfected after the Petition Date under section 362(b)(18) of the Bankruptcy Code, and (b) any liens arising under the chapter 11 cases that have priority as a matter of law.

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8

Page 17 of 20

          *3.*     *Limitation On Grant Of Replacement Liens And Reservation Of Rights*

38.     The Debtors believe that the liens asserted by the Prepetition Lenders are fully and properly perfected and that they are valid and enforceable.

## C.    The Prepetition Lenders Have Agreed To Make Available A Carveout

39.     As used in this Motion, "Carveout" means (a) the unpaid fees of the Clerk of the Bankruptcy Court and of the United States Trustee pursuant to 28 U.S.C. §§ 1930(a) (collectively, the "Statutory Fees"); (b) following delivery of written notice to the Debtors that an Event of Default (as defined below) has occurred and is continuing, and provided that such Event of Default has not been waived or cured, the payment of allowed professional fees and disbursements (the "Professional Fees and Disbursements") incurred by the professionals retained by the Debtors or the Committee (other than the fees and expenses, if any, of any professionals incurred, directly or indirectly, in respect of, arising from or relating to, the initiation or prosecution (but not the investigation conducted prior to any such initiation or prosecution) of any challenge to the Pre-Petition Obligations, the Agent's liens on the Pre-Petition Collateral or any other claims or causes of action against the Agent or the Lenders) not to exceed $4,000,000 in the aggregate, plus unpaid Professional Fees and Disbursements previously incurred prior to the delivery of written notice to the Debtors of the occurrence of such Event of Default; and (c) the costs and administrative expenses (other than the fees and expenses, if any, incurred, directly or indirectly, in respect of, arising from or relating to, the initiation or prosecution (but not the investigation conducted prior to such initiation or prosecution) of any challenge to the Pre-Petition Obligations, the Agent's liens on the Pre-Petition Collateral or any other claims or causes of action against the Agent or the Lenders) not

DEBTORS' EMERGENCY MOTION, PURSUANT TO
11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.
4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE
OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE
ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF
80370260.8                                                 Page 18 of 20

to exceed $500,000 in the aggregate that are permitted to be incurred by any Chapter 7 trustee pursuant to an order of this Court following any conversion to Chapter 7 of these Cases.[5]

## THE REQUESTED RELIEF SATISFIES RULE 6003

40.      The Debtors submit that the facts cited herein and in the Affidavit of Samuel D. Jones in Support of the Debtors' Chapter 11 Petitions and  First Day Motions, filed contemporaneously herewith, illustrate that the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Based on the foregoing, Bankruptcy Rule 6003 has been satisfied.

## CERTIFICATE OF CONFERENCE

41.      Undersigned counsel for the Debtors conferred with Steve Fuhrman, counsel for the Agent, prior to the filing of this Motion.  The Agent consents to the relief requested in the Motion on the terms set forth in the Interim Order.

## PRAYER

The Debtors respectfully request entry of an order (i) granting the relief requested herein, and (ii) granting the Debtors such other and further relief as the Court deems just and proper both at law and in equity.

---

[5]      Although not included in the Interim Order, the Debtors intend to seek a waiver of their 506(c) rights in the Final Order.

**DEBTORS' EMERGENCY MOTION, PURSUANT TO**
**11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.**
**4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE**
**OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE**
**ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF**
80370260.8                                                                                      **Page 19 of 20**

Dated: March 31, 2009

Respectfully submitted,

FULBRIGHT & JAWORSKI L.L.P.

_____/s/ Toby L. Gerber_____
Toby L. Gerber (SBT 07813700)
Kristian W. Gluck (SBT 24038921)
Ryan E. Manns (SBT 24041391)
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

and

Berry D. Spears (SBT 18893300)
Anna Maria Mendez (SBT 24055960)
600 Congress Avenue, Suite 2400
Austin, TX  78701-3271
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

PROPOSED COUNSEL FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION

**DEBTORS' EMERGENCY MOTION, PURSUANT TO**
**11 U.S.C. §§ 105, 361, 363, 506 AND 552 AND FED. R. OF BANKR. P.**
**4001(B), FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING THE USE**
**OF CASH COLLATERAL; (II) FINDING THAT SECURED INTERESTS ARE**
**ADEQUATELY PROTECTED; AND (III) GRANTING RELATED RELIEF**
**80370260.8**

**Page 20 of 20**