Attached hereto are the Debtors' First Amended Joint Plan of Reorganization and Proposed Disclosure Statement.

These materials contain the Debtors' proposal for a comprehensive financial and business restructuring of their businesses.

The proposed documents have not been agreed-to by all parties-in-interest and may be changed or amended with the agreement of the Debtors prior to a hearing for approval of the Proposed Disclosure Statement, currently scheduled for September 9, 2009.  In addition, certain provisions of the documents are contained in brackets to reflect the Debtors' continued willingness to consider the input of other parties-in-interest.

In the absence of Debtors' agreed changes or amendments prior to such hearing, the Debtors will remove the brackets and approve those material provisions as presented herein for solicitation of the First Amended Joint Plan of Reorganization.

Toby L. Gerber
Fulbright & Jaworski L.L.P.
2200 Ross Avenue - Suite 2800
Dallas, Texas 75201
Direct: 214-855-7171
Fax: 214-855-8200

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-31828 (BJH) |
| | § | |
| IDEARC INC., *et al.*, | § | (Chapter 11) |
| | § | |
| Debtors.[1] | § | (Jointly Administered) |

## DISCLOSURE STATEMENT WITH RESPECT TO
## FIRST AMENDED JOINT PLAN OF REORGANIZATION OF
## IDEARC INC., *ET AL.*, DEBTORS [AS OF SEPTEMBER 8, 2009]

Toby L. Gerber (SBT 07813700)
Kristian W. Gluck (SBT 24038921)
Ryan E. Manns (SBT 24041391)
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

and

Berry D. Spears (SBT 18893300)
Anna Maria Mendez (SBT 24055960)
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Avenue, Suite 2400
Austin, Texas 78701-3271
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

Counsel for the Debtors and Debtors-in-Possession

---

[1] The Debtors in these related cases are: Idearc Inc., Idearc Information Services LLC, Idearc Media LLC, Idearc Media Services – East Inc., Idearc Media Services – West Inc., Idearc Media Sales – West Inc., Idearc Media Sales – East LLC, Idearc Media Sales – East Co., License Application Corporation, and Second License Application Corporation.

THIS DISCLOSURE STATEMENT (THIS "<u>DISCLOSURE STATEMENT</u>") AND ACCOMPANYING FIRST AMENDED JOINT PLAN OF REORGANIZATION (THE "<u>PLAN</u>"), ATTACHED HERETO AS <u>APPENDIX A</u>, HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS WILL SEPARATELY NOTICE A HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT UNDER SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS RESERVE THE RIGHT TO MODIFY OR SUPPLEMENT THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING JOINT PLAN OF REORGANIZATION PRIOR TO AND UP TO THE DATE OF SUCH HEARING.

Dated as of September [__], 2009.

## DISCLAIMERS

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING VOTES ON THE JOINT PLAN OF REORGANIZATION OF IDEARC INC., *ET AL.*, DEBTORS. THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN. A COPY OF THE PLAN IS ATTACHED TO THIS DISCLOSURE STATEMENT AS APPENDIX A.

THE ONLY CREDITORS WHOSE VOTES ARE BEING SOLICITED ARE: (1) HOLDERS OF SECURED CREDIT FACILITY CLAIMS; (2) HOLDERS OF UNSECURED NOTE CLAIMS, WHO DO NOT ELECT TO HAVE SUCH CLAIMS CLASSIFIED AS CONVENIENCE CLAIMS; (3) HOLDERS OF UNSECURED CREDIT FACILITY CLAIMS; AND (4) HOLDERS OF GENERAL UNSECURED CLAIMS, WHO DO NOT ELECT TO HAVE SUCH CLAIMS CLASSIFIED AS CONVENIENCE CLAIMS. ALL OF SUCH CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, AND THE PLAN SUPPLEMENT DOCUMENTS ONCE FILED. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF IDEARC INC., OR ANY OF THE SUBSIDIARY DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN IDEARC INC. OR ANY OF THE SUBSIDIARY DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

## TREASURY DEPARTMENT CIRCULAR 230 NOTICE

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR INTEREST IS HEREBY NOTIFIED THAT:

(A)    ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE USED OR RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED;

(B)    SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND

(C)    EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................................. 1

II.  OVERVIEW OF THE PLAN ........................................................................................... 4

A.  General Structure of the Plan ................................................................................ 5
B.  Summary of Treatment of Claims and Interests under the Plan ....................... 7

III.  PLAN VOTING INSTRUCTIONS AND PROCEDURES ......................................... 15

A.  Notice to Holders of Claims ................................................................................ 15
B.  Voting Rights .......................................................................................................... 16
C.  Solicitation Materials ............................................................................................ 16
D.  Voting Procedures, Ballots, and Voting Deadline ........................................... 17
E.  Confirmation Hearing and Objections to Confirmation ................................. 19

IV.  GENERAL INFORMATION CONCERNING THE DEBTORS ............................. 19

A.  Business Overview ................................................................................................. 19
B.  Business Strategy ................................................................................................... 21
C.  The Spin-Off Transactions .................................................................................. 22
D.  Markets ..................................................................................................................... 23
E.  Incumbent Markets ............................................................................................... 23
F.  Expansion Markets ................................................................................................ 24
G.  Products .................................................................................................................... 24
H.  Sales and Marketing ............................................................................................. 29
I.  Clients ....................................................................................................................... 31
J.  Publishing, Production and Distribution ........................................................... 32
K.  Billing and Credit Control ................................................................................... 32
L.  Competition ............................................................................................................ 33
M.  Patents, Trademarks, and Licenses .................................................................... 34
N.  Employees ............................................................................................................... 34
O.  Assets and Properties ............................................................................................ 35
P.  Unencumbered Assets ........................................................................................... 35
Q.  Legal Proceedings .................................................................................................. 36
R.  Historical Financial Information ........................................................................ 39
S.  Executive Officers ................................................................................................. 40
T.  Board of Directors ................................................................................................. 49
U.  Capital Structure .................................................................................................... 52
V.  Website Information .............................................................................................. 56

V.  CHAPTER 11 CASE ......................................................................................................... 57

A.  Events Leading to Commencement of the Chapter 11 Case ........................... 57
B.  Continuation of Business; Stay of Litigation ................................................... 58
C.  Retention of Professionals ................................................................................... 58
D.  Postpetition Funding ............................................................................................. 59

VI.     SUMMARY OF THE PLAN OF REORGANIZATION ............................................................. 59

        A.      Overall Structure of the Plan............................................................................. 60
        B.      Reorganized Capital Structure Created by the Plan........................................... 60
        C.      Classification and Treatment of Claims and Interests ....................................... 62
        D.      Allowed Claims, Distribution Rights and Objections to Claims ....................... 68
        E.      Disposition of Contracts and Leases.................................................................. 71
        F.      Pension Plans ..................................................................................................... 74
        G.      Revesting of Assets; Liens ................................................................................ 75
        H.      Restructuring Transactions ................................................................................ 75
        I.      Authorization and Issuance of the New Securities ........................................... 75
        J.      Post-Consummation Corporate Structure, Management and Operation............. 76
        K.      Releases, Discharge, Injunctions, Exculpation, and Indemnification................ 79
        L.      Preservation of Rights of Action; Resulting Claim Treatment.......................... 84
        M.      Litigation Trust .................................................................................................. 86
        N.      Retention of Jurisdiction ................................................................................... 87
        O.      Amendment, Alteration, and Revocation of Plan .............................................. 88
        P.      Documents Implementing the Plan .................................................................... 89
        Q.      Confirmation or Consummation ........................................................................ 90

VII.    RISK FACTORS TO BE CONSIDERED........................................................................ 92

        A.      General Risk Considerations............................................................................... 92
        B.      Bankruptcy Risk Considerations........................................................................ 93
        C.      Risk of Claims Estimations................................................................................ 95
        D.      Risk Relating to Conditions Precedent to Consummation and Timing .............. 96
        E.      Risk Relating to the Inherent Uncertainty of Financial Projections .................. 96
        F.      Risks Relating to New Common Stock to be Issued Under the Plan .................. 97
        G.      Risks Relating to New Term Loans to be Issued Under the Plan....................... 98
        H.      Operational Risks................................................................................................ 98
        I.      Risks Related to The Debtors' Relationship with Verizon ............................... 105
        J.      Leverage............................................................................................................ 107
        K.      Tax Uncertainties and Considerations ............................................................. 108

VIII.   APPLICABILITY OF FEDERAL AND OTHER SECURITIES AND ANTITRUST
        LAWS ...................................................................................................................... 109

        A.      Offer and Sale of New Securities: Bankruptcy Code Exemption.................... 109
        B.      Subsequent Transfers of New Securities by Underwriters ............................... 109
        C.      Antitrust Requirements .................................................................................... 111

IX.     MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.............. 111

        A.      U.S. Federal Income Tax Consequences to the Debtors................................... 112
        B.      U.S. Federal Income Tax Consequences to U.S. Holders of Secured Credit
                Facility Debt, Unsecured Credit Facility Debt, Unsecured Notes, and General
                Unsecured Claims ............................................................................................ 114
        C.      Information Reporting and Backup Withholding ............................................. 120
        D.      Importance of Obtaining Professional Tax Assistance..................................... 120

X. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS ........................ 121

    A.    Feasibility of the Plan .................................................................................... 121
    B.    Acceptance of the Plan.................................................................................... 122
    C.    Best Interests Test .......................................................................................... 122
    D.    Liquidation Analysis ...................................................................................... 123
    E.    Valuation of the Reorganized Debtors............................................................ 124
    F.    Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation .......................................................................... 127
    G.    Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative.................................................................................. 127

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......... 128

    A.    Alternative Plans of Reorganization .............................................................. 128
    B.    Liquidation under Chapter 7 or Chapter 11 ................................................... 129

XII. STATEMENTS BY OBJECTING PARTIES .......................................................... 129

    A.    Statements By Peter Talbot on Behalf of the "Idearc Chapter 11 Independent Stock and Bondholders Committee"................................................................ 129
    B.    Statements by Committee ............................................................................... 130
    C.    Statements by Sean Ryan................................................................................ 135

XIII. THE SOLICITATION; VOTING PROCEDURES.................................................... 146

    A.    Parties in Interest Entitled to Vote ................................................................. 146
    B.    Classes Entitled to Vote to Accept or Reject the Plan..................................... 146
    C.    Solicitation Order........................................................................................... 147
    D.    Waivers of Defects, Irregularities, Etc............................................................ 147
    E.    Withdrawal of Ballots; Revocation................................................................. 147
    F.    Further Information; Additional Copies .......................................................... 148

The Debtors own or have rights to use various copyrights, trademarks, service marks and trade names in their business, including, but not limited to, Idearc(R), Idearc Media(R), the Idearc logo, the Idearc Media logo, Verizon(R) Yellow Pages, Verizon(R) White Pages, Verizon(R) Yellow Pages Companion Directories, FairPoint(R) Yellow Pages, FairPoint(R) Yellow Pages Companion Directories, Superpages(R), Superpages.com(R), Switchboard(R), Switchboard.com(SM), LocalSearch.com(SM), Superpages Mobile(R), SuperpagesDirect(TM), SuperpagesDirect Exclusive Mailer(TM), SuperTradeExchange(SM) and SuperGuarantee(SM). This Disclosure Statement also includes copyrights, trademarks, service marks, and trade names of other persons.

## TABLE OF APPENDICES AND EXHIBITS

Appendix A          First Amended Joint Plan of Reorganization of Idearc Inc., _et al.,_  Debtors

Appendix B          Corporate Structure Chart

Appendix C          Pro Forma Financial Projections

Appendix D          Liquidation Analysis


Exhibit A           Contracts and Leases Previously Rejected

Exhibit B           Contracts and Leases to be Rejected

Exhibit C           Creditors Committee Letter

**DISCLOSURE STATEMENT WITH RESPECT TO**
**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF**
**IDEARC INC. *ET AL.*, DEBTORS**

## I. INTRODUCTION

On March 31, 2009 (the "Petition Date"), the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") commenced cases (collectively, the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") by filing petitions for relief under the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). The corporate structure of the Debtors is attached to this Disclosure Statement as Appendix B. The Debtors are the following related companies:

> Idearc Inc., the ultimate parent corporation ("Idearc")
> Idearc Information Services LLC
> Idearc Media LLC
> License Application Corporation
> Second License Application Corporation
> Idearc Media Sales-East Co.
> Idearc Media Sales-East LLC
> Idearc Media Sales-West Inc.
> Idearc Media Services-East Inc.
> Idearc Media Services-West Inc.

On September [__], 2009, the Debtors filed the First Amended Joint Plan of Reorganization in the Chapter 11 Case (as amended, modified, or supplemented from time to time, the "Plan"), which sets forth the manner in which claims against and interests in the Debtors will be treated upon or following the Debtors' emergence from the Chapter 11 Case. The Debtors commenced the Chapter 11 Case to provide, through the Plan, for a financial restructuring to reduce their outstanding indebtedness and strengthen their balance sheets, thereby creating a capital structure more appropriate and sustainable for successfully reorganizing and pursuing their strategic business objectives. All Debtors other than Idearc are referred to as the "Subsidiary Debtors."

This Disclosure Statement (as amended, modified, or supplemented from time to time, this "Disclosure Statement") sets forth information regarding the Debtors' prepetition operating and financial history, the Debtors' reasons for seeking protection and reorganization under Chapter 11, significant events that are expected to occur during the Chapter 11 Case, and the anticipated organization, operations, and financing of the Debtors upon their successful emergence from Chapter 11. This Disclosure Statement also describes the terms and provisions of the Plan, the effects of confirmation of the Plan, certain risk factors associated with the Plan, the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted.

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are (i) "impaired" by a plan of reorganization and (ii) entitled to receive a distribution under such plan are entitled to vote on the plan. Under the Plan, (a) holders of secured credit facility claims in class 3, (b) holders of unsecured note claims, unsecured credit facility claims and unsecured general claims voting together as a single class in class 4, and (c) holders of convenience claims in class 5 are impaired by and entitled to receive a distribution under the Plan, and only the holders of claims in those classes are

entitled to vote to accept or reject the Plan; *provided, however* that by making the election to have their general unsecured claims or unsecured note claims classified as convenience claims, the holders of convenience claims in class 5 are deemed to have voted to accept the Plan. Claims and interests in classes 1 and 2 are unimpaired by the Plan, and the holders of such claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code and therefore are not entitled to vote. The holders of claims and interests in classes 6 and 7, which receive nothing under the Plan, are deemed to have rejected the Plan, and such holders are not entitled to vote.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATING TO THE PLAN, EVENTS EXPECTED TO OCCUR IN THE CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF UNDERLYING DOCUMENTS BY REFERENCE TO THE PLAN, SUCH STATUTORY PROVISIONS, AND DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION**.**

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN IDEARC INC., OR ANY OF THE SUBSIDIARY DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

## FORWARD LOOKING STATEMENTS

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE REORGANIZED DEBTORS AND OTHER FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A OF THE SECURITIES ACT OF 1933 AND SECTION 21E OF THE SECURITIES EXCHANGE ACT OF 1934, ALL OF WHICH ARE BASED ON VARIOUS FACTORS AND ARE DERIVED USING NUMEROUS ASSUMPTIONS. WHEN USED IN THIS DISCLOSURE STATEMENT, THE WORDS "ANTICIPATE," "BELIEVE," "ESTIMATE," "WILL," "MAY," "SHOULD," "PLAN," "POTENTIAL," "CONTINUE," "INTEND," AND "EXPECT" AND SIMILAR EXPRESSIONS GENERALLY IDENTIFY FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT INCLUDE THOSE RELATING TO THE PAYMENTS ON THE DEBTORS' CURRENT AND FUTURE DEBT.

ALTHOUGH THE DEBTORS BELIEVE THAT THEIR PLANS, INTENTIONS AND EXPECTATIONS REFLECTED IN THE FORWARD-LOOKING FINANCIAL INFORMATION

AND STATEMENTS ARE REASONABLE, THEY REFLECT ONLY THE DEBTORS' CURRENT EXPECTATIONS AND THE DEBTORS CANNOT BE SURE THAT THEY WILL BE ACHIEVED. SUCH FORWARD LOOKING FINANCIAL INFORMATION AND STATEMENTS ARE SUBJECT TO KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS THAT COULD CAUSE THE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE CONTEMPLATED BY THE STATEMENTS. *SEE* ARTICLE VII OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS TO BE CONSIDERED" FOR FACTORS THAT COULD CAUSE SUCH DIFFERENCES. THESE FACTORS ARE NOT INTENDED TO REPRESENT A COMPLETE LIST OF THE GENERAL OR SPECIFIC FACTORS THAT MAY AFFECT THE DEBTORS OR THE REORGANIZED DEBTORS. OTHER FACTORS, INCLUDING GENERAL ECONOMIC FACTORS AND BUSINESS STRATEGIES, MAY BE SIGNIFICANT, PRESENTLY OR IN THE FUTURE, AND THE FACTORS SET FORTH IN THIS DISCLOSURE STATEMENT MAY AFFECT THE DEBTORS TO A GREATER EXTENT THAN INDICATED.

EXCEPT AS REQUIRED BY LAW, THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO, TO THE EXTENT APPLICABLE, THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION AND REFORM ACT OF 1995 AND SECTION 1125(e) OF THE BANKRUPTCY CODE AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

**THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THE DEBTORS TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THE HOLDERS OF SECURED CREDIT FACILITY CLAIMS IN CLASS 3 AND UNSECURED NOTE CLAIMS, UNSECURED CREDIT FACILITY CLAIMS AND GENERAL UNSECURED CLAIMS IN CLASS 4. THE DEBTORS URGE SUCH HOLDERS TO VOTE TO ACCEPT THE PLAN.**

## II. OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan, a copy of which is attached to this Disclosure Statement as Appendix A. To the extent there is any inconsistency between this Disclosure Statement and the Plan, the Plan controls. For a more detailed description of the terms and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan of Reorganization." Capitalized terms used in this Disclosure Statement and not otherwise defined in this Disclosure Statement have the meanings given such terms in the Plan. Please refer to Section 1.2 of the Plan for a glossary of defined terms.

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor-in-possession may reorganize its business for the benefit of its creditors, stockholders, and other parties in interest. The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor-in-possession as of the date the petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee. In the Chapter 11 Case, each Debtor remains in possession of its property and continues to operate its businesses as a debtor-in-possession.

The filing of a chapter 11 petition triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, among other things, for an automatic stay of all attempts by creditors or other third parties to collect prepetition claims from the debtor or otherwise interfere with its property or business. Exempted from the automatic stay are governmental authorities seeking to exercise regulatory or policing powers. Except as otherwise ordered by the Bankruptcy Court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in the debtor's estate. Unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case. However, section 1121(d) of the Bankruptcy Code permits the bankruptcy court to extend or reduce the 120 day period upon a showing of "cause." Following the filing of a plan, a debtor must solicit acceptances of the plan within a certain time period. The solicitation period may also be extended or reduced by the bankruptcy court upon a showing of "cause." As the Debtors filed their original plan during the 120 day filing period, no other creditor or party in interest may file a plan until the expiration of such solicitation period unless the Bankruptcy Court shortens or extends such solicitation period for cause.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, that would enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the Debtors' solicitation of votes on the Plan.

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may confirm the plan if the bankruptcy court independently determines that the requirements of section

1129(a) of the Bankruptcy Code have been satisfied. The Debtors believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.

Chapter 11 of the Bankruptcy Code does not require that each holder of a claim or interest in a particular class vote in favor of a plan of reorganization for the bankruptcy court to determine that the class has accepted the plan.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan pursuant to Section 1126(f) of the Bankruptcy Code and therefore are not entitled to vote. Furthermore, classes that are to receive no distribution under the plan are conclusively deemed to have rejected the plan. Accordingly, acceptances of a plan generally will be solicited only from those persons who hold claims or equity interests in an impaired class that is receiving or retaining property under the Plan.

The bankruptcy court also may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the votes of Insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. The Debtors believe that the Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims or Equity Interests and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims or Equity Interests.

## A.     General Structure of the Plan

The Plan proposes (i) the payment of cash by Idearc and the issuance by Idearc of new senior secured term loans and new common stock in exchange for the portion of claims arising under, in connection with, or related to the Debtors' senior credit facility debt and swap obligations to the extent that it is secured, (ii) the issuance of new common stock and distributions from a litigation trust in exchange for the Debtors' unsecured notes that have not been classified as convenience claims, general unsecured claims that have not been classified as convenience claims, and the portion of the claims arising under, in connection with, or related to the Debtors' senior credit facility debt and swap obligations that is not secured (*i.e.*, the deficiency claims), (iii) the cash payment equal to 25% of each convenience claim, up to a maximum amount of $2,500 and up to a maximum amount of $[2.4] million for all convenience claims, (iv) the discharge of previously subordinated claims arising from previously issued securities of the Debtors, and (v) cancellation of the existing Idearc public equity. All intercompany claims between and among the Debtors will be deemed resolved. All other creditors and interests will be unimpaired.

Under the Plan, Claims are treated generally in accordance with the priorities established under the Bankruptcy Code, except that (i) holders of allowed secured credit facility claims will receive their pro rata share of [95]% of the new common stock to be issued by Idearc pursuant to the Plan, and (ii) holders of allowed unsecured note claims that have not been classified as convenience claims, allowed unsecured credit facility claims and allowed general unsecured claims which have not been classified as convenience claims, together as a single class, will receive their pro rata share of [5]% of the new common stock to be issued by Idearc pursuant to the Plan and their pro rata share of any distributions made from a litigation trust. In addition, holders of general unsecured claims may elect to have all of their general unsecured claims classified as convenience claims, and holders of unsecured note claims

may elect to have all of their unsecured note claims classified as convenience claims, and in such case, will receive a single cash payment equal to 25% of such claims up to a maximum of $2,500 and will be deemed to have voted in favor of the Plan. Subordinated claims arising from previously issued securities of the Debtors will be discharged. All intercompany claims between and among the Debtors will be deemed resolved. The Subsidiary Debtors' equity interests will remain in place, but the existing public equity of Idearc will be cancelled. All other claims will be paid in full or will be reinstated.

The following is an overview of certain material terms of the Plan:

- The Debtors will be reorganized pursuant to the Plan and will continue in operation, achieving the objectives of Chapter 11 for the benefit of their creditors, customers, suppliers, and employees.

- The corporate structure of the Debtors will remain intact with all the issued and outstanding shares of stock or membership interests of the Subsidiary Debtors, which stock and interests are owned directly or indirectly by Idearc, being retained for the benefit of the holders of the new common stock to be issued by Idearc.

- Administrative claims, priority and secured tax claims, and other priority claims in class 1, will be paid in full as required by the Bankruptcy Code, unless otherwise agreed by the applicable Debtor and the holders of such claims.

- Allowed credit facility claims that are secured will receive their pro rata share of (i) cash on hand held by the Debtors as of the Effective Date in excess of $150 million, as such amount is subject to adjustment as described below, (ii) new senior secured term loans to be issued by Idearc in the aggregate principal amount of $2.75 billion, and (iii) [95]% of the new common stock to be issued by Idearc pursuant to the Plan. The holders of allowed secured credit facility claims are in class 3 and will be entitled to vote on the Plan.

- Allowed unsecured note claims that have not been voluntarily classified as convenience claims, allowed claims of the unsecured portion of the senior credit facility debt (*i.e.* the deficiency claims) and allowed general unsecured claims that have not been voluntarily classified as convenience claims will receive their pro rata share of [5]% of the new common stock to be issued by Idearc pursuant to the Plan and any distributions made from a trust created to hold certain litigation rights of the Debtors. The holders of such allowed unsecured claims are in class 4 will be entitled to vote on the Plan as a single class.

- A holder of allowed general unsecured claims may elect to have all, but not less than all, of such holder's general unsecured claims reclassified as convenience claims in class 5. Also, a holder of unsecured note claims may elect to have all, but not less than all, of such holder's unsecured note claims reclassified as convenience claims in class 5. In either case, each holder of an allowed convenience claim will receive a single cash payment equal to 25% of its allowed convenience claim, up to a maximum of $2,500. By making such election, the holder will be deemed to have voted in favor of the Plan.

- Allowed subordinated claims arising from previously issued securities of the Debtors will not receive or retain any property on account of such allowed claims and all such

subordinated claims will be discharged. The holders of allowed subordinated claims are in class 6 and will be deemed to have rejected the Plan.

- The existing issued and outstanding Idearc common stock will be cancelled. The holders of Idearc common stock are in class 7 and will be deemed to have rejected the Plan.

- All intercompany claims against any Debtor by another Debtor will be deemed resolved and therefore the holder will neither vote on the Plan nor receive any distributions under the Plan.

The Debtors believe that the Plan provides the best recovery currently available to restructure their balance sheet and emerge successfully from Chapter 11.

## B. Summary of Treatment of Claims and Interests under the Plan

The Plan treats the Debtors as comprising a single estate solely for purposes of voting on the Plan, confirmation of the Plan, and making distributions in respect of allowed claims under the Plan. The Debtors will remain as separate legal entities, and the Chapter 11 Case will not change the organizational structure of the Debtors' business enterprise or cause the transfer of assets, except as otherwise provided or permitted by the Plan.

The table below summarizes the classification and treatment of the prepetition claims and interests under the Plan. Estimated claim amounts assume a calculation date of March 31, 2009, except for administrative claims, which are assumed as of August 18, 2009. For secured and unsecured credit facility claims, unsecured note claims, and general unsecured claims, estimated percentage recoveries have been calculated based upon a number of assumptions, including the estimated amount of allowed claims and the value ascribed to the new common stock and the interests in the litigation trust, as applicable, to be issued to them under the Plan.

For certain classes of claims, the actual amounts of allowed claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Estimated claim amounts for each class set forth below are based upon the Debtors' review of their books and records.

Solely for purposes of the Plan, Moelis & Company, LLC, the Debtors' financial advisor, has determined the estimated range of reorganization value of the Reorganized Debtors on a going concern basis, excluding cash on hand, is within the range of $2.525 billion to $3.05 billion (with a mid-point estimate of approximately $2.8 billion and a corresponding mid-point equity value of approximately $200 million based upon Idearc retaining $150 million of cash upon emergence) as of an assumed Effective Date of September 30, 2009.

The foregoing estimate of the enterprise value of the Reorganized Debtors is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' business plan, the achievement of the forecasts reflected in the business plan, continuity of a qualified management team, market conditions through the period covered by the business plan, and the Plan becoming effective in accordance with the estimates and other assumptions discussed below.

**The valuation assumptions are not a prediction or reflection of post-Confirmation trading prices or market value of the new common stock or senior secured term loans to be issued by Idearc under the Plan. The trading price of such securities will depend upon a number of factors,**

including, but not limited to, those discussed in <u>Article VII</u> of this Disclosure Statement, entitled "Risk Factors to be Considered." The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.

| Class Description | Summary of Treatment under Plan |
|---|---|
| <u>Administrative Claims</u><br><br>Estimated Allowed Claims (anticipated accrued Claims; exclusive of ordinary course operational expenses): Approximately $32 million | An Administrative Claim is a Claim for payment of an administrative expense of a kind specified in Sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case, (ii) Professional Fee Claims, (iii) Substantial Contribution Claims, (iv) all fees and charges assessed against the Estates under Section 1930 of Title 28 of the United States Code, and (v) payments to Cure contracts and leases that are assumed under Section 365 of the Bankruptcy Code.<br><br>Under the Plan, the holder of an Allowed Administrative Claim will receive either (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such different treatment as to which the applicable Debtor and such holder have agreed in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery: 100% |
| <u>Priority Tax Claims and Secured Tax Claims</u><br><br>Estimated Allowed Claims: Approximately $12.6 million | Priority Tax Claims and Secured Tax Claims of governmental units are entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.<br><br>Under the Plan, each holder of an Allowed Priority Tax Claim or an Allowed Secured Tax Claim will receive (i) regular installments payable in Cash, over a period not exceeding five years after the Petition Date, having a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) such different treatment as to which the applicable Debtor and such holder have agreed in writing; provided, that such treatment is on more favorable terms to the Debtors (or the |

| Class Description | Summary of Treatment under Plan |
|---|---|
| | Reorganized Debtors after the Effective Date), than the treatment set forth in <u>clause (i)</u> above; or (iii) payment in full in Cash on the later of the Effective Date or the date on which such Claim becomes an Allowed Claim.<br><br>Each holder of an Allowed Priority Tax Claim or Allowed Secured Tax Claim will not receive any Cash or other distribution on account of a penalty on, with respect to, or arising in connection with, such Allowed Priority Tax Claim or Allowed Secured Tax Claim.  All penalties on, with respect to, or arising in connection with, any Priority Tax Claim or Secured Tax Claim will be treated as Class 4 General Unsecured Claims.<br><br>Priority Tax Claims and Secured Tax Claims are not classified and are treated as required by the Bankruptcy Code.  The holders of such Claims are not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery:  100% |
| <u>Class 1: Other Priority Claims</u><br><br>Estimated Allowed Claims: Approximately $0.00 | Class 1 consists of all Other Priority Claims against any of the Debtors, which are Claims against the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code.<br><br>The Plan provides that each holder of an Allowed Other Priority Claim will receive either (i) Cash on the Effective date equal to the unpaid portion of such Allowed Other Priority Claim or (ii) such different treatment as to which the applicable Debtor and such holder have agreed in writing; provided, that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors after the Effective Date), than the treatment set forth in <u>clause (i)</u> above.<br><br>Other Priority Claims are Unimpaired.  The holders of such Claims are, therefore, not entitled to vote on the Plan.<br><br>Estimated Percentage Recovery:  100% |
| <u>Class 2: Other Secured Claims</u><br><br>Estimated Allowed Claims: Approximately $0.20 million | Class 2 consists of all Other Secured Claims against the Debtors, which are Secured Claims arising prior to the Petition Date against any of the Debtors, other than a Secured Credit Facility Claim.<br><br>At the election of the Debtors, either (i) the legal, equitable, and contractual rights of each holder of an Other Secured Claim will be Reinstated, or (ii) each holder of an Other Secured Claim will receive treatment so as to render Unimpaired such Other Secured Claim.<br><br>Other Secured Claims are Unimpaired.  The holders of such Claims are, therefore, not entitled to vote on the Plan. |

| Class Description | Summary of Treatment under Plan |
|---|---|
| | Estimated Percentage Recovery: 100% |
| Class 3: Secured Credit Facility Claims<br><br>Estimated Allowed Claims: $3.75 billion for purposes of the Plan by virtue of the reduction of the $250 million adequate protection payment made pursuant to the Cash Collateral Order from the Allowed Secured Credit Facility Claim of $4 billion | Class 3 consists of Secured Credit Facility Claims, which are the Secured portion of the Credit Facility Claims.<br><br>The Credit Facility Claims are any Claims arising or existing under or related to any of the following indebtedness: (i) approximately $6.2 billion in principal amount outstanding under the Credit Agreement, dated as of November 17, 2006 (as amended, supplemented or otherwise modified, the "Credit Agreement"), by and among JP Morgan Chase Bank, N.A. as the administrative agent (in such capacity, the "Administrative Agent"), Idearc, as the borrower, and the lenders party thereto (collectively, the "Lenders"), and guaranteed and collateralized pursuant to the Guarantee and Collateral Agreement, dated as of November 17, 2006, by and among the Administrative Agent, Idearc and the Subsidiary Debtors thereto (as amended, supplemented or otherwise modified, the "Guarantee and Collateral Agreement"), which amount is after giving effect to the adequate protection payment made pursuant to the interim order and a final order, respectively (collectively, the "Cash Collateral Order"), authorizing the Debtors to use the Cash collateral and granting adequate protection to the Lenders; and (ii) all obligations of the Debtors arising under the Swap Agreements (as defined in the Credit Agreement) that have been terminated by the applicable counterparty (such terminated agreements, the "Swap Agreements"), which amount is estimated to be approximately $550 million as of the Petition Date after giving effect to the adequate protection payment made pursuant to the Cash Collateral Order, and which obligations are secured pursuant to the Guarantee and Collateral Agreement on a *pari passu* basis with the other Credit Facility Claims and deemed indebtedness under the Credit Agreement (the "Swap Obligations").<br><br>The Secured Credit Facility Claims will be Allowed as of the Petition Date in the amount of $4 billion (which amount has been reduced to $3.75 billion for purposes of the Plan by virtue of the $250 million adequate protection payment made pursuant to the Cash Collateral Order), and other than as set forth below in respect to the Allowed amount of the Secured Credit Facility Claims, the Secured Credit Facility Claims will not be subject to defense, avoidance, recharacterization, disgorgement, subordination, setoff, recoupment, or other contest (whether legal or equitable), for all purposes of the Plan and the Chapter 11 Case. |

| Class Description | Summary of Treatment under Plan |
|---|---|
| | Solely for purposes of classification and treatment under the Plan, the definition of Secured Credit Facility Claims also includes all Claims, Liens, 507(b) Claims (as defined in the Cash Collateral Order) and other rights that were created under the Cash Collateral Order in favor of the holders of Secured Credit Facility Claims.<br><br>Notwithstanding the foregoing, the actual Allowed amount of the Secured Credit Facility Claims is subject to challenge by the Creditors' Committee pursuant to the Committee Lien Litigation (as described in Article IX.Q "Legal Proceedings – Valuation Adversary Proceedings") to be determined as part of the confirmation hearing on the Plan. As part of the Committee Lien Litigation, the Creditors' Committee is seeking, among other things, a valuation of the amount of the Secured Credit Facility Claims and a determination as to the amount of the adequate protection claim of the Agent and the Lenders under the Cash Collateral Order. In the context of the Committee Lien Litigation, the Agent and the Lenders reserve all of their rights, including without limitation, with respect to the determination and valuation of such adequate protection claim and the Secured Credit Facility Claims, and to demonstrate that the amount of the Secured Credit Facility Claims was in fact higher as of the Petition Date than the amount set forth in the Plan.<br><br>Each holder of an Allowed Secured Credit Facility Claim will receive, on the Effective Date and in full satisfaction, settlement, release, discharge of, in exchange for, and on account of such Allowed Secured Credit Facility Claim, its Pro Rata share of (i) Cash on hand held by the Debtors on the Effective Date in excess of an amount which will not be less than $150 million but which will be subject to certain adjustments, as may be agreed by the Debtors and the Administrative Agent, to account for normalized levels of accounts payable for the Reorganized Debtors, restructuring-related expenses incurred during the Chapter 11 Case prior to the Effective Date or under the Plan and to be paid after the Effective Date, and estimated tax payments for the 2009 tax year to be made by the Reorganized Debtors after the Effective Date, the initial calculation of which will be filed in the Plan Supplement ("Distributable Cash"); (ii) $2.75 billion in principal amount of new senior secured term loans to be issued on the Effective Date (the "New Term Loans") pursuant to a credit agreement with Reorganized Idearc as the borrower and the Reorganized Subsidiaries as guarantors (the "New Term Loan Agreement"), which represents all of the New Term Loans to be issued on the Effective Date; and (iii) shares of new |

| Class Description | Summary of Treatment under Plan |
|---|---|
| | common stock to be issued by Reorganized Idearc (the "New Common Stock"), which shares will represent [95]% of the New Common Stock to be issued and outstanding on the Effective Date.

In addition, each holder of an Allowed Secured Credit Facility Claim will retain any payment received by it pursuant to the Cash Collateral Order. Any replacement or other Liens created pursuant to the Cash Collateral Order will terminate and will have no further force and effect as of the Effective Date.

Notwithstanding the foregoing, if the approximately $2.7 million of letters of credit issued under the Credit Agreement remain undrawn as of the Effective Date, the Debtors will either, with the consent of such issuing Lender: (i) cash collateralize such letters of credit in an amount equal to 105% of the undrawn amount of any such letters of credit, (ii) return any such letters of credit to the issuing Lender undrawn and marked "cancelled," or (iii) provide a "back-to-back" letter of credit to the issuing Lender in a form and issued by an institution reasonably satisfactory to such issuing Lender, in an amount equal to 105% of the then undrawn amount of such letters of credit.

Secured Credit Facility Claims are Impaired and will receive distributions under the Plan. The holders of such Claims are therefore entitled to vote on the Plan.

Estimated Percentage Recovery: 90-95%. |
| Class 4: Unsecured Note Claims Unsecured Credit Facility Claims and General Unsecured Claims

Estimated Allowed Claims: Approximately $6 billion | Class 4 consists of: (i) Unsecured Note Claims, which are Claims arising or existing under or related to the 8% Senior Notes due 2016 in the original principal amount of $2.850 billion (the "Unsecured Notes") issued by Idearc and guaranteed by all or some combination of the Subsidiary Debtors, other than any Indenture Trustee Expenses (the "Unsecured Note Debt"), in respect of which the holder thereof has not elected to be classified as Convenience Claims, (ii) Unsecured Credit Facility Claims, which are the remaining portion of the Credit Facility Claims after deducting the Secured Credit Facility Claims (the "Unsecured Credit Facility Debt"), and (iii) General Unsecured Claims, which are unsecured Claims in respect of which the holder thereof has not elected to be classified as Convenience Claims and that are not Administrative Claims, Priority Tax Claims, Other Priority Claims, Unsecured Credit Facility Claims, Unsecured Note Claims or Subordinated Claims. All Rejection Damages Claims will be classified as General Unsecured Claims or at the election of the holder, |

| Class Description | Summary of Treatment under Plan |
|---|---|
| | Convenience Claims. |
| | Class 4 Claims will be Allowed, subject to resolution of any objections to such Claims, in an amount estimated to be up to (i) $2.936 billion for Unsecured Note Claims, (ii) approximately $3 billion for all Unsecured Credit Facility Claims, and (iii) $14 million for all General Unsecured Claims, and in each case, will not be subject to defense, avoidance, recharacterization, disgorgement, subordination, setoff, recoupment, or other contest (whether legal or equitable), for all purposes of the Plan and the Chapter 11 Case. |
| | All Unsecured Note Claims, Unsecured Credit Facility Claims and General Unsecured Claims will be discharged as of the Effective Date. |
| | Each holder of an Allowed Unsecured Claim, Allowed Unsecured Credit Facility Claim or an Allowed General Unsecured Claim will receive, on the Effective Date and in full satisfaction, settlement, release, discharge of, in exchange for, and on account of such Allowed Claim, its Pro Rata share of (i) shares of the New Common Stock, which shares will represent [5]% of the New Common Stock to be issued and outstanding on the Effective Date, and (ii) all distributions, if any, to be made from the litigation trust (the "Litigation Trust") to be established on the Effective Date for the sole benefit of Class 4 Claims to hold specified Litigation Rights of the Debtors consisting of (i) claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code, which include, but are not limited to, actions involving setoffs, preferences, or fraudulent transfers, and (ii) claims or causes of action belonging to the Debtors' estates against the Debtors' officers or directors, but only to the extent that insurance coverage exists for such claims or causes of action and further limited to the proceeds of such insurance coverage (the "Litigation Trust Rights"). |
| | Unsecured Note Claims, Unsecured Credit Facility Claims and General Unsecured Claims are Impaired and will receive distributions under the Plan. The holders of such Claims are, therefore, entitled to vote on the Plan as a single class. |
| | Estimated Percentage Recovery: Less Than 1% |
| Class 5: Convenience Claims<br><br>Estimated Allowed Claims: Unknown | Class 5 consists of Convenience Claims, which are Allowed General Unsecured Claims or Unsecured Note Claims in respect of which the holder thereof has elected, in its sole discretion, to be classified as Convenience Claims; *provided, however,* that for purposes of the Plan, the aggregate amount of distributions |

| Class Description | Summary of Treatment under Plan |
|---|---|
| | to holders of Convenience Claims will be limited to $[2.4] million. Such election must be made on a duly executed and timely delivered ballot. |
| | Allowed Convenience Claims will not be subject to defense, avoidance, recharacterization, disgorgement, subordination, setoff, recoupment, or other contest (whether legal or equitable) for all purposes of the Plan and the Chapter 11 Case. All Convenience Claims will be discharged as of the Effective Date. |
| | By making the election to be classified as a Convenience Claim, all, but not less than all, of such holder's Allowed General Unsecured Claims or Allowed Unsecured Note Claims will be reclassified as one Allowed Convenience Claim and such holder will receive on, or as soon as reasonably practicable after, the Effective Date and in full satisfaction, settlement, release, discharge of, in exchange for, and on account of such holder's Allowed Convenience Claim, a single Cash payment equal to 25% of its Allowed Convenience Claim up to a maximum of $2,500. |
| | Convenience Claims are Impaired. The holders of such Claims are, therefore, entitled to vote on the Plan. By making the election to be classified as Convenience Claims, the holders thereof will be deemed to have voted in favor of the Plan. |
| | Estimated Percentage Recovery: [Less Than 1% - 25%] |
| Class 6: Subordinated Claims | Class 6 consists of Subordinated Claims, which are Claims against any of the Debtors that are subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which will include any Claim arising from the rescission of a purchase or sale of any equity interest, note, bond or any other previously issued security of any Debtor (the "Old Securities"), any Claim for damages arising from the purchase or sale of an Old Security, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim. |
| | Under the Plan, Subordinated Claims will not receive or retain any property on account of such Claims. All Subordinated Claims will be discharged as of the Effective Date. |
| | Subordinated Claims are Impaired and will receive no distributions under the Plan. Therefore, holders of such Claims are deemed to have rejected the Plan and are not entitled to vote on the Plan. |
| | Estimated Percentage Recovery: 0% |

| Class Description | Summary of Treatment under Plan |
|---|---|
| Class 7: Idearc Interests | Class 7 consists of Idearc Interests. Idearc Interests are, collectively, all equity interests in Idearc outstanding prior to the Effective Date, including, without limitation, any preferred stock, common stock, restricted stock, restricted stock units, stock options or any other equity-based award settled in shares or other right to purchase the stock of Idearc whether or not arising under or in connection with any employment agreement), together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in Idearc prior to the Effective Date. |
| | Under the Plan, all Idearc Interests of any kind will be cancelled as of the Effective Date and the holders thereof will not receive or retain any property under the Plan on account of such Interests. |
| | Idearc Interests are Impaired and will receive no distributions under the Plan. The holders of such Claims are, therefore, deemed to have rejected the Plan and are not entitled to vote on the Plan. |
| | Estimated Percentage Recovery: 0% |

As set forth above, estimated Claim amounts assume a calculation date of March 31, 2009, except for Administrative Claims, which are assumed as of August 18, 2009. The calculation date is not necessarily the Effective Date of the Plan. The Effective Date will occur after the Confirmation Date, when the conditions precedent to the occurrence of the Effective Date are satisfied.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERY AVAILABLE TO THE VARIOUS CONSTITUENCIES AND IN ACCORDANCE WITH APPLICABLE LAW FOR HOLDERS OF (i) SECURED CREDIT FACILITY CLAIMS, (ii) UNSECURED NOTE CLAIMS, INCLUDING CONVENIENCE CLAIMS, (iii) UNSECURED CREDIT FACILITY CLAIMS, AND (iv) GENERAL UNSECURED CLAIMS, INCLUDING CONVENIENCE CLAIMS. AS A CONSEQUENCE, THE DEBTORS STRONGLY RECOMMEND THAT ALL HOLDERS OF SUCH CLAIMS VOTE TO ACCEPT THE PLAN.

### III. PLAN VOTING INSTRUCTIONS AND PROCEDURES

#### A. Notice to Holders of Claims

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable holders of Secured Credit Facility Claims, Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims, to make an informed judgment about whether to accept or reject the Plan or elect to classify their General Unsecured Claims or Unsecured Note Claims as a Convenience Claim, as applicable. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTEE OF THE

ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS REQUIRED TO APPROVE THE PLAN AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF SECURED CREDIT FACILITY CLAIMS, UNSECURED NOTE CLAIMS, UNSECURED CREDIT FACILITY CLAIMS, AND GENERAL UNSECURED CLAIMS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES, SUPPLEMENTS, AND EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no Person has been authorized to distribute any information concerning the Debtors other than the information contained herein. No such information should be relied upon in making a determination to vote to accept or reject the Plan.

## B.    Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims and interests in classes that are (a) treated as "impaired" by a plan of reorganization and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. Under the Plan, only the following parties in interest are entitled to vote on the Plan: (i) holders of Secured Credit Facility Claims in Class 3; and (ii) holders of Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims voting as a single class in Class 4. Holders of Convenience Claims in Class 5 will be deemed, by making such election to have their General Unsecured Claims or Unsecured Note Claims treated as a Convenience Claim, to have voted for the Plan upon their election to classify all of their General Unsecured Claims or Unsecured Note Claims, as applicable, as Convenience Claims. Claims and Interests in other Classes are either Unimpaired and their holders are deemed to have accepted the Plan, or they are receiving no distributions under the Plan and their holders are deemed to have rejected the Plan.

Holders of Allowed Secured Credit Facility Claims in voting Class 3 and Allowed Unsecured Note Claims, Allowed Unsecured Credit Facility Claims, and Allowed General Unsecured Claims voting together in voting Class 4 may vote on the Plan only if they are holders as of [_____, 2009], the voting record date established by the Bankruptcy Court (the "Voting Record Date"). Holders may elect to have all of their General Unsecured Claims or Unsecured Note Claims, as applicable, classified as Convenience Claims, and therefore be deemed to have voted in favor of the Plan, only if they are holders of such Claims as of the Voting Record Date. Such election must be made on an duly executed and timely delivered ballot.

## C.    Solicitation Materials

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors, through their voting agent Kurtzman Carson Consultants LLC (the "Voting Agent"), will send to holders that are entitled to vote a CD-ROM of (i) this Disclosure Statement and the Plan, (ii) the notice of, among other

things, the date, time, and place of the hearing to consider confirmation of the Plan and related matters and the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (iii) one or more beneficial owner ballots or master ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (iv) other materials as authorized by the Bankruptcy Court. Any party who receives a CD-ROM but desires a paper copy of these documents may request a copy from the Voting Agent. The CD-ROM will include hyper-links to documentation that can be accessed through the internet.

If you are the holder who is entitled to vote, but you did not receive a beneficial owner ballot or master ballot, or if your beneficial owner ballot or master ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

> KURTZMAN CARSON CONSULTANTS LLC
> 2335 ALASKA AVENUE
> EL SEGUNDO, CALIFORNIA 90245
> FACSIMILE: (310) 751-1847
> TELEPHONE: (866) 967-0670
> EMAIL: idearc@kccllc.com
> ATTENTION: IDEARC INC.

**D.      Voting Procedures, Ballots, and Voting Deadline**

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your beneficial owner ballot or master ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying beneficial owner ballot or master ballot. You should complete and sign your original beneficial owner ballot or master ballot (copies will not be accepted) and return it as instructed in the envelope provided.

Each beneficial owner ballot and master ballot has been coded to reflect the Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded beneficial owner ballots or master ballots sent to you with this Disclosure Statement.

If you are a holder of one or more Claims that may be classified as General Unsecured Claims or Unsecured Note Claims in Class 4, but you wish to elect, in your sole discretion, to have all of your General Unsecured Claims or Unsecured Note Claims, as applicable, reclassified as Convenience Claims, you must indicate your election on the accompanying ballot. Such election is irrevocable and by making such election, you will be deemed to vote in favor of the Plan.

This Disclosure Statement and the related materials will be furnished to (i) holders of Secured Credit Facility Claims and Unsecured Credit Facility Claims whose names (or the names of whose nominees) appear as of the Voting Record Date on the register of Lenders maintained by the Administrative Agent pursuant to the Credit Agreement, (ii) counter-parties to Swap Agreements whose names appear as of the Voting Record Date in the books and records maintained by the Debtors, (iii) holders of Unsecured Note Debt, including those Claims that may be reclassified as Convenience Claims, whose names (or the names of whose nominees) appear as of the Voting Record Date on the note holder lists maintained by the Indenture Trustee pursuant to the Indenture governing the Unsecured Notes or, if applicable, who are listed as participants in a clearing agency's security position listing, and (iv) holders of General Unsecured Claims, including those Claims that may be reclassified as Convenience Claims, whose names appear as of the Voting Record Date in the books and records maintained by the Debtors.

**IF ENTITIES OR PERSONS DO NOT HOLD FOR THEIR OWN ACCOUNT, THEY SHOULD PROVIDE COPIES OF THIS DISCLOSURE STATEMENT, THE PLAN, AND, IF APPLICABLE, APPROPRIATE BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS, TO THE BENEFICIAL OWNERS.** Special voting instructions apply to nominees of beneficial owners and securities clearing agencies. Those special instructions will accompany the master ballot. Those instructions may be different from the general instructions contained herein. If you have any questions, please contact the Voting Agent.

All votes to accept or reject the Plan must be cast by using the beneficial owner ballot or master ballot enclosed with this Disclosure Statement or, in the case of a bank, brokerage firm, or other nominee holding Secured Credit Facility Debt, Unsecured Credit Facility Debt, or Unsecured Note Debt in its own name on behalf of a beneficial owner, or any agent thereof (each, a "Nominee"), the master ballot provided to such Nominee under separate cover (or manually executed facsimiles thereof). IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BENEFICIAL OWNER BALLOT OR MASTER BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BENEFICIAL OWNER BALLOT OR MASTER BALLOT. UNLESS YOU HAVE RECEIVED A PRE-VALIDATED BENEFICIAL OWNER BALLOT (AS DESCRIBED HEREIN) FOR DIRECT RETURN TO THE VOTING AGENT, YOU MUST RETURN YOUR BENEFICIAL OWNER BALLOT TO YOUR NOMINEE IN ENOUGH TIME FOR YOUR VOTE TO BE PROCESSED ON A MASTER BALLOT AND SUBMITTED TO THE VOTING AGENT. MASTER BALLOTS AND PRE-VALIDATED BENEFICIAL OWNER BALLOTS MUST BE RECEIVED NO LATER THAN [_____], 2009, AT 4:00 P.M. CENTRAL TIME (THE "VOTING DEADLINE") BY THE FOLLOWING:

> KURTZMAN CARSON CONSULTANTS LLC
> 2335 ALASKA AVENUE
> EL SEGUNDO, CALIFORNIA 90245
> ATTENTION: IDEARC INC.

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS, FAXED BENEFICIAL OWNER BALLOTS OR FAXED MASTER BALLOTS WILL NOT BE TABULATED BY THE VOTING AGENT. PRE-VALIDATED BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL NOT BE COUNTED. DO NOT RETURN ANY DEBT INSTRUMENTS, NOTES, OR OTHER EVIDENCES OF YOUR CLAIM WITH YOUR BENEFICIAL OWNER BALLOT OR MASTER BALLOT.

If you have any questions about (i) the procedure for voting your Claim, (ii) the materials that you have received, or (iii) the amount of your Claim, or if you wish to obtain, at your own expense unless otherwise specifically required by Rule 3017(d) of the Bankruptcy Rules, an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

KURTZMAN CARSON CONSULTANTS LLC
2335 ALASKA AVENUE
EL SEGUNDO, CALIFORNIA 90245
TELEPHONE: (866) 967-0670
FACSIMILE (310) 751-1847
EMAIL: idearc@kccllc.com
ATTENTION: IDEARC INC.

For further information and general instruction on voting to accept or reject the Plan, *see* Article XII of this Disclosure Statement, entitled "The Solicitation; Voting Procedures" and the instructions accompanying your beneficial owner ballot or master ballot.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY COMPLETING THEIR BENEFICIAL OWNER BALLOTS OR MASTER BALLOTS AND RETURNING THEM AS QUICKLY AS POSSIBLE. IF YOU HAVE RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, PLEASE ALLOW ADDITIONAL TIME. ALL MASTER BALLOTS AND PRE-VALIDATED BENEFICIAL OWNER BALLOTS MUST BE RECEIVED BY THE VOTING AGENT BY THE VOTING DEADLINE.

## E.    Confirmation Hearing and Objections to Confirmation

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). The Debtors have requested that the Bankruptcy Court schedule the Confirmation Hearing as soon as possible, at the United States Bankruptcy Court for the Northern District of Texas, Earle Cabell Building, 1100 Commerce Street, Dallas, Texas 75242. At the Confirmation Hearing, the Debtors will request confirmation of the Plan, as may be modified from time to time under Section 1129(b) of the Bankruptcy Code. The Debtors may modify the Plan, to the extent permitted by Section 1127(a) of the Bankruptcy Code and Rule 3019 of the Bankruptcy Rules, as necessary to confirm the Plan. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequently adjourned Confirmation Hearing. The Confirmation Hearing Notice will be provided to holders of Claims and Interests or their representatives pursuant to an order of the Bankruptcy Court. Objections to Confirmation must be filed with the Bankruptcy Court by the date designated in the Confirmation Hearing Notice and are governed by Rules 3020(b) and 9014 of the Bankruptcy Rules. Objections to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## IV.  GENERAL INFORMATION CONCERNING THE DEBTORS

## A.    Business Overview

Idearc, together with the Subsidiary Debtors and its non-Debtor foreign subsidiary (collectively, the "Company"), is one of the largest yellow pages directories publishers in the United States as measured by revenues, and the Company believes that it is also one of the nation's leading online local search providers. The Company's products include print yellow pages, print white pages, Superpages.com, its online local search resource, and Superpages Mobile, its information directory for wireless subscribers. Idearc became an independent public company in November 2006 when Verizon

Communications Inc. ("Verizon"), the former parent of Idearc completed the spin-off of Idearc by distributing shares of Idearc's common stock to Verizon's stockholders.

The Company is transforming from a print-centric business to a multi-product business. As it effects this transformation, the Company's strategy is to continue providing a portfolio of multiple advertising products to ensure its advertisers will have opportunity for a presence regardless of where or when consumers are searching for local information.

Together with its predecessor companies, the Company has more than 125 years of experience in the print directory business and believes that it has consistently held a leading market position in the markets in which Verizon is the incumbent local exchange carrier. The Company publishes its directories in approximately 350 markets in 34 states across the United States and in the District of Columbia, providing a geographically diversified revenue base. In 2008, the Company published more than 1,200 distinct directory titles, including more than 1,100 directory titles in its incumbent markets and more than 100 directory titles in its expansion markets. During 2008, the Company distributed about 126 million copies of these directories to businesses and residences in the United States.

In 2008, Idearc generated revenues of $2.973 billion and operating income of $926 million. The Company derives its revenues primarily through the sale of print directory advertising. Approximately 90% of its revenues for 2008 came from the sale of advertising in print directories. Approximately 10% came from its Internet products. Idearc's Internet products and services are an important part of the Company's business, and will become increasingly important as the Company effects its transformation.

The Company is the exclusive official publisher of Verizon print directories in the markets in which Verizon is currently the incumbent local exchange carrier. The Company uses the Verizon brand on its print directories in these and other specified markets. Idearc launched Superpages.com in 1996, and now Superpages.com has approximately 20.9 million business listings and tens of millions of residential listings in the United States. In 2008, consumers conducted more than 23 billion network searches using the Superpages.com network.

In connection with the spin-off transaction from Verizon, Idearc incurred approximately $9.115 billion of debt. The combination of a prolonged economic downturn facing the United States economy, the highly competitive directory advertising industry, declining use of print yellow page directories and the Company's significant outstanding indebtedness has resulted in the Company having difficulty in meeting this substantial debt burden. The audited consolidated financial statements of Idearc for the fiscal year ending December 31, 2008 included a Report of Independent Registered Public Accounting Firm that raised doubts about the Company's ability to continue as a going concern, resulting in Idearc violating a covenant in the Credit Agreement to deliver an opinion without a going concern qualification.

Idearc has evaluated various options for restructuring its balance sheet and debt service obligations to create a capital structure that will permit the Company to remain a going concern. Idearc has considered various opportunities to strengthen its balance sheet and risk profile and has held numerous discussions with the Administrative Agent and other representatives of the Lenders regarding the Company's capital structure and debt service obligations.

The Company believes that a financial restructuring designed to reduce its outstanding indebtedness, strengthen its balance sheet, and improve its liquidity, and thereby enabling it to pursue its business objectives, can best be achieved through a reorganization pursuant to a Chapter 11 proceeding under the Bankruptcy Code.

**B.** **Business Strategy**

The principal elements of Idearc's business strategy include:

- *Strengthen its Multi-Product Portfolio.* The Company's ability to develop and adapt products to help its advertisers reach more consumers in more ways is key to increasing product usage and generating revenue. The Company is continuing to enhance its Internet products by focusing on improvements in content, technology and user experience. The Company is continuing to cater to the advertising needs of local and national businesses by offering print advertising options that fit their needs and budgets. To further increase advertisers' return on investment, the Company is continuing to implement and refine programs that align each advertiser's costs with the value of the advertising program purchased. In addition, the Company will introduce and market new products that provide its advertisers with additional opportunities to reach consumers and further enhance their cost per reference.

- *Drive Consumer Usage by Providing the SuperGuarantee.* The Company's new SuperGuarantee program provides a guarantee of the services performed by certain of its clients. Not all clients are eligible to participate, as the SuperGuarantee covers only certain service providers who meet minimum ad program criteria. To participate in the SuperGuarantee program, consumers must register and agree to the program terms and conditions prior to receiving the service, and then select a participating SuperGuarantee service provider.

- *Leverage the Verizon Brand.* Idearc believes the Verizon brand positions it as a preferred directory for both local advertisers and consumers in the markets in which Verizon is the incumbent local exchange carrier and provides it immediate credibility as the Company moves into other markets.

- *Continue to Leverage its Large Locally Based Sales Force.* Idearc is developing multi-product training programs for its sales representatives to enhance productivity, reinforce its multi-product portfolio and more effectively manage its client relationships. The Company offers an incentive-based compensation plan that it believes increases productivity and lowers employee turnover.

- *Continue to Implement Market-Specific Programs.* Idearc intends to continue to implement market-specific strategies. For example, in select markets, the Company intends to introduce Internet products first rather than print directory options. This approach allows the Company to penetrate the market more quickly and capitalize on the growth of this product. As market opportunity dictates, the Company may follow with a print advertising offer. In addition, where appropriate, Idearc intends to continue adjusting the geographic reach of specific products to reflect changing demographics and shopping patterns, adjusting the timing and method of directory distribution and expanding its product line to attract new spending from its client base.

## C.      The Spin-Off Transactions

The separation of Idearc from Verizon was structured as a spin-off.  Prior to the spin-off, Verizon transferred to Idearc all of its ownership interest in Verizon Information Services, Inc. (now named Idearc Information Services LLC) and other assets, liabilities, businesses and employees primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations.

In connection with the spin-off, Idearc entered into the Credit Agreement providing for an aggregate of $6.515 billion in debt, consisting of (i) a senior secured revolving credit facility of $250 million, (ii) a tranche A term loan facility of $1.515 billion, and (iii) a tranche B term loan facility of $4.750 billion.

In exchange for the contribution from Verizon of Idearc Information Services LLC and the other directory publishing assets, Idearc (i) issued to Verizon additional shares of Idearc common stock, which Verizon distributed to Verizon's stockholders pro rata in the spin-off, (ii) issued to Verizon the Unsecured Notes in the amount of $2.850 billion and a portion of the loans under the tranche B term loan facility, and (iii) transferred to Verizon $2.429 billion in cash from cash on hand, proceeds of the term loans under the tranche A facility and proceeds from the remaining portion of the term loans under the tranche B facility.  Following the spin-off, Verizon exchanged with its debt holders the Idearc debt obligations it was issued for outstanding Verizon debt, thereby reducing Verizon's outstanding indebtedness.

After the contribution and related transactions, Verizon spun-off Idearc to the stockholders of Verizon by distributing all of its shares of Idearc common stock to Verizon stockholders on a pro rata basis.  As a result of the spin-off, Idearc became an independent public company.

After giving effect to the issuance of the Unsecured Notes, the borrowing under the Credit Agreement and certain expenses related to the transactions, Idearc had $9.115 billion of indebtedness for borrowed money.  Immediately following the spin-off, Idearc had combined cash and equivalents of approximately $100 million and available liquidity under the revolving credit facility of approximately $249 million (net of $1 million of letters of credit issued).

In connection with the spin-off, Idearc entered into a number of significant agreements with Verizon to define the initial relationship between Verizon and Idearc with respect to a number of services.  These agreements became effective immediately after the consummation of the spin-off and include the following agreements with Verizon:

- An interim transition services agreement,

- a 30-year publishing agreement,

- a non-competition agreement,

- a 30-year branding agreement,

- a listings license agreement,

- an interim billing and collection agreement,

- an employee matters agreement,

- an intellectual property agreement, and

- an agreement providing for the sharing of taxes incurred before and after the spin-off, indemnification rights with respect to tax matters and restrictions to preserve the tax-free status of the spin-off (the "Tax Sharing Agreement").

Please see the remainder of this Article IV, entitled "General Information Concerning the Debtors," and Article VI.E.1, entitled "Assumed Executory Contracts and Leases" for more information about the agreements between Verizon and Idearc.

## D.     Markets

In 2008, the Company published more than 1,200 directories in approximately 350 markets in 34 states across the United States and in the District of Columbia and distributed approximately 126 million directories to businesses and residences in the United States. In 2008, the Company's top ten directories, as measured by revenues, accounted for approximately 11% of its revenues and no single directory accounted for more than 2% of its revenues. The Company's directories are generally well-established in their communities and cover contiguous geographic areas to create a strong local market presence and achieve selling efficiencies.

## E.     Incumbent Markets

The Company publishes its directories in approximately 310 incumbent markets. The incumbent markets principally include the markets in which Verizon is the incumbent local exchange carrier. Idearc believes its incumbent markets are attractive for local and national advertisers due to high concentrations of well-educated and affluent residents and higher consumer spending than the national average.

In connection with the spin-off, Idearc entered into a number of agreements with Verizon to preserve the benefits of being the publisher of Verizon print directories. These agreements included a publishing agreement and a branding agreement, each of which has an initial term of 30 years, expiring in 2036. The publishing agreement will automatically renew for additional five-year terms unless the Company or Verizon provide at least 24 months' notice of termination. Under the publishing agreement, Verizon named Idearc the exclusive official publisher of Verizon print directories of wireline listings for markets in which Verizon is currently the incumbent local exchange carrier. In the branding agreement, Verizon granted Idearc a limited right to use certain Verizon trademarks and service marks in connection with publishing certain print directories and to identify Idearc as its official print directory publisher.

In 2008, Idearc entered into a number of agreements with FairPoint Communications, Inc. ("FairPoint") in connection with the transfer by Verizon to FairPoint of certain local exchange assets in Maine, New Hampshire and Vermont. These agreements included a publishing agreement, a branding agreement, and a non-competition agreement, each of which has a term expiring in 2036. The publishing agreement will automatically renew for additional five-year terms unless Idearc or FairPoint provide at least 24 months' notice of termination. Under the publishing agreement, FairPoint named Idearc the exclusive official publisher of FairPoint print directories of wireline listings in the incumbent markets it acquired from Verizon. In the branding agreement, FairPoint granted Idearc a limited right to use certain FairPoint trademarks and service marks in connection with publishing certain print

directories and to identify Idearc as its official print directory publisher in the applicable markets. Under the non-competition agreement, FairPoint generally agreed not to publish tangible or digital (excluding Internet) media directory products consisting principally of wireline listings and classified advertisements of subscribers in the applicable markets.

In May 2009, Verizon reached agreement with Frontier Communications Corp. ("Frontier") to sell to Frontier local exchange assets in 14 states. The sale is subject to regulatory approval and other conditions and is expected to close in 2010. In accordance with the terms of the commercial agreements with Verizon, Frontier will enter into publishing, branding and non-competition agreements on substantially the same terms with Idearc for these local exchanges. Idearc has held preliminary discussions with Verizon and Frontier regarding the sale and commercial agreements.

Idearc believes it has a competitive advantage by serving as the exclusive official publisher of Verizon print directories in the markets in which Verizon is the incumbent local exchange carrier. Incumbent publishers can generally deliver a better value proposition to advertisers (measured in terms of cost per reference, or an advertiser's cost per contact generated from advertising through a publisher's product or service) because those publishers tend to have a higher frequency of consumer use in the market, largely due to their long-term presence in a particular market and user perceptions of accuracy, completeness and trustworthiness of their directories. Incumbent publishers also tend to benefit from established client bases and solid, cost-efficient operations infrastructures. Idearc believes that Verizon's long-term presence as the incumbent local exchange carrier in substantially all of the Company's incumbent markets, as well as its ongoing association with the Verizon brand, positions the Company as a preferred directory for both local advertisers and consumers in those markets.

## F.  Expansion Markets

In 2002, Idearc launched an initiative to expand into markets where Verizon is not the incumbent local exchange carrier. The Company currently operates in approximately 40 expansion markets, in which it publishes more than 100 distinct directory titles. Idearc's market expansion strategy enables the Company to compete with other publishers while broadening its geographic presence.

Idearc believes that Verizon's national brand presence provides it with a competitive advantage in its current expansion markets. The branding agreement Idearc entered into with Verizon granted it a limited right to use the Verizon brand on its print directories in its current expansion markets, in a small number of other expansion markets it is currently considering entering and, under certain circumstances, in other markets that the Company might wish to enter in the future. Idearc's right to use the Verizon brand in these markets is non-exclusive and subject to a number of conditions. This agreement also has an initial 30-year term expiring in 2036.

## G.  Products

### 1.  *Overview*

The Company's main product is print directories, which generated approximately 90% of its revenues in 2008. Idearc also operates Superpages.com, its online local search resource, and Superpages Mobile, its information service for wireless phone subscribers. Idearc also provides direct and database marketing services. The Company offers its clients an array of complementary products in which they can advertise, including Verizon Yellow Pages, Verizon White Pages, Verizon Yellow Pages Companion Directories, Superpages.com, Superpages Mobile, Switchboard.com, and Solutions on the Move and SolutionsDirect direct mail packages.

2.    *Print Directories*

In 2008, the Company published more than 1,200 distinct directory titles, consisting of directories that contain only yellow pages, directories that contain only white pages, directories that contain both white and yellow pages, smaller-sized companion directories, directories that include advertisements in both English and Spanish and directories in Spanish only.   In addition to print directories, the Company offers its complementary products that improve its advertisers' reach and return on investment.

Idearc directories are designed to meet the advertising needs of local and national businesses and the information needs of consumers.   The breadth of its advertising options enables it to create customized advertising programs that are responsive to specific client needs and advertising budgets. The Company's yellow pages and white pages directories are also efficient sources of information for consumers, featuring a comprehensive list of businesses in local markets.

*Yellow Pages Directories.*  The Company's yellow pages directories provide a range of paid advertising options, as described below:

- *Listing Options.*  An advertiser may:

  - pay for listings in additional headings;

  - pay to have listings highlighted or printed in bold or superbold text, increasing visibility; or

  - purchase extra lines of text to include information, such as hours of operation, a website address or a more detailed business description.

- *In-Column Advertising Options.*  For greater prominence on a page, an advertiser may expand its basic alphabetical listing by purchasing advertising space in the column in which the listing appears.   In-column advertisement options include bolding, special fonts, color and special features such as logos.   The cost of in-column advertising depends on the size and type of the advertisement purchased, and on the reach and scope of the directory.

- *Display Advertising Options.*  A display advertisement allows businesses to include a wide range of information, illustrations, photographs and logos.   Display advertisements are usually placed at the front of a heading, ordered first by size and then by advertiser seniority.   This ordering process provides a strong incentive to advertisers to increase the size of their advertisements and to renew their advertising purchases each year to ensure that their advertisements receive priority placement.   Display advertisements range in size from a quarter column to as large as a two page spread.   The cost of display advertisements depends on the size, type and value of advertisement purchased, and on the reach and scope of the directory.

- *Specialty Products.*  In addition to the advertisement options described above, the Company offers products that allow businesses to increase visibility or better target specific types of consumers.   The Company's specialty products include:

- color coupons and special offers that enable advertisers to deliver promotional offers to consumers;

- advertising space in a variety of specialty guides included in the Company's directories that list services by specialization or service area, including Golf Guides, Health and Wellness Guides, Dining Guides, Women- and Minority-Owned Business Guides and Sports Team-Related Guides;

- gatefold sections, cover tip-ons, cover advertising and specialty tabs that provide businesses with extra space to include more information in their advertisements; and

- a call measurement service, which uses metered telephone numbers to provide advertisers with information about the consumer responses to an advertisement.

*White Pages Directories.* Regulations established by state public utilities commissions require incumbent local exchange carriers to publish and distribute white pages directories of certain residences and businesses that order or receive local telephone service from the carriers. These regulations also require an incumbent carrier, in specified cases, to include information relating to the provision of telephone service provided by the incumbent carrier and other carriers in the service area, as well as information relating to local and state governmental agencies.

Pursuant to the publishing agreement with Verizon, the Company publishes and distributes these directories on behalf of Verizon. Under the publishing agreement, the Company provides a white pages listing free of charge to every residence and business with local wireline telephone service in the area, as well as a courtesy listing in the yellow pages for business clients. The listing includes the name, address and phone number of the residence or business unless the wireline client requests not to be listed or published. The Company is responsible for the costs of publishing, printing and distributing these directories, which costs are included in its operating expenses. The Company also publishes white pages directories in selected expansion markets when it believes doing so will have a positive impact on its business.

Advertising options include bolding and highlighting for added visibility, extra lines to include supplemental information and in-column and display advertisements. Verizon derives revenues from the sale of certain supplemental listing information in the white pages directories pursuant to state tariffs. Under the publishing agreement, Verizon shares with Idearc 5% of any revenue over a certain baseline amount, determined on a state-by-state basis, that it receives from the sale of supplemental listing information.

Due to increased and continued public policy pressure from consumers, environmental groups and legislatures with regard to the impact of telephone directories on the waste stream, the Company must enhance its self-regulating, do-not-distribute ("DND") efforts. Idearc implemented an internal DND list in 2008. Additionally, in 2009, the Company enhanced directory covers and E911 page text to more clearly indicate consumer opt-out (example: To order directories or to stop delivery of this directory, call 1-800-888-8448). On-going efforts will be to increase awareness of print product options, ensure ease of use of such features including opting out of printed directory distribution and to promote printed directory substitutes, for example CD-ROM directories and on-line directory listing access.

3.    *Internet Products*

*Overview.*  Idearc launched Superpages.com in 1996.  Superpages.com was the first online local search resource in the nation to offer advertisers both fixed-fee and performance-based product options. Superpages.com has approximately 20.9 million business listings and tens of millions of residential listings in the United States.  In 2008, consumers conducted more than 23 billion network searches using the Superpages.com network.  Idearc believes Superpages.com has evolved into a leading online product for traditional and non-traditional advertisers because of the Company's focus on delivering valuable consumer leads by offering accurate and relevant content.

Idearc is using technology to create a more useful online search experience.  The Company is constantly improving and evolving its relevancy algorithm and rules that combine the highest quality results and advertisers for every search query.  The Company also launched Superpages Mobile, which allows it to deliver its content directly to users of mobile devices.  In addition, the Company offers advertisers the ability to display video clips of their businesses within their business profiles, which is a content enhancement that gives advertisers a cost-effective tool to showcase their businesses for consumers.

The Superpages.com site is constantly evolving to meet consumer demands as they search for specific products or services.  Content enhancements include expanded user ratings and reviews and other user generated content.  For example, the Company launched a restaurant reviews application for Facebook to supply local advertiser content in a social networking environment.  With this application, Facebook users can browse, research and write restaurant reviews and compare favorite reviews with others.  Reviews written on Facebook are incorporated into the consumer reviews on Superpages.com.

The Company also offers feature-rich websites and professional website design services and accompanying search engine marketing options for businesses that do not have the capabilities or resources to manage Internet marketing.

The Company distributes its clients' advertising to more than 250 Internet sites to increase online traffic and extend its advertisers' online reach.  All of these distribution agreements bring consumers directly into the Superpages.com network.  The Company continues to seek out mutually beneficial arrangements that give its advertisers more exposure and its network more traffic, while giving end-users and others the benefit of the Company's local advertising content.  The Company believes that even as sites it partners with develop their own local search capabilities, they will continue to find agreements with the Company beneficial, because the Company's local sales force gives them access to local advertising content without having to invest in their own local sales force.

The Company provides all businesses with a basic listing on Superpages.com at no charge to the advertiser.  Businesses may pay to enhance their listings on Superpages.com and for other premium advertising products, including performance-based products in which advertisers pay on a per-click or per-call basis.  Other options that are available include extra lines, online replicas of print advertisements, website and e-mail links, priority placement and banners.

*Features.*  Superpages.com provides the following:

- fully searchable content that allows users to search an advertisement and provides refined geographic search capabilities;

- approximately 20.9 million business listings, and tens of millions of residential listings;

- professionally produced video advertisements that appear on Superpages.com as well as the top video sharing sites such as YouTube and Google;

- fixed-fee advertising that allows advertisers to purchase enhancements to their listings or expand their reach to additional geographic areas;

- performance-based advertising products ("PBAP") that allow advertisers to only pay for clicks on their Internet advertising (plus monthly service fees for some accounts based on advertising spend);

- full-service PBAP management to serve the needs of small businesses that cannot or do not wish to manage their program themselves;

- self-service management options for advertisers with the necessary technology resources;

- website hosting and design services, including e-commerce and Web 2.0 technologies;

- a user-generated content feature that enables consumers to rate, comment and add photos and blogs to business listings;

- links to business websites;

- restaurant and hotel reservation options;

- promotional coupons;

- shopping search services that allow consumers to research and compare products and services from multiple websites;

- movie listings and show times;

- street and aerial maps;

- driving directions;

- availability on wireless phones through Superpages Mobile;

- availability of Microsoft Windows Live Messenger instant messaging network;

- listings of local Wi-Fi hotspots;

- local weather and traffic conditions; and

- photos and blogs of local businesses.

*Agreements with Search Engines and Other Internet Companies.* The Company provides search engine marketing ("SEM") services through which it places local advertising content on major search engines as well as on Superpages.com. Through SEM services, Idearc increases its advertisers' reach, thus aiding its ability to retain them as clients and grow their programs. Idearc has agreements with several search engines that give the Company access to a higher volume of traffic. Even when client advertisements go on other websites, Idearc retains the client relationship. The search engines benefit from the Company's local sales force and full service capabilities for attracting and serving advertisers that might not otherwise transact business with them. As opposed to directly competing with these search engines, the Company's strategy is to collaborate with them, pairing its local sales reach with their extensive distribution networks. Idearc has also entered into strategic agreements with other Internet companies to provide enhanced search capabilities. For example, Superpages.com users may view street and aerial maps provided by Microsoft Map Point. This feature is integrated within the Company's service for Idearc client websites. The feature allows users to select detailed driving instructions to a client's location as well as view aerial and street level photos of the client's location.

## H.    Sales and Marketing

The marketing of directory advertisements is primarily a direct sales effort that requires both maintaining existing clients and developing new clients. Existing clients comprise its core advertiser base, and a large number of these clients have advertised in the Company's directories for many years. In 2008, the Company retained more than 80% of its local print clients from the previous year and exceeded 90% retention for its highest value clients. The Company bases its local print clients' renewal rate on the number of unique local print clients that have renewed advertising. The Company does not include clients that did not renew because they are no longer in business. Unique local print clients are counted once regardless of the number of advertisements they purchase or the number of directories in which they advertise. The Company's renewal rate would not be affected if any of these clients were to renew some, but not all, of their advertising. The Company's renewal rate reflects the importance of its directories to its local clients, for whom yellow pages directory advertising is, in many cases, the primary form of advertising. Larger national companies also use advertising in the Company's directories as an integral part of their national and regional advertising strategies.

Idearc believes the experience of its sales force has enabled it to develop long-term relationships with its clients, which, in turn, promotes a high rate of client renewal. Idearc also believes that its sales force can further penetrate the markets that it currently serves and increase its sales volume. To further improve the productivity of its sales force, the Company has initiated various programs, including:

- managing smaller accounts through a specialized low-cost mail-out and telemarketing center;

- using new technology to improve the efficiency of the Company's telemarketing center;

- equipping sales representatives with selling tools that accelerate the sales process;

- managing the Company's data through a single integrated information system; and

- enhancing the Company's initial sales training, field coaching and mentoring programs.

1. *Local Sales Force*

Each yellow pages sale, whether made in person, by telephone or through direct mail, is a separate transaction designed to meet the individual needs of a specific business. As the products have become more complex and as competition has presented advertisers with more choices, the sales process has also become more complex. A sales representative now spends more time learning and perfecting a sales proposal and preparing for a sales call. In addition, the average time a sales representative spends with a client has increased. Therefore, the Company believes its success in the marketplace is highly influenced by the size and proficiency of its local sales force. The more the Company employs well-trained, experienced sales representatives, the better able the Company is to call upon current and prospective clients and, when the Company does, to customize programs to meet specific client needs.

As of July 31, 2009, the Company employed more than 2,800 sales representatives in its local sales force, including sales management, operating out of 61 sales offices throughout the United States. The Company believes the size, local presence and local market knowledge of its sales force is a competitive advantage that enables it to develop and maintain long-standing relationships with its advertisers.

The Company's sales force is divided into four principal groups:

- *Premise Sales Representatives.* The Company's premise sales representatives generally focus on higher revenue clients with whom they typically interact on a face-to-face basis at the client's place of business. Within this group, there are specialized sales representatives for major accounts.

- *Telephone Sales Representatives.* The Company's telephone sales representatives generally focus on medium-sized clients with whom they typically interact over the telephone.

- *Centralized Sales Representatives.* The Company's centralized sales representatives include both centralized account representatives, who generally focus on the smallest accounts, and prospector sales representatives, who generally focus on potential new clients. These representatives manage both mail-out and telephone contact with lower revenue producing clients.

- *Internet Sales Representatives.* The Company's Internet sales representatives sell advertising on Superpages.com, search engine optimization services, website development and related products to businesses located outside the Company's traditional sales boundaries and to businesses that would not typically advertise in the print yellow pages. Internet sales are also made by the Company's premise, telephone and centralized sales representatives.

The Company assigns its clients among these groups based on a careful assessment of expected advertising expenditures and propensity to purchase the various products and services that it offers. Each sales representative has a specified client assignment consisting of both new business leads and renewing advertisers and is accountable for meeting sales goals in each two-week period. Idearc believes this practice allows it to deploy its sales force in a more effective manner. A majority of the Company's sales force is locally based, operating out of 61 sales offices. The Company's local sales force presence facilitates the personal, long-term relationships with local clients necessary to maintain a high rate of local print client renewal.

Formal training is important to maintain a highly productive sales force. New sales representatives receive approximately eight weeks of training in their first year, including classroom training on sales techniques, the Company's product portfolio, client care and ethics. Following classroom training, they are accompanied on sales calls by experienced sales personnel for further training. They then receive field coaching and mentoring. Idearc's commitment to developing the best sales practices are intended to ensure that sales representatives are able to give advertisers high-quality service and advice on appropriate advertising products and services.

The Company's sales representatives are compensated in the form of base salary and incentive compensation.

2. *National Sales Force*

In addition to the Company's local sales personnel, the Company has a separate sales channel to serve its national clients. These clients are typically national or large regional chains, including rental car companies, insurance companies and pizza delivery companies. These clients typically purchase advertisements in yellow pages directories in multiple geographical regions. In order to sell to national companies, the Company uses third-party certified marketing representatives ("CMRs") who design and create advertisements for national companies and place those advertisements in yellow pages directories nationwide. Some CMRs are departments or subsidiaries of general advertising agencies, while others are specialized agencies that focus solely on directory advertising. The national advertiser pays the CMR, which pays Idearc after deducting its commission. The Company accepts orders from approximately 160 CMRs.

## I. Clients

The Company generates revenues from its large base of clients. As of December 31, 2008, the Company had approximately 660,000 clients. In 2008, a new methodology to count clients on the basis of unique billing accounts was adopted. The year-end 2007 client count under the new methodology was 755,000. The decline in clients from 2007 to 2008 was primarily due to the loss of smaller clients with entry level programs.

As of December 31, 2008, approximately 84% of the Company's print directory advertising revenues were derived from selling advertising to local businesses, which are generally small- and medium-sized business. The Company does not depend to any significant extent on the sale of advertising to a particular industry or to a particular advertiser. In 2008, no single local client accounted for more than 0.08% of the Company's revenues, with the Company's top ten local clients representing less than 0.6% of its revenues. The breadth of the Company's client base reduces its exposure to adverse economic conditions that may affect particular geographic regions or specific industries and provides additional stability to its operating results. However, small- and medium-sized businesses tend to have fewer financial resources and a higher rate of failure than larger businesses, in particular during periods of economic downturn, such as the Company is currently experiencing.

The Company's performance-based incentive compensation programs reward sales representatives who retain a high percentage of their accounts, increase client spending and add new advertisers. Like most directory publishers, the Company gives priority placement within a directory classification to long-time clients. As a result, businesses have a strong incentive to renew their directory advertising purchases each year to avoid losing their placement within the directory.

**J.      Publishing, Production and Distribution**

The Company generally publishes its directories on a 12-month cycle.  The publishing cycles for its directories are staggered throughout the year, allowing the Company to more efficiently use its infrastructure and sales capabilities, as well as the resources of its third-party vendors.  The major steps of the publication and distribution process of its directories are:

- *Selling.*  The sales cycle of a directory varies based on the size of the market and can range from a few weeks to six months.  In the months prior to publication, the Company's sales force contacts both existing clients to encourage them to renew and increase the size and prominence of their advertisements and to purchase other products in the Company's portfolio, and potential clients in an effort to expand the Company's client base.  Potential clients include businesses that have operated in the area for some time but did not purchase advertising in the most recent edition of the Company's directory, as well as new businesses and businesses that have recently moved into an area.

- *Creation of Advertisements.*  Upon entering into an agreement with a client, the Company uses its proprietary software to create an advertisement in collaboration with the advertiser.

- *Pre-press Activities.*  Sales typically are completed 60 to 90 days prior to publication, after which time the Company does not accept additional advertisements.  Once a directory has closed, the Company begins pre-press activities.  Pre-press activities include finalizing artwork, proofing and paginating the directories.  When the composition of the directory is finalized, the Company transmits the directory files to a third-party printer.

- *Printing.*  Idearc outsources the printing of its directories using paper it purchases.  All of the paper that the Company uses is supplied by several different suppliers.  Under current agreements, suppliers are required to provide up to 100% of the annual forecasted paper requirements in their contracts.  Prices under these agreements are negotiated each year based on prevailing market rates, market demand, production capacity and the total available tonnage for each supplier.

- *Transportation.*  The Company transports directories from printing locations to its distributors by truck and rail on a publication-by-publication basis using numerous different carriers.

- *Distribution.*  The Company's goal is to deliver its directories to residences and businesses in the geographical areas for which it produces directories.  The Company uses several vendors to distribute its directories.  Depending on the circulation and size of the directory, distribution typically ranges from three to eight weeks.

**K.      Billing and Credit Control**

The Company direct bills all of its clients.  Because most directories are published on 12-month cycles, the Company bills most of its clients over the course of that 12-month period.  Fees for national advertisers are typically billed upon issue of each directory in which advertising is placed by CMRs after

deducting commissions. Because the Company does not usually enter into contracts with national advertisers the Company is subject to the credit risk of CMRs on sales to those advertisers, to the extent the Company does not receive fees in advance.

The Company manages the collection of its accounts receivable by conducting initial credit checks of new clients under certain circumstances and, in certain circumstances, requiring personal guarantees from business owners. The Company checks all new orders from existing clients for payments that are past due prior to publishing the new order. When applicable, based on its credit policy, the Company uses both internal and external data to decide whether to sell to a prospective client. In some cases, the Company may also require the client to prepay part or all of the amount of its order. Beyond efforts to assess credit risk, the Company employs collection strategies using an integrated system of internal, external and automated means to engage with clients concerning payment obligations.

For 2008, bad debt expense represented 6.9% of the Company's net revenue, an increase from 5.0% in 2007. For the first six months of 2009, bad debt expense represented 9.2% of the Company's total revenue, an increase from 5.7% in the first six months of 2008.

## L.    Competition

The U.S. directory advertising industry is highly competitive. The Company competes with many different advertising media, including newspapers, radio, television, the Internet, billboards, direct mail, telemarketing and other yellow pages directory publishers. There are a number of independent directory publishers, such as Yellowbook (the U.S. business of Yell Group), with which the Company competes in the majority of its major markets. To a lesser extent, the Company competes with other directory publishers, including AT&T, R.H. Donnelley and Local Insight Media. The Company competes with these publishers on cost per reference, quality, features, usage leadership and distribution.

As the exclusive official publisher of Verizon print directories for wireline listings in the markets in which Verizon is the incumbent local exchange carrier, Idearc believes it has an advantage over its independent competitors due to the strong awareness of the Verizon brand, higher usage of its directories by consumers and its long-term relationships with its clients. Under the non-competition agreement that Idearc entered into with Verizon at the time of the spin-off, Verizon generally agreed that it will not publish tangible or digital (excluding Internet) media directory products consisting principally of wireline listings and classified advertisements of subscribers in the markets in which it is the incumbent local exchange carrier through 2036, as long as the Company meets its obligations under the publishing agreement in those markets, and, subject to certain termination rights, in certain expansion markets through 2011.

The Company has competed with other directory publishers for well over a decade and in some markets has had as many as eight different print yellow pages competitors at one time. Historically, much of this competition was from small publishers that had minimal impact on the Company's performance. Over the past decade, however, Yellowbook and several other regional competitors have become far more aggressive and have expanded their businesses, including through acquisitions.

The Company has competition in over [95]% of its markets, including the Company's incumbent markets where it is the exclusive official publisher of Verizon print directories, and the expansion markets it has penetrated. The Company's largest competitor is Yellowbook, which participates in most of its incumbent markets nationwide.

Idearc believes that it is maintaining its leading market position in its incumbent markets, measured both in terms of usage and advertising revenue. On the usage side, it believes that it continues to be a preferred source of information for consumers by innovating its product line with the addition of smaller-sized companion directories and directories in Spanish, with marketing initiatives aimed at increasing usage. On the advertising revenue side, Idearc believes that it has countered its competitors' pricing strategies with differentiated product offerings that caters to its clients' advertising needs and with value-enhancing programs that provide clients with a competitive cost per reference compared with other print directory publishers.

Although advertising on the Internet still represents only a small part of the total advertising market, as the commercial use of the Internet expands, it will become an increasingly important advertising medium. The Company competes directly, through Superpages.com, with the Internet yellow pages directories of some of the major directory publishers and the independent publishers. In addition, the Company competes with several search engines and portals, some of which have entered into agreements with other major directory publishers. Idearc has also entered into agreements with numerous search engines, portals and individual websites pursuant to which it places local advertising content on their respective websites, giving the Company access to a higher volume of traffic.

## M.     Patents, Trademarks, and Licenses

The Company owns several patents, patent applications, trademarks, service marks and Internet domain names in the United States and other countries, including, but not limited to, Idearc, Idearc Media, the Idearc logo, the Idearc Media logo, Superpages.com, Superpages, Switchboard, Switchboard.com, Superpages Mobile, SuperTradeExchange, SuperpagesDirect and SuperGuarantee. In addition, in connection with the spin-off, Idearc entered into a branding agreement with Verizon that gives it limited rights to use the Verizon name and logo in conjunction with the publication of its print directories in specified markets and an intellectual property agreement that governs the Company's and Verizon's rights with respect to other intellectual property currently shared by the Company and Verizon. In 2008, Idearc also entered into a branding agreement with FairPoint, which granted Idearc a limited right to use certain FairPoint trademarks and service marks in connection with publishing certain print directories and to identify the Company as its official print directory publisher in the applicable markets.

## N.     Employees

As of July 31, 2009, the Company had approximately 6,175 employees, of which 1,677, or approximately 27% of its employees, were represented by unions. In December 2008, the Company reached new, five year agreements on three labor contracts that had expired in June 2007 covering approximately 537 sales and clerical employees in the Company's New England and Upstate New York offices. In February 2009, agreements were reached for six contracts which had expired in the fall of 2008 covering 332 employees in the Company's New York offices. Agreements were also reached in February 2009 for five contracts covering 318 employees in the Company's Pennsylvania sales offices. Approximately 490 employees are covered by union contracts that will expire at various dates prior to November 2009. On May 18, 2009, the Bankruptcy Court entered an order authorizing the Debtors to assume all of their collective bargaining agreements except for one collective bargaining agreement with CWA Local 1301.

In the second quarter of 2008, Idearc began implementing strategic organizational and market initiatives to improve ongoing operational efficiencies. In connection with these initiatives, the Company reduced its headcount by approximately 570 employees in 2008. In 2009, the Company has

reduced its total employee headcount by 75, as of July 31, 2009. As a result of the Company's cost reduction efforts, further headcount reductions may result before the end of 2009.

## O.   Assets and Properties

The Company's assets consist primarily of cash, trade and other receivables, deferred directory costs and property, plant and equipment. Information as to the Company's assets (including the foreign non-Debtor subsidiary) is available in the balance sheets included in the Annual Report on Form 10-K of Idearc for the fiscal year ended December 31, 2008, as amended, and the Quarterly Reports on Form 10-Q of Idearc for the fiscal quarters ending March 31, 2009 and June 30, 2009, filed with the Securities and Exchange Commission (the "SEC"). The Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, as may be amended, along with other filings made by Idearc with the SEC, may be accessed on the SEC's website, www.sec.gov, or on Idearc's website, www.idearc.com.

Idearc's property mainly consists of land and buildings. Its corporate headquarters is located in D/FW Airport, Texas, and is leased from Verizon. Although most of the Company's offices are leased, Idearc owns several of its facilities. Idearc believes that its existing facilities are in good working condition and are suitable for their intended purposes.

The following is a list of the Company's (i) owned facilities and (ii) leased facilities that have at least 100,000 square feet. These facilities are administrative facilities, except for the Martinsburg, West Virginia, and Fullerton, California, facilities, which are warehouse/distribution centers.

| Location | Square Feet |
| --- | --- |
| *Owned* | |
| Martinsburg, WV | 191,068 |
| Los Alamitos, CA | 149,326 |
| St. Petersburg, FL | 100,000 |
| Marlton, NJ | 32,200 |
| | |
| *Leased* | |
| D/FW Airport, TX | 418,824 |
| Irving, TX (Executive Drive) | 152,121 |
| Middleton, MA | 128,746 |
| Fullerton, CA | 112,944 |

## P.   Unencumbered Assets

The Company has pledged substantially all of its assets as collateral security for the obligations under the Credit Agreement, including the Swap Obligations.

The assets of the Company that are not collateral security or otherwise encumbered consist of the Company's real property (other than the Los Alamitos, California facility), leasehold interests, fleet of vehicles, copyrights on the yellow pages directories, and commercial tort claims. The Company is not aware of any other unencumbered assets of material value. Valuation of the leasehold interests includes 79 lease valuation sites. The appraised value of the leasehold interest is a negative amount because these leases represent above market leases. The vehicle fleet appraisal value includes values provided for each of the five Idearc business units based upon an analysis of market values. Valuations for the three real properties were based upon an evaluation of micro and macro market environments utilizing a sales comparison, income capitalization approach and a cost approach. Cost, market and income

valuation approaches were utilized in valuation of the copyrights on the yellow pages business directories.  The copyrights' final appraisal value is based upon the cost approach, deemed to be the only viable method of the three utilized.

The valuation of the unencumbered assets is as follows:

| Unencumbered Asset | Appraisal Value [1] | Date of Appraisal [2] |
|---|---|---|
| Leasehold Interests | ($46,235,315) | July 17, 2009 |
| Vehicle Fleet | $199,380 | May 31, 2009 |
| Real Property: | | |
| St. Petersburg, FL | $5,200,000 | June 30, 2009 |
| Marlton, NJ | $2,600,000 | March 31, 2009 |
| Martinsburg, WV | $7,500,000 | July 9, 2009 |
| Copyrights on the Yellow Pages Business Directories | Little to no value [1] | July 20, 2009 |
| Commercial tort claims | Unknown | None |

[1]  Opinions and conclusions are preliminary pending review of any additional information.

[2]  Leasehold Appraisal performed by GVA Cawley, Vehicle Fleet Appraisal performed by Grant Thornton LLC and Real Property Appraisal performed by CB Richard Ellis.

## Q.   Legal Proceedings

The Company is subject to various lawsuits and other claims in the normal course of business. In addition, from time to time, the Company receives communications from government or regulatory agencies concerning investigations or allegations of noncompliance with laws or regulations in jurisdictions in which the Company operates.

Idearc establishes reserves for the estimated losses on specific contingent liabilities for regulatory and legal actions where the Company deems a loss to be probable and the amount of the loss can be reasonably estimated.  In other instances, Idearc is not able to make a reasonable estimate of liability because of the uncertainties related to the outcome or the amount or range of loss.  Idearc does not expect that the ultimate resolution of pending regulatory and legal matters in future periods, including the matters described below, will have a material effect on its financial condition or results of operations.

### 1.   Tax Related Legal Proceedings

In October 2007, Idearc received a proposed assessment from the State of New York related to sales and use tax on printing and mailing charges.  The proposed assessment relates to the audit period March 1998 through May 2005.  On May 5, 2008, the State of New York issued a Notice of Determination to the Company for approximately $28 million.  Idearc filed its response on July 25, 2008 and any further action has been stayed beyond the outcome of a related matter.

In late December 2008, the Company received tax assessments from the State of Washington related to operating taxes allegedly due on the Company's inter-company transactions. The proposed assessments totaling approximately $12.5 million relate to the audit period January 1, 2003 through June 30, 2008. On February 19, 2009, the Company filed appeals to these assessments.

### 2. Copyright Legal Proceedings

Idearc was served with a lawsuit on January 29, 2009, originally filed on January 13, 2009, in the U.S. District Court for the Southern District of California. The plaintiff in this case claims that the Company used plaintiff's copyrighted material without a license in multiple publications across the country. Plaintiff seeks an injunction and both statutory and actual damages. This matter has been stayed by the filing of the Chapter 11 Case on March 31, 2009.

### 3. Officers and Directors Related Legal Proceedings

On April 20, 2009, a lawsuit was filed in the district court of Tarrant County, Texas, against certain of the Company's officers and directors (but not against the Company or its subsidiaries) on behalf of Jack B. Corwin as Trustee of The Jack B. Corwin Revocable Trust, and Charitable Remainder Stewardship Company of Nevada, and as Trustee of the Jack B. Corwin 2006 Charitable Remainder Unitrust. The suit generally alleges that at various times in 2008 and 2009, the named Company officers and directors made false and misleading representations, or failed to state material facts which made their statements misleading, regarding the Company's financial performance and condition. The suit brings fraud and negligent misrepresentation claims and alleges violations of the Texas Securities Act and Section 27 of the Texas Business Commerce Code. The plaintiffs seek unspecified compensatory damages, exemplary damages, and reimbursement for litigation expenses. On June 3, 2009, the plaintiffs filed an amended complaint with the same allegations adding two additional Company directors as party defendants. On June 26, 2009, the Bankruptcy Court entered an injunction prohibiting the prosecution of the Corwin litigation while the Company remains in bankruptcy. The Company plans to honor its indemnification obligations and vigorously defend the lawsuit on the defendants' behalf.

On April 30, 2009, May 21, 2009, and June 5, 2009, three separate putative class action securities lawsuits were filed in the U.S. District Court for the Northern District of Texas, Dallas Division, against certain current and former Company officers (but not against the Company or its subsidiaries). The suits were filed by Jan Buettgen, John Heffner, and Alan Goldberg as three separate named plaintiffs on behalf of purchasers of the Company's common stock between August 10, 2007, and March 31, 2009, inclusive. The complaints are virtually identical and generally allege that the defendants violated federal securities laws by issuing false and misleading statements regarding the Company's financial performance and condition. Specifically, the complaints allege violations by the defendants of Section 10(b) of the Securities Exchange Act of 1934 (as amended, the "Exchange Act"), Rule 10b-5 under the Exchange Act, and Section 20 of the Exchange Act. The plaintiffs are seeking unspecified compensatory damages and reimbursement for litigation expenses. A class has not been certified. Since the filing, all three cases have been consolidated into one court in the Northern District. Each of the plaintiffs have filed motions to be named lead plaintiff and each of the plaintiffs attorneys have filed motions to be named lead plaintiffs' counsel. The Company's response will not be due until after the motions are resolved. The Company plans to honor its indemnification obligations and vigorously defend the lawsuits on the defendants' behalf.

On May 22, 2009, a putative class action securities lawsuit was filed in the U.S. District Court for the Eastern District of Arkansas, against two of the Company's current officers (but not against the Company or its subsidiaries). The suit was filed by Wade L. Jones on behalf of purchasers of the

Company's bonds between March 27, 2008, and March 30, 2009, inclusive. The complaint generally alleges that the defendants violated federal securities laws by issuing false and misleading statements regarding the Company's financial performance and condition. Specifically, the complaint alleges violations by the defendants of Section 10(b) of the Exchange Act, Rule 10b-5 under the Exchange Act, and Section 20 of the Exchange Act. The plaintiff is seeking unspecified compensatory damages and reimbursement for litigation expenses. A class has not been certified. The Company plans to honor its indemnification obligations and vigorously defend the lawsuit on the defendants' behalf. On August 18, 2009, an order was entered transferring this case to the United States District Court for the Northern District of Texas.

On July 13, 2009, an adversary proceeding was filed by Sean Ryan in the Bankruptcy Court against certain of the Company's current officers, directors and employees (the "Idearc Defendants") (but not against the Company or its subsidiaries), in addition to the Administrative Agent, Verizon and certain current and former officers and directors of Verizon. Among other causes of action, the complaint specifically alleges that the Idearc Defendants breached their fiduciary duties of fairness and candor to Mr. Ryan. The plaintiff is seeking damages of $1,000,000 and reasonable costs and attorneys' fees. The Company plans to honor its indemnification obligations and vigorously defend the lawsuit on the Idearc Defendants' behalf. On August 10, 2009, the Idearc Defendants filed a motion to dismiss the claims against them. Ryan filed a response to the motion to dismiss and oral argument has been scheduled for September 24, 2009.

    *4.    Motion to Appoint Trustee*

On May 12, 2009, Peter and Helga Talbot, alleged stockholders of the Company, filed a motion requesting appointment of a Chapter 11 Trustee. The Company believes that the motion has no merit and intends to vigorously oppose the request to appoint a Chapter 11 Trustee. The movants requested a continuance of the hearing on the motion. Since the filing of the motion, numerous other alleged stockholders have filed joinders to the motion requesting appointment of a Chapter 11 Trustee.

    *5.    Motion to Dismiss/Appoint Equity Committee*

On July 6, 2009, a motion to dismiss the Chapter 11 Case was filed by the so-called "Spencer ad hoc Equity Committee", an ad hoc committee represented by Peter Talbot. Alternatively, the motion seeks appointment of an official equity committee. The Company believes that the motion has no merit and intends to vigorously oppose the dismissal of the Chapter 11 Case or the appointment of an equity committee. The hearing on the motion has been reset to November 2, 2009.

    *6.    Valuation Adversary Proceedings*

As of the date of this Disclosure Statement, three proceedings have been filed regarding, among other things, the valuation of the Lenders' collateral and the validity of the Lenders' liens in certain assets of the Company.

- MatlinPatterson Proceeding. On July 13, 2009, MatlinPatterson Global Opportunities Partners (Cayman) III LP and MatlinPatterson Global Opportunities Partners III LP (collectively, "MatlinPatterson"), holders of Unsecured Notes, filed an adversary proceeding in the Bankruptcy Court against the Administrative Agent. The complaint seeks a determination of the validity, priority and extent of the Lenders' liens. MatlinPatterson alleges that the Lenders do not have perfected security interests in the Debtors' registered copyrights, the Lenders do not have

security interests in the branding agreement and listing licensing agreement between the Company and Verizon, the Lenders' liens do not attach to property acquired post-petition, and that the granting of the Lenders' liens was a fraudulent transfer.

- <u>Ryan Proceeding</u>. As discussed above, on July 13, 2009, Sean Ryan filed an adversary proceeding in the Bankruptcy Court against the Idearc Defendants, the Administrative Agent, Verizon and certain current and former officers and directors of Verizon. Among other causes of action, the complaint seeks a determination of the validity, priority, and extent of the Lenders' liens on the same grounds set forth in the adversary proceeding filed by MatlinPatterson.

- <u>Creditors Committee Proceeding</u>. On August 4, 2009, the Creditors Committee filed an adversary proceeding in the Bankruptcy Court against the Administrative Agent. On August 5, 2009, the Creditors Committee filed an amended complaint against the Administrative Agent. Among other causes of action, the amended complaint seeks a valuation of the Lenders' collateral as of the Petition Date. The Creditors Committee challenges the valuation of the Lenders' collateral on the grounds that the Lenders' do not have liens on the copyrights, the receivables generated by the copyrights, the Company's rights under the branding agreement with Verizon, and that portions of the post-petition going concern enterprise value of the Company relating to post-petition advertising contracts and their proceeds (such proceeding, the "<u>Committee Lien Litigation</u>").

MatlinPatterson, Ryan and the Creditors Committee (collectively, the "<u>Valuation Plaintiffs</u>") have asked the Bankruptcy Court to hold that a failure to perfect a lien on a registered copyright on a yellow pages book in the U.S. Copyright Office invalidates the Lenders' Uniform Commercial Code-perfected liens on the Company's advertising contracts and the proceeds thereof. The Company disagrees with certain of the arguments set forth by the Valuation Plaintiffs in the above complaints and amended complaint.

The claims made by the Valuation Plaintiffs have been made in proceedings that are in their early stages. While litigation is an inherently uncertain process, the Company disagrees with the arguments of the Valuation Plaintiffs and has proposed this Plan. However, there can be no assurance as to the ultimate outcome of any proceeding concerning the claims made by the Valuation Plaintiffs. Parties in interest may obtain copies of the filings made in connection with the valuation adversary proceedings described above by accessing www.kccllc.net/idearc/.

## R. Historical Financial Information

Idearc's fiscal year ends on December 31. Financial information regarding the Company for the fiscal year ended December 31, 2008, is available in the Annual Report on Form 10-K of Idearc, as amended, filed with the SEC. Financial information regarding the Company for the fiscal quarters ending on March 31, 2009 and June 30, 2009 are available in the Quarterly Reports on Form 10-Q of Idearc as filed with the SEC. The financial information contained in the Company's Annual Report on Form 10-K, as amended, for the fiscal year ended December 31, 2008 has been audited. The Company's Annual Report on Form 10-K and the subsequent Quarterly Reports on Form 10-Q may be accessed on the SEC's website, www.sec.gov, or on Idearc's website, www.idearc.com. Idearc has prepared its financial statements in accordance with generally accepted accounting principles as set forth by the Public Company Accounting Oversight Board (United States).

## S.     Executive Officers

Idearc's executive officers as of the date of this Disclosure Statement, all of whom are expected to serve during the pendency of the Chapter 11 Case, are set forth below.

| Name | Position |
| --- | --- |
| Scott W. Klein | Chief Executive Officer |
| David O. Bethea | Executive Vice President – Sales |
| Briggs Ferguson | President – Internet |
| Frank P. Gatto | Executive Vice President – Operations |
| Sandra L. Henjum | Executive Vice President – Transformation and Marketing |
| Samuel D. Jones | Executive Vice President, Chief Financial Officer and Treasurer |
| Scott B. Laver | Executive Vice President – Sales |
| Michael D. Pawlowski | Executive Vice President – Sales |
| Georgia R. Scaife | Executive Vice President – Human Resources and Employee Administration |
| Cody Wilbanks | Executive Vice President, General Counsel and Secretary |

1.     *Biographies of Executive Officers*

*Scott W. Klein,* age 52, has been Idearc's Chief Executive Officer and a director since June 2008. Mr. Klein previously served as an Operating Partner of Symphony Technology Group, a private investment firm, since November 1, 2007.  From January 2004 to October 2007, Mr. Klein served as President and Chief Executive Officer of Information Resources, Inc., a provider of information solutions for the consumer packaged goods, retail and healthcare industries.  Prior to joining Information Resources, Mr. Klein served as President, Consumer Industries, Retail & Energy Global Industry Group of Electronic Data Systems Corporation from July 2001 to January 2004.   Mr. Klein also held management positions with PC Mall, Inc., PrimeSource Building Products, Inc., Guardian Purchasing Corp., PepsiCo, Inc. and The Procter & Gamble Company earlier in his career.

*David O. Bethea*, age 40, has been an Executive Vice President since September 2008 overseeing sales for the Western United States.  Mr. Bethea served as Regional Vice President of Operations for PrimeSource Building Products, Inc., from July 2008 to September 2008.  Mr. Bethea also served as Vice President of National Accounts for PrimeSource Building Products, Inc. from August 2002 to July 2008.

*Briggs Ferguson*, age 44, has served as President-Internet since April 2008.  Mr. Ferguson has responsibility for advanced Internet-based local search products and a broad array of search engine marketing, website development and management and Internet advertising programs.  Mr. Ferguson previously served as Chief Executive Officer for Citysearch, a unit of IAC/InterActive Corp. from April 2002 to April 2007.  Prior to that, Mr. Ferguson served as Executive Vice President of Marketing and Product Strategy for Launch Media from 2000 to 2002.

*Frank P. Gatto*, age 55, has been an Executive Vice President since January 2008 with responsibility for the Company's operations, including sales operations, customer care, billing and collections, printing management, publishing, distribution and print information technology.  Mr. Gatto served as acting Chief Executive Officer from February 2008 through May 2008.  Prior to his current position, Mr. Gatto served as President of the Northeast region from June 2005.  Mr. Gatto also served as Senior Vice President – Operations from September 2001 to June 2005.  Before joining the Company, he served as Vice President – Finance and Chief Financial Officer of the Puerto Rico Telephone Company from September 1999 to September 2001.

*Sandra L. Henjum*, age 49, has been Executive Vice President – Transformation and Marketing since 2008. Ms. Henjum is responsible for the marketing organization and guiding a wide range of business transformation initiatives addressing sales productivity, new products, pricing programs and market and customer segmentation. Ms. Henjum previously served as Area President – Southeast and Central regions from September 2003 to September 2008. Prior to holding that position, Ms. Henjum served as Group Vice President – Human Resources from July 2000 to September 2003.

*Samuel D. Jones*, age 46, has been Executive Vice President, Chief Financial Officer and Treasurer since September 2008. He served as acting Chief Financial Officer and Treasurer from November 2007 to September 2008. Mr. Jones is responsible for the Company's financial operations and is also the primary liaison with the investment community, responsible for developing and executing investor relations programs; providing strategic communications with shareholders, both institutional and individual; and leading the mergers and acquisitions team in financially beneficial transactions. Mr. Jones served as Idearc's Executive Director – Financial Planning and Analysis from June 2002 to October 2006. Prior to holding that position, Mr. Jones served as Executive Director – International Sales and Operations from June 2000 to May 2002.

*Scott B. Laver,* age 53, has been an Executive Vice President since January 2008, overseeing sales for the DC Metropolitan area, Great Lakes, Virginia, Carolinas, Florida, Western Pennsylvania, Phoenix, Denver and Minneapolis-St. Paul regions. He also oversees Internet sales in Washington, Texas, Georgia, Illinois and California. Previously, he served as President of the Mid-Atlantic region. Prior to holding that position, Mr. Laver served as President – Internet Division from February 2004 to September 2005 and as President – Superpages Canada and the Northwest from June 2001 to December 2003.

*Michael D. Pawlowski,* age 48, has been Executive Vice President-East Sales since January 2008, overseeing sales for a large portion of the Northeastern United States, including New England, New York, New Jersey and most of Pennsylvania. Prior to this position, he served as Idearc's Senior Vice President and Chief Marketing Officer from November 2006 to December 2007. He also served as Vice President – Marketing and Strategic Planning from March 2005 to November 2006. Additionally, Mr. Pawlowski served as Vice President – Marketing and Customer Relations of Verizon International Operations from July 2000 to March 2005.

*Georgia R. Scaife,* age 59, has been Executive Vice President – Human Resources and Employee Administration since February 2008 with responsibility for the Company's human resources and employee communications. She served as Senior Vice President – Human Resources from November 2006 to February 2008, and was Vice President – Human Resources from October 2003 to October 2006. Prior to joining the Company, Ms. Scaife was Vice President – Staffing Services for Verizon Communications Inc. from June 2001 to October 2003. Prior to that, she served as Vice President – Human Resources for the Puerto Rico Telephone Company.

*Cody Wilbanks,* age 56, has been the Company's Corporate Secretary since August 2008 and Executive Vice President and General Counsel since September 2008. Mr. Wilbanks served as acting Executive Vice President – General Counsel since April 2008. Mr. Wilbanks has responsibility for the Company's legal, compliance and security functions. He also served as Vice President, Associate General Counsel – Commercial Operations from November 2006 to March 2008. From February 1987 through November 2006, Mr. Wilbanks was employed by Verizon Communications Inc. and its predecessor GTE Incorporated, in the legal departments of various business units.

2. *Compensation and Benefits of Executive Officers*

Compensation and benefit plans for Idearc's executive officers include:

- Annual cash compensation consisting of base salary and short-term incentive plans;

- Long-term equity based compensation;

- Retirement benefits consisting of a 401(k) savings pan and management and excess pension plans that were transferred to the Company by Verizon in connection with the spin-off and frozen in 2006;

- Severance benefits absent a change in control of Idearc and severance benefits in connection with a change in control of Idearc; and

- Other customary benefits and perquisites including health and disability insurance and whole life insurance.

Historical information and descriptions of Idearc's compensation and benefits arrangements for its executive officers are provided in Idearc's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, as amended, which was filed with the SEC and which may be accessed on the SEC's website, www.sec.gov, or on Idearc's website, www.idearc.com.

The following table sets forth selected historical information regarding the compensation of Idearc's "named executive officers," as defined in the SEC's Regulation S-K, for 2008.

| Name and Principal Position | Year | Salary | Bonus (1) | Stock Awards (2) | Option Awards (3) | Non-Equity Incentive Plan Compensation (4) | Change in Pension Value (5) | All Other Compensation(6) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Scott W. Klein (8) ........................................<br>Chief Executive Officer | 2008 | $ 580,769 | $ 681,846 | $ 421,800 | $ 133,187 | $ 218,154 | — | $ 1,841,120(7) | $3,876,876 |
| Samuel D. Jones..........................................<br>Executive Vice President,<br>Chief Financial Officer and Treasurer | 2008 | 334,007 | — | 314,785 | — | 92,170 | 40,503 | 42,588 | 824,053 |
| | 2007 | 200,308 | — | 243,693 | — | 119,340 | — | 36,220 | 599,561 |
| Frank P. Gatto (9)........................................<br>Executive Vice President – Operations | 2008 | 437,115 | — | 858,541 | — | 109,186 | $ 13,711 | 85,147 | 1,503,700 |
| | 2007 | 307,400 | — | 724,288 | — | 188,129 | 34,035 | 75,992 | 1,329,844 |
| | 2006 | 272,800 | 100,000 | — | — | 206,646 | 132,426 | 64,952 | 776,824 |
| Scott B. Laver.............................................<br>Executive Vice President – Central | 2008 | 425,000 | — | 744,058 | — | 120,530 | 3,940 | 75,209 | 1,368,737 |
| | 2006 | 270,000 | 150,000 | — | — | 204,525 | 106,029 | 50,664 | 781,218 |
| Georgia R. Scaife ........................................<br>Executive Vice President – Human<br>Resources and Employee<br>Administration | 2008 | 304,808 | — | 691,278 | — | 80,871 | — | 39,616 | 1,116,573 |
| Cody Wilbanks............................................<br>Executive Vice President, General<br>Counsel and Secretary | 2008 | 293,323 | — | 816,697 | — | 84,193 | — | 32,914 | 1,227,127 |

---

(1) Bonus in 2008 to Mr. Klein consisted of (a) a signing bonus of $400,000 paid in connection with the commencement of his employment in May 2008, and (b) a year-end bonus of $281,846, which, together with his short-term incentive award payment for 2008 of $218,154, represents his minimum short-term incentive payment for 2008 of $500,000 in accordance with the terms of his employment agreement. Bonuses paid to other named executive officers in 2006 represent one-time awards for extraordinary efforts in connection with Idearc's spin-off from Verizon in 2006.

(2) Represents the accounting expense recognized by Idearc in 2008 for stock awards granted to the named executive officers in 2008 and prior years. The dollar amounts were computed in accordance with Financial Accounting Standards Board Statement No. 123(R), Share-Based Payment ("FAS 123R"), as required by SEC regulations, and do not reflect the actual value that may be realized by the named executive officers. *See* note 14 to the consolidated financial statements in Idearc's Annual Report on Form

10-K for the year ended December 31, 2008, as amended, for a description of the assumptions used in determining the accounting expense associated with these stock awards.

(3)   Represents the accounting expense recognized by Idearc in 2008 for the option award granted to Mr. Klein in June 2008.  The dollar amount was computed in accordance with FAS 123R, as required by SEC regulations, and does not reflect the actual value that may be realized by Mr. Klein.  This accounting expense includes the grant date fair value of the option award, pro-rated for the number of days outstanding during 2008.  *See* note 14 to the consolidated financial statements in Idearc's Annual Report on Form 10-K for the year ended December 31, 2008, as amended, for a description of the assumptions used in determining the accounting expense associated with this option award.

(4)   Represents cash awards under Idearc's short-term incentive plan.

(5)   Represents the year-to-year increase in pension value for each of the named executive officers that participate in Idearc's pension plans.  Mr. Klein does not participate in Idearc's pension plan.

(6)   *See* the All Other Compensation table in Idearc's Annual Report on Form 10-K/A, for the year ended December 31, 2008, for the various components of compensation for Idearc's named executive officers, other than Mr. Klein.

(7)   Included in the "All Other Compensation" for Mr. Klein are relocation benefits, including (a) $47,309 associated with the sale of his Chicago, Illinois residence; (b) $1,051,812 representing the difference between the appraised value of his Chicago, Illinois residence and his cost basis in the residence; (c) $50,320 associated with the purchase of his Dallas, Texas residence; (d) $86,247 for relocation and moving expenses; and (e) approximately $545,000 in tax gross-up payments associated with his relocation benefits; $15,400 for flexible allowance; $17,909 for company contributions to savings plans; and $27,123 for the reimbursement of legal fees related to the negotiation of Mr. Klein's employment agreement.

(8)   Mr. Klein was appointed Chief Executive Officer of Idearc effective May 30, 2008.

(9)   Mr. Gatto served as Acting Chief Executive Officer of Idearc from February 26, 2008 to May 30, 2008.  For his service as Acting Chief Executive Officer, Mr. Gatto received an additional $25,000 in monthly base salary and a special award of restricted stock.

The Plan provides for the continuation of all compensation and benefit arrangements, including all employment, incentive, retirement, severance, indemnification and other agreements or arrangements in place, in each case as such arrangements may be amended in accordance with their terms, but excluding any equity-based arrangements, which will be terminated, and the provisions of the tax-qualified defined contribution plan pertaining to equity interest in Idearc will be removed from such plan.

Regardless of whether the Company decides to assume or reject any of the executive compensation agreements, which determination has not yet been made but will be made by the Company prior to or as of Confirmation, the Company does not believe that unsecured creditors will be materially affected.  If the agreements are assumed, there will be no Rejection Damages Claim to dilute returns to the Company's unsecured creditors in Class 4.  And, to the extent such agreements are rejected, resulting in an unsecured damages Claim, there will be no net savings to the Company as it would enter into new executive compensation arrangements to retain or engage management.

The Plan provides for a new equity incentive plan pursuant to which shares of New Common Stock will be reserved for grants of equity incentive awards for the management and key employees of the Reorganized Debtors (the "New Equity Incentive Plan").  The New Equity Incentive Plan may consist of incentive awards comprised of restricted stock, stock options, restricted stock units, stock appreciation rights and other customary equity based incentive awards of the New Common Stock.  Awards under the New Equity Incentive Plan will be allocated to management of the Company by the new Board of Directors of Reorganized Idearc (the "New Board").  The terms of the New Equity Incentive Plan will be set forth in a Plan Supplement and be subject to the approval of the New Board, which could provide that as much as 10% of the New Common Stock is reserved for distribution to management.  The Debtors believe that the New Equity Incentive Plan is in the best interests of the Debtors.

3.    *Employment Agreements*

In May 2008, Idearc entered into an employment agreement with Mr. Klein in connection with his appointment as its Chief Executive Officer.  The agreement has a three year term (with automatic annual renewals unless six months prior notice of nonrenewal is provided by either party) and provides for an annual base salary of not less than $1,000,000.  Mr. Klein is entitled to annual short-term and long-term incentive opportunities of at least 100% and 300%, respectively, of his annual base salary. Pursuant to his employment agreement, Mr. Klein also received a cash payment of $400,000 and an option to purchase 250,000 shares of Idearc's common stock upon the commencement of his employment.  Under the terms of his employment agreement, Mr. Klein received a short-term incentive payment in 2008 of $500,000.

Under his employment agreement, Mr. Klein is entitled to receive payments and other benefits upon the termination of his employment, which are outlined below.  Mr. Klein does not participate in, and is not entitled to receive any payments under, Idearc's executive transition plan.

The Company has not entered into any employment agreements with its other executive officers. This decision was based in part on the fact that the other executive officers are eligible to receive severance benefits and are subject to certain restrictive covenants under Idearc's executive transition plan.

4.    *Potential Benefits and Payments Upon Severance and Change in Control*

Idearc provides its executive officers with severance benefits in the event of a termination of employment without cause or in connection with a change in control of Idearc.  These types of benefits are provided to Mr. Klein, the Chief Executive Officer, pursuant to his employment agreement.  For the other executive officers, these benefits are provided pursuant to Idearc's executive transition plan.

*CEO Employment Agreement*.  Under his employment agreement, Mr. Klein is deemed to have been terminated without cause if he is terminated for any reason other than: (i) a felony conviction; (ii) fraud involving the Company; (iii) willful failure to carry out material employment responsibilities; (iv) behavior likely to have an adverse effect on the Company or Mr. Klein's ability to perform his employment responsibilities; or (v) a material violation of Company policy.  Mr. Klein is deemed to have terminated his employment for good reason if the termination follows: (a) a material reduction in duties and responsibilities; (b) the non-renewal by Idearc of the term of his employment agreement; (c) a reduction in base salary or target incentive opportunities; (d) a breach by Idearc of any of its material obligations under the employment agreement; (e) a required relocation of his principal place of employment of more than 50 miles; or (f) in connection with a change in control, a failure by the successor company to assume Idearc's obligations under his employment agreement.  For at least one year after a change in control, however, Mr. Klein will not have good reason to terminate his employment merely because he is no longer chief executive officer of a public company, provided that his operational duties and responsibilities are not materially diminished.

If Idearc terminates Mr. Klein's employment without cause during the period beginning six months prior to the date of a change in control and ending on the second anniversary of the change in control, or he terminates employment for good reason within two years after a change in control, then Mr. Klein is entitled to receive the payments and benefits described below, except that the amount of the pro rata short-term incentive award will be based on his target short-term incentive award for the year in which the termination occurs.  In the event a change in control occurs, all outstanding equity-based and other long-term incentive awards held by Mr. Klein will become vested in accordance with their terms or, if earlier, upon the termination of his employment after a change in control for any reason other than by Idearc (or successor company) for cause or by Mr. Klein without good reason.

Under the employment agreement, a change in control is defined as:

- the acquisition of 40% or more of Idearc's common stock, except in connection with a merger or consolidation where a majority of the directors of the surviving entity were directors of the company prior to the transaction;

- a change in a majority of the members of the board of directors, without the approval of the then incumbent members of the board;

- the completion of a merger or consolidation unless (i) a majority of the directors of the surviving entity were directors of Idearc prior to the transaction or (ii) the transaction is a recapitalization of Idearc in which no person, entity, or group beneficially owns 40% or more of the combined voting stock of the surviving entity;

- a sale of all or substantially all Idearc's assets unless the sale is to an entity in which Idearc's stockholders own at least 50% of the voting stock in substantially the same proportions as their ownership of the company immediately prior to the sale;

- stockholder approval of a complete liquidation or dissolution of Idearc; or

- any other event designated by the board of directors as a change in control or required to be reported as a change in control on a Form 8-K under the Exchange Act.

*Executive Transition Plan*.  Idearc's executive transition plan provides specified payments and other benefits to its executive officers, other than its Chief Executive Officer, in the event the officer's employment is terminated under the circumstances described below.  Idearc is not required to provide any payment or benefit under the executive transition plan that duplicates any payment or benefit that an executive officer is entitled to receive under any other Company compensation or benefit plan, award agreement, or other arrangement.

If Idearc terminates the employment of an executive officer without cause during the period beginning six months prior to the date of a change in control (or, if earlier, the date a definitive agreement is signed that would result in a change in control) and ending on the first anniversary of the change in control, or if an executive officer terminates employment for good reason within one year after a change in control, then the officer is entitled to receive the payments and benefits described below.

In the event a change in control occurs, all outstanding long-term incentive awards held by an executive officer will become fully vested if the officer is employed by Idearc immediately before the change in control occurs.  The payout under any performance-based award will equal the target amount. Under the executive transition plan, a change in control is defined in the same manner as in the employment agreement with Mr. Klein described above.

An executive officer is deemed to have terminated his or her employment for good reason if the termination follows: (i) a material reduction in duties and responsibilities; (ii) a reduction in base salary or target incentive opportunities; (iii) a required relocation of the covered executive officer's principal place of business of more than 50 miles; or (iv) in connection with a change in control, a failure by the successor company to assume the Company's obligations under the executive transition plan.

To the extent any change of control provision contained in any compensation or benefit agreements would be triggered solely as a result of the transactions required for the Plan to become effective, such agreements will not be assumed unless a waiver of the change of control provision is executed by the employee having the benefit of such change of control provision, which waiver will waive any change of control that might otherwise be triggered solely as a result of the transactions required for the Plan to become effective, but will provide that any such change of control provisions will otherwise remain in full force and effect, and therefore may be triggered as a result of any transactions that occur after the Effective Date.

The following tables summarize the compensation and other benefits that would have become payable to each of Idearc's named executive officers assuming their employment had terminated on December 31, 2008. In addition, the following tables summarize the compensation that would become payable to such named executive officers assuming that a change in control of Idearc had occurred on December 31, 2008.

**Scott W. Klein**
**Chief Executive Officer**

| Benefits and Payments | Voluntary Termination | Termination Without Cause or for Good Reason | Change in Control Only | Change in Control and Termination Without Cause or for Good Reason | Death | Disability |
|---|---|---|---|---|---|---|
| **Compensation** | | | | | | |
| Separation Benefits | $ — | $ 3,230,000 | $ — | $ 3,230,000 | $1,500,000 | $ 1,500,000 |
| Short-Term Incentive | — | 500,000 | — | 615,385 | — | — |
| Performance Share Units (2008) | — | 2,695 | — | 2,695 | 2,695 | 2,695 |
| Restricted Stock (2008) | — | 12,023 | — | 12,023 | 12,023 | 12,023 |
| Stock Options | — | — | — | — | — | — |
| | — | | | | | |
| **Benefits and Perquisites** | | | | | | |
| Health & Welfare Benefits | — | 21,521 | — | 21,521 | 21,521 | 21,521 |
| Life Insurance Program | — | — | — | — | — | — |
| Flexible Allowance | — | 52,800 | — | 52,800 | — | — |
| Financial Planning | — | 30,000 | — | 30,000 | — | — |
| Physical Examination | — | 4,000 | — | 4,000 | — | — |
| Outplacement Services | — | 9,500 | — | 9,500 | — | — |
| Excise Tax Gross-Up | — | — | — | — | — | — |
| **Totals:** | $ — | $ 3,862,539 | $ — | $ 3,977,924 | $1,536,239 | 1,536,239 |

**Samuel D. Jones**
**Executive Vice President - Chief Financial Officer and Treasurer**

| Benefits and Payments | Voluntary Termination | Termination Without Cause | Change in Control Only | Change in Control and Termination Without Cause or for Good Reason | Death | Disability |
|---|---|---|---|---|---|---|
| **Compensation** | | | | | | |
| Separation Benefits | $ — | $ 585,000 | $ — | $ 1,170,000 | $ 422,500 | $ 422,500 |
| Short-Term Incentive | — | 260,000 | — | 260,000 | — | — |
| Performance Share Units (2008) | — | 3,279 | 34,125 | 34,125 | 3,279 | 3,279 |
| Restricted Stock (2008) | — | 14,625 | 14,625 | 14,625 | 14,625 | 14,625 |
| Performance Units (2007) | — | — | 778 | 778 | — | — |
| Restricted Stock (2007) | — | 693 | 1,422 | 1,422 | 711 | — |
| **Benefits and Perquisites** | | | | | | |
| Health & Welfare Benefits | — | 8,192 | — | 16,384 | — | 16,384 |
| Life Insurance Program | — | — | — | — | — | — |
| Flexible Allowance | — | 15,600 | — | 31,200 | — | — |
| Financial Planning | — | 12,380 | — | 24,760 | — | — |
| Physical Examination | — | 2,000 | — | 4,000 | — | — |
| Outplacement Services | — | 9,500 | — | 9,500 | — | — |
| Excise Tax Gross-Up | — | — | — | 541,618 | — | — |
| **Totals:** | $ — | $ 911,269 | $ 50,950 | $ 2,108,412 | $ 441,115 | $ 456,788 |

**Frank P. Gatto**
**Executive Vice President – Operations**

| Benefits and Payments | Voluntary Termination | Termination Without Cause | Change in Control Only | Change in Control and Termination Without Cause or for Good Reason | Death | Disability |
|---|---|---|---|---|---|---|
| **Compensation** | | | | | | |
| Separation Benefits | $    — | $  693,000 | $ | $  1,386,000 | $  500,500 | $  500,500 |
| Short-Term Incentive | 308,000 | 308,000 | — | 308,000 | — | — |
| Performance Share Units (2008) | 515 | 515 | 5,359 | 5,359 | 515 | 515 |
| Restricted Stock (2008) | 2,297 | 2,297 | 2,297 | 2,297 | 2,297 | 2,297 |
| Special Restricted Stock (2008) | 7,836 | 7,836 | 7,836 | 7,836 | 7,836 | 7,836 |
| Performance Units (2007) | — | — | 1,574 | 1,574 | — | — |
| Restricted Stock (2007) | 1,517 | 1,480 | 3,035 | 3,035 | 1,517 | — |
| **Benefits and Perquisites** | | | | | | |
| Health & Welfare Benefits | 130,383 | 130,383 | — | 130,383 | — | 130,383 |
| Life Insurance Program | 162,142 | 162,142 | — | 162,142 | 3,150,000 | 162,142 |
| Flexible Allowance | — | 15,600 | — | 31,200 | — | — |
| Financial Planning | — | 12,380 | — | 24,760 | — | — |
| Physical Examination | — | 2,000 | — | 4,000 | — | — |
| Outplacement Services | — | 9,500 | — | 9,500 | — | — |
| Excise Tax Gross-Up | — | — | — | 596,398 | — | — |
| **Totals**: | $  612,690 | $1,345,133 | $  20,101 | $  2,672,484 | $  3,662,665 | $  803,673 |

**Scott B. Laver**
**Executive Vice President – Central**

| Benefits and Payments | Voluntary Termination | Termination Without Cause | Change in Control Only | Change in Control and Termination Without Cause or for Good Reason | Death | Disability |
|---|---|---|---|---|---|---|
| **Compensation** | | | | | | |
| Separation Benefits | $    — | $  765,000 | $ | $  1,530,000 | $  552,500 | $  552,500 |
| Short-Term Incentive | — | 340,000 | — | 340,000 | — | — |
| Performance Share Units (2008) | — | 625 | 6,508 | 6,508 | 625 | 625 |
| Restricted Stock (2008) | — | 2,789 | 2,789 | 2,789 | 2,789 | 2,789 |
| Performance Units (2007) | — | — | 1,558 | 1,558 | — | — |
| Restricted Stock (2007) | — | 1,480 | 3,035 | 3,035 | 1,517 | — |
| **Benefits and Perquisites** | | | | | | |
| Health & Welfare Benefits | — | 10,760 | — | 21,520 | — | 21,520 |
| Life Insurance Program | — | 233,580 | — | 233,580 | 3,825,000 | 233,580 |
| Flexible Allowance | — | 15,600 | — | 31,200 | — | — |
| Financial Planning | — | 12,380 | — | 24,760 | — | — |
| Physical Examination | — | 2,000 | — | 4,000 | — | — |
| Outplacement Services | — | 9,500 | — | 9,500 | — | — |
| Excise Tax Gross-Up | — | — | — | 713,597 | — | — |
| **Totals**: | $    — | $1,393,714 | $  13,890 | $  2,922,047 | $  4,382,431 | $  811,014 |

**Georgia R. Scaife**
**Executive Vice President – Human Resources and Employee Administration**

| Benefits and Payments | Voluntary Termination | Termination Without Cause | Change in Control Only | Change in Control and Termination Without Cause or for Good Reason | Death | Disability |
|---|---|---|---|---|---|---|
| **Compensation** | | | | | | |
| Separation Benefits | $ — | $ 585,000 | $ — | $ 1,170,000 | $ 422,500 | $ 422,500 |
| Short-Term Incentive | 260,000 | 260,000 | — | 260,000 | — | — |
| Performance Share Units (2008) | 1,316 | 1,316 | 13,698 | 13,698 | 1,316 | 1,316 |
| Restricted Stock (2008) | 5,871 | 5,871 | 5,871 | 5,871 | 5,871 | 5,871 |
| Performance Units (2007) | — | — | 1,067 | 1,067 | — | — |
| Restricted Stock (2007) | 711 | 693 | 1,422 | 1,422 | 711 | — |
| **Benefits and Perquisites** | | | | | | |
| Health & Welfare Benefits | 45,956 | 45,956 | — | 45,956 | — | 45,956 |
| Life Insurance Program | — | — | — | — | — | — |
| Flexible Allowance | — | 15,600 | — | 31,200 | — | — |
| Financial Planning | — | 12,380 | — | 24,760 | — | — |
| Physical Examination | — | 2,000 | — | 4,000 | — | — |
| Outplacement Services | — | 9,500 | — | 9,500 | — | — |
| Excise Tax Gross-Up | — | — | — | 489,528 | — | — |
| **Totals:** | $ 313,854 | $ 938,316 | $ 22,058 | $ 2,057,002 | $ 430,398 | $ 475,643 |

**Cody Wilbanks**
**Executive Vice President, General Counsel and Secretary**

| Benefits and Payments | Voluntary Termination | Termination Without Cause | Change in Control Only | Change in Control and Termination Without Cause or for Good Reason | Death | Disability |
|---|---|---|---|---|---|---|
| **Compensation** | | | | | | |
| Separation Benefits | $ — | $ 585,000 | $ — | $ 1,170,000 | $ 422,500 | $ 422,500 |
| Short-Term Incentive | 260,000 | 260,000 | — | 260,000 | — | — |
| Performance Share Units (2008) | 2,497 | 2,497 | 25,987 | 25,987 | 2,497 | 2,497 |
| Restricted Stock (2008) | 11,137 | 11,137 | 11,137 | 11,137 | 11,137 | 11,137 |
| Performance Units (2007) | — | — | 510 | 510 | — | — |
| Restricted Stock (2007) | 324 | 316 | 647 | 647 | 324 | — |
| **Benefits and Perquisites** | | | | | | |
| Health & Welfare Benefits | 74,444 | 74,444 | — | 74,444 | — | 74,444 |
| Life Insurance Program | — | — | — | — | — | — |
| Flexible Allowance | — | 15,600 | — | 31,200 | — | — |
| Financial Planning | — | 12,380 | — | 24,760 | — | — |
| Physical Examination | — | 2,000 | — | 4,000 | — | — |
| Outplacement Services | — | 9,500 | — | 9,500 | — | — |
| Excise Tax Gross-Up | — | — | — | 568,631 | — | — |
| **Totals:** | $ 348,402 | $ 972,874 | $ 38,281 | $ 2,180,816 | $ 436,458 | $510,578 |

Under the executive transition plan, the aggregate amounts of benefits and payments payable to all other senior executive officers, assuming all such other senior executive officers' employment had terminated on December 31, 2008 and a change in control occurred on December 31, 2008, are: (i) termination without cause - $3,615,449; (ii) change in control only - $50,288; (iii) change in control and termination without cause or for good reason - $6,170,273; (iv) death - $4,194,631; and (v) disability - $1,859,934.

5. *Executive Officers Post Confirmation*

The Plan provides that the officers of Idearc will serve in their same capacities after the Effective Date for Reorganized Idearc. In addition, the Plan also provides that the existing officers of the

Subsidiary Debtors will continue to serve in their same respective capacities after the Effective Date for the Reorganized Subsidiaries.

## T.    Board of Directors

Idearc's Board of Directors (the "Board" or "Board of Directors") oversees the Company's management, reviews its long-term strategy plans and exercises direct decision making authority in key areas.  The Board has three standing committees:  Audit Committee, Human Resources Committee and Nominating and Corporate Governance Committee.  Each Board committee operates under a written charter adopted by the Board.  All of the charters are available on Idearc's website at www.idearc.com. The Board is not classified, with all directors standing for re-election at each annual meeting of stockholders.

Additional information regarding Idearc's Board of Directors and its corporate governance is provided in Idearc's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, as amended, which was filed with the SEC and may be accessed on the SEC's website, www.sec.gov, or on Idearc's website, www.idearc.com.

1.    *Director Biographies*

Set forth below is information with respect to the members of Idearc's Board as of the date of this Disclosure Statement, all of whom are expected to serve during the pendency of the Chapter 11 Case.

*Donald B. Reed*, age 65, has served as a director of Idearc since November 2006 and as Chairman of the Board since April 2008.  He serves as chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.  Mr. Reed currently serves on the board of directors of CSG Systems International Inc. From May 2000 to January 2003, he served as chief executive officer of Cable and Wireless Global, or C&W, a unit of Cable & Wireless plc (UK). C&W provided Internet protocol and data services to business customers in the United States, Europe and Japan.  Mr. Reed served in various other executive positions at C&W from June 1998 to May 2000. He also served for 30 years in various executive positions at New England Telephone, NYNEX Corporation and Bell Atlantic Corporation, including as NYNEX's vice president of government affairs in Washington, D.C., vice president of NYNEX Human Resources, president of NYNEX Information Resources, the directory operations of NYNEX, and president and group executive of NYNEX Corporation.

*Stephen L. Robertson*, age 58, has served as a director of Idearc since November 2006.  He serves as the chair of the Human Resources Committee and as a member of the Audit Committee. Mr. Robertson is currently a business consultant.  Previously, he served as president of Convergys International, a unit of Convergys Corporation, from 2002 to 2005.  Convergys Corporation, or Convergys, is a global outsourcing solutions company.  Mr. Robertson also served as Convergys' executive vice president of operations from 2000 to 2002 and as Convergys' president of telecom solutions from 1996 to 2000.  In addition to his positions with Convergys, Mr. Robertson has held several other executive positions throughout his 32 years in the telecommunications and technology industries, including serving as chief executive officer of CBD, Inc., a directory publishing and media services company, from 1990 to 1995.  Mr. Robertson also successfully completed the Director Certification Program at the University of California-Los Angeles in May, 2007.

*Thomas S. Rogers*, age 55, has served as a director of Idearc since November 2006. He serves as a member of the Human Resources Committee and the Nominating and Corporate Governance Committee. Mr. Rogers currently serves as president and chief executive officer of TiVo Inc., a position he has held since July 2005. He also currently serves on the board of directors of TiVo Inc., a provider of television-based interactive and entertainment services. Mr. Rogers previously served as chairman of the board of Teleglobe International Holdings, Ltd., a provider of international voice, data, internet and mobile roaming services, from November 2004 to February 2006. He also has served as chairman of TRget Media LLC, a media industry investment and operations advisory firm, since July 2003. Mr. Rogers served as the senior operating executive for media and entertainment for Cerberus Capital Management, a large private equity firm, from 2004 to July 2005. Prior to holding that position, he served as chairman and chief executive officer of Primedia, Inc., a print, video and online media company, from October 1999 to April 2003. From January 1987 until October 1999, Mr. Rogers held positions with National Broadcast Company, Inc., including president of NBC Cable and executive vice president.

*Paul E. Weaver*, age 63, has served as a director of Idearc since December 2006. He serves as the chair of the Audit Committee and as a member of the Human Resources Committee. Mr. Weaver is a former Vice Chairman of PricewaterhouseCoopers, LLP. During his more than 30 years at PricewaterhouseCoopers, Mr. Weaver served as the lead partner on a number of the firm's largest global clients and held various management positions, including serving as vice chairman of the firm and chairman of the firm's global technology practice group for a number of years, focusing on the technology, infocomm, entertainment and media industries. Mr. Weaver currently serves as a director of AMN Healthcare Services Inc., and chairman of the board of the Ellis Island/Statue of Liberty Foundation, and serves on the Corporate Advisory Board of the University of Michigan Business School.

*Scott W. Klein*, age 52, has been Idearc's Chief Executive Officer and a Board member since June 2008. Mr. Klein previously served as an operating partner of Symphony Technology Group, a private investment firm, since November 1, 2007. From January 2004 to October 2007, Mr. Klein served as President and Chief Executive Officer of Information Resources, Inc., a provider of information solutions for the consumer packaged goods, retail and healthcare industries. Prior to joining Information Resources, Mr. Klein served as President, Consumer Industries, Retail & Energy Global Industry Group of Electronic Data Systems Corporation from July 2001 to January 2004. Mr. Klein also held management positions with PC Mall, Inc., PrimeSource Building Products, Inc., Guardian Purchasing Corp., PepsiCo, Inc. and The Procter & Gamble Company earlier in his career.

2. *Compensation of Directors*

The table below summarizes the components of cash compensation payable to Idearc's non-management directors for Board service during 2008. Idearc also reimburses directors for all expenses incurred in attending Board and committee meetings and Board related education or training programs. A director who is an employee of the Company does not receive additional compensation for serving as a director.

| Fee | Amount |
|---|---|
| Cash Retainer for Board service | $70,000 |
| Chairman of the Board | $70,000 |
| Audit Committee Chair | $15,000 |
| Human Resources Committee Chair | $15,000 |
| Nominating and Corporate Governance Committee Chair | $10,000 |
| Committee Meeting Fee | $1,500 |

Non-management directors also receive an annual restricted stock award equal to $90,000 divided by the closing price of Idearc's common stock on the grant date. The shares of restricted stock vest on the first anniversary of the grant. Non-management directors who join the Board also receive a one-time award of restricted stock valued at $85,000.

Except as otherwise indicated, the table below sets forth the compensation earned by Idearc's directors who served as non-management directors during 2008.

| Name | Fees Earned or Paid in Cash (1) | Stock Awards (2) | Total |
|---|---|---|---|
| Jonathan F. Miller[3] | $ 79,000 | $ 97,347 | $ 176,347 |
| Donald B. Reed | 148,750 | 127,180 | 275,930 |
| Stephen L. Robertson | 124,750 | 127,180 | 251,930 |
| Thomas S. Rogers | 79,000 | 127,180 | 206,180 |
| Paul E. Weaver | 122,500 | 127,180 | 249,680 |
| Jerry V. Elliott[3] | 112,000 | 127,180 | 239,180 |

_____

(1) Includes cash retainers for serving as chairman of the Board or as a committee chair in 2008 as follows: Mr. Reed: $52,500 as chairman of the Board, $7,500 as chair of the Nominating and Corporate Governance Committee and $3,750 as chair of the Human Resources Committee; Mr. Robertson: $11,250 as chair of the Human Resources Committee; and Mr. Weaver: $15,000 as chair of the Audit Committee.

(2) Represents the accounting expense recognized by Idearc in 2008 with respect to stock awards granted to the non-management directors in 2008 and 2007. The dollar amounts were computed in accordance with FAS 123R, as required by SEC regulations, and do not reflect the actual value that may be realized by the non-management directors. *See* note 14 to the consolidated financial statements in Idearc's annual report on Form 10-K, as amended, for the year ended December 31, 2008, for a description of the assumptions used in determining the accounting expense associated with these awards.

(3) Mr. Elliott resigned from the Board effective as of December 31, 2008 and Mr. Miller resigned from the Board effective as of March 27, 2009.

### 3. *Post Confirmation Board of Directors*

The New Board will consist of seven individuals, six of whom (including the chairman of the New Board) will be designated by representatives of holders of the Allowed Secured Credit Facility Claims and identified in the Plan Supplement. The chief executive officer of Reorganized Idearc will also be a member of the New Board. The New Board and committees of the New Board must satisfy the independence, financial literacy, and other requirements of applicable law and any securities exchange upon which the New Common Stock is listed. The election of the New Board will be approved by the Bankruptcy Court in the Confirmation Order. Thereafter, the New Board will be elected in accordance with the New Idearc Governing Documents.

The Plan also provides that the New Board will appoint the directors of the Subsidiary Debtors to serve as of the Effective Date until replaced or removed in accordance with the Reorganized Subsidiary Governing Documents.

## U.    Capital Structure

### 1.    *Postpetition Superpriority Secured Obligations*

The Bankruptcy Code requires the Debtors to satisfy their postpetition super-priority secured obligations at confirmation, unless otherwise agreed to in the Plan. The only postpetition super-priority secured obligation that the Debtors are aware of is the Administrative Agent's possible super-priority claim for any postpetition diminution in value of the collateral securing the Debtors' obligations under the Credit Agreement, as provided for in the Cash Collateral Order. Although this amount has not been established, the Debtors do not expect the amount of the Administrative Agent's super-priority claim to affect distributions to unsecured creditors since it would be payable by reducing the amount of the Distributable Cash available to holders of Class 3 Claims. However, to the extent the super-priority claim exceeds the amount of Distributable Cash, the Debtors may be unable to confirm the Plan.

### 2.    *Material Prepetition Secured Obligations*

As of the Petition Date, Idearc's liabilities include senior secured obligations arising under the Credit Agreement. The Subsidiary Debtors guarantee all obligations under the Credit Agreement. Idearc and the Subsidiary Debtors have pledged substantially all of their assets as collateral security for the obligations under the Credit Agreement, including Swap Obligations.

The credit facilities under the Credit Agreement aggregate $6.515 billion and consist of (i) a revolving credit facility in the amount of $250 million, (ii) a tranche A term loan facility in the amount of $1.515 billion, and (iii) a tranche B term loan facility in the amount of $4.750 billion. In addition, any Swap Obligations in which the counter-party is a Lender (or an affiliate of a Lender) are secured obligations under the Credit Agreement ranking pari passu with all revolving credit and term loan indebtedness thereunder. As of the Petition Date, not less than $6.419 billion in principal amount (plus not less than $42 million in accrued and unpaid interest) was outstanding under the Credit Agreement, prior to giving effect to payments made pursuant to the Cash Collateral Order. In addition, the aggregate Swap Obligations were approximately $550 million after giving effect to payments made pursuant to the Cash Collateral Order, and outstanding letters of credit were issued pursuant to the Credit Agreement for approximately $2.7 million.

Under the express terms of the Credit Agreement and the Swap Agreements, the filing of the Chapter 11 Case created an event of default.

The value of the assets pledged by the Debtors to secure the indebtedness outstanding under the Credit Agreement, including the Swap Obligations and letters of credit, is not sufficient to fully collateralize such outstanding obligations. Under the terms of the Plan, the obligations under the Credit Agreement, the Swap Agreements or the Guarantee and Collateral Agreement that are fully collateralized by the assets of the Debtors are Secured Credit Facility Claims under the Plan in Class 3.

### 3.    *Material Prepetition Unsecured Obligations*

Idearc issued $2.850 billion in principal amount of Unsecured Notes, bearing interest at 8% per annum, pursuant to an indenture dated as of November 17, 2006, with U.S. Bank National Association,

as trustee, and the Subsidiary Debtors as guarantors (the "Indenture"). The Unsecured Notes mature in 2016 and require semi-annual interest-only payments until maturity.

Under the express terms of the Indenture, the filing of the Chapter 11 Case created an event of default. The Unsecured Notes are unsecured obligations that are treated as Unsecured Note Claims under the Plan in Class 4.

The Credit Facility Claims, which are all Claims arising under the Credit Agreement, including Swap Obligations, that are not secured by the assets of the Debtors, are Unsecured Credit Facility Claims under the Plan in Class 4.

Other unsecured obligations owed by the Debtors include, without limitation, claims of the Company's vendors and suppliers, contract and lease parties, employees, shippers, contractors, utility companies, consultants, providers of business services, credit card companies, healthcare providers, litigation claimants, and holders of Rejection Damages Claims. These unsecured obligations are General Unsecured Claims included in Class 4 under the Plan together with the Unsecured Note Claims and Unsecured Credit Facility Claims, unless the holders of these General Unsecured Claims or Unsecured Note Claims have elected for such Claims to be classified as a Convenience Claim in Class 5 under the Plan.

4.      *Intercompany Claims*

In settlement and compromise of certain existing and potential disputes regarding intercompany Claims and related matters, pursuant to Sections 1123(b)(3) and (6) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan treats the Debtors as comprising a single Estate solely for purposes of voting on the Plan (except as set forth in Section 4.6 of the Plan), confirmation of the Plan and making distributions in respect of Allowed Claims against the Debtors under the Plan. Such settlement and compromise will not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any Assets and, except as otherwise provided by or permitted in the Plan, all Debtors will continue to exist as separate legal entities.

Reorganized Idearc will continue to own directly and indirectly 100% of the stock of its subsidiaries, the other Debtors. Therefore, any positive or negative effect from the forgiveness of intercompany Claims, while it may inure to the benefit or detriment of a particular Subsidiary Debtor, would have no net effect on Idearc. Thus, the cancellation of intercompany Claims results in no net positive or negative effect on the holders of unsecured Claims in Class 4 who will receive distributions of Idearc stock in payment of their Claims regardless of which subsidiary is alleged to owe the claim. All of the Subsidiary Debtors are guarantors of the Credit Facility Claims and have pledged substantially all of their assets to secure the Credit Facility Claims. Therefore, the Debtors believe that no holder of any unsecured Claims against any Subsidiary Debtor would receive any greater distribution from the Subsidiary Debtors if the Subsidiary Debtors' petitions for relief under the Bankruptcy Code were separately administered.

The amount of intercompany Claims as of March 31, 2009, was as follows:

Intercompany Receivables and Payables

As Of March 31, 2009

(in millions)

| Party | Counterparty | Accounts Receivable | Notes Receivable | Accounts Payable | Notes Payable | Total Net Receivable (Payable) |
|---|---|---|---|---|---|---|
| Idearc Media Sales East Co. | Idearc Media LLC | $ 16.30 | $ - | $ - | $ (22.0) | $ (5.7) |
| Idearc Media Sales East Co. | Idearc Media Services - West Inc. | | | | | - |
| Idearc Media Sales East Co. | Idearc Media Sales - West Inc. | | | | | - |
| Idearc Media Sales East Co. | Idearc Media Services - East Inc. | | | | | - |
| Idearc Media LLC | Idearc Media Sales East Co. | | 22.0 | (16.3) | | 5.7 |
| Idearc Media LLC | Idearc Media Services - West Inc. | 17.5 | | | (25.4) | (7.9) |
| Idearc Media LLC | Idearc Media Sales - West Inc. | | 67.0 | (11.8) | | 55.2 |
| Idearc Media LLC | Idearc Media Services - East Inc. | | | (10.5) | (73.1) | (83.6) |
| Idearc Media LLC | Idearc Media Sales East LLC | (0.3) | | 0.3 | (27.9) | (27.9) |
| Idearc Media LLC | Idearc Inc. | | | (4.1) | (26.2) | (30.3) |
| Idearc Media Services - West Inc. | Idearc Media Sales East Co. | | | | | - |
| Idearc Media Services - West Inc. | Idearc Media LLC | | 25.4 | (17.5) | | 7.9 |
| Idearc Media Services - West Inc. | Idearc Media Sales - West Inc. | (0.7) | | | | (0.7) |
| Idearc Media Services - West Inc. | Idearc Media Services - East Inc. | 38.2 | | | | 38.2 |
| Idearc Media Sales - West Inc. | Idearc Media Sales East Co. | | | | | - |
| Idearc Media Sales - West Inc. | Idearc Media LLC | 11.8 | | | (67.0) | (55.2) |
| Idearc Media Sales - West Inc. | Idearc Media Services - West Inc. | | | (0.7) | | (0.7) |
| Idearc Media Sales - West Inc. | Idearc Media Services - East Inc. | | | (0.1) | | (0.1) |
| Idearc Media Services - East Inc. | Idearc Media Sales East Co. | | | | | - |
| Idearc Media Services - East Inc. | Idearc Media LLC | 10.5 | 73.1 | | | 83.6 |
| Idearc Media Services - East Inc. | Idearc Media Services - West Inc. | | | (38.2) | | (38.2) |
| Idearc Media Services - East Inc. | Idearc Media Sales - West Inc. | 0.1 | | | | 0.1 |
| Idearc Media Sales East LLC | Idearc Media LLC | (0.3) | 27.9 | 0.3 | | 27.9 |
| Idearc Inc. | Idearc Media LLC | 4.1 | 26.2 | | | 30.3 |
| | | $ 98.6 | $ 241.6 | $ (98.6) | $ (241.6) | $ - |

Notes: The schedule above reflects all intercompany accounts receivable, notes receivable, accounts payable and notes payable balances between and among the Debtors as of March 31, 2009. A net negative number in the "Total Net Receivable/(Payable)" column means that the entity in the "Party" column owes that amount to the entity in the "Counterparty" column. A net positive number in the "Total net Receivable/(Payable)" column means that the entity in the "Party" column has a receivable/is owed that amount from the entity in the "Counterparty" column.

As a result of such settlement and compromise, intercompany Claims between and among the Debtors will, solely for purposes of receiving distributions under the Plan, be deemed resolved under the Plan and therefore neither entitled to vote on the Plan nor to receive any distributions under the Plan. Notwithstanding the treatment provided under the Plan, the Plan permits the Debtors to otherwise restructure, in their discretion, intercompany Claims for all other purposes other than for the making of Plan Distributions. For example, the Debtors may designate that a Claim owed by one Debtor to another Debtor will not constitute an intercompany Claim. Consequently, the Claim will not be deemed satisfied in full (or in part) under or pursuant to the Plan, but will remain a valid and enforceable Claim against the applicable Debtor. Notwithstanding the fact that a Debtor's Claim against another Debtor will remain a valid and enforceable Claim, the Debtor holding the Claim will not be entitled to vote on the Plan on account of the Claim.

Many courts have confirmed plans that "substantively consolidate" debtors for purposes of voting on, confirming, and making distributions under a chapter 11 plan of reorganization while providing for the continued separate existence of the debtors. See, e.g., In re Mirant, Case No. 03-46590 (Bankr. N.D. Tex. Dec. 9, 2005); In re Magnatrax Corp., Case No. 03-11402 (Bankr. D. Del. Nov. 17, 2003); In re Standard Brands Paint Co., 154 B.R. 563 (Bankr. C.D. Cal. 1993) (noting that there is a distinction between the legal merger of two corporations and the merger of their bankruptcy estates and stating that "[t]he cases and the [Bankruptcy] Code do not state that in substantive consolidation the debtor corporations cannot keep their charters and continue operating as separate corporations."); In re Genesis Health Ventures, Inc., 280 B.R. 95, 98 (Bankr. D. Del. 2002), aff'd, 2005 WL 729031 (3d Cir. 2005) (noting that the plan, by consolidating two debtor groups for purposes of voting and distribution under the plan, "did not change the legal and organizational structure of the individual debtors"); Packaging Indus. Group, Inc. v. Dennison Mfg. Co., Inc. (In re Sentinel Products Corp., PI), 192 B.R. 41, 46 (N.D.N.Y. 1996) (noting that plan confirmed by bankruptcy court provided for the substantive consolidation of the debtors for purposes of the treatment of claims under the plan while providing that the debtors would continue to maintain their separate corporate existences).

The Third Circuit's ruling in In re Owens Corning, 419 F.3d 195 (3rd Cir. 2005), though not binding on the Bankruptcy Court, calls into question the power of the courts to implement substantive consolidation. The Debtors believe that the resolution of intercompany issues and the grouping of the Debtors into one group does not constitute formal substantive consolidation similar to that which was addressed by the Owens Corning decision. Accordingly, to simplify matters and to avoid the potential confusion and complexity of prolonged substantive consolidation litigation in the face of potential and anticipated objections to confirmation, including in light of the Owens Corning decision, the Debtors are not pursuing formal substantive consolidation through the Plan, and instead have replaced such provisions with the settlement described herein. Nevertheless, the principles announced by courts in their assessment of substantive consolidation may be relevant to the Bankruptcy Court's consideration of the proposed settlement of inter-Debtor matters as contemplated by the Plan. To the extent the Bankruptcy Court, however, determines that the Plan does in fact constitute a formal substantive consolidation or that a showing of substantive consolidation is necessary to confirm the Plan, the Debtors reserve the right to make such showing and to seek to substantively consolidate the Debtors in a manner consistent with the settlement and compromise set forth herein.

5. *Litigation Claims*

As a result of the filing of the Chapter 11 Case, with certain exceptions or unless otherwise ordered by the Court, litigation claims and causes of action are subject to the automatic stay of the Bankruptcy Court. The automatic stay prevents parties from pursuing any prepetition claims and lawsuits. All liabilities alleged against any Debtor in such claims and lawsuits will be treated under the

Plan as General Unsecured Claims, unless the holder thereof otherwise elects to have such Claims classified as a Convenience Claim. Claims and lawsuits based upon liabilities arising after the Petition Date generally are not subject to the automatic stay.

6. *Prepetition Equity*

Idearc had approximately 148,157,618 shares of common stock, $.01 par value per share, outstanding as of May 8, 2009, held by approximately 436,758 record holders.

Beginning in November 2006 after the spin-off from Verizon, Idearc's common stock traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "IAR."

As a result of Idearc's failure to maintain certain continued listing standards on the NYSE, Idearc's common stock was suspended from trading on the NYSE on November 20, 2008. The NYSE removed the common stock from listing and registration on the NYSE due to the Company's low market capitalization and because the share price had fallen below the NYSE's continued listing standard for average closing price (less than $1.00 per share) over a consecutive 30 day trading period. Due to the NYSE's delisting of Idearc's common stock, the common stock is quoted over-the-counter under the symbol "IDAR."

The following table sets forth for the periods indicated, the highest and lowest sales price for Idearc's common stock, as reported on the NYSE for the periods through November 20, 2008 and the quarterly high and low bid quotations for Idearc's common stock as reported on the Pink Sheets for the period beginning November 21, 2008.

| | High | Low | Per Share Cash Dividend |
|---|---|---|---|
| **2009** | | | |
| Second Quarter | $0.07 | $0.02 | $0.00 |
| First Quarter | $0.12 | $0.02 | $0.00 |
| | | | |
| **2008** | | | |
| Fourth Quarter | $1.23 | $0.02 | $0.00 |
| Third Quarter | $2.37 | $0.86 | $0.00 |
| Second Quarter | $6.03 | $2.22 | $0.00 |
| First Quarter | $17.74 | $3.40 | $0.3425 |
| | | | |
| **2007** | | | |
| Fourth Quarter | $32.52 | $16.27 | $0.3425 |
| Third Quarter | $38.00 | $29.50 | $0.3425 |
| Second Quarter | $38.00 | $33.61 | $0.3425 |
| First Quarter | $36.18 | $28.00 | $0.3425 |

Under the Plan, Idearc's outstanding common stock will be cancelled and no distributions will be made to holders of the common stock. Idearc's outstanding common stock is treated as Idearc Interests in Class 7 under the Plan.

## V.   Website Information

Idearc's corporate website is located at www.idearc.com. Idearc makes its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and other reports filed or furnished with the SEC, including amendments to those reports, available free of charge through its

website as soon as reasonably practicable after Idearc electronically files the reports with, or furnishes them to, the SEC. Copies of all of Idearc's recent press releases are also included on its website. Idearc's website also contains important information regarding its corporate governance practices, including its corporate governance guidelines, code of conduct and charters for the committees of the Board of Directors. In addition, the SEC maintains a website, www.sec.gov, which contains reports, proxy and information statements, and other information that Idearc files with the SEC.

# V.  CHAPTER 11 CASE

## A.    Events Leading to Commencement of the Chapter 11 Case

Idearc began operations as an independent, public company on November 17, 2006 when the Company was spun-off from Verizon. In connection with the spin-off transaction, the Debtors recorded approximately $9.115 billion of debt. The Debtors' outstanding debt consisted of senior secured facilities and senior unsecured notes totaling $9.267 billion at December 31, 2008. The senior secured facilities consist of the following under the Credit Agreement: (i) a tranche A term loan facility of $1.515 billion, (ii) a tranche B term loan facility of $4.655 billion, and (iii) a revolving credit facility with $247 million of outstanding principal amount and approximately $2.7 million in outstanding letters of credit. As of March 31, 2009, the outstanding Unsecured Notes totaled $2.850 billion and the aggregate Swap Obligations totaled an additional $572 million.

The prolonged economic downturn facing the United States economy has adversely affected the Debtors' business given that substantially all of their net revenues are derived from the sale of advertising. Expenditures by advertising companies are particularly sensitive to economic conditions and tend to decline in a recession or economic uncertainty. Moreover, the Debtors' economic hardships have been compounded by slowed growth in major economies as a result of declining business and consumer confidence.

The Debtors' operations have also been adversely impacted by the highly competitive directory advertising industry in the United States. The Debtors compete with many different advertising media, including newspapers, radio, television, the Internet, billboards, direct mail, telemarketing and other yellow pages directory publishers. The Debtors compete with Yellowbook in the majority of their markets, and to a lesser extent AT&T, R.H. Donnelley and White Publishing. This competition has negatively affected the Debtors on cost per reference, quality, features, usage leadership and distribution.

Declining use of print yellow page directories has also adversely affected the Debtors' business. Overall references to print yellow pages directories in the United States declined from 14.5 billion in 2005 to 12.3 billion in 2008 according to the YPA Industry Usage Study. This decline can be attributed to increased use of Internet search providers, particularly in business-to-business and retail categories, as well as the proliferation of very large retail stores for which consumers and businesses may not reference the yellow pages.

The audited consolidated financial statements of Idearc for the fiscal year ending December 31, 2008 included a Report of Independent Registered Public Accounting Firm that raised doubts about Idearc's ability to continue as a going concern, resulting in a default under the Credit Agreement. In addition, on March 31, 2009, Idearc failed to make scheduled payments under the Credit Agreement of approximately $69 million in interest and approximately $30 million in principal, resulting in an additional default under the Credit Agreement. Upon an event of default, the Lenders could have declared the total debt outstanding under the Credit Agreement to be due and payable. If the Lenders

had declared the outstanding debt under the Credit Agreement to be due and payable, the Unsecured Notes and the Swap Obligations would also have become due and payable. Idearc would not have had sufficient liquidity to satisfy its debt obligations.

Idearc evaluated various options for restructuring its balance sheet and debt service obligations to create a capital structure that would permit the Company to remain a going concern. Idearc considered various opportunities to strengthen its balance sheet and risk profile. Idearc concluded that any restructuring would likely result in (i) holders of the common stock of Idearc receiving little or no value for their holdings; (ii) a substantial reduction in the principal amount and modification of the terms of debt outstanding under the Credit Agreement and the Unsecured Notes; and (iii) holders of the Company's indebtedness receiving a significant equity interest in Idearc. Prior to the Petition Date, Idearc held discussions with the Administrative Agent and a steering committee of Lenders regarding these restructuring options and reached an agreement in principle to provide liquidity during the course of the Chapter 11 Case and for an acceptable level of term debt upon emergence from the Chapter 11 proceeding.

Subsequent to the Petition Date, the economic downturn continued to adversely affect Idearc as advertising revenues declined further. Idearc concluded that the level of term debt should be lower than the amount originally agreed to in principle with the Administrative Agent and the steering committee of Lenders. After further discussions with the Administrative Agent, the steering committee of Lenders and the Creditors Committee in the Chapter 11 Case, the Company reached an agreement in principle with the Administrative Agent and the steering committee of Lenders on a revised level and terms of debt upon emergence of the Chapter 11 proceeding, which agreement is as set forth in this Disclosure Statement.

## B.     Continuation of Business; Stay of Litigation

On March 31, 2009, the Debtors commenced the Chapter 11 Case by filing petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The Debtors continue to operate as debtor-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties in the ordinary course, with transactions outside of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Chapter 11 Case was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of Liens against property of the Debtors, and the continuation of litigation against the Debtors. The filing of the Chapter 11 Case provides the Debtors with the financial "flexibility" necessary in order to allow the Debtors the ability to effectuate a reorganization of their businesses while simultaneously preventing Creditors from obtaining or pursuing an unfair recovery advantage during the pendency of the Chapter 11 Case.

## C.     Retention of Professionals

The Debtors are represented in the Chapter 11 Case by Fulbright & Jaworski L.L.P. as bankruptcy counsel and Diamond McCarthy, LLP as special and conflicts counsel. In addition, the Debtors have retained the financial advisory and investment banking services of Moelis & Company, LLC, the financial advisory services of Grant Thornton LLC, and noticing and claim agent services of Kurtzman Carson Consultants LLC. The Debtors have also retained Russell Reynolds Associates, Inc. as search advisors for members of the Board of Directors upon emergence from the Chapter 11 Case and

Ernst & Young LLP to provide certain audit and tax services. The Debtors have also retained a number of other professional firms to assist them in the ordinary course of their businesses.

## D.  Postpetition Funding

On the Petition Date the Debtors maintained more than $668 million of Cash on hand. The Debtors believed and acknowledged that such sums were encumbered by the Liens of the holders of the Secured Credit Facility Claims. On April 1, 2009 and April 29, 2009, the Bankruptcy Court entered the interim order and a final Cash Collateral Order, respectively. Since those dates and pursuant to those orders, the Debtors have operated their businesses through the use of such Cash collateral.

On July 6, 2009, MatlinPatterson filed a motion seeking reconsideration of the final Cash Collateral Order (the "MatlinPatterson Reconsideration Motion"). On July 8, 2009, the Creditors Committee filed a motion seeking reconsideration of the final Cash Collateral Order (the "Committee Reconsideration Motion"). On July 9, 2009, Sean Ryan filed a motion seeking reconsideration of the final Cash Collateral Order (the "Ryan Reconsideration Motion", and together with the MatlinPatterson Reconsideration Motion and the Committee Reconsideration Motion, the "Reconsideration Motions"). The Reconsideration Motions challenge the findings in the final Cash Collateral Order that the Lenders have liens on substantially all of the Debtors' assets. These are the same arguments raised by the Creditors Committee in the Committee Litigation and by MatlinPatterson in the MatlinPatterson Litigation. *See* Article IV.Q.6 entitled "Legal Proceedings – Valuation Adversary Proceedings."

On August 5, 2009, the Debtors, the Creditors' Committee and the Administrative Agent filed a motion seeking authority to enter into a stipulation, pursuant to which, among other things, the Creditors Committee agreed to withdraw the Committee Reconsideration Motion with prejudice. The stipulation does not seek to waive claims the Debtors' estates may have against Verizon arising out of the spin-off. The MatlinPatterson Reconsideration Motion and the Ryan Reconsideration Motion have not been set for hearing.

## VI.  SUMMARY OF THE PLAN OF REORGANIZATION

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS INCLUDED IN THIS DISCLOSURE STATEMENT AS APPENDIX A, AND TO THE APPENDICES AND EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE

STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A.    Overall Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and stockholders.  Upon the filing of a petition for relief under Chapter 11, Section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 Case.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 Case.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor of, or equity security holder in, the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The Plan treats the Debtors as comprising a single Estate solely for purposes of voting on the Plan, confirmation of the Plan and making distributions in respect of Allowed Claims against the Debtors under the Plan.  The Chapter 11 Case will not affect any Debtor's status as a separate legal entity or except as otherwise provided or permitted by the Plan, change the organizational structure of the Debtors' business enterprise.

The terms of the Debtors' Plan are based upon, among other things, the Debtors' assessment of their ability to achieve the goals of their business plan, make the distributions contemplated under the Plan, and pay their continuing obligations in the ordinary course of their businesses.  Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria.

If the Plan is confirmed by the Bankruptcy Court and consummated, (i) Claims in certain Classes will be reinstated or receive distributions equal to the full amount of such Claims, (ii) Claims in certain other Classes will receive partial recovery on such Claims, and (iii) Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests.  On the Effective Date and at certain times thereafter, the Reorganized Debtors will distribute Cash, New Common Stock, New Term Loans, and other property in respect of certain Classes of Claims as provided in the Plan.  The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan are described below.

## B.    Reorganized Capital Structure Created by the Plan

The Plan sets forth the capital structure for the Reorganized Debtors upon their emergence from Chapter 11, which is summarized as follows:

- *New Term Loans.*  The Reorganized Idearc will authorize the New Term Loans issued by Reorganized Idearc pursuant to the New Term Loan Agreement.  On the Effective Date, the Reorganized Debtors and holders of Allowed Secured Credit Facility Claims will become parties to and bound by the New Term Loan Agreement, regardless of whether any such party executes the New Term Loan Agreement.  The New Term Loans will be in an aggregate principal amount equal to $2.75 billion and will mature on the sixth year anniversary of the Effective Date.  The New Term Loans will bear interest at an annual rate of LIBOR (to be defined in the New Term Loan Agreement) plus 800 basis points with a LIBOR floor of 3.0%.  If on or any time after the first year anniversary of the issuance of the New Term Loans, Reorganized Idearc has a fixed charge coverage ratio (to be defined in the New Loan Agreement) of less than 1.25:1.00, then for the remaining term of the New Term Loans Reorganized Idearc will have the option to pay up to 250 basis points of the 800 basis points spread over LIBOR in kind, with the balance payable in cash.  The New Loans will be guaranteed by all domestic subsidiaries of Reorganized Idearc, including the Reorganized Debtors, and will be secured by substantially all of the assets (including Cash) of the Reorganized Debtors.  The New Term Loan Agreement will provide for no mandatory amortization of the New Term Loans, but will provide for an annual cash flow sweep equal to 67.5% of free cash flow.  Reorganized Idearc will have the right to make open market purchases of a certain amount of New Term Loans, subject to terms and conditions that will be set forth in the New Term Loan Agreement. The Debtors will use reasonable best efforts to obtain ratings on the New Term Loans from two out of three of Moody's, Standard & Poor's and Fitch.  The material terms and conditions of the New Term Loans will be set forth in the New Term Loan Agreement, which will be filed with the Plan Supplement.

  Any refinancing of the New Term Loans would be an event that could occur several years in the future, and as such, it is difficult to predict whether there could be a refinancing, and no assurances can be given that such new term loans will be refinanced.

- *Reorganized Idearc Equity Ownership.*  Reorganized Idearc will (i) issue on the Effective Date shares of New Common Stock for distribution to holders of Allowed Secured Credit Facility Claims, which shares will represent [95]% of the New Common Stock to be issued and outstanding on the Effective Date; and (ii) issue on the Effective Date shares of New Common Stock for distribution to holders of Allowed Unsecured Note Claims, Allowed Unsecured Credit Facility Claims and Allowed General Unsecured Claims, which shares will represent [5]% of the New Common Stock to be issued and outstanding on the Effective Date.

- *New Equity Incentive Plan.*  Reorganized Idearc will reserve shares of New Common Stock (excluding shares that may be issuable as a result of the anti-dilution provisions thereof) for distributions of equity incentive awards to be granted under the New Equity Incentive Plan, which number of shares will represent up to 10% of the New Common Stock to be issued and outstanding on the Effective Date.

- *Reorganized Subsidiaries Equity Ownership.*  The corporate organizational structure of the Debtors and direct and indirect ownership of the Subsidiary Debtors will remain the same as before the Effective Dates, with Reorganized Idearc directly or indirectly owning all of the Reorganized Subsidiaries for the benefit of the holders of the New Common Stock.

**C.      Classification and Treatment of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than Administrative Claims, Priority Tax Claims and Secured Tax Claims, which, pursuant to Section 1123(a)(l), do not need to be classified).  The Debtors also are required, under Section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtors into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtors' classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtors intend, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtors believe that the consideration, if any, provided under the Plan to holders of Claims and Interests reflects an appropriate resolution of their Claims and Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Interests and the fair value of the Debtors' assets.  In view of the deemed rejection by Classes 6 and 7, however, as set forth below, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.  In addition, the Debtors are prepared to request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.  In addition, the Debtors are prepared to request confirmation of the Plan under Section 1129(b) with respect to Class 4, if Class 4, voting as a Class, rejects the Plan.  Specifically, Section 1129(b) of the Bankruptcy Code permits confirmation of a Chapter 11 plan in certain circumstances even if the plan has not been accepted by all impaired classes of claims and interests.  *See* Article X.G entitled "Confirmation Without Acceptance of All Impaired Classes: The 'Cramdown' Alternative."  Although the Debtors believe that the Plan can be confirmed under Section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

1.      *Treatment of Unclassified Claims under the Plan*

(a)      Administrative Claims

An Administrative Claim is defined in the Plan as a Claim for payment of an administrative expense of a kind specified in Sections 503(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to Section 507(a)(2) of the Bankruptcy Code, including, but not limited to, (i) the actual, necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors, including, without limitation, wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (ii) Professional Fee Claims; (iii) Substantial Contribution Claims; (iv) all fees and charges assessed against the Estates under Section

1930 of Title 28 of the United States Code; and (v) payments to Cure contracts and leases that are assumed under Section 365 of the Bankruptcy Code.

Under the Plan, except as otherwise provided for in Section 10.1 of the Plan, on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date such Administrative Claim becomes an Allowed Administrative Claim, or (c) the date such Administrative Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Administrative Claim, the holder of each such Allowed Administrative Claim will receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim or (ii) such different treatment to which the applicable Debtor and such holder agrees in writing; *provided*, *however*, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Case will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

The Plan provides that all final requests for payment of Professional Fee Claims and Substantial Contribution Claims must be filed and served on the Reorganized Debtors, their counsel, counsel to the Administrative Agent and other necessary parties in interest no later than 60 days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such requests for payment must be filed and served on the Reorganized Debtors, their counsel, counsel to the Administrative Agent, other necessary parties in interest and the requesting Professional or other entity no later than 20 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for payment was served.

In addition, on the Effective Date, the Reorganized Debtors will pay the Indenture Trustee Expenses without the need for the Indenture Trustee to file an application or otherwise seek Bankruptcy Court approval for the payment of the Indenture Trustee Expenses.

(b)     Priority Tax Claims and Secured Tax Claims

The Plan defines Priority Tax Claims as Claims and Secured Tax Claims entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. Such Claims include Claims of governmental units for taxes owed by the Debtors that are entitled to a certain priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (i) taxes on or measured by income or gross receipts that meet the requirements set forth in Section 507(a)(8)(A) of the Bankruptcy Code, (ii) property taxes meeting the requirements of Section 507(a)(8)(B) of the Bankruptcy Code, (iii) taxes that were required to be collected or withheld by the Debtors and for which the Debtors are liable in any capacity as described in Section 507(a)(8)(C) of the Bankruptcy Code, (iv) employment taxes on wages, salaries, or commissions that are entitled to priority pursuant to Section 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of Section 507(a)(8)(D), (v) excise taxes of the kind specified in Section 507(a)(8)(E) of the Bankruptcy Code, (vi) customs duties arising out of the importation of merchandise that meet the requirements of Section 507(a)(8)(F) of the Bankruptcy Code, and (vii) penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in Section 507(a)(8)(G) of the Bankruptcy Code.

Under the Plan, each holder of an Allowed Priority Tax Claim or a Secured Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Claim, as will have been determined by the Debtors in their sole discretion, either (i) regular installments payable in Cash, over a period not exceeding five years after the Petition Date, having a total value, as of the Effective Date Allowed amount of such Claim; (ii) such different treatment as to

which the applicable Debtor and such holder have agreed in writing; provided, that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors after the Effective Date) than the treatment set forth in clause (i) above; or (iii) payment in full in Cash on the later of the Effective Date or the date on which such Claim becomes an Allowed Claim.

Under the Plan, all penalties relating to any of the taxes set forth in Sections 507(a)(8)(A) through 507(a)(8)(F) of the Bankruptcy Code are deemed to not be in compensation for actual pecuniary loss and thus disallowed as either a Priority Tax Claim or a Secured Tax Claim. Therefore, each holder of an Allowed Priority Tax Claim or Allowed Secured Tax Claim will not receive any Cash or other distribution on account of a penalty on, with respect to, or arising in connection with, such Allowed Priority Tax Claims or Allowed Secured Tax Claims. All penalties on, with respect to, or arising in connection with, any Priority Tax Claim or Secured Tax Claim will be treated as Class 4 General Unsecured Claims.

2.     *Treatment of Classified Claims and Interests under the Plan*

(a)     Class 1: Other Priority Claims

The Plan defines Other Priority Claims as Claims against any of the Debtors entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim, Secured Tax Claims, or an Administrative Claim.

The Plan provides that on, or as soon as reasonably practicable after, the latest of (i) the Distribution Date, (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) the date on which such Allowed Other Priority Claim becomes payable pursuant to any agreement between a Debtor and the holder of such Other Priority Claim, each holder of an Allowed Other Priority Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, either (a) Cash equal to the unpaid portion of such Allowed Other Priority Claim or (b) such different treatment as to which the applicable Debtor and such holder agrees in writing; provided, that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors after the Effective Date) than the treatment set forth in clause (a) above.

Other Priority Claims are not Impaired under the Plan.

(b)     Class 2: Other Secured Claims

The Plan defines Other Secured Claims as Secured Claims arising prior to the Petition Date against any of the Debtors, other than a Secured Credit Facility Claim. A Secured Claim is a Claim (i) that is secured by a Lien on property in which an Estate has an interest, which lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law, or a Claim that is subject to a valid right of setoff; (ii) to the extent of the value of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to a valid right of setoff, as applicable; and (iii) the amount of which is agreed upon in writing by the Debtors or the Reorganized Debtors and the holder of such Claim or determined, resolved, or adjudicated by final, nonappealable order of a court or other tribunal of competent jurisdiction.

The Plan provides that at the election of the Debtors, either (i) the legal, equitable, and contractual rights of each holder of an Other Secured Claim will be Reinstated, or (ii) each holder of an Other Secured Claim will receive treatment so as to render Unimpaired such Other Secured Claim.

As used in the Plan, Reinstated means (i) leaving unaltered the legal, equitable, and contractual rights to which the holder of a Claim or Interest is entitled so as to leave such Claim unimpaired in accordance with Section 1124 of the Bankruptcy Code; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default, (A) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, or of a kind that Section 365(b)(2) expressly does not require to be cured, (B) reinstating the maturity of such Claim or Interest as such maturity existed before such default, (C) compensating the holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, (D) if such Claim or Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Section 365(b)(l)(A) of the Bankruptcy Code, compensating the holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure, and (E) not otherwise altering the legal, equitable, or contractual rights to which the holder of such Claim or Interest is entitled; *provided*, *however*, that any Claim that is Reinstated under the Plan will be subject to all limitations set forth in the Bankruptcy Code, including, in particular, Sections 502 and 510.

As used in the Plan, Unimpaired means, with respect to any Claim, that such Claim is not impaired within the meaning of Section 1124 of the Bankruptcy Code.

The Plan further provides that notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all prepetition Liens on property of any Debtor held with respect to an Allowed Other Secured Claim will survive the Effective Date and continue in accordance with the contractual terms or statutory provisions governing such Allowed Other Secured Claim until such Allowed Other Secured Claim is satisfied, at which time such Liens will be released, will be deemed null and void, and will be unenforceable for all purposes. Nothing in the Plan will preclude the Debtors or the Reorganized Debtors from challenging the validity of any alleged Lien on any asset of a Debtor or the value of the property that secures any alleged Lien.

Other Secured Claims are not Impaired under the Plan.

(c)     Class 3: Secured Credit Facility Claims

The Plan defines Secured Credit Facility Claim as that portion of the Credit Facility Claim equal to $4 billion that is a Secured Claim (which amount has been reduced to $3.75 billion for purposes of the Plan by virtue of the $250 million adequate protection payment made pursuant to the Cash Collateral Order).

Solely for purposes of classification and treatment under the Plan, the definition of Secured Credit Facility Claims also includes all Claims, Liens, 507(b) Claims (as defined in the Cash Collateral Order) and other rights that were created under the Cash Collateral Order in favor of the holders of Secured Credit Facility Claims.

All Secured Credit Facility Claims will be Allowed in the amount of $4 billion and will not be subject to defense, avoidance, recharacterization, disgorgement, subordination, setoff, recoupment, or other contest (whether legal or equitable), for all purposes of the Plan and the Chapter 11 Case. The Plan provides that each holder of a Secured Credit Facility Claim as of the Effective Date will receive, on the Effective Date and in full satisfaction, settlement, release, discharge of, in exchange for, and on account of such Allowed Secured Credit Facility Claim, its Pro Rata share of (i) Distributable Cash; (ii)

$2.75 billion in principal amount of the New Term Loans, which represents all of the New Term Loans to be issued on the Effective Date; and (iii) shares of New Common Stock representing [95]% of the New Common Stock to be issued and outstanding on the Effective Date.

In addition, each holder of an Allowed Secured Credit Facility Claim will retain any payment received by it pursuant to the Cash Collateral Order. Any replacement or other Liens created pursuant to the Cash Collateral Order will terminate and will have no further force and effect as of the Effective Date.

Notwithstanding the foregoing, if the approximately $2.7 million of letters of credit issued under the Credit Agreement remains undrawn as of the Effective Date, the Debtors will either, with the consent of such issuing Lender: (i) cash collateralize such letters of credit in an amount equal to 105% of the undrawn amount of any such letters of credit, (ii) return any such letters of credit to the issuing Lender undrawn and marked "cancelled", or (iii) provide a "back-to-back" letter of credit to the issuing Lender in a form and issued by an institution reasonably satisfactory to such issuing Lender, in an amount equal to 105% of the then undrawn amount of such letters of credit.

Secured Credit Facility Claims are Impaired and the holders of such Claims will receive a distribution under the Plan.

> (d)     Class 4: Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims

The Plan defines Unsecured Note Claims as any Claim arising or existing under or related to the Unsecured Notes, all of which were issued by Idearc and guaranteed by all or some combination of the Subsidiary Debtors, other than any Indenture Trustee Expenses, and in respect of which the holder thereof has not elected for such Claim to be classified as a Convenience Claim.

The Plan defines Unsecured Credit Facility Claims as the aggregate amount of Credit Facility Claims after deducting the Secured Credit Facility Claim.

The Plan defines a General Unsecured Claim as an unsecured Claim that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, an Unsecured Credit Facility Claim, an Unsecured Note Claim, or a Subordinated Claim, and in respect of which the holder thereof has not elected for such Claim to be classified as a Convenience Claim. Rejection Damages Claims will be General Unsecured Claims unless the holder thereof elects to have such Claims classified as a Convenience Claim.

Subject to resolution of any objections to such Claims, all Unsecured Note Claims will be Allowed in the amount of up to $2.936 billion, all Unsecured Credit Facility Claims will be Allowed in the amount of up to approximately $3 billion, and all General Unsecured Claims will be Allowed in the amount of up to $14 million, and in each case, will not be subject to further defense, avoidance, recharacterization, disgorgement, subordination, recoupment, or other contest (whether legal or equitable), for all purposes of the Plan and the Chapter 11 Case.

The Plan provides that each holder of an Allowed Unsecured Note Claim, Allowed Unsecured Credit Facility Claim, or Allowed General Unsecured Claim will receive on the Effective Date and in full satisfaction, settlement, release, discharge of, in exchange for, and on account of such Claim, its Pro Rata share of (i) shares of New Common Stock representing [5]% of the New Common Stock to be issued and outstanding on the Effective Date, and (ii) any distributions made from the Litigation Trust.

Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims are Impaired and the holders of such Claims will receive a distribution under the Plan.

        (e)        Class 5: Convenience Claims

The Plan defines Convenience Claims as Allowed General Unsecured Claims or Allowed Unsecured Note Claims in respect of which the holder thereof has elected, in its sole discretion, to classify all, but not less than all, of such holder's Allowed General Unsecured Claims of Allowed Unsecured Note Claims, as applicable, as one Convenience Claim; *provided, however,* that for purposes of the Plan and the Distributions to be made thereunder, the aggregate amount of Cash distributed to holders of Convenience Claims will be limited to $[2.4] million.

The Plan provides that each holder of an Allowed Convenience Claim will receive on, or as soon as reasonably practicable after the Effective Date and in full satisfaction, settlement, release, discharge of, in exchange for, and on account of all of such holder's Allowed Convenience Claim, a single Cash payment equal to 25% of its Allowed Convenience Claim, up to a maximum of $2,500.

Convenience Claims are Impaired and the holders of such Claims will receive a distribution under the Plan.

        (f)        Class 6: Subordinated Claims

The Plan defines a Subordinated Claim as any Claim against any of the Debtors that is subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which will include any Claim arising from the rescission of a purchase or sale of any Old Security, any Claim for damage arising from the purchase or sale of an Old Security, or any Claims for reimbursement, contribution, or indemnification on account of any such Claims.

The Plan provides that the holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims. All Subordinated Claims will be discharged as of the Effective Date.

Subordinated Claims are Impaired and the holders of such Claims will not receive a distribution under the Plan.

        (g)        Class 7: Idearc Interests

The Plan defines Idearc Interests as, collectively, all equity interests in Idearc outstanding prior to the Effective Date, including, without limitation, any preferred stock, common stock, restricted stock, restricted stock units, stock options or any other equity-based award settled in shares or other right to purchase the stock of Idearc (whether or not arising in connection with any employment agreement), together with any warrants, conversion rights, rights of first refusal, subscriptions, commitments, agreements, or other rights to acquire or receive any stock or other equity ownership interests in Idearc prior to the Effective Date.

Under the Plan, all Idearc Interests of any kind will be cancelled as of the Effective Date and the holders thereof will not receive or retain any property under the Plan on account of such Interests.

Idearc Interests are Impaired and the holders of such Interests will not receive a distribution under the Plan.

**D.     Allowed Claims, Distribution Rights and Objections to Claims**

      1.     *Allowance Requirement*

Only holders of Allowed Claims are entitled to receive distributions under the Plan.

The Plan differentiates between Filed Claims and all other Claims. A Filed Claim is a Claim for which a Proof of Claim bar date has been established pursuant to a Final Order and a Proof of Claim has been timely filed with the Bankruptcy Court. A Filed Claim is an Allowed Claim if either (a) no objection to its allowance has been timely filed or (b) any objection to its allowance has been settled or withdrawn by the Debtors or has been denied by a Final Order. Otherwise, a Claim is an Allowed Claim if (i) it is not Disputed by the Debtors, (ii) it has been Disputed by the Debtors but has been settled, determined, resolved, or adjudicated, as the case may be, in the procedural manner in which such Claim would have been settled, determined, resolved, or adjudicated if the Chapter 11 Case had not been commenced; (iii) it has been expressly allowed in the Plan; or (iv) it has been permitted to be adjudicated before the Bankruptcy Court and is allowed by a Final Order. All Allowed Claims will remain subject to all limitations set forth in the Bankruptcy Code, including, in particular, Section 502 and 510.

If a Proof of Claim bar date for a Claim has been established pursuant to a Final Order, unless such Claim is expressly allowed in the Plan or pursuant to a Final Order of the Bankruptcy Court, the Claim is a Disputed Claim if it is (i) a Claim as to which a Proof of Claim is not timely filed, (ii) a Filed Claim as to which the time period set for the Debtors to file an objection to such Claim has not expired, or (iii) a Filed Claim as to which the Debtors have timely filed an Objection but the Claim has not been settled by the Debtors or determined, resolved, or adjudicated by Final Order.

If a Proof of Claim bar date has not been established for a Claim, the Claim is a Disputed Claim if (a) the Debtors dispute their liability in any manner that would have been available to them had the Chapter 11 Case not been commenced, and (b) the liability of the Debtors has not been settled by the Debtors or determined, resolved, or adjudicated by final, nonappealable order of a court or other tribunal of competent jurisdiction. A Claim is also a Disputed Claim if it is a Claim that (i) has been expressly disputed in the Plan; or (ii) has been permitted to be adjudicated before the Bankruptcy Court and has not been allowed by a Final Order.

      2.     *Distribution Record Date Requirements*

In making distributions under the Plan, the Debtors will recognize only holders as of the applicable Distribution Record Date. As defined in the Plan, the Distribution Record Date is the date for determining entitlement to receive distributions under the Plan on account of all Allowed Claims receiving distributions, which date, in the case of Credit Facility Claims and all other Allowed Claims, will be the Confirmation Date.

The Plan provides that at the close of business on the Distribution Record Date, the transfer ledgers for the indebtedness under the Credit Agreement and the Unsecured Notes and the obligations under the Swap Agreements will be closed, and there will be no further changes in the record holders of such indebtedness. The Reorganized Debtors, the Disbursing Agent, the Indenture Trustee, and each of their respective agents, successors, and assigns will have no obligation to recognize the transfer of any indebtedness under the Credit Agreement, any Swap Agreement or any Unsecured Note occurring after the Distribution Record Date and will be entitled instead to recognize and deal for all purposes related to the Plan with only those record holders stated on the transfer ledgers as of the close of business on the

Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

3. *Date of Distribution*

The Plan provides that except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all distributions to holders of Allowed Claims as of the applicable Distribution Date will be made on or as soon as practicable after the applicable Distribution Date. The Reorganized Debtors will have the right, in their discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant.

Except as otherwise provided in the Plan, for any Claim that is an Allowed Claim on the Effective Date, the Distribution Date is (i) for any portion that was due prior to the Effective Date on or as soon as practicable after the Effective Date but not later than the first Business Day that is 20 days after the Effective Date or (ii) for any portion that is due after the Effective Date, at such time as such portion becomes due in the ordinary course of business or in accordance with its terms.

For any Claim that is not an Allowed Claim on the Effective Date, the later of (i) the date on which the Debtors become legally obligated to pay such Claim and (ii) the date on which the Claim becomes an Allowed Claim; *provided*, *however*, that a later date may be established by order of the Bankruptcy Court upon motion of the Debtors, the Reorganized Debtors, or any other party.

4. *Distributions to Holders of Allowed Claims*

The Plan provides that except with respect to the Allowed Secured Credit Facility Claims, Allowed Unsecured Credit Facility Claims and Allowed Unsecured Note Claims and unless otherwise agreed to between the Debtors and the holder of an Allowed Claim, the Debtors will make distributions to the holders of the Allowed Claims in the same manner and to the same addresses as such payments are made in the ordinary course of the Debtors' businesses.

No distributions will be made on Disputed Claims until and unless such Disputed Claims become Allowed Claims.

No reserve will be required with respect to any Disputed Claim.

The Plan also provides that on the Effective Date, distributions to (a) holders of Allowed Unsecured Note Claims will be delivered to the Indenture Trustee or, if directed by the Indenture Trustee, will be delivered to the Disbursing Agent for distribution to such holders, and (b) holders of Allowed Secured Credit facility Claims and Unsecured Credit Facility Claims will be delivered to the Administrative Agent or, if directed by the Administrative Agent, will be delivered to the Disbursing Agent for distribution to such holders.

On or before the Effective Date, the Debtors will designate the Person (whether Reorganized Idearc or an independent third party) to serve as the Disbursing Agent under the Plan on mutually agreeable terms and conditions. If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent will receive, without further Bankruptcy Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from Reorganized Idearc. No Disbursing Agent will be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

5.    *Calculation of Distribution Amounts of New Common Stock*

The Plan provides that no fractional shares of New Common Stock will be issued or distributed under the Plan.  Each Person entitled to receive New Common Stock will receive the total number of whole shares of New Common Stock to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of New Common Stock, the actual distribution of shares of such stock will be rounded to the next higher or lower whole number as follows: (i) fractions ½% or greater will be rounded to the next higher whole number, and (ii) fractions of less than ½% will be rounded to the next lower whole number.  Notwithstanding the foregoing, whenever rounding to the next lower whole number would result in such Person receiving zero shares of New Common Stock, such Person will receive one share of New Common Stock.

6.    *Tax Withholding, Payment, and Reporting Requirements*

In connection with the Plan and all distributions under the Plan, the Disbursing Agent will, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions under the Plan will be subject to any such withholding and reporting requirements.  The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.  Notwithstanding any other provision of the Plan, (i) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any such withholding tax obligations imposed on the Disbursing Agent by any governmental unit on account of such distribution, and (ii) no distribution will be made to or on behalf of such holder pursuant to the Plan unless and until such holder has either made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations or timely provided the Disbursing Agent with either an IRS Form W-9 or an applicable IRS Form W-8 certifying that such holder is not subject to U.S. federal withholding tax with respect to such distribution.  Any property to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable distribution to be held by the Indenture Trustee or the Disbursing Agent, as the case may be, until such time as the Disbursing Agent is satisfied with the holder's arrangements for any withholding tax obligations.

7.    *Setoffs*

Except for a Claim that is expressly Allowed under the Plan, the Reorganized Debtors may, but will not be required to, set off against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided, however*, that neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder.

8.    *Allocations of Distributions*

All distributions received under the Plan by holders of Claims will be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued but unpaid interest, if any, with respect to such Claim.

### E.    Disposition of Contracts and Leases

#### 1.    *Assumed Executory Contracts and Leases*

Except as otherwise provided in the Plan, the Confirmation Order, or the Plan Supplement, as of the Effective Date, (i) any contract or lease to which a Debtor is a party as of the Petition Date will be deemed to be and treated as though it is an executory contract or unexpired lease, as applicable, subject to Section 365 of the Bankruptcy Code; and (ii) each Debtor will be deemed to have assumed such contracts and leases to which it is a party unless such contract or lease (a) was previously assumed or rejected upon motion by a Final Order, including, without limitation, the Final Order entered granting any Lease Rejection Motion, (b) previously expired or terminated pursuant to its own terms, (c) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by a Debtor on or before the Confirmation Date or (d) is listed on <u>Exhibit B</u> to this Disclosure Statement or any subsequently filed "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of the Confirmation Order, all of which will be rejected, as of the Effective Date, pursuant to the terms of the Plan.  The Confirmation Order will constitute an order of the Bankruptcy Court under Section 365(a) of the Bankruptcy Code approving the contract and lease assumptions described above, as of the Effective Date.

Pursuant to the Plan, each contract and lease that is assumed will include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such contract or lease and (ii) all contracts or leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

On April 15, 2009, the Debtors filed a motion to assume certain on-going commercial contracts between the Debtors and Verizon, including assumption of the publishing agreement, the branding agreement, the non-competition agreement, the listings license agreement, and the intellectual property agreement in their current forms.  A hearing was held on May 7, 2009, at which time the Bankruptcy Court granted the motion to assume, subject to agreement by the Debtors, Verizon and the Creditors Committee on the terms of the order.  As of the date hereof, an order has not been entered on the motion to assume.  The Debtors intend to reject the Tax Sharing Agreement.

On May 18, 2009, the Bankruptcy Court entered an order authorizing the Debtors to assume all of their collective bargaining agreements, except for one collective bargaining agreement with CWA Local 1301.

#### 2.    *Payments Related to Assumption of Executory Contracts and Leases*

Any monetary amounts by which each contract and lease to be assumed pursuant to the Plan is in default will be satisfied, under Section 365(b)(l) of the Bankruptcy Code, by payment of the Cure amount.   The Debtors' proposed Cure amounts can be found (i) via the Internet at <u>http://www.kccllc.com/Idearc/cureamounts.pdf</u>, or (ii) by writing to Idearc, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, by calling (866) 967-0670, or by emailing <u>idearc@kccllc.com</u>.  The proposed Cure amounts will also be filed with the Bankruptcy Court and can be found via the Internet at <u>http://ecf.txnb.uscourts.gov</u>.

If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of any Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order resolving the dispute and approving the assumption; *provided, however,* that the Reorganized Debtors will be authorized to reject any contract or lease to the extent the Reorganized Debtors, in the exercise of their sound business judgment, conclude that the amount of the Cure obligation as determined by such Final Order, renders assumption of such contract or lease unfavorable to the Reorganized Debtors. In the event the Reorganized Debtors so reject any previously assumed contract or lease, and such rejection gives rise to a Rejection Damages Claim, such Rejection Damages Claim arising out of such rejection will be limited to the Allowed Rejection Damage Claim Amount.

3.      *Rejected Contracts and Leases*

Under the Plan, the Debtors reserve the right, at any time prior to the Effective Date, except as otherwise specifically provided herein, to seek to reject any contract or lease to which any Debtor is a party and to file a motion requesting authorization for the rejection of any such contract or lease. Any contracts or leases that expire by their terms prior to the Effective Date are deemed to be rejected, unless previously assumed or otherwise disposed of by the Debtors. As of the date of this Disclosure Statement, the Debtors have rejected the contracts and leases set forth on <u>Exhibit A</u>. Finally, as of the Effective Date, the Debtors will, pursuant to the terms of the Plan, reject the executory contracts and unexpired leases set forth on <u>Exhibit B</u> to this Disclosure Statement or any subsequently filed "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of the Confirmation Order.

While the Debtors have not undertaken a complete analysis of the magnitude of the Rejection Damages Claims or the amounts that might be owed in the form of cure payments, the Debtors do not believe that any Rejection Damages Claims or cure amounts owed will materially affect the distributions to holders of Claims under the Plan.

4.      *Compensation and Benefit Programs*

The Plan provides that except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by a Debtor on or before the Confirmation Date, or (iv) previously terminated, all Employee Programs in effect on the Effective Date, will be deemed to be, and will be treated as though they are, executory contracts that are assumed under the Plan. Nothing contained in the Plan will be deemed to modify the existing terms of any assumed Employee Programs, including, without limitation, the Debtors' and the Reorganized Debtors' rights of termination and amendment thereunder; *provided, however,* (a) the Employee Programs will be assumed as modified so as to remove the provisions of Idearc's tax-qualified defined contribution plan pertaining to equity interests in Idearc, and (b) to the extent any change of control provision contained in any Employee Program may be triggered solely as a result of the transactions required for the Plan to become effective, such Employee Programs will not be assumed unless a waiver of the change of control provision is executed by the employee having the benefit of such change of control provision, which waiver will waive any change of control that might otherwise be triggered solely as a result of the transactions required for the Plan to become effective, but will provide that any such change of control provisions will otherwise remain in full force and effect, and therefore may be triggered subsequent to the Effective Date by a transaction unrelated to the Plan.

The Plan defines "Employee Programs" as all of the Debtors' employee benefit programs, plans, policies, and agreements, including, without limitation, (i) all employee welfare benefit plans within the meaning of Section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) all employee pension benefit plans within the meaning of Section 3(2) of ERISA, (iii) all employment, bonus retention, long and short-term incentive, executive transition, and other severance, compensation, and other similar agreements, and (iv) all other employee compensation, benefit, and reimbursement programs, plans, policies, and agreements, but excluding any equity incentive plans, equity ownership plans, or any equity-based plans of any kind of the Debtors.

Under the Plan, as of the Effective Date, any and all equity incentive plan, equity ownership plan, or any other equity-based plan entered into before the Effective Date, including Claims arising from any change in control provision therein, will be deemed to be, and will be treated as though they are, contracts that are rejected pursuant to Section 365 of the Bankruptcy Code under the Plan pursuant to the Confirmation Order. Any Claims resulting from such rejection will constitute Idearc Interests and will be treated in accordance with Section 3.4(b) of the Plan. The Plan provides that for the avoidance of doubt, in no event will Section 6.4(b) of the Plan be held to impair any Employee Program.

5.  *Certain Indemnification Obligations*

The Plan provides that Indemnification Obligations owed to those of the Debtors' directors, officers, and employees serving prior to, on and after the Petition Date will be deemed to be, and will be treated as though they are, contracts that are assumed pursuant to Section 365 of the Bankruptcy Code under the Plan, and such Indemnification Obligations (subject to any defenses thereto) will survive the Effective Date of the Plan and remain unaffected by the Plan, irrespective of whether obligations are owed in connection with an occurrence prior to or after the Petition Date.

The Debtors are assuming these indemnification obligations because (i) indemnification of officers and directors is required under Delaware law and under the employment arrangements being assumed, (ii) indemnification is routine and is expected by any officer or director and Debtors would be unable to retain existing or engage new officers or directors without such an undertaking, and (iii) the consideration for the indemnification is the officers' and directors' agreement to continue to provide current and future services to the Debtors' restructuring process and ongoing business operations. Further, the indemnification obligations in the Plan are not material and will not affect distributions to creditors under the Plan or the future operations of the Debtors in that the Debtors maintained significant directors' and officers' liability insurance coverage and the Plan provides for a release of the officers and directors for any personal liability above the limits of the insurance coverage.

6.  *Extension of Time to Assume or Reject*

The Plan provides that notwithstanding anything set forth in Article VI of the Plan, in the event of a dispute as to whether a contract is executory or a lease is unexpired, the right of the Reorganized Debtors to move to assume or reject such contract or lease will be extended until the date that is 30 days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. The deemed assumption provided for in Section 6.1(a) of the Plan will not apply to any such contract or lease, and any such contract or lease will be assumed or rejected only upon motion of the Reorganized Debtors following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

7.      *Claims Arising from Assumption or Rejection*

Except as otherwise provided in the Plan or by Final Order of the Bankruptcy Court, all (i) Allowed Claims arising from the assumption of any contract or lease will be treated as Administrative Claims pursuant to Section 3.1(a) of the Plan; and (ii) Allowed Rejection Damages Claims will be treated as General Unsecured Claims pursuant to and in accordance with the terms of Section 3.3(b) of the Plan, which may be classified as Convenience Claims at the election of the holder.

If the rejection by a Debtor, pursuant to the Plan or otherwise, of a contract or lease results in a Rejection Damages Claim, then such Rejection Damages Claim will be forever barred and will not be enforceable against any Debtor or Reorganized Debtor or the properties of any of them unless a Proof of Claim is filed with the clerk of the Bankruptcy Court and served upon counsel to the Reorganized Debtors on or prior to the later of (i) 30 days after entry of the order authorizing the rejection of such contract or lease and (ii) 15 days after the date designated as the rejection date in the order authorizing the rejection of such contract or lease.  The Debtors reserve their rights to object to any Rejection Damages Claim.

## F.      **Pension Plans**

The Pension Benefit Guaranty Corporation ("PBGC") is a wholly-owned United States government corporation, created by the Employee Retirement Income Security Act of 1974 ("ERISA"), to administer the mandatory pension plan termination insurance program established under Title IV of ERISA.  The PBGC's principal purpose is to guarantee the payment of certain pension benefits to participants upon termination of a pension plan covered by Title IV.

One of the Debtors, Idearc, sponsors two defined benefit pension plans that are covered by Title IV of ERISA.  The plans are called the "Idearc Pension Plan for Management Employees" and the "Idearc Pension Plan for Collectively Bargained Employees" (collectively, the "Pension Plans").  Under ERISA, Idearc and each member of its controlled group are jointly and severally liable to the PBGC and the Pension Plans for the unfunded benefit liabilities of the Pension Plans, for any employer contributions owed under ERISA's minimum funding standards, and for the Title IV insurance premiums.  Idearc's controlled group includes each of the other Debtors.

To date, Idearc has made all of the contributions required to be made to the Pension Plans.  No changes have been made with respect to the administration of the Pension Plans and retirees and their beneficiaries are being paid their pensions on time.  As provided in the 2008 plan year annual funding notice required under 29 U.S.C. § 1021(f), as of December 31, 2008, the fair market value of assets of the Idearc Pension Plan for Management Employees was $426,961,000 and its liabilities were $310,425,000.  As provided in the 2008 plan year annual funding notice required under 29 U.S.C. § 1021(f), as of December 31, 2008, the fair market value of the assets of the Idearc Pension Plan for Collectively Bargained Employees was $221,233,000 and its liabilities were $184,353,000.

The Pension Plans may be terminated only if the statutory requirements of either 29 U.S.C. § 1341 or 29 U.S.C. § 1342 are met.  The filing of a petition under the Bankruptcy Code does not automatically result in plan termination.

If the Pension Plans terminate in a distress termination pursuant to 29 U.S.C. §§ 1341(c)(2)(b)(ii) or (iii), or in an involuntary termination under 29 U.S.C. § 1342, the Debtors may owe Termination Premiums at the rate of $1,250 per plan participant per year for three years.  *See* 29 U.S.C. § 1306(a)(7),

as amended by § 8101(b) the Deficit Reduction Act of 2005 (Pub. L. 109-280). Debtors do not intend to terminate any of the Pension Plans.

The Plan provides that Reorganized Idearc will continue to sponsor the Pension Plans. The Confirmation Order will provide that (i) the Pension Plans are subject to the minimum funding requirements of ERISA and the Internal Revenue Code, (ii) no provision of the Plan, the Confirmation Order or section 1141 of the Bankruptcy Code will, or will be construed to, discharge, release or relieve the Debtors or any other party from any liability with respect to the Pension Plans under ERISA or the Internal Revenue Code, and (iii) that neither the PBGC nor the Pension Plans will be enjoined from enforcing such liability as a result of any provisions in the Plan or the Confirmation Order for satisfaction, release or discharge of Claims.

The PBGC filed claims against the Debtors for their liabilities under ERISA with respect to the Pension Plans that are contingent on the termination of the Pension Plans during the Chapter 11 Case. In the event that the Pension Plans do not terminate during the Chapter 11 Case, the PBGC will withdraw the claims.

## G.    Revesting of Assets; Liens

Except as otherwise provided in the Plan, the property of each Debtor's Estate will re-vest in the applicable Reorganized Debtor on the Effective Date. Thereafter, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. Except for the Liens granted on substantially all of the Debtors' assets (including Cash) to secure the New Term Loans or as otherwise specifically provided in the Plan or the Confirmation Order, as of the Effective Date, all property of each Reorganized Debtor will be free and clear of all Claims and Interests.

## H.    Restructuring Transactions

The Plan provides that after the Effective Date, with the consent of the New Board, each of the Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of their respective businesses, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtors, to achieve corporate or operational efficiencies, or to otherwise improve financial results; *provided, however*, that such transactions or actions are not otherwise inconsistent with the Plan, the distributions to be made under the Plan or the New Term Loan Agreement. Such transactions or actions may include such mergers, consolidations, restructurings, dispositions, liquidations, closures, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate.

## I.    Authorization and Issuance of the New Securities

The Plan provides that Reorganized Idearc will (i) issue on the Effective Date shares of New Common Stock for distribution to the holders of Allowed Secured Credit Facility Claims, which shares will represent [95]% of the New Common Stock to be issued and outstanding on the Effective Date; (ii) issue on the Effective Date shares of New Common Stock for distribution to holders of Allowed Unsecured Notes, Allowed Unsecured Credit Facility Claims, and Allowed General Unsecured Claims, which shares will represent [5]% of the New Common Stock to be issued and outstanding on the Effective Date; and (iii) reserve for issuance shares of New Common Stock (excluding shares that may be issuable as a result of the antidilution provisions thereof) for distributions of stock options, stock

appreciation rights, restricted stock, and other forms of equity-based awards granted under the New Equity Incentive Plan, which shares will represent up to 10% of the New Common Stock to be issued and outstanding on the Effective Date.

The rights of the holders of New Common Stock will be as provided for in the New Idearc Governing Documents. The New Common Stock issued under the Plan will be subject to dilution based upon (i) the issuance of New Common Stock and the grant of equity-based awards pursuant to the New Equity Incentive Plan as set forth in Section 5.6 of the Plan, and (ii) any other shares of New Common Stock issued post-emergence.

The Plan further provides that on the Effective Date, Reorganized Idearc will authorize the New Term Loans in the aggregate principal amount of $2.75 billion. The New Term Loans will be governed by the New Term Loan Agreement, which will be filed with the Plan Supplement.

The offer, issuance and distribution of securities pursuant to the Plan to holders of Allowed Secured Credit Facility Claims, Allowed Unsecured Credit Facility Claims, Allowed Unsecured Note Claims and Allowed General Unsecured Claims will be authorized under Section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any Person, except as may be required by the New Idearc Governing Documents or applicable law, regulation, order or rule; and all documents evidencing the same will be executed and delivered as provided for in the Plan or the Plan Supplement.

As of the Effective Date it is intended that Reorganized Idearc will be subject to periodic filing requirements pursuant to the Exchange Act. Pursuant to Rule 12g-3(a) of the Exchange Act, the New Common Stock will be deemed registered under Section 12(g) of the Exchange Act. Reorganized Idearc intends to file with the SEC a Form 8-A to register the New Common Stock under Section 12(b) of the Exchange Act in connection with its application to list the New Common Stock for trading on NASDAQ. Reorganized Idearc will use reasonable efforts to list the New Common Stock on NASDAQ as of the Effective Date.

## J.    Post-Consummation Corporate Structure, Management and Operation

### 1.    *Continued Corporate Existence*

The Plan provides that the Reorganized Debtors will continue to exist after the Effective Date as separate legal entities, in accordance with the applicable laws in the respective jurisdictions in which they are incorporated and pursuant to the New Idearc Governing Documents in the case of Reorganized Idearc, and pursuant to the Reorganized Subsidiary Governing Documents in the case of the Reorganized Subsidiaries. The corporate organizational structure of the Debtors and direct and indirect ownership of the Subsidiary Debtors will remain the same as before the Effective Dates, with Reorganized Idearc directly or indirectly owning all of the Reorganized Subsidiaries for the benefit of the holders of the New Common Stock. On the Effective Date, Idearc intends to change its corporate legal name and the corporate names of the Subsidiary Debtors as may be included in the Plan Supplement.

### 2.    *Certificates of Incorporation and By-laws*

The certificate or articles of incorporation, by-laws, articles of organization, or operating agreement, as applicable, of each Debtor will be amended to (i) change the authorized capital of Reorganized Idearc as provided for in the Plan Supplement, (ii) change the legal names of the

Reorganized Debtors; and (iii) as may be necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, among other things, pursuant to Section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6) of the Bankruptcy Code; and, as amended, will constitute the New Idearc Governing Documents and the Reorganized Subsidiary Governing Documents. The New Idearc Governing Documents and the Reorganized Subsidiary Governing Documents will be in substantially the forms of such documents included in the Plan Supplement.

3. *Cancellation of Old Securities and Agreements; Release*

On the Effective Date, except as otherwise provided for herein, (a) the Old Securities will be deemed extinguished, cancelled, and of no further force or effect, and (b) the obligations of the Debtors (and the Reorganized Debtors) under any agreements, indentures, or certificates of designations governing the Old Securities and any other note, bond, or indenture evidencing or creating any indebtedness or obligation of any Debtor with respect to the Old Securities will be discharged in each case without further act or action under any applicable agreement, law, regulation, order, or rule and without any action on the part of the Bankruptcy Court or any Person; *provided*, *however*, that the Unsecured Notes and the Indenture and the Credit Agreement will continue in effect solely for the purposes of (i) allowing the holders of such indebtedness to receive the distributions provided for under the Plan, (ii) allowing the Disbursing Agent to make distributions on account of such Claims, (iii) preserving the rights of the Indenture Trustee under the Indenture, including without limitation the Trustee's charging lien rights and rights with respect to compensation, reimbursement of expenses (including attorney's fees), and indemnity under the Indenture; provided, however, that except for payment of Indenture Trustee Expenses or as otherwise provided in the Plan, the personal liability of the Debtors under the Indenture will be discharged on the Effective Date of the Plan pursuant to 11 U.S.C. Section 1141, and (iv) preserving the Administrative Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Credit Agreement in respect of any claim or cause of action asserted against the Administrative Agent by a Person that is not party to the Credit Agreement; provided, however, that any claim or right to payment on account of such indemnification will be an unsecured claim and will not be secured in any of the assets of the Debtors, the Reorganized Debtors or their affiliates

Subsequent to the performance by the Indenture Trustee or its agents of any duties that are required under the Plan, the Confirmation Order, or under the terms of the Indenture, the Indenture Trustee and its agents will be relieved of, and released from, all obligations associated with the Unsecured Notes arising under the Indenture, the indebtedness arising under the Credit Agreement, or under other applicable agreements or law and the Indenture will be deemed to be discharged.

4. *Directors and Officers of Reorganized Debtors*

The New Board will consist of seven individuals, six of whom (including the chairman of the New Board) will be selected by holders of Allowed Secured Credit Facility Claims and identified in the Plan Supplement. The chief executive officer of Reorganized Idearc will also be a member of the New Board. The New Board and committees of the New Board must satisfy the independence, financial literacy, and other requirements of applicable law and any securities exchange upon which the New Common Stock is listed. Thereafter, the New Board will be elected in accordance with the New Idearc Governing Documents.

The Plan further provides that the officers of the Reorganized Subsidiaries will continue to serve in their same respective capacities after the Effective Date. The New Board will appoint directors of the

Reorganized Subsidiaries to serve as of the Effective Date until replaced or removed in accordance with the Reorganized Subsidiary Governing Documents.

5.  *New Equity Incentive Plan; Further Participation in Incentive Plans*

The Plan provides that as of the Effective Date, Reorganized Idearc will be authorized and directed to establish and implement the New Equity Incentive Plan for shares of New Common Stock, which shares will represent up to 10% of the New Common Stock to be issued and outstanding on the Effective Date. Awards granted thereunder may be in the form of stock options, stock appreciation rights, restricted stock, restricted stock units and other forms of equity-based awards. The New Equity Incentive Plan will be promulgated by the New Board for the benefit of members of management, employees, and directors of the Reorganized Debtors and any of Reorganized Idearc's subsidiaries as are designated by the New Board, or a committee designated by the New Board, in its sole and absolute discretion, on such terms as to timing of issuance, manner and timing of vesting, duration, individual entitlement, and all other terms, as such terms are determined by the New Board in its sole and absolute discretion. The New Equity Incentive Plan may be amended or modified from time to time by the New Board.

Reorganized Idearc intends to file with the SEC a Form S-8 Registration Statement to register the shares of New Common Stock issuable under the New Equity Incentive Plan.

Pursuant to the Plan any pre-existing understandings, either oral or written, between the Debtors and any current or former member of management or any employee, or any other Person as to entitlement to (i) any pre-existing equity or equity-based awards or (ii) participate in any pre-existing equity incentive plan, equity ownership plan, or any other equity-based plan will be null and void as of the Effective Date and will not be binding on Reorganized Idearc on or following the Effective Date. All decisions as to entitlement to participate after the Effective Date in any equity or equity-based plans will be within the sole and absolute discretion of the New Board or a committee designated by the New Board.

6.  *Indebtedness and Funding of Reorganized Debtors*

On the Effective Date, the New Term Loan Agreement, together with guarantees evidencing the pledges and obligations of the Reorganized Debtors thereunder, and all other security documents, instruments, and agreements to be executed and delivered in connection therewith on the Effective Date, will become effective. The New Term Loans and all obligations under the New Term Loan Agreement and related documents will be paid as set forth in the New Term Loan Agreement and such related documents.

As the New Term Loan Agreement consists of senior secured term debt only, the Reorganized Debtors will be dependent on existing cash balances, vendor financing, and cash flow from operations to fund working capital, capital expenditures, any acquisitions, and other general corporate requirements. The Reorganized Debtors might be able to raise capital by issuing additional debt or equity securities, although restrictions in the New Term Loan Agreement could restrict their ability to do so.

7.  *Exemption from Certain Transfer Taxes*

Pursuant to Section 1146(a) of the Bankruptcy Code, any transfers from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan in the United States, including any Liens granted by a Debtor or a Reorganized Debtor to secure the obligations under the New Term Agreement,

will not be taxed under any law imposing a stamp tax, real estate transfer tax, sales or use tax, or other similar tax. Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement.

8.  *Corporate Action*

On the Effective Date, the adoption and filing of the New Idearc Governing Documents and all actions contemplated by the Plan will be authorized and approved in all respects pursuant to the Plan. All matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors, and any corporate action required by the Debtors or Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the stockholders or Board of Directors of the Debtors or Reorganized Debtors. On the Effective Date, the appropriate chief executive officer, president, chief financial officer, general counsel, or any other appropriate officer or director of the Reorganized Debtors are authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan, or as may be appropriate to effectuate or further evidence the transactions contemplated by the Plan, in the name of and on behalf of the Reorganized Debtors without the need for any required approvals, authorizations, or consents except for express consents required under the Plan. Any secretary or assistant secretary of Reorganized Idearc, or any applicable Reorganized Subsidiary, as the case may be, will be authorized to certify or attest to any of the foregoing actions.

**K.  Releases, Discharge, Injunctions, Exculpation, and Indemnification**

1.  *Releases by Debtors in Favor of Third Parties*

**The Plan provides for certain releases to be granted by the Debtors in favor of the other Debtors and all of the Debtors' non-Debtor subsidiaries; the present or former directors, officers, and employees of the Debtors or of the Debtors' non-Debtor subsidiaries (but only to the extent in excess of insurance coverage); any Professionals of the Debtors; the Administrative Agent, the Lenders and their Professionals; members (but not in their individual capacities) and Professionals of any creditors' committee and the Indenture Trustee and its advisors.**

**Specifically, as of the Effective Date, for good and valuable consideration, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to Section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising in whole or in part from the negligence of such Person or under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever (other than for fraud, willful misconduct, or gross negligence) in connection with or related to the Debtors, the Chapter 11 Case, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, instruments, and other agreements or documents delivered thereunder), and that may be asserted by or on behalf of the Debtors, the Estates or the Reorganized Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against (i) the**

**other Debtors and the Debtors' non-Debtor subsidiaries, (ii) the directors, officers, or employees of the Debtors or the Debtors' non-Debtor subsidiaries serving during the pendency of the Chapter 11 Case (but only to the extent in excess of insurance coverage), (iii) any Professionals of the Debtors, (iv) the Administrative Agent, the Lenders, and their professionals; (v) the members (but not in their individual capacities) and Professionals of any Creditors Committee; (vi) the Indenture Trustee and its advisors; and (vii) with respect to each of the above-named Persons, such Person's principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns; *provided, however,* that nothing in Section 10.7 of the Plan will be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action, or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, noncompete, or any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors. Notwithstanding the foregoing, the Plan will not release the claims of any Person against Verizon.**

The releases being provided by the Debtors relate to claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities held by the Debtors or that may be asserted on behalf of the Debtors (the "Debtor Claims"). The Debtor Claims are part of the Debtors' estates created pursuant to Section 541 of the Bankruptcy Code, and, absent extraordinary circumstances, the Debtors have the exclusive authority to pursue or settle such claims. *See*, e.g., In re Educators Group Health Trust, 25 F.3d 1281, 1284-1285 (5th Cir. Tex. 1994) (holding that to the extent that creditors' claims derived from a direct injury to the bankruptcy estate, those claims belonged solely to the estate); Mitchell v. Mitchell, 734 F.2d 129, 131 (2d Cir. 1984) (holding that derivative actions are property of the bankruptcy estate and enforceable by the trustee). The releases of the Debtor Claims are in the best interests of the Debtors' estates and arise from an appropriate exercise of the Debtors' authority under Section 1123(b)(3) to include in the Plan "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3). *See* also In re Heritage Org., L.L.C., 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) (a trustee's plan may "unquestionably" resolve potential claims against third parties through settlement under the express authority of § 1123(b)(3)); In re Best Products Co., Inc., 168 B.R. 35, 61, 63-64 (Bankr. S.D.N.Y. 1994) (court approved release and settlement of debtor's claims pursuant to Section 1123(b) (3)); In re General Homes Corp., FGMC, Inc., 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that the language contained in the plan purports to release any causes of action against the Bank Group, which the Debtor could assert, such provision is authorized by § 1123(b)(3)(A), subject to compliance with provisions of the code requiring that the plan be proposed in good faith.")

The Debtors do not believe that there are any valid Debtor Claims against any of their present or former directors, officers, and employees, against any of their subsidiaries, any of their Professionals, the Administrative Agent, the Lenders, or any of their Professionals, members and Professionals of any creditors' committee, or the Indenture Trustee and its advisors. Any action brought to enforce a potential Debtor Claim would involve significant costs to the Debtors, including legal expenses and the distraction of the Debtors' key personnel from the demands of the Debtors' ongoing businesses. In light of these considerations, and given the contributions made by the recipients of the releases to the Debtors' businesses and reorganization efforts, the releases of the Debtor Claims are appropriate and in the best interests of the Debtors' estates.

2. *Discharge and Discharge Injunction*

Confirmation of the Plan effects a discharge of all Claims against the Debtors. As set forth in the Plan, except as otherwise provided in the Plan or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtors or any of their assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtors, and each of them, will be deemed discharged and released under Section 1141(d)(l)(A) of the Bankruptcy Code from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under Section 502 of the Bankruptcy Code, (c) a Claim based upon such debt is or has been disallowed by order of the Bankruptcy Court, or (d) the holder of a Claim based upon such debt accepted the Plan.

Under the Plan, as of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons will be precluded from asserting against the Debtors or the Reorganized Debtors, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtors and termination of all Idearc Interests, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtors at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

**In furtherance of the discharge of Claims and the termination of Interests, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtors, the Reorganized Debtors, and their respective subsidiaries or their property on account of any such discharged Claims, debts, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors or the Reorganized Debtors; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

**The Plan further provides that except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, or liability that is released pursuant to Section 10.6, 10.7, or 10.10 of the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or**

order; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person; or (v) commencing or continuing any action, in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

Moreover, the Plan provides that, without limiting the effect of the provisions Section 10.10 of the Plan upon any Person, by accepting distributions pursuant to the Plan, each holder of an Allowed Claim receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in Section 10.9 of the Plan.

3.    *Third Party Releases*

As of the Effective Date, each holder of a Claim that affirmatively checks the box on their ballot titled "Third-Party Release Pursuant to Plan", will forever release, waive and discharge all Claims, obligations, suits, judgments, remedies, damages, demands, debts, rights, causes of action, and liabilities whatsoever against the Debtors, the Reorganized Debtors, the officers, directors and employees of the Debtors who were either serving in such capacities as of the Confirmation Date, or who had served in such capacities during the Chapter 11 Case, the officers, directors and employees of the Reorganized Debtors serving in such capacity after the Effective Date, the Administrative Agent and the Lenders and, with respect to each of the above-named Persons, such Person's principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns, arising under or in connection with or related to the Debtors, the Estates, the conduct of the Debtors' business, the Chapter 11 Case, the Plan or the Reorganized Debtors (other than the rights under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered or to be delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence, taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Case, the Plan or the Reorganized Debtors.

4.    *Exculpation Relating to Chapter 11 Case*

**The Plan contains standard exculpation provisions applicable to the key parties in interest with respect to their conduct in the Chapter 11 Case. Specifically, the Plan provides that none of the Debtors, the Reorganized Debtors or their respective subsidiaries, the Administrative Agent, the Lenders, any Creditors Committee, the Indenture Trustee or any of their respective principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns, will have or incur any liability to any holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including any event or circumstance caused in whole or in part by the negligence of such Person, but excluding any acts or omissions that are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code of 1986, as**

amended, and in all respects will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

**Moreover, the Plan provides that notwithstanding any other provision of the Plan, no holder of a Claim or an Interest, no other party in interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns will have any right of action against any Debtor, any Reorganized Debtor, any of its subsidiaries, the Administrative Agent, the Lenders, any Creditors Committee or the Indenture Trustee or any of their respective present or former principals, employees, agents, affiliates, current and former officers, current and former directors, financial advisors, attorneys, investment bankers, accountants, consultants and other professionals, agents and any of their successors and assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including any acts or omissions caused by the negligence of such Person, but excluding acts or omissions which are the result of fraud, gross negligence, or willful misconduct or willful violation of federal or state securities laws or the Internal Revenue Code of 1986, as amended. Notwithstanding the foregoing, the Plan will not release the claims of any Person against Verizon.**

The exculpations contained in the Plan are appropriate and are standard in large Chapter 11 cases such as the Chapter 11 Case. The exculpations are appropriately limited in scope, applying only to acts and omissions occurring after the Petition Date and in connection with the Chapter 11 Case or the Plan and conferring only a qualified immunity by including acts or omissions that are the result of the negligence of a Person but excluding acts or omissions which are the result of fraud, gross negligence or willful misconduct. Moreover, these exculpations have, in the Debtors' view, been earned. The beneficiaries of the exculpations have made significant contributions to the Debtors' reorganization, which contributions have allowed for the formulation of the Plan which resolves many complicated issues between and among the Debtors and other interested parties and which, in the Debtors' view, provides for the best possible recoveries for Claims against the Debtors. In the Debtors' view, the beneficiaries of the exculpations would not have contributed as they did without the prospect of the limited immunity reflected in the exculpations. The Debtors are also unaware of any valid causes of action against any of the beneficiaries of the exculpations. In view of the foregoing, the exculpations are appropriate and in the best interests of the Debtors' estates.

5.       *Post-Effective Date Indemnifications*

The Plan provides that upon the Effective Date, the New Idearc Governing Documents and the Reorganized Subsidiary Governing Documents will contain provisions that, to the fullest extent permitted by applicable law, (i) eliminate the personal liability of the Debtors' directors, officers, and key employees serving before, on, and after the Petition Date and the Reorganized Debtors' directors, officers, and key employees serving on and after the Effective Date for monetary damages; and (ii) require such Reorganized Debtor, subject to appropriate procedures, to indemnify those of the Debtors' directors, officers, and key employees serving prior to, on, or after the Petition Date, and the Reorganized Debtors' directors, officers and key employees serving on and after the Effective Date for all claims and actions, including, without limitation, for pre-Effective Date acts and occurrences.

**L.        Preservation of Rights of Action; Resulting Claim Treatment**

Under the Plan, Litigation Rights consist of claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person including, without limitation, claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code an also include state law fraudulent transfer actions and include potential avoidance or other bankruptcy causes of action.  Such causes of action may exist as a result of "preferential" payments or other transfers made on account of antecedent debts within ninety (90) days prior to the Debtors' filing the Chapter 11 Case, or one year in the case of insiders.  A preference results in payment to a creditor that exceeds the amount the creditor would receive in bankruptcy.

In response to Questions 3(b) and 3(c) in each Statement of Financial Affairs filed on the docket in the Chapter 11 Case by each Debtor, each Debtor provided a list of all payments made within the preference period immediately preceding the filing of the Chapter 11 cases.  The Statement of Financial Affairs for each Debtor (as they may have been amended) is incorporated herein by reference.  The Debtors may have valid preference actions under Chapter 5 of the Bankruptcy Code against the parties identified therein.

Litigation Rights also include fraudulent transfer actions under Chapter 5 of the Bankruptcy Code.  A transaction may be a "fraudulent transfer" if a debtor, within the 2 years prior to filing bankruptcy, either incurred debt or transferred assets without receiving reasonably equivalent value in exchange for the transaction.  In addition, in order to be a fraudulent transfer at the time of the transaction, the debtor: (I) must have been insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.  If a transaction is determined to be a fraudulent transfer it may be avoided under Chapter 5 of the Bankruptcy Code resulting in the return of the transferred assets or the reduction or cancellation of debt.

Each Debtor has also listed in the Statement of Financial Affairs transfers made to insiders within the 2 years prior to their filing bankruptcy.  While the Debtors have not identified any claims that would provide substantial value to unsecured creditors, in order to ensure maximum value for the benefit of unsecured creditors, all such claims will be assigned to the Litigation Trust, where those claims can be independently evaluated and a determination made whether to pursue such claims.  See Section 5.12 of the Plan.  The Debtors reserve the right to add information regarding any such claims in the Plan Supplement.

Some creditors or equity security holders have maintained that the Litigation Trust Rights, including avoidance actions under Chapter 5 of the Bankruptcy Code, constitute valuable claims against Verizon, the Agent and Lenders, the Noteholders and other persons who received transfers from or claims against the Debtors as part of the spin-off.  See section IV, C above, describing the Spin-off Transactions.  Those creditors maintain that the transaction in which Idearc was spun off from Verizon caused the Debtors to incur debt without receiving reasonably equivalent consideration and rendered the Debtors insolvent.  Those creditors also maintain that the claims of persons who received transfers from or claims against the Debtors as part of the spin-off should, because of alleged inequitable conduct, be subordinated to the claims of other creditors.  The Debtors disagree, but have acknowledged that all such claims, as they relate to the Agent and Lenders should be independently investigated and reviewed by

the Official Committee of Unsecured Creditors and resolved in accordance with the procedure set forth in the Cash Collateral Order. Claims against other persons or entities arising out of the transaction in which Idearc was spun off from Verizon, to the extent not resolved pre-confirmation after notice and opportunity for hearing, will be transferred to the Litigation Trust for review and prosecution and for the benefit of the Class 4 creditors. See Section 5.12 of the Plan.

The Plan provides that except for the Litigation Trust Rights being transferred to the Litigation Trust, and as otherwise provided in the Plan, the Confirmation Order, or the Plan Supplement, and in accordance with Section 1123(b) of the Bankruptcy Code, on the Effective Date, each Debtor or Reorganized Debtor will retain all Litigation Rights that such Debtor or Reorganized Debtor may hold against any Person and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Litigation Rights, a substantial portion of which consist of the Debtors' collection actions on accounts receivable, which should remain with the Debtors for commercial reasons. In addition, Litigation Rights include non-bankruptcy claims, rights of action, suits, or proceedings that arise in the ordinary course of the Debtors' businesses, including the Debtors' collection actions and commercial tort claims. The Debtors currently hold certain claims or rights of action against a number of parties, the Debtors or Reorganized Debtors intend to retain and continue to prosecute all of these actions, other than the Litigation Trust Rights which will be transferred to the Litigation Trust, unless settled on acceptable terms. The Debtors or Reorganized Debtors may also have claims against certain parties that may ripen into litigation. Additional information regarding the Litigation Rights is contained in the Statements of Financial Affairs filed on the docket in the Chapter 11 Case by each Debtor. In response to Question 4a in each Statement of Financial Affairs, each Debtor provided a list of all suits and administrative proceedings to which it is or was a party within one year immediately preceding the filing of the bankruptcy cases. The Plan Supplement will include a schedule which sets forth all known claims and litigation the Debtors and Reorganized Debtors intend to retain and pursue post-confirmation.

Prior to the filing of these bankruptcy cases, the Debtors analyzed potential causes of action against the Administrative Agent and the Lenders, and acknowledged in the Final Cash Collateral Order that the Administrative Agent holds, on behalf of the Lenders, valid and enforceable first priority, perfected liens and security interests in the Pre-petition Collateral and Cash Collateral, and also acknowledged that they have no right to file a complaint pursuant to Bankruptcy Rule 7001 or otherwise, or any other pleading asserting a claim or cause of action arising out of or related to the Credit Agreement or any transactions or course of conduct related thereto. While the Debtors have ceded the right to challenge the Lenders' liens and claims, and to allowance of the Claims of holders of Unsecured Notes, the Debtors retained the right to assert claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code against any other party, including but not limited to claims which have been asserted against Verizon.

The Debtors have not assigned a specific estimate of value to any of the claims, rights of action, suits, or proceedings against other parties included in the Litigation Rights, including any claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code. However, the Debtors do not anticipate that the pursuit of these and their other pending actions will yield recoveries that will materially impact or enhance the value of the New Common Stock.

The Debtors and the Reorganized Debtors reserve the right to pursue, settle, or otherwise not pursue any pending or potential claims, rights of action, suits, or proceedings, other than the Litigation Trust Rights, against any of the parties described herein. Neither the listing nor the failure to list any party or claim shall serve to prejudice the Debtors' or Reorganized Debtors' rights to pursue any claims,

rights of action, suits, or proceedings that have arisen or may arise in the future in the ordinary course of the Debtors' or Reorganized Debtors' businesses.

## M.    Litigation Trust

Except as otherwise provided in the Plan, on the Effective Date, the Debtors' Litigation Trust Rights will be transferred to the Litigation Trust to be pursued by the Litigation Trustee for the benefit of the holders of Allowed Unsecured Note Claims, holders of Allowed Unsecured Credit Facility Claims, and the holders of Allowed General Unsecured Claims in Class 4, as provided in the Plan and the Litigation Trust Agreement. The Litigation Trust will be administered by the Litigation Trustee who will be identified prior to the conclusion of the Confirmation Hearing. The appointment of the initial Litigation Trustee and the terms of its compensation will be subject to the approval of the Bankruptcy Court.

Litigation Trust Rights will consist of (i) claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code (and/or applicable state law), which include the recovery of preferential payments and fraudulent transfers, including but not limited to such claims which may exist as against Verizon Communications Inc. and/or its affiliates, and (ii) claims or causes of action belonging to the Debtors' estates against the Debtors' officers or directors, but only to the extent that insurance coverage exists for such claims or causes of action and further limited to the proceeds of such insurance coverage. The Plan Supplement will include a schedule which sets forth all known claims and litigation the Debtors and Reorganized Debtors intend to retain and pursue post-confirmation.

The Debtors have not analyzed potential claims or causes of action arising under or pursuant to Chapter 5 of the Bankruptcy Code. However, the Debtors have provided a list of all payments made within the 90 days prior to the bankruptcy filings and a list of payments made by the Debtors to possible insiders within the year prior to bankruptcy in response to Questions 3b and 3c respectively in the Debtors' Statements of Financial Affairs, copies of which are incorporated herein by reference. The Debtors have not estimated the value of the Litigation Trust Rights, however, successful prosecution of such claims or causes of action may enhance unsecured creditors' recoveries to the extent such unsecured creditors have allowed claims.

Upon creation of the Litigation Trust, holders of Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims in Class 4 will become the beneficiaries of the Litigation Trust as their respective interests may appear. The Litigation Trustee may make interim distributions to beneficiaries of the Litigation Trust in the exercise of its reasonable business judgment. Upon the settlement, conclusion of litigation and collection of all of the claims in the Litigation Trust, after the payment of all costs and expenses of collection, the Litigation Trustee must distribute the corpus of the Litigation Trust Pro Rata to the beneficiaries of the Litigation Trust.

The Litigation Trustee appointed pursuant to the Litigation Trust Agreement will, subject to the terms of the Litigation Trust Agreement, have full power, authority, and standing to prosecute, compromise, or otherwise resolve the Litigation Trust Rights. The Litigation Trust will be established for the sole purpose of prosecuting the Litigation Trust Rights and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business. The Reorganized Debtors will not be subject to any counterclaims with respect to the Litigation Trust Rights.

As soon as practicable after the Effective Date, the Reorganized Debtors will set aside $[250,000] in a litigation expense account to pay the professional fees and expenses for prosecuting

Litigation Trust Rights in accordance with the Plan. The Debtors are in the process of analyzing the Litigation Trust Rights and the Litigation Trust will be provided with sufficient initial funding in an amount to be determined after such analysis is completed. In addition, it is anticipated that the Litigation Trustee may be able to supplement the initial funding through settlement payments and the collection of judgments, by borrowing funds to finance litigation, or by retaining contingent fee counsel. Any increase in excess of [$250,000] in funding for the Litigation Trust will require the consent of the Administrative Agent, to the extent such increase in amount is from the proceeds of the Lenders' collateral.

## N. Retention of Jurisdiction

The Plan provides that under Sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

- with respect to Filed Claims or to the extent necessary with respect to other Claims, allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the holder), including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

- hear and determine all applications for Professional Fees and Substantial Contribution Claims; *provided, however*, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

- hear and determine all matters with respect to contracts or leases or the assumption or rejection of any contracts or leases to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary and without limitation, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

- effectuate performance of and payments under the provisions of the Plan;

- hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case or the Litigation Rights;

- enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and execute and implement all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Confirmation Order;

- hear and determine any disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including, without limitation, disputes arising under agreements, documents, or instruments executed in

connection with the Plan, *provided*, *however*, that any dispute arising under or in connection with the New Term Loan Agreement will be dealt with in accordance with the provisions thereof;

- consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

- enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

- hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument or other agreement or document created in connection with the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order;

- enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

- except as otherwise limited herein, recover all assets of the Debtors and property of the Estates, wherever located;

- hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

- hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

- enter a final decree closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Section 9.1 of the Plan, the provisions of this <u>Article VI</u> will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## O. Amendment, Alteration, and Revocation of Plan

The Debtors may, with the consent of the Administrative Agent, which consent will not be unreasonably withheld or delayed, alter, amend, or modify the Plan under Section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in Section 1101(2) of the Bankruptcy Code, the Debtors may, with the consent of the Administrative Agent, which consent will not be unreasonably

withheld or delayed, under Section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, *provided*, *however*, that prior notice of such proceedings must be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of any Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

The Debtors reserve the right to, with the consent of the Administrative Agent, which consent will not be unreasonably withheld or delayed, revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

Additionally, because the actual Allowed amount of the Secured Credit Facility Claims is subject to challenge by the Creditors' Committee pursuant to the Committee Lien Litigation, which could result in the Allowed amount of the Secured Credit Facility Claims being fixed at an amount different than that included in the Plan, the Debtors reserve all rights to alter, amend, or modify the Plan, the Plan Supplement, or any exhibit upon such a result.

## P. Documents Implementing the Plan

The documents and actions necessary to implement the Plan include, but are not limited to, the following:

- the New Term Loan Agreement and related guaranty, security and other loan documents;

- the New Idearc Governing Documents and the Reorganized Subsidiary Governing Documents;

- the appointment of the New Board;

- the New Equity Incentive Plan;

- the Litigation Trust Agreement;

- the Registration Rights Agreement; and

- indemnification agreements for the directors and officers of the Reorganized Debtors.

The proposed forms for the New Idearc Governing Documents, the New Equity Incentive Plan, the New Term Loan Agreement and guaranty and security documents for the New Term Loans, the Litigation Trust Agreement, the Registration Rights Agreement, and the form of indemnification agreement for the officers and directors will each be included in the Plan Supplement. The identification of the New Board by the steering committee of the holders of Allowed Secured Credit Facility Claims will also be included in the Plan Supplement. The Plan Supplement will be filed with the clerk of the Bankruptcy Court at least ten Business Days prior to Voting Deadline. Upon such filing, all documents included in the Plan Supplement may be inspected via the Bankruptcy Court's electronic filing system at https://ecf.txnb.uscourts.gov or at www.kccllc.net/idearc. Holders of Claims or Interests may obtain a copy of any document included in the Plan Supplement upon written request to the Debtors in accordance with Section 10.15 of the Plan.

## Q. Confirmation or Consummation

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

### 1. *Requirements for Confirmation of the Plan*

Before the Plan can be confirmed, the Bankruptcy Court must determine at the Confirmation Hearing that, among others, the following requirements for confirmation, set forth in Section 1129 of the Bankruptcy Code, have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and is not by any means forbidden by law.

- Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors have disclosed (a) the identity and affiliations of (i) any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Reorganized Debtors, (ii) any affiliate of the Debtors participating in a joint plan with the Debtors, or (iii) any successor to the Debtors under the Plan (and the appointment to, or continuance in, such office of such individuals is consistent with the interests of Claim and Interest holders and with public policy), and (b) the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

- With respect to each Class of Claims or Interests, each Impaired Claim and Impaired Interest holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such holder, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code. *See* Article X.D entitled "Liquidation Analysis."

- The Plan provides that Administrative Claims and Other Priority Claims (other than Priority Tax Claims and Secured Tax Claims) will be paid in full on the Effective Date and that Priority Tax Claims and Secured Tax Claims will receive on account of such Claims regular installment payments in cash, over a period not exceeding five years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed Amount of such Claims, and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan, except to the extent that the holder of any such Claim has agreed to a different treatment. *See* Article VI.D.l entitled "Allowed Claims, Distribution Rights, and Objection to Claims-Allowance Requirement."

- If a Class of Claims is Impaired under the Plan, at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by insiders holding Claims in such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. *See* Article X.A entitled "Feasibility of the Plan."

- The Plan provides for the continuation after the Effective Date of all retiree benefits, if any, at the level established pursuant to Section 1114(e)(l)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

The Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code. The Debtors have complied or will have complied with all of the requirements of Chapter 11, and the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

2. *Conditions to Confirmation Date and Effective Date*

The Plan specifies conditions precedent to the Confirmation Date and the Effective Date.

Under the Plan the conditions precedent to the occurrence of the Confirmation Date, which is the date of entry by the clerk of the Bankruptcy Court of the Confirmation Order, are that: (i) an order finding that the Disclosure Statement contains adequate information pursuant to Section 1125 of the Bankruptcy Code must have been entered; and (ii) the proposed Confirmation Order must be in form and substance reasonably satisfactory to the Debtors and the Administrative Agent.

The Plan further provides that the conditions that must be satisfied on or prior to the Effective Date, which is the Business Day upon which all conditions to the consummation of the Plan have been satisfied or waived, and is the date on which the Plan becomes effective, are that: (a) the Confirmation Order must have been entered in form and substance reasonably satisfactory to the Debtors and the Administrative Agent, and must, among other things: (i) provide that the Debtors and the Reorganized

Debtors be authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, to enter into, implement, and perform under consummate the contracts, instruments, and other agreements or documents created in connection with the Plan; (ii) approve the New Term Loan Agreement; (iii) authorize the issuance of the New Securities; and (iv) provide that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order be immediately effective, subject to the terms and conditions of the Plan; (b) the Confirmation Order must not then be stayed, vacated, or reversed; (c) the New Idearc Governing Documents, the Reorganized Subsidiary Governing Documents and the New Term Loan Agreement, must be in form and substance reasonably satisfactory to the Debtors and the Administrative Agent, and, to the extent any of such documents contemplates execution by one or more persons, any such document must have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document will have been satisfied or waived; (d) all material authorizations, consents, and regulatory approvals required, if any, in connection with consummation of the Plan must have been obtained; and (e) all material actions, documents, and agreements necessary to implement the Plan must have been effected or executed.

Each of the conditions set forth in Sections 8.1 and 8.2 of the Plan, with the express exception of the conditions contained in Section 8.1(a) and Sections 8.2(a)(i), (ii), and (iii), and 8.2(b), may be waived in whole or in part by the Debtors without any notice to parties in interest or the Bankruptcy Court and without a hearing, *provided, however,* that such waiver will not be effective without the consent of the Administrative Agent, which consent will not be unreasonably withheld or delayed.

3.    *Anticipated Effective Date*

The length of time between a confirmation date and an effective date varies from case to case and depends upon how long it takes to satisfy each of the conditions precedent to the occurrence of the effective date specified in the particular plan of reorganization.  The Debtors anticipate that the Effective Date will be within 30 days after the entry of a final nonappealable order approving the confirmation of the Plan; however, there can be no assurances that the effective Date will occur in that time frame.  Under the Debtors' Plan, of the conditions precedent set forth above, the time necessary to satisfy the conditions relating to the New Term Loan Agreement is most likely to dictate the Effective Date.

## VII.  RISK FACTORS TO BE CONSIDERED

The holders of Secured Credit Facility Claims, Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan or have their General Unsecured Claims or Unsecured Note Claims reclassified as Convenience Claims, as applicable.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

## A.    General Risk Considerations

The Plan sets forth the means for satisfying the Claims against each of the Debtors.  Certain Claims and Interests receive no distributions pursuant to the Plan.  Nevertheless, reorganization of the Debtors' businesses and operations under the proposed Plan avoids the potentially adverse effects of a liquidation on the Debtors' customers, suppliers, employees and other stakeholders.

## B.     Bankruptcy Risk Considerations

1.     *The Debtors' business, financial condition, and results of operations could be negatively affected by the loss of customers and suppliers.*

Difficulties of providing services while attempting to reorganize the Debtors' business in bankruptcy may make it more difficult to maintain and promote the Debtors' services and attract customers to their services and to keep their suppliers. The Debtors' suppliers, vendors and services providers may require stricter terms and conditions. The loss of any of the Debtor's customers during the pendency of the Chapter 11 Case or otherwise could have an adverse effect on the Debtors' businesses, financial condition, and results of operations. In addition, the Debtors may experience other adverse effects, including, without limitation, a loss of confidence by current and prospective suppliers. Any failure to timely obtain suitable supplies at competitive prices could materially adversely affect the Debtors' businesses, financial condition, and results of operations.

2.     *The Debtors may have insufficient liquidity to successfully operate their businesses.*

The Debtors expect to incur significant costs as a result of the Chapter 11 Case and the transactions contemplated by the Plan. The Debtors expect to incur substantial costs for professional fees and other expenses. The Debtors are dependent upon the negotiation of an acceptable use of cash collateral in order to have access to existing cash balances to fund working capital expenses as well as all other expenses incurred throughout the pendency of the Chapter 11 Case. The Debtors and the Administrative Agent have an agreed order, approved by the Bankruptcy Court, for the use of cash collateral. While the Debtors anticipate that the use of cash collateral will be sufficient to fund the Chapter 11 Case, the Debtors may need to obtain additional financing to fund their operations and capital expenditures. There can be no assurance as to the Debtors' ability to obtain sufficient financing. The Debtors are currently financing operations during the reorganization using cash on hand. The challenge of obtaining financing are exacerbated by adverse conditions in the general economy and the tightening in the credit markets. These conditions and the Chapter 11 Case make it more difficult to obtain financing.

3.     *The Debtors' businesses could suffer from the loss of key personnel.*

The Debtors are dependent on the continued services of their senior management team and other key personnel. The loss of key personnel could have a material adverse effect on the Debtors' business, financial condition, and results of operations. The Debtors may be unable to retain and motivate key executives and employees through process of reorganization and the Debtors may have difficulty attracting new employees. In addition, so long as the Chapter 11 Case continues, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

4.     *The Debtors' may not be able to grow their business during the Chapter 11 Case without Bankruptcy Court approval.*

Transactions outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. In addition, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell or otherwise dispose of all or substantially all of the Debtors' assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage. The Debtors may be unable to continue to grow the Debtors' business

through acquisitions and restrictions on the Debtors' ability to pursue other business strategies, unless the Debtors obtain Bankruptcy Court approval for those transactions.

5.   *Pursuit of litigation by the parties in interest could disrupt the confirmation of the Plan and could have material adverse effects on the Debtors' businesses and financial condition.*

There can be no assurance that any parties in interest will not pursue litigation strategies to enforce any claims in respect of the Debtors. Litigation is by its nature uncertain and there can be no assurance of the ultimate resolution of such claims. As described in Article IV.Q entitled "Legal Proceedings," certain creditors have asserted the invalidity of liens in favor of the Lenders. The pursuit of litigation in connection with objections to this Disclosure Statement related to the invalidity of liens could delay and disrupt confirmation of the Plan and the Company's emergence from bankruptcy. Any litigation may be expensive, lengthy, and disruptive to the Debtors' normal business operations and the Plan confirmation process, and a resolution of any such strategies that is unfavorable to the Debtors could have a material adverse effect on the Plan confirmation process, emergence from bankruptcy or on the Debtors' respective businesses, results of operations, financial condition, liquidity, and cash flow.

6.   *The Bankruptcy Court could exercise substantial discretion and could prevent the confirmation of the Plan in its current form.*

Even if the voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, *see* Article X.A entitled "Feasibility of the Plan," and that the value of distributions to dissenting holders of Claims and Interests will not be less than the value such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. *See* Article X.C entitled "Best Interest Test." Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. *See* Article X.D entitled "Liquidation Analysis" for a liquidation analysis of the Debtors.

7.   *The Debtors may not be able to consummate a successful plan of reorganization or obtain Bankruptcy Court approval.*

There can be no assurance that the Debtor will be able to successfully develop, execute, confirm and consummate one or more plans of reorganization with respect to the Chapter 11 Case that are acceptable to the Bankruptcy Court and the Debtors' creditors and other parties in interest. Additionally, third parties may seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm one or more plans of reorganization, to appoint a Chapter 11 Trustee, or to convert the case to a Chapter 7 case.

After developing a plan of reorganization and obtaining the approval of an impaired class, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the plan of reorganization. The Debtors may not be able to obtain Bankruptcy Court approval or such approval may be delayed with respect to actions the Debtors may seek to undertake in the Chapter 11 Case.

8.    *A long and protracted restructuring could adversely affect the Debtors' businesses and financial condition.*

If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtors' enterprise would be substantially eroded to the detriment of all stakeholders.

The Debtors' future results are dependent upon the successful confirmation and implementation of a plan of reorganization.  Failure to obtain this approval in a timely manner could adversely affect the Debtors' operating results, as the Debtors' ability to fund their operations and their relations with customers and suppliers may be harmed by protracted bankruptcy proceedings.  Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for their liabilities that will be subject to a plan of reorganization.  Once a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective customers, suppliers, and other business partners to do business with a company that recently emerged from bankruptcy proceedings.  Even assuming a successful emergence from Chapter 11, there can be no assurance as to the overall long-term viability of the Debtors' business.

9.    *Adverse publicity in connection with the Chapter 11 Case or otherwise, could negatively affect the Debtors' businesses.*

Adverse publicity or news coverage relating to the Debtors, including but not limited to publicity or news coverage in connection with the Chapter 11 Case, may negatively affect the Reorganized Debtors' efforts to establish and promote name recognition and a positive image after the Effective Date.

## C.    Risk of Claims Estimations

The Debtors intend (i) to pay in full all Administrative Claims, Priority Tax Claims, Secured Tax Claims, Other Priority Claims, and Other Secured Claims, (ii) to pay Distributable Cash, issue the New Term Loans and [95]% of the New Common Stock issued and outstanding on the Effective Date in exchange for Secured Credit Facility Claims, (iii) to issue [5]% of the New Common Stock issued and outstanding on the Effective Date and establish the Litigation Trust for holders of Unsecured Note Claims, Unsecured Credit Facility Claims and General Unsecured Claims, (iv) pay a single cash payment equal to 25% of each Convenience Claim up to a maximum of $2,500, and no more than $[2.4] million in the aggregate on account of all Convenience Claims, and (v) cancel and not pay or issue any interests or property for Subordinated Claims and Idearc Interests.

For a detailed discussion of the litigation challenging the Lenders' liens and the valuation of the Lenders' collateral, *see* Article IV.Q.6 entitled "Valuation Adversary Proceedings."

The Debtors have filed schedules of liabilities and the general bar date for the filing of proofs of claim is August 10, 2009 and the governmental bar date for the filing of proofs of claim is September 26, 2009.  The Debtors reserve the right to dispute Claims outside of the Bankruptcy Court in the same manner they would have done prior to the Petition Date.  The estimates of Claim amounts in this Disclosure Statement derive from the Debtors' books and records.  There can be no assurance that any such estimated Claim amounts are correct.  The actual Allowed amount of Claims likely will differ in some respect from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated.

With respect to Secured Credit Facility Claims, Unsecured Note Claims, Unsecured Credit Facility Claims and General Unsecured Claims, the value of the New Common Stock received by holders of such Claims will be diluted by issuances of equity awards under the New Equity Incentive Plan and any other share issuances.

## D.    Risk Relating to Conditions Precedent to Consummation and Timing

The Plan provides for conditions that must be satisfied (or waived) prior to the Confirmation Date and for other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## E.    Risk Relating to the Inherent Uncertainty of Financial Projections

The financial projections set forth in the attached <u>Appendix C</u> cover the operations of the Reorganized Debtors through fiscal year 2013 (the "<u>Projections</u>").  These Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtors' retention of key management and other key employees; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive risks, uncertainties, and contingencies, many of which will be beyond the control of the Reorganized Debtors.  Accordingly, the Projections are only estimates and are necessarily speculative in nature.  It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time.  In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.

The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts.  The Projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants.  The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved.

**F.     Risks Relating to New Common Stock to be Issued Under the Plan**

1.     *No public market for the New Common Stock is currently present, and lack of the development of a public market could result in the New Common Stock being difficult or impossible to trade.  Other uncontrollable market factors could also negatively affect the value of the New Common Stock.*

The New Common Stock to be issued pursuant to the Plan are securities for which there is currently no market, and there can be no assurance as to the development or liquidity of any market for the New Common Stock.  If a trading market does not develop or is not maintained, holders of the New Common Stock may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including, without limitation, prevailing interest rates, markets for similar securities, industry conditions and the performance of, and investor expectations for, Reorganized Idearc.

Furthermore, Persons to whom the New Common Stock is issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis.  Accordingly, any market that does develop for such securities may be volatile.  Other factors, such as the current intention of Reorganized Idearc not to pay dividends for the foreseeable future, may further depress any market for the New Common Stock.

2.     *The New Common Stock could be subject to future dilution and, as a result, could decline in value.*

The ownership percentage represented by New Common Stock distributed on the Effective Date under the Plan will be subject to dilution in the event that (i) New Common Stock is issued pursuant to the New Equity Incentive Plan, including issuances upon the exercise of options, and (ii) any other shares of New Common Stock are issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by Reorganized Idearc could adversely affect the market price of the New Common Stock.  Sales by existing holders of a large number of shares of the New Common Stock in the public market, or the perception that additional sales could occur, could cause the market price of the New Common Stock to decline.

3.     *Dividends are not expected to be paid with respect to the New Common Stock for the foreseeable future.*

The Debtors do not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.  In addition, restrictive covenants in certain debt instruments to which Reorganized Idearc will be a party, including the New Term Loan Agreement, may limit the ability of Reorganized Idearc to pay dividends.

4.     *The New Idearc Governing Documents may delay, deter, or prevent a change of control of the Reorganized Debtors.*

The New Idearc Governing Documents may contain provisions that may have the effect of delaying, deterring, or preventing a change in control of Reorganized Idearc.

### G.     Risks Relating to New Term Loans to be Issued Under the Plan

As of the date of this Disclosure Statement, a draft of the proposed Term Loan Agreement has not been agreed to by the Debtors and the holders of Secured Credit Facility Claims.  The financial covenants, affirmative and negative covenants, events of default and other material terms and conditions of the New Term Loans will be agreed to by the parties subsequent to the date hereof and included in the Plan Supplement.  It is anticipated that the New Term Loan Agreement will place restrictions on the Reorganized Debtors' operations and use of cash, including, without limitation, restrictions on the Reorganized Debtors' ability to make capital expenditures, acquire or sell businesses and assets, incur additional indebtedness, issue capital stock, create liens, redeem or repurchase debt, enter into transactions with affiliates, enter new lines of business and pay dividends.  Events beyond the Reorganized Debtors' control could affect their ability to comply with these restrictions and covenants. Failure to comply with any of these restrictions, including financial covenants, would result in a default under the New Term Loan Agreement.

In addition, there will be no established market for the New Term Loans.  Holders of the New Term Loans may experience difficulty in reselling the New Term Loans or may be unable to sell them at all.  Previously, rating agencies lowered the corporate ratings of Idearc with a ratings outlook of negative.  There can be no assurances that Reorganized Idearc will be able to obtain favorable ratings on the New Term Loans from any rating agencies.

Although the Debtors desire that the New Term Loans be refinanced on more favorable terms in the future, there can be no assurances that the Debtors will be able to refinance the New Term Loans on more favorable terms or if at all.  In voting on the Plan, all holders of Claims entitled to vote should assume that the New Term Loans will not be refinanced and will remain outstanding.

### H.     Operational Risks

1.     *The Debtors' revenues have declined and may continue to decline.*

The Debtors' print products revenue has continued to decline due to weak economic conditions and competition from other advertising media.  Recent print products advertising sales continue to decline as compared to the prior year.  The Debtors recognize print products revenue ratably over the life of each directory.  These declines in print products advertising sales will adversely affect print products revenue into 2009.  For the years ended December 31, 2008 and 2007, net print products advertising sales declined 11.4% and 4.1%, compared to the same periods in 2007 and 2006, respectively, with multi-product advertising sales declining 9.8% and 2.0% for the same periods, respectively.  Accordingly, if revenue from the Debtors' Internet products does not increase significantly, their cash flow, results of operations and financial condition may be adversely affected.

2.     *The Debtors face widespread competition from other print directory publishers and other media.  This competition may reduce the Debtors' market share or materially affect their financial performance.*

The directory advertising industry in the United States is highly competitive.  The incumbent publishers with which the Debtors compete include AT&T and R.H. Donnelley.  Independent publishers with which the Debtors compete include Yellowbook (the U.S. business of Yellow Group), Valley Yellow Pages and White Directory Publishing Inc.  The Debtors compete with Yellowbook in the majority of their major markets.

Some of the incumbent publishers with which the Debtors compete are or may become larger than the Debtors are and have or may obtain greater financial resources than the Debtors have. Although the Debtors may have limited market overlap with incumbent publishers relative to the size of their overall market coverage, the Debtors may not be able to compete effectively with these publishers for advertising sales in these limited markets. In addition, independent publishers may commit more resources to certain markets than the Debtors are able to commit, thus limiting their ability to compete effectively in these areas. Given the mature state of the directory advertising industry and the Debtors' position in most of the Debtors' markets, independent publishers are typically focused on aggressive pricing to gain market share.

The Debtors also compete for advertising sales with other traditional media, including newspapers, magazines, radio, direct mail, telemarketing, billboards and television. Many of these competitors are larger than the Debtors are and have greater financial resources than the Debtors have. The market share of these competitors may increase and their market share may decrease.

The Debtors also compete for advertising sales with other new media. The Internet has become increasingly accessible as an advertising medium for businesses of all sizes. Further, the use of the Internet, including as a means to transact commerce through wireless devices, has resulted in new technologies and services that compete with the Debtors' traditional products and services. Through Superpages.com, the Debtors' online local search product, the Debtors compete with the Internet yellow pages directories of other major and independent directory publishers, such as Yellowpages.com, as well as other Internet sites that provide classified directory information, such as Citysearch.com.

The Debtors' Internet products also compete with search engines and portals, such as Google, Yahoo! and AOL, some of which have entered into commercial agreements with the Debtors or with other major directory publishers. The Debtors may not be able to compete effectively for advertising with these other companies, some of which have greater resources. The Debtors' Internet strategy may be adversely affected if major search engines build local sales forces or otherwise begin to more effectively market to small- and medium-sized local businesses.

3. *Declining use of print yellow pages directories is adversely affecting the Debtors' business.*

Overall references to print yellow pages directories in the United States have declined from 14.5 billion in 2005 to 12.3 billion in 2008 according to the YPA Industry Usage Study. The Debtors believe this decline is primarily attributable to increased use of Internet search providers, particularly in business-to-business and retail categories, as well as the proliferation of very large retail stores for which consumers and businesses may not reference the yellow pages. The Debtors believe the decline negatively affected the revenues of their traditional print business in 2008. Use of the Debtors' print directories may continue to decline. A significant decline in usage of their print directories could:

- impair their Debtors' ability to maintain or increase advertising prices; and

- cause businesses to reduce or discontinue purchasing advertising in their yellow pages directories.

Either or both of these factors would adversely affect the Debtors' revenues and have a material adverse effect on their business.

4.  *Increased competition in local telephone markets could reduce the benefit of using the Verizon brand name.*

The Federal Communications Commission rules regarding local number portability, advances in communications technology (including wireless devices and voice over Internet protocol) and demographic factors (including potential shifts from wireline telephone communications to wireless or other communications technologies) may erode the market position of telephone service providers, including Verizon.  The Debtors believe that the use of traditional wireline carriers, including Verizon, is declining.  The Debtors believe the loss of market share by Verizon in any particular local service area decreases the value of the Debtors' license to use the Verizon brand name in particular local telephone markets.  As a result, the Debtors may not realize the expected benefits of their commercial arrangements with Verizon.

5.  *Further transfers of local exchange assets by Verizon could reduce the benefit of using the Verizon brand name.*

In 2008, Verizon transferred rural exchange assets in three states to FairPoint Communications, Inc.  In connection with this transaction, the Company entered into publishing, branding and non-competition agreements with FairPoint Communications, Inc. and its affiliates.  In May 2009, Verizon entered into an agreement to transfer additional rural exchange assets in 14 states to Frontier Communications Corp.  Although the purchasers of the Verizon local service areas are required to enter into publishing, branding and non-competition agreements with terms substantially the same as those contained in the corresponding Verizon agreements, transfers to third parties decrease the scope of the Debtors' license to use the Verizon brand name.

6.  *A prolonged economic downturn and other external events would adversely affect the Debtors' business and financial condition.*

Substantially all of the Debtors' net revenues are derived from the sale of advertising.  Expenditures by advertising clients are sensitive to economic conditions and tend to decline in a recession or other periods of uncertainty.  Any decline or change of this type could materially affect the Debtors' business, financial condition and results of operations.

The Debtors' business is subject to the adverse economic conditions currently present in the United States, including decreased levels of business activity across many market segments, decreased advertising demand, interest rate volatility, and limited credit availability.  The Debtors' revenues are affected by economic downturns.  The Debtors' total operating revenues in 2008 and 2007 were negatively affected by the current economic downturn, which has persisted into 2009.  A continuation of current economic conditions or other events that could impact shopping patterns, such as the housing market crisis or a terrorist attack, could have a material adverse effect on their business.

7.  *If the Debtors fail to anticipate or respond effectively to changes in technology and consumer preferences, their competitive position could be harmed.*

Advances in technology will continue to bring new competitors, products, and distribution channels to the Debtors' industry.  As a result, their growth and future financial performance will depend on their ability to develop and market new products and services and create new distribution channels, while enhancing existing products, services and distribution channels, to incorporate the latest technological advances and accommodate changing user preferences, including the use of the Internet.

The Debtors may not be able to timely or successfully adapt their business to these changes in technology.

8. *The Debtors' reliance on small- and medium-sized businesses exposes them to increased credit risk.*

As of December 31, 2008, approximately 84% of the Debtors' print directory advertising revenues were derived from selling advertising to local businesses, which are generally small- and medium-sized businesses. In the ordinary course of their directory operations, the Debtors bill most of these clients over the course of a 12-month period. Full collection of delinquent accounts can take many months or may never occur. For 2008, bad debt expense represented 6.9% of the Debtors' net revenue, an increase from 5.0% in 2007. In addition, for the first six months of 2009 bad debt expense represented 9.2% of the Debtors' total operating revenue, an increase from 5.7% in the first six months of 2008. Small- and medium-sized businesses tend to have fewer financial resources and higher rates of failure than larger businesses, in particular during periods of economic downturn, such as the Debtors are currently experiencing. These factors increase the Debtors' exposure to delinquent accounts by their clients.

9. *The Debtors' dependence on third-party providers for printing and distribution services could materially affect the Debtors.*

The Debtors depend on third parties to print and distribute the Debtors' directories. In connection with these services, the Debtors rely on the systems and services of the Debtors' third-party service providers, their ability to perform key functions on the Debtors' behalf in a timely manner and in accordance with agreed levels of service and their ability to attract and retain sufficient qualified personnel to perform services on the Debtors' behalf. There are a limited number of these providers with sufficient scale to meet the Debtors' needs. A failure in the systems of one of the Debtors' key third-party service providers, or their inability to perform in accordance with the terms of the Debtors' contracts or to retain sufficient qualified personnel, could have a material adverse effect on the Debtors' business, results of operations and financial condition.

In February 2006, the Debtors entered into a multi-year printing agreement pursuant to which a third party prints all of their directories. Because of the large print volume and specialized directory binding, there are a limited number of companies capable of servicing the Debtors' printing needs. Accordingly, the inability or unwillingness of the Debtors' third party vendor to perform its obligations under the printing agreement could result in higher costs and disrupt the Debtors' operations, which could have a material adverse effect on the Debtors' business.

The Debtors are also a party to multi-year contracts with third parties for the distribution of their print directories. The inability or unwillingness of these distributors to provide distribution services to the Debtors on acceptable terms or at all could have a material adverse effect on the Debtors' business, results of operations and financial condition.

If the Debtors were to lose the services of any of their key third party service providers, the Debtors would be required either to hire and train sufficient personnel to perform these services or to find an alternative service provider. In some cases it would be impracticable for the Debtors to perform these functions, including the printing of their directories. In the event the Debtors were required to perform any of the services that they currently outsource, it is unlikely that the Debtors would be able to perform them without incurring additional costs.

10.     *Increases in the price or decreases in the availability of paper could materially affect the Debtors' costs of operations.*

Paper is the principal raw material the Debtors use to produce their print directories.  The paper they use is provided by several different suppliers.  Under the Debtors' agreements with these suppliers, they are obligated to provide up to 100% of the annual forecasted paper requirements in their contracts.  The price of paper under these agreements is set each year based on total tonnage by supplier, paper basis weights, production capacity, market price and demand.  Based on current paper prices, the Debtors' cost for paper may be somewhat higher in 2009 and 2010.

The Debtors do not engage in hedging activities to limit the Debtors' exposure to increases in paper prices.  Historically, the price of paper has fluctuated significantly.  If the Debtors cannot secure access to paper in the necessary amounts or at reasonable prices, or if paper costs increase substantially, it could have a material adverse effect on their business, results of operations or financial condition.

11.     *The Debtors' sales of advertising to national accounts are dependent upon third parties that they do not control.*

Approximately 16% of the Debtors' print revenue is derived from the sale of advertising to national or large regional companies, including rental car companies, insurance companies, and pizza delivery companies.  These companies typically purchase advertising in numerous directories.  Substantially all of the revenue from these large advertisers is derived through CMRs.  CMRs are independent third parties that act as agents for national companies and design their advertisements, arrange for the placement of those advertisements in directories and provide billing services.  The Debtors' relationships with these national advertisers depend significantly on the performance of the CMRs, which the Debtors do not control.  If some or all of the CMRs with which the Debtors have existing relationships were unable or unwilling to transact business with the Debtors on acceptable terms or at all, this inability or unwillingness could materially adversely affect their business.  In addition, any decline in the performance of the CMRs could harm the Debtors' ability to generate revenues from national accounts and could materially adversely affect their business.

12.     *The Debtors have agreements with several major Internet search engines and portals. The termination of one or more of these agreements could adversely affect the Debtors' business.*

The Debtors have expanded their Internet product line by establishing relationships with several other Internet yellow pages directory providers, portals, search engines and individual websites, which make the Debtors' content easier for search engines to access and provides a differentiated response to general searches on the Internet.  Under the terms of the agreements with these Internet providers, the Debtors place the Debtors' clients' advertisements on major search engines, which give the Debtors access to a higher volume of traffic than the Debtors could generate on their own, without relinquishing the client relationship.  The search engines benefit from the Debtors' local sales force and full-service capabilities for attracting and serving advertisers that might not otherwise transact business with search engines.  The termination of one or more of the Debtors' agreements with major search engines could adversely affect the Debtors' business.

13.     *Increased regulation regarding information technology could lead to increased costs.*

As the Internet yellow pages directories industry develops, the provision of Internet services and the commercial use of the Internet and Internet-related applications may become subject to greater

regulation. Regulation of the Internet and Internet-related services is still developing, both by new laws and government regulation, and also by industry self-regulation. If the Debtors' regulatory environment becomes more restrictive, including by increased Internet regulation, their profitability could decrease.

14. *A significant portion of the Debtors' employees are union-represented. Their business could be adversely affected by the progress and outcome of labor negotiations and by the Debtors' ability to maintain good relations with unionized employees.*

As of July 31, 2009, approximately 1,677, or approximately 27% of the Debtors' employees were union-represented. In December 2008, the Debtors reached new, five-year agreements on three labor contracts which had expired in June 2007, covering approximately 537 sales and clerical employees in the Debtors' New England and Upstate New York offices. In February 2009, agreements were reached for six contracts which had expired in the fall of 2008 covering 332 employees in the Debtors' New York offices. Agreements were also reached in February 2009 for five contracts covering 318 employees in the Debtors' Pennsylvania sales offices. Approximately 490 additional employees are covered by union contracts that will expire at various dates prior to November 2009. On May 18, 2009, the Bankruptcy Court entered an order authorizing the Debtors to assume all of their collective bargaining agreements except for one collective bargaining agreement with CWA Local 1301.

In addition, the employees of some of the Debtors' key suppliers are represented by unions. Work stoppages or slow-downs involving the Debtors' union-represented employees, or those of their suppliers, could significantly disrupt the Debtors' operations and increase operating costs, which would have a material adverse effect on their business.

The inability to negotiate acceptable terms with the unions could also result in increased operating costs from higher wages or benefits paid to union employees or replacement workers. A greater percentage of the Debtors' work force could also become represented by unions. If a union decides to strike, and others choose to honor its picket line, it could have a material adverse effect on the Debtors' business.

15. *Loss of key personnel or the Debtors' inability to attract and retain highly qualified individuals would have a material adverse affect on the Debtors' ability to achieve their operating goals.*

The Debtors depend on the continued services of key personnel, including the Debtors' experienced senior management team. The Debtors' ability to achieve operating goals depends to a significant extent on their ability to identify, hire, train and retain qualified individuals in the directories publishing business. The Debtors review and adjust their compensation plans on an annual basis to ensure they are competitive with market trends; however, the loss of key personnel could have a material adverse effect on the Debtors' business operations.

16. *Turnover among sales representatives could materially adversely affect the Debtors' business.*

The loss of a significant number of experienced sales representatives would likely result in fewer sales of advertising in the Debtors' directories and could materially adversely affect the Debtors' business. The turnover rate of the Debtors' sales representatives is higher than for their employees generally. A majority of the attrition of the Debtors' sales representatives occurs with employees with less than two years experience. The Debtors expend substantial resources and management time on identifying and training the Debtors' sales representatives. The Debtors' ability to attract and retain

qualified sales personnel depends on numerous factors outside of their control, including conditions in the local employment markets in which they operate. A substantial decrease in the number of sales representatives could have a material adverse effect on their business, financial condition and results of operation.

17. *The loss of important intellectual property rights could adversely affect the Debtors' results of operations and future prospects.*

Various trademarks, such as the Verizon brand name, and other intellectual property rights are key to the Debtors' business. The Debtors rely upon a combination of trademark and copyright laws as well as contractual arrangements to protect their intellectual property rights. The Debtors may be required to bring lawsuits against third parties to protect their intellectual property rights. Similarly, the Debtors may be party to proceedings by third parties challenging their rights. Lawsuits brought by the Debtors may not be successful, or the Debtors may be found to infringe the intellectual property rights of others. As the commercial use of the Internet further expands, it may be more difficult to protect the Debtors' trade names, including Superpages.com, from domain name infringement or to prevent others from using Internet domain names that associate their businesses with ours. In the past, the Debtors have received claims of material infringement of intellectual property rights significant to their business. Related lawsuits, regardless of the outcome, could result in substantial costs and diversion of resources and could have a material adverse effect on the Debtors' business, financial condition or results of operations. Further, the loss of important trademarks or other intellectual property rights could have a material adverse effect upon the Debtors' business, financial condition and results of operations.

18. *The Debtors' significant reliance on technology could have a material adverse effect on their business.*

Most of the Debtors' business activities rely to a significant degree on the efficient and uninterrupted operation of the Debtors' computer and communications systems and those of others. Any failure of existing or future systems could impair the Debtors' ability to collect, process and store data and the day-to-day management of the Debtors' business. This could have a material adverse effect on the Debtors' business, financial condition and results of operations.

The Debtors' computer and communications systems are vulnerable to damage or interruption from a variety of sources. A natural disaster or other unanticipated problems that lead to the corruption or loss of data at the Debtors' facilities could have a material adverse effect on their business, financial condition and results of operations.

19. *Legislative initiatives directed at limiting or restricting the distribution of the Debtors' print directory products or shifting the costs and responsibilities of waste management related to the Debtors' print products could adversely affect their business.*

A number of state and local municipalities are considering legislative initiatives that would limit or restrict the Debtors' ability to distribute their print directories in the markets they serve. The most restrictive initiatives would prohibit the Debtors from distributing their print directories unless residents affirmatively opt to receive the Debtors' print products. Other less restrictive initiatives would allow residents to opt out of receiving the Debtors' print products. In addition, some states are considering legislative initiatives that would shift the costs and responsibilities of waste management for discarded directories from municipalities to the producers of the directories. If these or other similar initiatives are passed into law, they would increase the Debtors' costs to distribute their print products, reduce the

number of directories that are distributed, and negatively impact the Debtors' ability to market their advertising to new and existing clients.

20. *Legal actions could have a material adverse effect on the Debtors' operating results or financial condition.*

Various lawsuits and other claims typical for a business of the Debtors' size and nature are pending against the Debtors. In addition, from time to time, the Debtors receive communications from government or regulatory agencies concerning investigations or allegations of noncompliance with laws or regulations in jurisdictions in which the Debtors operate. The Debtors do not expect that the ultimate resolution of pending regulatory and legal matters in future periods will have a material effect on their financial condition. Any potential judgments, fines or penalties relating to these matters, however, may have a material effect on their results of operations in the period in which they are recognized.

The Debtors are also exposed to defamation, breach of privacy and other claims and litigation relating to the Debtors' directories business, as well as methods of collection, processing and use of personal data. The subjects of the Debtors' data and users of data collected and processed by the Debtors could also have claims against the Debtors if the Debtors' data were found to be inaccurate, or if personal data stored by the Debtors were improperly accessed and disseminated by unauthorized persons. These claims could have a material adverse effect on the Debtors' business, financial condition or results of operations or otherwise distract the Debtors' management.

## I. Risks Related to The Debtors' Relationship with Verizon

1. *Limitations on the Debtors' use of the Verizon brand could adversely affect the Debtors' business and profitability.*

Prior to the spin-off, the Debtors marketed their products and services using the Verizon brand name and logo. The Debtors believe the association with Verizon provided the Debtors with preferred status among the Debtors' clients due to Verizon's globally recognized brand and perceived high-quality products and services. In connection with the spin-off, the Debtors entered into a 30-year branding agreement with Verizon. This agreement grants the Debtors a limited right to use certain Verizon service and trademarks in connection with publishing certain print directories and identify the Debtors as Verizon's official print directory publisher. The Debtors' right to use the Verizon brand is subject to the Debtors' compliance with the terms and conditions of the branding agreement and the publishing agreement. While the Debtors continue to use the Verizon brand on the Debtors' print directories in substantially all of the Debtors' incumbent markets and other specified markets, the Debtors are not permitted to use Verizon as part of the Debtors' name and may not advertise the Debtors as a Verizon company.

2. *The loss of any of the Debtors' key agreements with Verizon could have a material adverse effect on the Debtors' business.*

In connection with the spin-off, the Debtors entered into several agreements with Verizon, including a publishing agreement, a branding agreement, and a non-competition agreement. Under the publishing agreement, Verizon named the Debtors the exclusive official publisher of Verizon print directories in the markets in which Verizon currently is the incumbent local exchange carrier. The Debtors believe that acting as the exclusive official publisher of directories for Verizon provides the Debtors with a competitive advantage in those markets. Under the branding agreement, Verizon granted the Debtors a limited right to use certain Verizon service and trademarks in connection with publishing

certain print directories and identify the Debtors as Verizon's official print directory publisher. Under the non-competition agreement, Verizon generally agreed not to publish tangible or digital (excluding Internet) media directory products consisting principally of wireline listings and classified advertisements of subscribers in the markets in which it is the incumbent local exchange carrier through 2036 and, subject to certain termination rights, in certain expansion markets through 2011. Verizon also agreed not to publish, for one year following the spin-off, an Internet yellow pages substantially similar to Superpages.com. This provision expired in November 2007.

Each of these agreements with Verizon has an initial term of 30 years from the date of the spin-off, subject to certain early termination rights. These agreements may be terminated by Verizon prior to the stated term under specified circumstances, some of which are beyond the Debtors' reasonable control or could require extraordinary efforts or the incurrence of material excess costs on the Debtors' part in order to avoid breach of the applicable agreement. Each of these agreements has a cross-default provision, so that a termination under any of the agreements may, at Verizon's option, result in a partial or complete termination of rights under any of the other agreements. It is possible that these agreements will not remain in place for their full stated term or that the Debtors may be unable to avoid all potential breaches or defaults of these agreements.

3.    *Regulatory obligations requiring incumbent local exchange carriers to publish white pages directories in its incumbent markets may change over time, which may increase the Debtors' future operating costs.*

Regulations established by state public utilities commissions require incumbent local exchange carriers to publish and distribute white pages directories of certain residences and businesses that order or receive local telephone service from the carriers. These regulations also require an incumbent carrier, in specified cases, to include information relating to the provision of telephone service provided by the incumbent carrier and other carriers in the service area, as well as information relating to local and state governmental agencies. The costs of publishing, printing and distributing the directories are included in the Debtors' operating expenses.

Under the terms of the Debtors' publishing agreement with Verizon, the Debtors are required to perform Verizon's regulatory obligation to publish white pages directories in its incumbent markets. If any additional legal requirements are imposed on Verizon with respect to this obligation, the Debtors would be obligated to comply with these requirements on behalf of Verizon, even if this were to increase the Debtors' operating costs. Pursuant to the publishing agreement, until November 2014, Verizon is generally obligated to reimburse the Debtors for 50% of any net increase in the Debtors' costs of publishing white pages directories that satisfy its publishing obligations to the extent these increased costs exceed $2.5 million in a given year and are the direct result of changes in legal requirements. After November 2014, Verizon generally will not be obligated to reimburse the Debtors for any increase in the Debtors' costs of publishing directories that satisfy its publishing obligations. The Debtors' results of operations relative to competing directory publishers that do not have those obligations could be adversely affected if the Debtors were not able to increase the Debtors' revenues to cover any of these unreimbursed compliance costs.

4.    *The Debtors' ability to enforce the non-competition agreement with Verizon may impair the value of the Debtors' business.*

In connection with the spin-off, the Debtors entered into a non-competition agreement with Verizon pursuant to which Verizon generally agreed not to publish tangible or digital (excluding Internet) media directory products consisting principally of wireline listings and classified

advertisements of subscribers in the markets in which it is the incumbent local exchange carrier that are directed primarily at clients in these markets. Under applicable law, however, a covenant not to compete is only enforceable:

- to the extent it is necessary to protect a legitimate business interest of the party seeking enforcement;

- if it does not unreasonably restrain the party against whom enforcement is sought; and

- if it is not contrary to the public interest.

Enforceability of a non-competition covenant is determined by a court based on all of the facts and circumstances of the specific case at the time enforcement is sought. For this reason, it is not possible to predict whether, or to what extent, a court would enforce Verizon's covenants not to compete against the Debtors during the term of the non-competition agreement. If a court were to determine that the non-competition agreement is unenforceable, Verizon could compete directly against the Debtors in the previously restricted markets. The Debtors' inability to enforce the non-competition agreement with Verizon could have a material adverse effect on their financial condition or results of operation.

## J.  Leverage

The Debtors believe that they will emerge from Chapter 11 with a level of debt that can be effectively serviced in accordance with their business plan. Circumstances, however, may arise which might cause the Debtors to conclude that they are overleveraged, which could have significant negative consequences, including:

- it may become more difficult for the Reorganized Debtors to satisfy their obligations with respect to all of their obligations;

- the Reorganized Debtors may be vulnerable to a downturn in the markets in which they operate or a downturn in the economy in general;

- the Reorganized Debtors may be required to dedicate a substantial portion of their cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements;

- the Reorganized Debtors may be limited in their flexibility to plan for, or react to, changes in their businesses and the industry in which they operate or entry of new competitors into their markets;

- the Reorganized Debtors may be placed at a competitive disadvantage compared to their competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and

- the Reorganized Debtors may be limited in borrowing additional funds.

The covenants in the New Term Loan Agreement may also restrict the Reorganized Debtors' flexibility. Such covenants may place restrictions on the ability of the Reorganized Debtors to incur indebtedness; pay dividends and make other restricted payments or investments; sell assets; make capital expenditures; engage in certain mergers and acquisitions; and refinance existing indebtedness.

Additionally, there may be factors beyond the control of the Reorganized Debtors that could affect their ability to meet debt service requirements. The ability of the Reorganized Debtors to meet debt service requirements will depend on their future performance, which, in turn, will depend on the Reorganized Debtors' ability to sustain sales conditions in the markets in which the Reorganized Debtors operate, the economy generally, and other factors that are beyond their control. The Debtors can provide no assurance that the businesses of the Reorganized Debtors will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Reorganized Debtors to pay their indebtedness or to fund their other liquidity needs. Moreover, the Reorganized Debtors may need to refinance all or a portion of their indebtedness on or before maturity. The Debtors cannot make assurances that the Reorganized Debtors will be able to refinance any of their indebtedness on commercially reasonable terms or at all. If the Reorganized Debtors are unable to make scheduled debt payments or comply with the other provisions of their debt instruments, their lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

The Debtors expect that, post-consummation of the Plan, they will continue to require substantial funds for general corporate and other expenses and may require additional funds for working capital fluctuations. There can be no assurance that the Reorganized Debtors' capital resources will be sufficient to enable them to achieve operating profitability following consummation of the Plan. Failure to generate or raise sufficient funds may require the Reorganized Debtors' to delay or abandon some of their expansion plans or expenditures, which could harm their respective business and competitive positions.

The Reorganized Debtors' expect to meet their funding needs through various sources, including existing cash balances, vendor financing and cash flow from future operations. It is expected that the New Term Loan Agreement will place restrictions on the Reorganized Debtors' ability to make capital expenditures and engage in acquisitions.

The Reorganized Debtors' might meet additional financial needs by issuing additional debt or equity securities. The addition of new debt post-consummation of the Plan could increase the leverage-related risks described above. There, however, can be no assurance that the Reorganized Debtors' will have timely access to additional financing sources on acceptable terms, if at all. The Reorganized Debtors' ability to issue debt securities, borrow funds from additional lenders and participate in vendor financing programs will be restricted under the terms of the New Term Loan Agreement, and there can be no assurance that the respective lenders will waive these restrictions if additional financing is needed beyond that permitted.

Furthermore, failure to secure necessary capital could restrict the Reorganized Debtors' ability to operate and further develop their respective businesses.

## K.     Tax Uncertainties and Considerations

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Article IX, entitled "Material U.S. Federal Tax Consequences of the Plan," regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to certain holders of Claims who are entitled to vote to accept or reject the Plan.

## VIII.  APPLICABILITY OF FEDERAL AND OTHER SECURITIES AND ANTITRUST LAWS

The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act of 1933, as amended (the "Securities Act"), the Bankruptcy Code, and state securities laws exempt from federal and state securities registration requirements (i) the offer and the sale of securities pursuant to the Plan and (ii) subsequent transfers of such securities.

### A.      Offer and Sale of New Securities: Bankruptcy Code Exemption

Pursuant to the Plan, holders of Allowed Secured Credit Facility Claims, Allowed General Unsecured Claims, Allowed Unsecured Credit Facility Claims and Allowed Unsecured Note Claims will receive New Securities.   Section 1145(a)(l) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (ii) the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtors believe that the offer and sale of the New Securities under the Plan satisfies the requirements under Section 1145(a)(1) and will be exempt from registration under the Securities Act and state securities laws.   In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.

Section 1145(c) of the Bankruptcy Code provides that the offer and sale of securities pursuant to Section 1145(a)(1) of the Bankruptcy Code is deemed to be a "public offering."  Therefore, none of the New Securities to be issued pursuant to the Plan will, if offered and sold in accordance with Section 1145(a)(1) of the Bankruptcy Code, be deemed to be restricted securities as defined in the Securities Act.   Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" (see discussion below) with respect to such securities, as that term is defined under the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.  However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

### B.      Subsequent Transfers of New Securities by Underwriters

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (i) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered or sold under a plan for the holders of such securities; (iii) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is: (a) with a view to distribution of such securities and (b) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

The term "issuer" is defined in Section 2(4) of the Securities Act, but the reference contained in Section 1145(b)(l)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Mere ownership of securities of a reorganized debtor could result in a person being considered to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Securities pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell New Securities unless such securities were registered under the Securities Act or an exemption from such registration requirements were available. Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code may, however, be able, at a future time and under certain conditions, to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act. These rules permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the New Securities to be issued pursuant to the Plan, or an "affiliate" of Reorganized Idearc, would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any such Person would be such an "underwriter" or "affiliate." PERSONS WHO RECEIVE NEW SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH RECIPIENT OF NEW SECURITIES AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW SECURITIES.

As of the Effective Date, Reorganized Idearc will enter into a registration rights agreement (the "Registration Rights Agreement"), the form of which will be filed with the Plan Supplement, for the benefit of any creditor to be issued 5% or more of the New Common Stock as of the Effective Date. On the Effective Date, the Reorganized Debtors and all such 5% holders of New Common Stock will

become parties to and bound by the terms of the Registration of Rights Agreement, regardless of whether any such party actually executes the Registration Rights Agreement.

## C.    Antitrust Requirements

The Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), requires parties to certain acquisitions of assets or voting securities to file notification with the Federal Trade Commission (the "FTC") and the Antitrust Division of the U.S. Department of Justice (the "DOJ"), and to observe certain statutory waiting periods.  Persons who will hold as a result of an acquisition in excess of $65.2 million of New Common Stock (as valued in accordance with the HSR Act) may be required to file a Notification and Report Form with the FTC and the DOJ, observe a statutory waiting period, and pay the requisite filing fee, provided certain jurisdictional thresholds are satisfied.  Persons filing the Notification and Report Form are required to provide, among other information, a description of the transaction, certain financial statements of the Person filing notification, a classification by North American Industry Classification System Code of the revenues the Person filing notification derived from U.S. operations, detail on the Person filing notification's corporate structure, including significant minority holdings and, where applicable, certain filings made by the Person filing notification with the SEC.  Both the HSR Act and its implementing regulations contain exemptions from the application of the HSR Act.  Persons acquiring New Common Stock should consult with independent legal counsel to determine whether they may be subject to the HSR Act.

## IX.  MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

This section summarizes the material U.S. federal income tax consequences of the Plan to the Debtors and to U.S. holders (as defined below) of Claims who are entitled to receive cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust in discharge of such Claims. This summary is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plan as discussed herein.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service (the "IRS") or other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or any other tax authority.  A substantial amount of time may elapse between the date of this Disclosure Statement and the Effective Date, and events occurring after the date of this Disclosure Statement (including after the Effective Date), including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Plan discussed below.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder of Claims.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury regulations promulgated thereunder, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).

This summary does not describe all of the tax consequences that may be relevant to the Debtors and to U.S. holders of Claims.  For example, the following summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax

consequences of the Plan to special classes of U.S. holders (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities for U.S. federal income tax purposes (such as entities that are classified as partnerships or S corporations for U.S. federal income tax purposes), persons whose functional currency is not the U.S. dollar, regulated investment companies, expatriates, certain former citizens or long-term residents of the United States, persons who are not U.S. holders, dealers in securities or foreign currency, employees, persons who received their Claims as compensation, persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction, persons who are related to the Debtors within the meaning of the Internal Revenue Code, persons who are small business investment companies or persons who hold Claims who are themselves in bankruptcy). Furthermore, the following summary does not address U.S. federal taxes other than U.S. federal income taxes.

If a partnership (or any entity classified as a partnership for U.S. federal income tax purposes) holds a Claim, the U.S. federal income tax treatment of a partner of such partnership will generally depend upon the status of the partner and the activities of the partnership. If a person is a partner of a partnership holding a Claim, such person should consult its own tax advisor.

Each holder of a Claim is strongly urged to consult its own tax advisor regarding the U.S. federal, state, and local and any foreign tax consequences of the transactions described herein and in the Plan.

The following summary assumes that the Plan will be implemented as described herein and does not address the U.S. federal income tax consequences if the Plan is not carried out. This summary further assumes that the various indebtedness discussed herein constitutes indebtedness for U.S. federal income tax purposes.

## <u>TREASURY DEPARTMENT CIRCULAR 230 NOTICE</u>

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A CLAIM OR INTEREST IS HEREBY NOTIFIED THAT:

(A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED OR RELIED UPON, AND CANNOT BE USED OR RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE;

(B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN; AND

(C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A. U.S. Federal Income Tax Consequences to the Debtors

Idearc is the common parent of a consolidated group (the "<u>Idearc Group</u>") that files a consolidated U.S. federal income tax return, which takes into account the income and losses of all of the Debtors (some of which are treated as partnerships or disregarded entities for U.S. federal income tax

purposes). As discussed below and in connection with the implementation of the Plan, the Idearc Group is expected to be able to exclude any COD income (as defined below) for purposes of determining its gross income for U.S. federal income tax purposes, but certain of its tax attributes may be reduced or eliminated.

In general, the discharge of indebtedness in exchange for an amount of consideration that is less than the amount of the indebtedness that is discharged (in the case of indebtedness that constitutes a "debt instrument" for U.S. federal income tax purposes, the amount of such indebtedness considered to be discharged should equal the "adjusted issue price" of such indebtedness), or the discharge of indebtedness without providing any consideration for such discharge, gives rise to discharge of indebtedness income ("COD income") to the debtor. The amount of consideration paid to a creditor generally equals the amount of cash, the fair market value of property (including stock), and/or the "issue price" of any new debt instrument paid to such creditor. If a new debt instrument is issued to the creditor, then the "issue price" of such debt instrument is determined under either Section 1273 or 1274 of the Internal Revenue Code. Generally, these provisions treat the fair market value of a publicly-traded debt instrument as its "issue price" and the stated principal of any other debt instrument as its "issue price" if its terms provide for adequate stated interest.

However, if the debt discharge is granted by the court or pursuant to a plan approved by the court in a case under the Bankruptcy Code, the COD income realized from such discharge is excluded from the debtor's gross income. However, in such a situation, the debtor is required to reduce its tax attributes up to the amount of the excluded COD income in generally the following order: (i) net operating loss ("NOL") and NOL carryforwards, (ii) general business credit carryforwards, (iii) minimum tax credit carryforwards, (iv) capital loss carryforwards, (v) tax basis in the debtor's property (but not below the amount of its liabilities immediately after the discharge), (vi) passive activity loss and credit carryforwards, and (vii) foreign tax credit carryforwards. In the case of debtors that are members of a consolidated group that files a U.S. consolidated U.S. federal income tax return, the tax attributes of each debtor are reduced first (including its tax basis in its assets and the stock of its subsidiaries). In this regard, the Treasury regulations adopt a "look through" rule such that, if the debtor reduces its tax basis in its stock in a member of the consolidated group, corresponding reductions must be made to that member's tax attributes, including such member's tax basis in its assets. To the extent that the amount of excluded COD income exceeds the tax attributes of the debtor member, the Treasury regulations generally require the reduction of certain consolidated tax attributes (e.g., NOLs, capital loss carryovers and credits) of all other members of the consolidated group, but do not require the reduction of the tax basis in their assets. The reduction in tax attributes occurs only after the tax for the year in which the discharge of indebtedness occurred has been determined. To the extent that the amount of excluded COD income exceeds the tax attributes available for reduction, the remaining COD income is nevertheless excluded from gross income.

If the amount of the Claims that will be discharged pursuant to the Plan (in the case of a Claim that constitutes a "debt instrument" for U.S. federal income tax purposes, the amount of such Claim considered to be discharged pursuant to the Plan should equal such Claim's "adjusted issue price") exceeds the sum of the cash, the "issue price" of the New Term Loans, and the fair market value of the New Common Stock and the beneficial interests in the Litigation Trust that will be received in exchange therefor, the Debtors will realize COD income equal to such excess, which would generally be required to be included in the gross income of the Idearc Group. However, since any such discharge will occur in the Chapter 11 Case, the Idearc Group expects to be able to exclude any such realized COD Income from gross income, but the members of the Idearc Group may be required to reduce certain tax

attributes. The Idearc Group does not expect to have any material amount of NOL carryforwards or other tax attributes that would be subject to any such reduction.

Since the amount of any realized COD income depends on the amount of the Claims that will be discharged pursuant to the Plan and the amount of the cash, the "issue price" of the New Term Loans, and the fair market value of the New Common Stock and the beneficial interests in the Litigation Trust received in exchange therefor, the amount of any such COD income and the corresponding reduction in tax attributes cannot be known with certainty until after the Effective Date.

**B.**     **U.S. Federal Income Tax Consequences to U.S. Holders of Secured Credit Facility Debt, Unsecured Credit Facility Debt, Unsecured Notes, and General Unsecured Claims**

The following summarizes the material U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. holders of Secured Credit Facility Debt, Unsecured Credit Facility Debt, Unsecured Notes, and General Unsecured Claims who or that hold such indebtedness as capital assets within the meaning of Section 1221 of the Internal Revenue Code (generally, assets held for investment purposes) and will hold the New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust, as applicable, as capital assets. Holders of Secured Credit Facility Debt, Unsecured Credit Facility Debt, Unsecured Notes, and General Unsecured Claims should consult their own tax advisors for information that may be relevant based on their particular situations and circumstances regarding the particular tax consequences to them of the transactions contemplated by the Plan. This discussion is written on the basis that the U.S. holder has not taken a bad debt deduction with respect to its indebtedness (or any portion thereof) in the current or any prior taxable year and such indebtedness did not become completely or partially worthless in a prior taxable year.

For purposes of the following discussion, a "U.S. holder" is a holder of Secured Credit Facility Debt, Unsecured Credit Facility Debt, Unsecured Notes, or General Unsecured Claims who or that is for U.S. federal income tax purposes (i) a citizen or individual resident of the United States, (ii) a corporation, or an entity taxable as a corporation, created or organized in the United States or under the laws of the United States or any political subdivision thereof, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons within the meaning of Section 7701(a)(30) of the Internal Revenue Code have the authority to control all substantial decisions of the trust or (b) the trust has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

1.     *Issuance of Cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust to U.S. Holders*

Pursuant to the Plan, the Debtors will issue (i) a combination of cash, New Term Loans, and New Common Stock to U.S. holders of Secured Credit Facility Debt to discharge secured Claims arising or existing under the Credit Agreement, (ii) a combination of New Common Stock and beneficial interests in the Litigation Trust to U.S. holders of Unsecured Credit Facility Debt to discharge unsecured Claims arising or existing under the Credit Agreement, and (iii) a combination of New Common Stock and beneficial interests in the Litigation Trust to U.S. holders of Unsecured Note Claims and General Unsecured Claims (the "Unsecured Holders"). A U.S. holder of Secured Credit Facility Debt also holds Unsecured Credit Facility Debt, and each such U.S. holder of both Classes of Claims is referred to as a "Credit Facility Holder." For U.S. federal income tax purposes, the Secured Credit Facility Debt and the Unsecured Credit Facility Debt held by a Credit Facility Holder are treated as the same indebtedness and are referred to collectively as the "Credit Facility Debt."

As explained below, the U.S. federal income tax consequences arising from such issuances to the U.S. holders will vary depending upon, among other things, whether the Credit Facility Debt, the Unsecured Notes, and the General Unsecured Claims constitute "securities" for U.S. federal income tax purposes. Neither the Internal Revenue Code nor the Treasury regulations promulgated thereunder define the term "security." The determination of whether indebtedness constitutes a "security" for U.S. federal income tax purposes depends upon an evaluation of the nature of the indebtedness, but most authorities have held that the length of the term of the indebtedness is an important factor in determining whether such indebtedness is a "security" for U.S. federal income tax purposes. These authorities have indicated that indebtedness with maturities when issued of less than five years are not considered "securities," while indebtedness with maturities when issued of ten years or more are considered "securities." There are numerous other factors that could be taken into account in determining whether indebtedness is a security, including the security for payment, the creditworthiness of the debtor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the debtor, convertibility of the instrument into an equity interest of the debtor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. Due to the inherently factual nature of the determination, each U.S. holder is urged to consult its own tax advisor regarding whether its Credit Facility Debt, Unsecured Notes, and General Unsecured Claims are "securities" for U.S. federal income tax purposes.

For purposes of the following discussion, it is expected that the New Common Stock will be treated as "stock" for U.S. federal income tax purposes and that the beneficial interests in the Litigation Trust will not be treated as "securities" for U.S. federal income tax purposes.

      (a)     Credit Facility Holders

The following discusses the U.S. federal income tax consequences to the Credit Facility Holders who or that pursuant to the Plan will receive both (i) in exchange for Secured Credit Facility Debt, a combination of cash, New Term Loans, and New Common Stock, and (ii) in exchange for Unsecured Credit Facility Debt, a combination of New Common Stock and beneficial interests in the Litigation Trust.

      (i)     Consequences if Both the Credit Facility Debt and the New Term Loans Constitute "Securities"

If the Credit Facility Debt held by a Credit Facility Holder and the New Term Loans constitute "securities" for U.S. federal income tax purposes, the exchange of the Credit Facility Debt for a combination of cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust should constitute a "recapitalization" for U.S. federal income tax purposes in which the Credit Facility Holder should recognize gain (but not loss) in an amount equal to the lesser of (i) the sum of the amount of cash and the fair market value, at the Effective Date, of the beneficial interests in the Litigation Trust received (other than cash and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt, which will be taxed in the manner discussed below), and (ii) the amount, if any, by which the sum of the amount of cash, the "issue price" of the New Term Loans, and the fair market value, at the Effective Date, of the New Common Stock and the beneficial interests in the Litigation Trust received (other than cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt, which will be taxed in the manner discussed below) exceeds such Credit Facility Holder's adjusted tax basis in such Credit Facility Debt. For this purpose, the "issue price" of the New Term Loans should equal their fair market value, at the Effective Date, if the New Term Loans are considered to be "publicly traded" for U.S. federal income tax purposes;

however, if the New Term Loans are not considered to be "publicly traded" for U.S. federal income tax purposes but the Credit Facility Debt is considered to be "publicly traded" for U.S. federal income tax purposes, then the "issue price" of the New Term Loans should be equal to the fair market value, at the Effective Date, of the Credit Facility Debt. If neither the New Term Loans nor the Credit Facility Debt is considered to be publicly traded, then the "issue price" of the New Term Loans should generally be equal to their principal amount.

Except to the extent that gain is re-characterized as ordinary income pursuant to the "market discount" rules (as discussed below), the gain recognized in the exchange should generally be capital gain and should generally be long-term capital gain if, at the Effective Date, the Credit Facility Holder's holding period in the Credit Facility Debt is more than one year. Long-term capital gains of non-corporate taxpayers are currently taxed at lower rates than those applicable to ordinary income. Immediately after the exchange, a Credit Facility Holder should have an adjusted tax basis in the New Term Loans and New Common Stock received equal to the adjusted tax basis it had in its Credit Facility Debt immediately prior to the exchange, decreased by the sum of the amount of cash and the fair market value, at the Effective Date, of the beneficial interests in the Litigation Trust received (other than cash and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt), and increased by the amount of gain, if any, recognized in the exchange (except that the adjusted tax basis in New Term Loans and New Common Stock received that are attributable to accrued but unpaid interest on the Credit Facility Debt should be equal to the "issue price" of the New Term Loans, as determined in the manner described above, and the fair market value, at the Effective Date, of the New Common Stock), and such adjusted tax basis should be allocated among the New Term Loans and New Common Stock in proportion to the relative fair market values. The Credit Facility Holder's holding period for the New Term Loans and New Common Stock received should include the period during which the Credit Facility Holder held the Credit Facility Debt (except that the holding period for New Term Loans and New Common Stock received that are attributable to accrued but unpaid interest on the Credit Facility Debt should begin on the day after the Effective Date).

The Credit Facility Debt may constitute a "market discount bond" in the hands of a Credit Facility Holder. In general, any indebtedness (other than indebtedness with a fixed maturity of one year or less from the date of issue) that is acquired by a person other than at its original issue is a "market discount bond" in such person's hands if the indebtedness has "market discount." "Market discount" exists if the "stated redemption price at maturity" of the indebtedness (or, in the case of indebtedness having "original issue discount," the "revised issue price") exceeds the adjusted tax basis of such indebtedness immediately after its acquisition by more than a *de minimis* amount. "Market discount" accrues on a ratable basis unless the person holding the indebtedness elects to accrue the "market discount" using a constant yield method. If the Credit Facility Debt is a "market discount bond" in the hands of the Credit Facility Holder as discussed above, any gain recognized in the exchange should generally be treated as ordinary income to the extent of any accrued "market discount" that has not previously been included in income by such Credit Facility Holder (and such Credit Facility Holder may be required to recognize any accrued "market discount" not recognized in the exchange upon a subsequent taxable disposition of its New Term Loans and/or New Common Stock received). In addition, any cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt should be taxable as ordinary interest income if not previously included in income by the Credit Facility Holder.

        (ii)      Consequences if Credit Facility Debt Constitutes a "Security" but New Term Loans Do Not

If the Credit Facility Debt held by a Credit Facility Holder constitutes a "security" for U.S. federal income tax purposes but the New Term Loans do not constitute "securities" for U.S. federal income tax purposes, the exchange of the Credit Facility Debt for a combination of cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust should constitute a "recapitalization" for U.S. federal income tax purposes in which the Credit Facility Holder should recognize gain (but not loss) in an amount equal to the lesser of (i) the sum of the amount of cash, the "issue price" of the New Term Loans, and the fair market value, at the Effective Date, of the beneficial interests in the Litigation Trust received (other than cash, New Term Loans, and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt, which will be taxed in the manner discussed below), and (ii) the amount, if any, by which the sum of the amount of cash, the "issue price" of the New Term Loans, and the fair market value, at the Effective Date, of the New Common Stock and the beneficial interests in the Litigation Trust received (other than cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt, which will be taxed in the manner discussed below) exceeds such Credit Facility Holder's adjusted tax basis in such Credit Facility Debt. For this purpose, the "issue price" of the New Term Loans should be determined in the same manner as described above.

Except to the extent that gain is re-characterized as ordinary income pursuant to the "market discount" rules (as discussed below), the gain recognized in the exchange should generally be capital gain and should generally be long-term capital gain if, at the Effective Date, the Credit Facility Holder's holding period in the Credit Facility Debt is more than one year. Long-term capital gains of non-corporate taxpayers are currently taxed at lower rates than those applicable to ordinary income. A Credit Facility Holder's holding period for the New Common Stock received should include the period during which the Credit Facility Debt was held (except that the holding period for New Common Stock received that is attributable to accrued but unpaid interest on the Credit Facility Debt should begin on the day after the Effective Date), and immediately after the exchange, a Credit Facility Holder's adjusted tax basis in the New Common Stock received should equal such Credit Facility Holder's adjusted tax basis in the Credit Facility Debt at the Effective Date, decreased by the sum of the amount of cash, the "issue price" of the New Term Loans, as determined in the manner described above, and the fair market value, at the Effective Date, of the beneficial interests in the Litigation Trust received (other than cash, New Term Loans, and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt) and increased by the amount of gain, if any, recognized in the exchange (except that the adjusted tax basis in New Common Stock received that is attributable to accrued but unpaid interest on the Credit Facility Debt should equal the fair market value, at the Effective Date, of the New Common Stock). A Credit Facility Holder's holding period for New Term Loans received should begin on the day after the Effective Date, and immediately after the exchange, a Credit Facility Holder's adjusted tax basis in the New Term Loans received should equal the "issue price" of the New Term Loans, as determined in the manner described above.

If the Credit Facility Debt is a "market discount bond" in the hands of the Credit Facility Holder as discussed above, any gain recognized in the exchange should generally be treated as ordinary income to the extent of any accrued "market discount" that has not previously been included in income by such Credit Facility Holder (and such Credit Facility Holder may be required to recognize any accrued "market discount" not recognized in the exchange upon a subsequent taxable disposition of its New Common Stock received). In addition, any cash, New Term Loans, New Common Stock, and beneficial

interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt should be taxable as ordinary interest income if not previously included in income by the Credit Facility Holder.

(iii)    Consequences if Credit Facility Debt Does Not Constitute a "Security"

If the Credit Facility Debt held by a Credit Facility Holder does not constitute a "security" for U.S. federal income tax purposes, the exchange of the Credit Facility Debt for a combination of cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust should constitute a taxable exchange for U.S. federal income tax purposes.  As a result, a Credit Facility Holder should generally recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of cash, the "issue price" of the New Term Loans, and the fair market value, at the Effective Date, of the New Common Stock and the beneficial interests in the Litigation Trust received (other than cash, New Term Loans, New Common Stock and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt, which will be taxed in the manner discussed below), and (ii) such Credit Facility Holder's adjusted tax basis in its Credit Facility Debt. For this purpose, the "issue price" of the New Term Loans should be determined in the same manner as described above.

Except to the extent the recognized gain is re-characterized as ordinary income pursuant to the "market discount" rules (as discussed below), the recognized gain or loss should generally be capital gain or loss and should generally be long-term capital gain or loss if, at the Effective Date, the Credit Facility Holder's holding period in the Credit Facility Debt is more than one year.  Long-term capital gains of non-corporate taxpayers are currently taxed at lower rates than those applicable to ordinary income.  The deductibility of losses could be subject to certain limitations, and any realized loss may not be recognized as a deductible loss until all litigation subject to the Litigation Trust is resolved. Immediately after the exchange, a Credit Facility Holder's adjusted tax basis in the New Term Loans and New Common Stock received should generally be equal to the "issue price" of the New Term Loans (as determined in the manner described above) and the fair market value, at the Effective Date, of the New Common Stock.  The holding period for the New Term Loans and New Common Stock received should begin on the day after the Effective Date.

If the Credit Facility Debt is a "market discount bond" in the hands of the Credit Facility Holder as discussed above, any gain recognized should generally be treated as ordinary income to the extent of any accrued "market discount" that has not previously been included in income by such Credit Facility Holder.  In addition, any cash, New Term Loans, New Common Stock, and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Credit Facility Debt should be taxable as ordinary interest income if not previously included in income by the Credit Facility Holder.

(b)    Unsecured Holders

The following discusses the U.S. federal income tax consequences to the Unsecured Holders whose Unsecured Notes and General Unsecured Claims (the "Unsecured Debt") are exchanged for a combination of New Common Stock and beneficial interests in the Litigation Trust.

(i)    Consequences if Unsecured Debt Constitutes a "Security"

If the Unsecured Debt held by an Unsecured Holder constitutes a "security" for U.S. federal income tax purposes, the exchange of the Unsecured Debt for a combination of New Common Stock

and beneficial interests in the Litigation Trust should constitute a "recapitalization" for U.S. federal income tax purposes in which such Unsecured Holder should recognize gain (but not loss) in an amount equal to the lesser of (i) the fair market value, at the Effective Date, of the beneficial interests in the Litigation Trust received (other than beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Unsecured Debt, which will be taxed in the manner discussed below), and (ii) the amount, if any, by which the fair market value, at the Effective Date, of the New Common Stock and the beneficial interests in the Litigation Trust received (other than New Common Stock and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Unsecured Debt, which will be taxed in the manner discussed below) exceeds such Unsecured Holder's adjusted tax basis in such Unsecured Debt.

Except to the extent the recognized gain is re-characterized as ordinary income pursuant to the "market discount" rules (as discussed below), the recognized gain should generally be capital gain and should generally be long-term capital gain if, at the Effective Date, the Unsecured Holder's holding period in the Unsecured Debt is more than one year. Long-term capital gains of non-corporate taxpayers are currently taxed at lower rates than those applicable to ordinary income. An Unsecured Holder's holding period for the New Common Stock received should include the period during which the Unsecured Debt was held (except that the holding period for the New Common Stock received that is attributable to accrued but unpaid interest on the Unsecured Debt should begin on the day after the Effective Date), and immediately after the exchange, an Unsecured Holder's adjusted tax basis in the New Common Stock received should equal such Unsecured Holder's adjusted tax basis in the Unsecured Debt at the Effective Date, decreased by the fair market value, at the Effective Date, of the beneficial interests in the Litigation Trust received (other than beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Unsecured Debt) and increased by the amount of gain, if any, recognized in the exchange (except that the adjusted tax basis in New Common Stock received that is attributable to accrued but unpaid interest on the Unsecured Debt should equal the fair market value, at the Effective Date, of the New Common Stock).

If the Unsecured Debt is a "market discount bond" in the hands of the Unsecured Holder as discussed above, any gain recognized should generally be treated as ordinary income to the extent of any accrued "market discount" that has not previously been included in income by such Unsecured Holder (and such Unsecured Holder may be required to recognize any accrued "market discount" not recognized in the exchange upon a subsequent taxable disposition of its New Common Stock received). In addition, any New Common Stock and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Unsecured Debt should be taxable as ordinary interest income if not previously included in income by the Unsecured Holder.

<div align="center">(ii)      Consequences if Unsecured Debt Does Not Constitute a "Security"</div>

If the Unsecured Debt held by an Unsecured Holder does not constitute a "security" for U.S. federal income tax purposes, the exchange of the Unsecured Debt for New Common Stock and beneficial interests in the Litigation Trust should constitute a taxable exchange for U.S. federal income tax purposes. As a result, an Unsecured Holder should generally recognize gain or loss in an amount equal to the difference between (i) the fair market value, at the Effective Date, of the New Common Stock and the beneficial interests in the Litigation Trust received (other than New Common Stock and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Unsecured Debt, which will be taxed in the manner discussed below), and (ii) such Unsecured Holder's adjusted tax basis in its Unsecured Debt.

Except to the extent the recognized gain is re-characterized as ordinary income pursuant to the "market discount" rules (as discussed below), the gain or loss recognized should generally be capital gain or loss and should generally be long-term capital gain or loss if, at the Effective Date, the Unsecured Holder's holding period in the Unsecured Debt is more than one year. Long-term capital gains of non-corporate taxpayers are currently taxed at lower rates than those applicable to ordinary income. The deductibility of losses could be subject to certain limitations, and any realized loss may not be recognized as a deductible loss until all litigation subject to the Litigation Trust is resolved. Immediately after the exchange, an Unsecured Holder's adjusted tax basis in the New Common Stock received should generally be equal to the fair market value, at the Effective Date, of the New Common Stock. The holding period for the New Common Stock received should begin on the day after the Effective Date.

If the Unsecured Debt is a "market discount bond" in the hands of the Unsecured Holder as discussed above, any gain recognized in the exchange should generally be treated as ordinary income to the extent of any accrued "market discount" that has not previously been included in income by such Unsecured Holder. In addition, any New Common Stock and beneficial interests in the Litigation Trust received that are attributable to accrued but unpaid interest on the Unsecured Debt should be taxable as ordinary interest income if not previously included in income by the Unsecured Holder.

2. *Ownership of Beneficial Interests in the Litigation Trust*

Depending upon the structure of the Litigation Trust, amounts received by the Litigation Trust that are allocable to the U.S. holder's beneficial interest therein may be taxable to such U.S. holder either at the time of receipt by the Litigation Trust or upon distribution by the Litigation Trust to such Unsecured U.S. holder. Each U.S. holder should consult its tax advisors to determine the tax consequences to such U.S. holder of holding and disposing of a beneficial interest in the Litigation Trust.

## C. Information Reporting and Backup Withholding

Information returns may be filed with the IRS in connection with the transactions contemplated by the Plan and on certain payments with respect to the New Common Stock, the New Term Loans, and the beneficial interests in the Litigation Trust. A U.S. holder may be subject to U.S. backup withholding tax on these payments if the U.S. holder fails to provide its taxpayer identification number to the paying agent and comply with certification procedures, or to otherwise establish an exemption from U.S. backup withholding tax.

U.S. backup withholding tax is not an additional tax. The amount of any U.S. backup withholding tax from a payment should be allowed as a credit against the U.S. holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the required information is timely furnished to the IRS.

U.S. holders should consult their tax advisors regarding the application of backup withholding and information reporting.

## D. Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF THE MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO U.S. HOLDERS AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE

ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES CASES SUMMARIZED HEREIN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON EACH U.S. HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## X. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.   Feasibility of the Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

To support their belief in the feasibility of the Plan, the Debtors have relied upon the Projections, which are annexed to this Disclosure Statement as Appendix C.

The Projections indicate that the Reorganized Debtors should have sufficient cash flow to pay and service the New Term Loans and to fund their operations. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of Section 1129(a)(11) of the Bankruptcy Code.

The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtors; industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtors' retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtors and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtors, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections have not been audited, reviewed, or compiled by the Debtors' independent public accountants. The Debtors will be required to adopt "fresh start" accounting upon their emergence from Chapter 11. The actual adjustments for "fresh start" accounting that the Debtors may be required to adopt upon emergence, may

differ substantially from those "fresh start" adjustments in the Projections. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtors, the Debtors' advisors, or any other Person that the Projections can or will be achieved.

Idearc is currently subject to the informational requirements of the Exchange Act, and in accordance therewith files periodic reports and other information with the SEC relating to its businesses, financial statements, and other matters. Such filings do not and will not include projected financial information. The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions.

All forward-looking statements, as well as the Debtors' business and strategic initiatives, are subject to risks and uncertainties that could cause actual results to differ materially from expected results after the Effective Date. The Debtors believe that these forward-looking statements are reasonable. However, you should not place undue reliance on such statements. These statements are based on current expectations and speak only as of the date of such statements. The Debtors undertake no obligation to publicly update or revise any forward-looking statement, whether as a result of future events, new information or otherwise. Additional information concerning the risks and uncertainties are contained in this Disclosure Statement in Article VII, entitled "Risk Factors to be Considered" and other factors you may wish to consider, in Idearc's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, as amended, Idearc's Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2009 and June 30, 2009 and Idearc's other filings with the SEC.

## B.    Acceptance of the Plan

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least 2/3 in dollar amount and more than 1/2 in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, for example, holders of Secured Credit Facility Claims in Class 3 will have voted to accept the Plan only if 2/3 in amount and a majority in number of the Secured Credit Facility Claims actually voting cast their ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan. There is no minimum requirement of votes that must be voted in any impaired class.

## C.    Best Interests Test

As noted above, even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member that has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtors in its Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the Chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting Rejection Damages Claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

**D.     Liquidation Analysis**

For purposes of the Best Interest Test, in order to determine the amount of liquidation value available to Creditors, the Debtors, with the assistance of their financial advisor, Moelis & Company, LLC, prepared a liquidation analysis (the "Liquidation Analysis"), which concludes that in a Chapter 7 liquidation, holders of prepetition unsecured Claims, including the holders of Unsecured Credit Facility Debt, General Unsecured Claims, Convenience Claims and Unsecured Notes, would receive less of a recovery than the recovery they would receive under the Plan. This conclusion is premised upon the assumptions set forth in the Liquidation Analysis, which the Debtors and their financial advisor believe are reasonable. The Liquidation Analysis is attached hereto as Appendix D.

Notwithstanding the foregoing, the Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' review of the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the Chapter 7 liquidation dividend to holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

E.      **Valuation of the Reorganized Debtors**

The Debtors have been advised by Moelis & Company, LLC ("Moelis"), the Debtors' financial advisor, with respect to the estimated reorganization value of Reorganized Idearc on a going concern basis. Solely for purposes of the Plan, the analysis performed by Moelis indicates that the estimated reorganization value of the Reorganized Debtors, excluding cash on hand, is within the range of $2.525 billion to $3.05 billion (with a mid-point estimate of approximately $2.8 billion and a corresponding mid-point equity value of approximately $200 million based on the Debtor retaining $150 million of cash upon emergence) as of an assumed Effective Date of September 30, 2009.

THE ESTIMATED RANGE OF REORGANIZATION VALUES ASSUMES AN EFFECTIVE DATE OF SEPTEMBER 30, 2009, REFLECTS WORK PERFORMED BY MOELIS ON THE BASIS OF INFORMATION CONCERNING THE BUSINESS, AND ASSETS OF THE DEBTORS AVAILABLE TO MOELIS AS OF AUGUST 27, 2009. NEITHER MOELIS NOR THE DEBTORS HAVE UPDATED THE ESTIMATED RANGE OF REORGANIZATION VALUES TO REFLECT INFORMATION AVAILABLE TO THE DEBTORS OR MOELIS SUBSEQUENT TO AUGUST 27, 2009.

The foregoing estimate of the enterprise value of Reorganized Idearc is based on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of the Reorganized Debtors' business plan, the achievement of the forecasts reflected in the Projections, continuity of a qualified management team, market conditions through the period covered by the Projections, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

The valuation assumptions are not a prediction or reflection of post-Confirmation trading prices of the New Common Stock. Such securities may trade at substantially lower or higher prices because of a number of factors, including, but not limited to, those discussed in Article VII entitled "Risk Factors to be Considered". The trading prices of securities issued under a plan of reorganization are subject to many unforeseeable circumstances and therefore cannot be predicted.

In preparing its analysis of the estimated reorganization equity value of Reorganized Idearc, Moelis, among other analyses: (i) reviewed certain historical financial information of the Debtors for recent years and interim periods including the most current financial results through June 30, 2009; (ii) reviewed certain internal financial and operating data of the Debtors including financial projections prepared and provided by management relating to their business and their prospects; (iii) met with certain members of senior management of the Debtors to discuss the Debtors' operations and future prospects; (iv) reviewed publicly available financial data and considered the market value of public companies which Moelis deemed generally comparable to the operating business of the Debtors; (v) considered certain economic and industry information relevant to the Reorganized Debtors; and (vi) conducted such other studies, analysis, inquiries, and investigations as it deemed appropriate.

ALTHOUGH MOELIS CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND THE REORGANIZED DEBTORS' BUSINESS PLANS, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL (I) FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AND (II) PUBLICLY AVAILABLE INFORMATION. IN ADDITION, MOELIS DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE, AND NO INDEPENDENT VALUATIONS OR

APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

THE ESTIMATED RANGE OF REORGANIZATION VALUES DESCRIBED HEREIN DOES NOT PURPORT TO BE AN APPRAISAL OR NECESSARILY REFLECT THE VALUES WHICH MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

THE ANALYSIS OF THE DEBTORS' REORGANIZATION EQUITY VALUE PREPARED BY MOELIS REPRESENTS THE HYPOTHETICAL RANGE OF EQUITY VALUES AND IS BASED ON THE ASSUMPTIONS CONTAINED HEREIN. THE ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF A PLAN OF REORGANIZATION AND THE DETERMINATION OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF EQUITY VALUES OF REORGANIZED IDEARC THROUGH THE APPLICATION OF VARIOUS GENERALLY ACCEPTED VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT, AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF EQUITY VALUES OF REORGANIZED IDEARC SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, MOELIS, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.

Moelis performed a variety of analyses and considered a variety of factors in preparing its estimated range of Reorganized Idearc's enterprise value. Moelis primarily relied on three principal methodologies to estimate the value of Reorganized Idearc, based on the financial projections described under "Projections" which were prepared by Idearc management: (i) a calculation of the present value of the unlevered free cash flows reflected in Reorganized Idearc's Projections, including calculating the terminal value of the business based upon a range of perpetuity growth rates and weighted average cost of capital ("WACC"), (ii) a comparison of financial data of Idearc with similar data for other publicly held companies in businesses similar to Idearc, and (iii). an analysis of comparable valuations indicated by precedent mergers and acquisitions of such companies

Idearc believes the Current Case is a more likely scenario given the current trajectory of the business, attributing an approximate two-thirds probability of achieving the Current Case relative to the Opportunity Case. Accordingly, in reaching its valuation conclusions, Moelis placed 67% weight on the valuation ranges resulting from the Current Case and 33% weight on the ranges resulting from the Opportunity Case.

The following summary does not purport to be a complete description of the analyses undertaken and factors reviewed to support Moelis' conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, and the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized. Moelis' valuation must be considered as a whole and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to Idearc's value.

1.    *Discounted Cash Flow Analysis*

The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by an estimated weighted average cost of capital ("WACC"). The expected future cash flows have two components: the present value of the projected unlevered free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections). Moelis discounted cash flow valuation is based on the projection of Idearc's operating results in both the Current Case and Opportunity Case.

This approach relies on the company's ability to project future cash flows with some degree of accuracy. Since Idearc's projections reflect significant assumptions made by Idearc's management concerning anticipated results, the assumptions and judgments used in the Current Case and Opportunity Case projections may or may not prove correct and therefore, no assurance can be provided that projected results are attainable or will be realized. Moelis cannot and does not make any representations or warranties as to the accuracy or completeness of Idearc's projections.

2.    *Comparable Companies Analysis*

The comparable company analysis involved identifying a group of publicly traded companies whose businesses are similar to those of Reorganized Idearc and then calculating ratios of enterprise value to EBITDA of these companies based upon the public market value of such companies' securities. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of business, business risks, growth prospects, business maturity, market presence, and size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. The ranges of ratios derived were then applied to Idearc's' projected financial results to derive a range of implied values.

3.    *Precedent Transactions Analysis*

The precedent transaction analysis estimates value by examining public merger and acquisition transactions. The valuations paid in such acquisitions or implied in such mergers were analyzed as ratios of various financial results. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to Idearc. Moelis also observed historical expected synergies and enterprise premiums paid in selected transactions. Since precedent transaction analysis reflects aspects of value other than the intrinsic value of a company, coupled with the fact that these transactions occurred in a different operating and financial environment, there are limitations as to its usage in Reorganized Idearc's valuation.

THE RANGE OF REORGANIZATION VALUES DETERMINED BY MOELIS IS AN ESTIMATE AND DOES NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.

**F.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation**

It is impossible to determine with any specificity the value holders of a Secured Credit Facility Claim, Unsecured Note Claim, Unsecured Credit Facility Claim or General Unsecured Claim will receive as a percentage of its Allowed Claim. The difficulty in estimating the value of recoveries for such holders is due to, among other things, the lack of any public market for the New Common Stock or the value of any distributions from the Litigation Trust.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures and projections contained in this Disclosure Statement imply a greater or equal recovery to holders of a Secured Credit Facility Claim, Unsecured Note Claim, Unsecured Credit Facility Claim, or General Unsecured Claim than the recovery available in a Chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test of Section 1129 of the Bankruptcy Code is satisfied.

**G.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

Because each of Class 6 and Class 7 is deemed to have rejected the Plan, the Debtors will seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. In addition, the Debtors are prepared to request confirmation of the Plan, as it may be modified from time to time, under Section 1129(b) with respect to Class 4, if Class 4, voting as a Class, rejects the Plan. Specifically, Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtors if the plan both (i) "does not discriminate unfairly" and (ii) is "fair and equitable" as to each impaired class that has not accepted the plan.

1.      *No Unfair Discrimination*

A plan of reorganization "does not discriminate unfairly" if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are related to the legal rights of the non-accepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or equity interests. The Debtors believe that under the Plan all impaired classes of Claims and Interests are treated in a manner that does not discriminate unfairly.

2.      *Fair and Equitable Test*

The Bankruptcy Code establishes different "fair and equitable" tests for secured creditors, unsecured creditors and holders of equity interests as follows:

- Secured Creditors. A plan is fair and equitable as to a class of secured claims that rejects a plan if the plan provides: (i)(a) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b)

that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; (ii) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under <u>clause (i)</u> or <u>(ii)</u>; or (iii) for the realization by such holders of the indubitable equivalent of such claims.

- <u>Unsecured Creditors</u>.  A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides: (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

- <u>Holders of Equity Interests</u>.  A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides: (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or (ii) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable as to all classes of Claims and Interests.  With respect to any class of Claims that that does not vote in favor of the Plan, the Debtors are prepared to cram down the Plan over the rejection by such class of Claims.

## XI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Secured Credit Facility Claims in Class 3, holders of Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims in Class 4, and holders of Convenience Claims in Class 5, the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders.  If, however, the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives include (i) formulation of an alternative plan or plans of reorganization or (ii) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

## A.    Alternative Plans of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Debtors believe that the Plan enables all Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

B.      Liquidation under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Interests in the Debtors.

The Debtors believe that in a liquidation under Chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' Estates. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtors' assets. More importantly, conversion to Chapter 7 liquidation would likely result in the immediate cessation of the Debtors' businesses, as most Chapter 7 trustees are disinclined to continue operations.

The Debtors could also be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization. In a liquidation under Chapter 11, the Debtors' assets theoretically could be sold in an orderly fashion over a more extended period of time than in a liquidation under Chapter 7, thus resulting in a potentially greater recovery. Conversely, to the extent the Debtors' businesses incur operating losses, the Debtors' efforts to liquidate their assets over a longer period of time theoretically could result in a lower net distribution to Creditors than they would receive through Chapter 7 liquidation. Nevertheless, because there would be no need to appoint a Chapter 7 trustee and to hire new professionals, Chapter 11 liquidation might be less costly than Chapter 7 liquidation and thus provide larger net distributions to Creditors than in Chapter 7 liquidation. Any recovery in a Chapter 11 liquidation, while potentially greater than in a Chapter 7 liquidation, would also be highly uncertain.

Although preferable to a Chapter 7 liquidation, the Debtors believe that any alternative liquidation under Chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated by the Plan.

## XII.  STATEMENTS BY OBJECTING PARTIES

A.      Statements By Peter Talbot on Behalf of the "Idearc Chapter 11 Independent Stock and Bondholders Committee"

The "Idearc Chapter 11 Independent Stock and Bondholders Committee" has informed the Debtors that it does not support the Plan. While the Debtors disagree with the "Idearc Chapter 11 Independent Stock and Bondholders Committee's" positions as set forth below, the "Idearc Chapter 11 Independent Stock and Bondholders Committee" has requested that the following statements be included in this Disclosure Statement.

An ad hoc stock and bondholder committee (called the "Spencer Committee") has filed a Motion to Dismiss this Chapter 11 Proceeding on the grounds of alleged "Bad Faith", "Unconstitutionality" and "Fraud" in the spin-off transactions and these Proceedings.

Beside the foregoing, the Spencer Committee maintains that the Idearc indebtedness was divided into two classes: (i) a "basis" debt, which represents the reasonable "tax basis" for the enterprise value

of the company, amounting to $2 Billion more or less, and (ii) all other debt incurred over and above that amount.

The Spencer Committee alleges that a contract basis for the enterprise value of the company was established upon first issuance of the 8% unsecured Notes, in aggregate amount of $2.8 Billion under a so-called "Purchase Agreement" between Verizon and its subsidiary, predecessor of Idearc, dated 11/1/06, the earliest of the loan agreements.

The Spencer Committee alleges that all later debt agreements were, by definition, "excess" indebtedness (over and above the admitted "basis" debt) and were voidable on that ground since they lacked consideration. All later debt was "bank" debt with proceeds made payable over (or passed through quickly) to Verizon, and Verizon giving nothing further in exchange, as the whole "basis" value of the company was already given or promised by the said earliest of the loan agreements.

The Spencer Committee alleges that the said "excess" debt consists of the so-called "Spinco Notes" referred to in the "Exchange Agreement", dated 11/13/06, as well as the Tranche A bank debt. On information, the Spencer Committee believes that the Tranche B bank debt is encompassed by the above mentioned "Spinco Notes", and does not represent any additional amount over that.

The Spencer Committee asserts that the whole Idearc indebtedness in excess of the first $2.8 Billion 8% Notes that defined the limit of the enterprise value (and debts arising out of the normal course of business - so called "swap" indebtedness) produced, at inception of the company, both a defined "insolvency" condition under the Bankruptcy Code [11 U.S.C. Sec. 101 (32)] and (B) an unenforceable indebtedness for lack of good consideration - because all loans were "pass through", to the parent entity - and because of circumstance of undue influence by a controlling parent.

The Spencer Committee additionally avers that the public sale and distribution of the securities of this company, insolvent at inception, followed by a take-back of the public ownerships within so short a period as two and a half years, is, under certain case law, a "collapsed" single fraudulent transaction.

The Debtors disagree with the above statements by the "Idearc Chapter 11 Independent Stock and Bondholders Committee." The Debtors believe that this Disclosure Statement supports confirmation of the Plan.

## B.    Statements by Committee

The Committee has informed the Debtors that it does not support the Plan. A letter from the Committee setting forth the bases of its decision to not support the Plan is attached as Exhibit C to this Disclosure Statement. While the Debtors disagree with the Committee's positions as set forth below, the Committee has requested that the following statements be included in this Disclosure Statement.

### 1.    *The Debtors' Financial Projections*

The Debtors are not explaining the basis for the deteriorations in their business reflected in their financial projections. Accordingly, it is unclear whether (i) such deteriorations are caused, for example, by general economic conditions or a general failure in the print advertising business or (ii) significant improvements in the economy would materially impact the Debtors' print businesses.

The Debtors' financial projections do not contain the same level of comprehensive information and industry analysis set forth in the financial projections made at the time of the spin-off. Accordingly, it is unclear whether the underlying assumptions for the two sets of projections are the same or whether they have changed, and, further, what the reason for any such change may be and whether such change could or should have been forecasted.

2.     *The Decision to Pursue the Current Plan*

The Debtors are not disclosing the other specific restructuring alternatives they considered. Accordingly, creditors are unable to determine whether or not such alternatives were in fact viable. In addition, the Debtors are not disclosing how there has been such a dramatic deterioration in their business since late 2008.

3.     *The Debtors' Cash Holdings at the Time of Filing*

The Debtors, using their existing cash on hand at the time of filing and their expected cash flows, could have continued to service their debt obligations in the ordinary course for at least a few more months. The continued debt service would have permitted additional distributions to unsecured creditors and potentially would have allowed the Debtors to postpone their bankruptcy filing and to continue exploring restructuring alternatives that may have allowed for better recoveries to unsecured creditors.

4.     *Debtors' Cash On Hand at Exit*

The Debtors are not explaining whether the expected cash on hand at exit will be sufficient to fund the Debtors' operations going forward. Therefore, it is unclear if the Plan is feasible.

5.     *Claims Against the Debtors' Directors and Officers*

These claims are based various causes of action, including [_____]. Other creditors may have similar claims against present and former officers and directors of the Debtors. The Debtors are not explaining whether such actions represent property of the estate that may provide additional source of recovery for unsecured creditors.

6.     *Executive Compensation*

The Debtors are not explaining whether they intend to assume the existing compensation packages, employment agreements, and benefit plans for their senior management, nor whether the threat of rejection of such employment agreements and benefit plans may present an opportunity to renegotiate the terms of those agreements. In addition, the Debtors are not explaining whether the restructuring transactions contemplated by the Plan will trigger the vesting of the benefits provided under the plans. Accordingly, it is unclear if the assumption of the employment agreements and benefit plans would be in the best interests of the estate.

7.     *Management's Equity Incentive Plan*

The Debtors are not identifying the amount of equity that they are reserving, or the caps on any distributions, under the new equity incentive program for the Debtors' management. Accordingly, it is unclear if the potential awards that the Debtors' management may receive under such program are appropriate in light of the Plan's proposed recoveries for unsecured creditors.

8.      *Principal Amount of New Debt*

The Debtors are not identifying the anticipated outstanding principal balance of the new secured notes to be provided to the Lenders nor whether the Debtors will have the ability to repay or refinance those notes at maturity. Thus, it is unclear if the Plan is feasible. In addition, the Debtors are not identifying the anticipated cash flows-to-debt ratio at the time of the new notes' maturity. Therefore, it cannot be determined whether the Debtors are able to refinance a larger amount of debt, which would thereby permit the Lenders to receive a greater amount of debt upon exit in exchange for a decrease in their share of the new equity.

9.      *Post-Effective Date Cash Payments to Lenders*

The Debtors are not identifying the amount of the expected cash payments to be made to the Lenders under the new secured notes nor whether the aggregate payments made to the Lenders following the commencement of these cases (including the $250 million adequate protection payment) exceed the payments that the Debtors would have made if they had continued to service their prepetition debt in the ordinary course. Accordingly, it is unclear if the Debtors could have pursued alternatives to the expedited bankruptcy filing and proposed Plan.

10.     *Assumption of Executory Contracts*

The Debtors have not identified the cure amounts that would be due upon the assumption of those contracts. In addition, the Debtors have not identified the magnitude of the unsecured claims that would arise from the rejection of such executory contracts nor whether the threat of rejection of such contracts could have allowed the Debtors to negotiate concessions from the counterparties. Accordingly, it cannot be determined whether the Debtors have exercised their business judgment in seeking to assuming these executory contracts.

11.     *Indemnification Obligations*

The Debtors are not explaining the basis for assuming certain prepetition and postpetition indemnification obligations to their officers and directors, what the magnitude of those obligations may be, what consideration the officers and directors have provided for the assumption of these obligations, nor why the prepetition contingent obligations should be treated differently than general unsecured claims. Therefore, it cannot be determined whether the assumption of these obligations is appropriate in light of the Plan's proposed recoveries for general unsecured creditors.

12.     *Tax Implications of Distributions*

The Debtors are not identifying the specific tax implications of the proposed distributions under the Plan. Accordingly, it cannot be determined what effect those tax implications will have on the recipients of distributions under the Plan.

13.     *Avoidance Actions and Other Litigation Rights*

The Debtors are not analyzing the avoidance actions and are not providing an estimate of the potential recoveries under such avoidance actions. Accordingly, it cannot be determined if the avoidance actions present a material source of recovery for general unsecured creditors. In addition, the Debtors are not explaining the basis for the retention by the Lenders, as the proposed majority owners of the Reorganized Debtors, of all other litigation rights given that the Lenders' prepetition liens do not

attach to those rights. In addition, the Debtors are not identifying what those other litigation rights may be or the estimate of any recoveries on those actions. Therefore, it cannot be determined if the retention of those litigation rights by the Lenders is appropriate or whether they may present an additional source of recovery for general unsecured creditors.

14.    *Third Party Releases and Investigation of Claims*

The Debtors are not identifying the good and valuable consideration provided by the released parties. Accordingly, it cannot be determined if in fact such releases and exculpations are appropriate. In addition, the Debtors are not explaining how they reached the conclusion that they do not have any valid claims against any of their present or former directors or officers, the Lenders, the Administrative Agent and various other third parties. Therefore, it cannot be determined if these conclusions are correct.

15.    *Funding of Litigation Trust*

The Debtors are not explaining the basis for funding the Litigation Trust with $250,000 (or less) to prosecute the Avoidance Actions. Accordingly, it cannot be determined whether such funding is in fact sufficient to prosecute the Avoidance Actions.

16.    *Intercompany Payables*

The amount of the intercompany payables that will be forgiven pursuant to the Plan is as follows [_____]. The Debtors, however, are not explaining why the intercompany payables are being forgiven nor what impact the forgiving has on general unsecured creditors. Therefore, it cannot be determined if the forgiving of the intercompany payables is appropriate.

17.    *Subsidiary Equity Interests*

The Debtors are not explaining why the retention of their equity interests in various subsidiaries is appropriate given that the Debtors' creditors are not being paid in full. Accordingly, it cannot be determined whether the retention of those equity interests is appropriate and not a violation of the absolute priority rule.

18.    *Classes Presumed to Accept Plan*

The Debtors are not identifying why certain classes of creditors are not entitled to vote on the Plan but instead are presumed to accept the Plan. Accordingly, it cannot be determined if the Debtors' characterization of these classes as non-voting classes is appropriate.

19.    *Recommendations Regarding Plan; Consents to Modification and Waivers*

The Committee does not support the Plan and recommends that creditors vote to reject the Plan. In addition, the Debtors are not explaining why it is appropriate to require the consent of the Administrative Agent to modify or waive any conditions to the effectiveness of the Plan.

20.    *The Debtors' Unencumbered Assets*

The Committee contends that the Lenders did not perfect their liens in the copyrights and the revenues that they generate, nor did the Lenders' liens attach to certain intellectual property licensed from Verizon. In addition, the Committee contends that the Lenders liens do not attach to the proceeds

of the postpetition advertising contracts.  As of the date of the solicitation of this Plan, the Debtors have not identified the value of the aforementioned collateral nor what investigations the Debtors have undertaken to value these assets and other unencumbered assets.  The Committee contends that the value of the aforementioned assets and other unencumbered assets remains undetermined.  In addition, the Debtors have not explained whether there are other assets in which the Lenders' purport to have a lien but, in fact, the perfection of such lien is lacking, nor whether the Debtors have undertaken any investigations either prior to or subsequent to the filing of the Disclosure Statement to reach any such determination.

Accordingly, the Committee contends that the allocation of the value of the aforementioned assets and any other unencumbered assets, and the resultant plan distributions to both the Lenders and the general unsecured creditors, cannot be determined at this time.  In addition, the Committee contends that any allocation of the entire amount of the value of the aforementioned assets or any unencumbered assets solely to the Lenders on account of their secured claims is improper as it would violate the requirements of Bankruptcy Code section 506(a).

21.     *The Filing of these Cases was Premature and Could have been Avoided*

At the time of the filing of these bankruptcy cases, the only pending default under the Credit Agreement was the issuance of a going-concern qualification in the Debtors' most recent financial statements—which was based on the Debtors' concerns about possible future covenant defaults.  That default carried a 30-day grace period for the Debtors to cure.  There were no payment defaults at the time of the bankruptcy filing, and the Debtors had more than $668 million in cash to continue servicing the Debtors' existing debt obligations in the ordinary course of business.   The Debtors have not identified whether they sought a forbearance from the Lenders or other restructuring alternatives besides commencing these cases.

22.     *The Debtors' Failure to Segregate $247 million Draw-Down*

The Debtors failed to segregate (i) the $247 million in funds drawn under the Credit Agreement in October 2008 and (ii) the proceeds from the dispositions of certain unencumbered assets, including, without limitation, certain real property owned by the Debtors as they had intended.  The Debtors instead deposited such funds and proceeds into certain deposit and securities accounts that were encumbered by the Lenders' liens, thus encumbering such funds and proceeds with the Lenders' liens and thus greatly reducing the recoveries that may have been available to general unsecured creditors.

23.     *The Terms of the New Secured Debt and Comparison to RH Donnelley*

The Debtors have not yet identified many of the material terms (such as financial covenants) of the new secured notes to be provided to the Lenders.  Accordingly, it cannot be determined if these terms are appropriate or in line with current market terms.

In addition, the Debtors are not including a comparison of the new secured notes under the Plan to the terms of the new secured debt proposed to be issued by its closest competitor, RH Donnelly, in its own bankruptcy case.  The Committee contends that the terms of the RH Donnelly secured debt is significantly more favorable to the borrower than the new secured notes proposed under the Plan.  For example, the proposed interest rate on the Lenders' new secured notes—LIBOR plus 8.5%—ranges anywhere from 2.25% to 6% higher than the interest rate under the new note that RHD Donnelley's secured lenders will receive—LIBOR plus 2.5% to 6.25%, depending on the particular tranche of debt.

The Debtors also are not explaining why their financial projections indicate continuing revenue declines while RH Donnelley's projections indicate revenue growth in the outer years, even though both companies contemplate a similar deleveraging of their balance sheets.

Furthermore, the terms of the new secured notes were negotiated by the Debtors in [_____].  As of the date of the solicitation of the Plan, and notwithstanding the Committee's contentions regarding the deficiencies in the Lenders' liens and potential fluctuations in the market that may provide for better terms, the Debtors have not renegotiated the terms of the new secured debt.

24.    *The Failure to Address any Cost-Savings Measures*

The Debtors are not identifying what, if any, cost-savings measures they have implemented during these bankruptcy cases to reduce their operating costs and whether any such cost-savings measures have been effective and resulted in increased cash flows and debt capacity for the Debtors.

25.    *The Committee's Exclusion from the Plan Process*

The Debtors did not engage the Committee in any meaningful discussions or negotiations prior to the filing of the Plan and the Disclosure Statement.  In addition, notwithstanding the Committee's identification of certain alleged infirmities in the Plan subsequent to the filing of the Plan, the Debtors have not modified the Plan in any way.

The Debtors disagree with the above statements by the Committee.  The Administrative Agent has informed the Debtors that it disagrees with the above statements by the Committee.  The Debtors believe that this Disclosure Statement supports confirmation of the Plan.

**C.    Statements by Sean Ryan**

Sean Ryan has informed the Debtors that he does not support the Plan.  While the Debtors disagree with Mr. Ryan's positions as set forth below, Mr. Ryan has requested that the following statements be included in this Disclosure Statement.

The financial explanation of this real reason for this bankruptcy is contained within the Securities and Exchange Commission Form 10-Q filing of Verizon  Communications, Inc., dated August 4, 2006, available                                                  online                                                  at http://investor.verizon.com/sec/sec_frame.aspx?FilingID=4576589&haspdf=0&hasxls=1

Verizon Communications, Inc., with the assistance of the Agent for the proposed Secured Credit Facility Claimants in  this bankruptcy proceeding loaded up the Debtor, before it was an independent company, with debt in excess of 6  times the subsidiary's book value, and more than 24 times the subsidiary's net quarterly income.

As stated in Verizon Communications Inc.'s quarterly report issued on August 4, 2006:

For the Three months ending June 30, 2006, Verizon Communications Inc., reported Operating Revenue $22,678 Million.

For the Three months ending June 30, 2006, Verizon Communications Inc., reported Net Income of $1,611 Million.

Verizon Communications Inc., reported its Consolidated Assets valued on June 30, 2006 as $183,843 Million.

Verizon Communications, Inc., reported its Consolidated Long Term Debt valued on June 30, 2006 at $ 32,030 Million

(Page 16, Verizon Communications, Inc., 10-Q of August 2006.)

In comparison, the Debtor's former parent Verizon Communications provided the following financial information for its subsidiary Verizon Information Services, what was to become "Idearc," debtor herein:

Assets (unreconciled) valued on June 30, 2006, at $1,488 Million.
(Page 17, Verizon Communications, Inc., 10-Q of August 4, 2006.)

Operating Revenues (unreconciled) valued on June 30, 2006, at $802 Million.
(Page 16, Verizon Communications, Inc., 10-Q of August 4, 2006.)

Operating Income (unreconciled) valued on June 30, 2006, at $367 Million
(Page 16, Verizon Communications, Inc., 10-Q of August 4, 2006.)

Idearc's predecessor, *e.g.*, Verizon Information Services, with only $1,488 Million in assets book value, *i.e.*, held less than 1% percent of the total assets of its parent Verizon with $183,843 Million in Assets. Idearc's predecessor Verizon Information Services had quarterly revenue of $802 Million, *e.g.*, approximately 3.5% of Verizon Communications $22,678 Million in Quarterly Revenue. Yet, Verizon Communications Inc. encumbered its subsidiary with $9,115 Million in debt. That amount roughly equals 28.45% of Verizon's total long term debt of $32,030 Million. Had the debt load of Idearc corresponded to the overall debtload of Verizon Communications, Inc., before the spin, proportionate to its assets, i.e., 17.4% liabilities to assets, the Information Services division that was to become Idearc would have been spun with a debt load not to exceed $259 Million, to wit: 17.4 % of $1,488 Million. Instead, the parent Verizon Communications, Inc., with the assistance of JPMorgan Chase, saddled the company with THIRTY-FIVE times that Idearc's properly proportionate amount compared to the debt to book assets ratio. Alternatively, had the secured lender JPMorgan Chase encumbered the spun subsidiary with an amount proportionate to the ratio of the subsidiary's earnings to that of the parent Verizon, i.e., 3.5% of the total debt, Idearc would only have $1,121 million in long term debt to concern itself with.

Nor can irrational exuberance explain the decisions of JPMorgan Chase to assist in the "bust-out" of the former division known as Verizon Information Services; the operating revenues of the subsidiary declined by 7.8 % compared to the same three month period ending June 30, 2005. (Page 37, Verizon Communications, Inc., 10-Q of August 4, 2006.)

     1.     *The Plan does not consider the value of claims against the Directors and Officers of Idearc preceding the bankruptcy, or otherwise fails to provide sufficient information as to the prospect of those claims.*

Prior to November 17, 2006, the Debtor was wholly owned and controlled by Verizon Communications, Inc., a Delaware corporation. The $9.115 billion in debt incurred in connection with the spin-off, was issued prior to November 17, 2006. The Directors of Idearc after November 17, 2006,

ratified the transaction despite the fact that the amount of debt imposed upon Idearc was disproportionate to the revenue in comparison to the pre-spin debt load allocatable to the predecessor subsidiary of Verizon Communications, Inc..

The underlying mechanics of the spinoff was explained by Verizon Communications, Inc., in its Form 8-K filed with the Securities Exchange Commission on November 17, 2006:

On November 17, 2006 (the "Distribution Date"), Verizon Communications Inc. ("Verizon") spun off the companies that comprised its domestic print and Internet yellow pages directories publishing operations. In connection with the spin-off, Verizon transferred to Idearc Inc. ("Idearc") all of its ownership interest in Idearc Information Services LLC and other assets, liabilities, businesses and employees primarily related to Verizon's domestic print and Internet yellow pages directories publishing operations (the "Contribution"). The spin-off was completed by making a pro rata distribution to Verizon's shareholders of all of the outstanding shares of common stock of Idearc.

In connection with the spin-off, on the Distribution Date, and in consideration for the Contribution, Idearc (1) issued to Verizon additional shares of Idearc common stock, (2) issued to Verizon $2.85 billion aggregate principal amount of Idearc's 8% senior notes due 2016 and $4.3 billion aggregate principal amount of loans under Idearc's tranche B term loan facility (collectively, the "Idearc Debt Obligations") and (3) transferred to Verizon approximately $2.4 billion in cash from cash on hand, from the proceeds of loans under Idearc's tranche A term loan facility and from the proceeds of the remaining portion of the loans under Idearc's tranche B term loan facility.

In addition, in connection with the spin-off, Verizon entered into the agreements described below.

Distribution Agreement

On November 13, 2006, Verizon entered into a distribution agreement with Idearc, which contains the key provisions relating to the separation of Idearc from Verizon and the distribution of Idearc common stock. The distribution agreement identifies the assets to be transferred, liabilities to be assumed and contracts to be assigned to Idearc by Verizon and by Idearc to Verizon in the separation and describes when and how these transfers, assumptions and assignments occur. The Contribution is made on an "as is," "where is" basis without any representations or warranties, and Idearc bears the economic and legal risks that the conveyance is insufficient to vest good and marketable title, free and clear of any lien or other security interest, that any necessary consents or approval were not obtained, and that requirements of laws or judgments were not complied with. A copy of the distribution agreement is attached hereto as Exhibit 10.1 and incorporated herein by reference into this Item 1.01.

Exchange Agreements

On November 13, 2006, Verizon entered into (1) an Exchange Agreement with Idearc (with respect to certain sections thereof) and J.P. Morgan Ventures Corporation and (2) an Exchange Agreement with Idearc (with respect to certain sections thereof) and Bear, Stearns & Co. Inc. (together with J.P. Morgan Ventures Corporation, the "Investment Entities") (collectively, the "Exchange Agreements"). Pursuant to the Exchange Agreements, Verizon transferred to the Investment Entities the Idearc Debt Obligations in exchange (the "Exchange") for certain debt obligations of Verizon held by

the Investment Entities. A copy of each Exchange Agreement is attached hereto as Exhibit 10.2 and 10.3, and each is incorporated herein by reference into this Item 1.01.

The Exchange was consummated on November 17, 2006.

(Verizon Communications, Inc., Form 8-k, filed on November 17, 2006.)

Thus, the spin occurred while Debtor was entirely controlled by its parent Verizon Communications, Inc..  Despite the lopsided amount of debt in comparison to the assigned asset value of Verizon Information Services as published by Verizon Communications, Inc., the Directors and Officers failed to disavow the disproportioned and unreasonable conditions associated with the spin, resulting in the present bankruptcy and likely loss to the unsecured creditors.  Moreover, the Officers and Directors published incorrect and misleading statements to the public regarding the financial condition of the Debtor, while the statute of limitation for avoidance of preferential payments lapsed.

Any plan must appropriately address these obvious issues.

2.      *The Plan allows a security interest by the Secured Lenders that is otherwise avoidable as fraudulent transfer, an illegal dividend, subject to subordination, or barred by the Absolute Priority Rule.*

In light of the notoriety of the transaction, and the underlying presence of an inadequate consideration, it is not beyond the realm of consideration that the liens of the Secured Lender Facility are subject to avoidance in their entirety, or subject to subordination to the claims of the unsecured trade and tort creditors, e.g., ". . . [a] claim purchaser with actual notice of the seller's receipt of an avoidable transfer may be subject to equitable subordination for its own misconduct." (See, *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 446 (S.D.N.Y. 2007).   The plan does not disclose that the money that is owed to the proposed Class 3 Secured Credit Facility Claimants was paid to Verizon Communications, Inc., the sole stockholder, prior to the spin off, with Idearc receiving **none** of the $9,115 Million.  The financial condition of both parent Verizon Communications, Inc., as well as its Information Services subsidiary were public record prior to the spin, thus impairing the allegedly "Secured Lenders" lien rights.

3.      *The Plan discriminates against classes of creditors.*

The proposed plan does not differentiate between creditors that were owed money by the Debtor's predecessor Verizon Information Services prior to November 17, 2006, and secured and unsecured creditors whose claims arose as a result of purchase of debt instruments which funded Verizon Communications Inc.'s payment of a dividend.  In so failing to differentiate between the claims arising from judgments, and trade claims incurred prior to the spin date  of November 17, 2006, and the debt incurred to fund the distribution to Verizon Communications, Inc.'s shareholders, the plan is unfair to the "pre-spin" creditors.

4.      *The Plan improperly exculpates the Debtors Insiders, Debtors' counsel, and the Official Creditors Committee representative Milbank Tweed.*

The proponents of the plan fail to describe their reasoning behind proposing a plan that suggests to exculpate participants in the bankruptcy proceeding in light of the circumstances of record.

Fulbright and Jaworski, Debtor's counsel in this proceeding, also represent Verizon, and represented the controlled Idearc preceding the "spin." [See, APPLICATION, PURSUANT TO 11 U.S.C. §§ 327, 328 & 329 AND RULES 2014, 2016 AND 6003 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, FOR AN INTERIM AND FINAL ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF FULBRIGHT & JAWORSKI L.L.P. AS ATTORNEYS FOR THE DEBTORS, filed on March 31, 2009, Docket No. 14]; also see Idearc 8-K, November 21, 2006, Exhibit 10-9 (Employee Matters), with Fulbright and Jaworski lawyer Glen J. Hettinger.]

Furthermore, the lawyers of Fulbright presently represent Verizon Communications, Inc., administrative agent of senior debt JPMorgan Chase Bank NA, swap agreement counterparty Goldman Sachs & Co. and eight other such counterparties, and presently represent and formerly represented numerous allegedly "secured lenders." Although these relationships were disclosed in the application for employment in this case, the solution indicated by Debtors counsel was to refer litigation implicating a conflict to the Official Creditors Committee. Unfortunately, the counsel chosen by the United States Trustee, MILBANK, TWEED, HADLEY & McCLOY LLP was similarly constructively conflicted as a result of relationships with secured lenders, Verizon, and swap agreement counterparties. In the interim, time has passed. Statutes of limitations may have lapsed.

Specifically, prior to the bankruptcy filing Milbank Tweed was counsel to a steering committee (the "Steering Committee") of the holders of $2.85 billion aggregate principal amount of 8% Senior Notes due 2016 (the "Notes") issued by Idearc "pursuant to that certain Indenture dated November 17, 2006." [APPLICATION PURSUANT TO 11 U.S.C. § 1103 AND FED. R. BANKR. P. 2014 AND 5002 FOR ORDER AUTHORIZING RETENTION AND EMPLOYMENT OF MILBANK, TWEED, HADLEY & McCLOY LLP AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF IDEARC, INC., ET AL, EFFECTIVE AS OF APRIL 13, 2009, dated April 30,2009]. The lawyers of Milbank necessarily have taken positions preceding the litigation that are inconsistent with a position by the non-bond, trade and judgment unsecured creditors challenging the invalidity of the debt or its characterization for the same the same debt that is relied upon by the Class 6 Claimants as secured. Furthermore, the lawyers of Milbank presently represent Verizon Communications, Inc., swap agreement counterparty Goldman Sachs & Co., and formerly represented secured lenders, including but not limited to, Thrivent Financial for Lutherans, Royal Bank of Canada / RBC, currently represent affiliates of a secured lender including but not limited to ING Senior Income Fund, ING Pimco High Yield Portfolio, ING International II- Senior Bank Loan Euro. The conflicting positions have coincided in lawyers with Milbank allowing some creditors to review documents related to this bankruptcy that other unsecured creditors, including Sean Ryan and his lawyers, were denied inspection.

Ostensibly to address conflicts, the Official Creditor Committee has referred litigation to yet *another* set of lawyers. On July 29, 2009, those lawyers of Quinn Emanuel Urquhart Oliver & Hedges, LLP, made their entrance into the proceeding. While designated independent, the Quinn Emanuel firm's participation in this case is lead by Susheel Kirpalani, who prior to joining Quinn Emanuel, from 2001 to 2007, was a partner with the law firm of Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), lead counsel to the Creditors' Committee. Mr. Kirpalani was associated with Milbank from 1998 to 2001. Since Mr. Kirpalani joined Quinn Emanuel, he has have served as conflicts counsel to Milbank in a variety of matters including, most recently, in the Lehman Brothers chapter 11 cases.

Milbank was alerted to events in the proceeding that should have merited attention and concern. Specifically, and by way of example, on April 21, 2009, Creditors Dallas County, Tarrant County, City of Coppell, Coppell Independent School District and Irving Independent School District submitted its "OBJECTION OF DALLAS COUNTY, TARRANT COUNTY, CITY OF COPPELL, COPPELL

INDEPENDENT SCHOOL DISTRICT AND IRVING INDEPENDENT SCHOOL DISTRICT TO INTERIM AGREED ORDER  AUTHORIZING USE OF CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION TO LENDERS."  The objection pointed out several onerous provisions within the proposed Cash Collateral order which should have apprized the Official Creditors Committee of problems within the proposed order that would potentially result in injury to the unsecured creditors. However, the opposition of the Official Creditors Committee filed on April 23, 2009 to the proposed order failed to join with those Creditors.

Moreover, the Milbank lawyers acceded to the imposition of a deadline of July 13, 2009, for creditors and other parties in interest to raise challenge the secured creditors liens resulting in the necessity of reconsideration motions by the Committee, and two other creditors.   Notwithstanding the existence of the deadline, the Creditor Committee concerned itself with the secured lenders funding investigation and litigation efforts rather than pursuing the viable claims against the characterization of the secured creditors lien rights.

Notwithstanding the obvious conflict between the non-bond trade and judgments creditors claims to the claims of the bondholders and any disallowed security interest of the alleged secured creditors, the Official Creditors Committee has held itself out as representing "all unsecured creditors" when in fact there is a conflict between the two
variety of creditors and their respective legal positions.  Indeed, the Official Unsecured Creditors Committee successfully sought and obtained leave to deny the unsecured creditors information.  The claims of the pre-spin, non-bond creditors, who are a minority in light of valuation of the claims, have actually been denied information provided other creditors, and have been inadequately represented in the dealings before the bankruptcy court.

Thus, the exculpation clauses are not in the best interest of the estate of the Debtors, nor in the best interest of the unsecured creditors.

> 5.     *The Plan insufficiently provides for customer retention.*

According to the proponents of the Debtors' Plan:

> "As of December 31, 2008, approximately 84% of the Company's print directory advertising revenues were derived from selling advertising to local businesses, which are generally small- and medium-sized business. The Company does not depend to any significant extent on the sale of advertising to a particular industry or to a particular advertiser. In 2008, no single local client accounted for more than 0.08% of the Company's revenues, with the Company's top ten local clients representing less than 0.6% of its revenues. The breadth of the Company's client base reduces its exposure to adverse economic conditions that may affect particular geographic regions or specific industries and provides additional stability to its operating results. However, small- and medium-sized businesses tend to have fewer financial resources and a higher rate of failure than larger businesses, in particular during periods of economic downturn, such as the Company is currently experiencing."

(First Amended Disclosure Statement,Section IV, sub.section (I).)

Although, the continued patronage of the Debtor by small and medium sized business customers is essential to the continuing operations of the Debtor, within the Plan there is an absence of information addressing how the Company intends to cure past customer retention and service issues.

The Company has initiated a number of lawsuits against former employees arising from allegations that employees engaged in forgery of customer contracts of advertising within the directories. To the extent the allegations are true, there is no information provided as to the number of forged insertion orders, and the Company's plan to remedy that potential problem. Further, some percentage of the existing customer base is dissatisfied with the services provided by the Company. Whether the company has failed to address customer retention by way of its policies and the consequence of that failure is a factor for consideration in the existing plan of reorganization, and in particular, whether the existing management of the company should be retained.

6.    *The Debtors' Financial Projections*

The Debtors fail to explain the basis for the deteriorations in their business reflected in their financial projections. Accordingly, it is unclear whether (i) such deteriorations are caused, for example, by general economic conditions or a general failure in the print advertising business or (ii) significant improvements in the economy would materially impact the Debtors' print businesses.

The Debtors' financial projections do not contain the same level of comprehensive information and industry analysis set forth in the financial projections made at the time of the spin-off. Accordingly, it is unclear whether the underlying assumptions for the two sets of projections are the same or whether they have changed, and, further, what the reason for any such change may be and whether such change could or should have been forecasted.

The Plan proponents similarly fail to explain the deterioration of the business preceding the economic difficulties. E.g., the significant decline in revenue in the Debtors' predecessor division between 2005 to 2006, despite a healthy economy. (See, e.g., page 37, Verizon Communications, Inc., 10-Q of August 4, 2006.)

7.    *The Decision to Pursue the Current Plan*

The Debtors fail to disclose other specific restructuring alternatives they considered.
Accordingly, creditors are unable to determine whether or not such alternatives were in fact viable. In addition, the Debtors offer no explanation why there has been such a dramatic deterioration in their business since late 2008.

8.    *The Debtors' Cash Holdings at the time of filing of bankruptcy is inconsistent with the timing of the decision to file bankruptcy.*

The Debtors, using their existing cash on hand at the time of filing and their expected cash flows, could have continued to service their debt obligations in the ordinary course for at least a few more months. The continued debt service would have permitted additional distributions to unsecured creditors and potentially would have allowed the Debtors to postpone their bankruptcy filing and to continue exploring restructuring alternatives that may have allowed for better recoveries to unsecured creditors. Alternatively, the bankruptcy filing could have occurred sooner in light of the insolvency of Debtor at the outset. To the extent that Management timed the filing of the bankruptcy to occur after the lapse of

any time periods specified in 11 USC section 546, the creditors are entitled to disclosure. The proponents fail to explain timing of the decision to declare bankruptcy.

### 9. Debtors' Cash On Hand at Exit

The proponents of the Plan fail to explain whether the expected cash on hand at exit will be sufficient to fund the Debtors' operations going forward. Therefore, it is unclear if the Plan is feasible.

### 10. Executive Compensation

The proponents of the Plan fail to explain whether Debtors intend to assume the existing compensation packages, employment agreements, and benefit plans for their senior management, nor whether the threat of rejection of such employment agreements and benefit plans may present an opportunity to renegotiate the terms of those agreements. In addition, the Debtors are not explaining whether the restructuring transactions contemplated by the Plan will trigger the vesting of the benefits provided under the plans. Accordingly, it is unclear if the assumption of the employment agreements and benefit plans would be in the best interests of the estate.

Further, in light of the declining revenue since 2005, and apparently less than effective management of the Debtor and its predecessor Verizon Information Services, it is unclear from the disclosure statement the reasoning process and factors considered in deciding to retain current management.

### 11. Management's Equity Incentive Plan

The plan proponents fail to identify the amount of equity that Debtors would be reserving, or the caps on any distributions, under the new equity incentive program for the Debtors' management. Accordingly, it is unclear if the potential awards that the Debtors' management may receive under such program are appropriate in light of either past performance in sales growth, or the Plan's proposed recoveries for unsecured creditors.

### 12. Principal Amount of New Debt

The Plan proponents do not identify the anticipated outstanding principal balance of the new secured notes to be provided to the Lenders nor whether the Debtors will have the ability to repay or refinance those notes at maturity. Thus, it is unclear if the Plan is feasible. In addition, the proponents do not identify the anticipated cash flows-to-debt ratio at the time of the new notes' maturity. Therefore, it cannot be determined whether the Debtors are able to refinance a larger amount of debt, which would thereby permit the Lenders to receive a greater amount of debt upon exit in exchange for a decrease in their share of the new equity.

### 13. Post-Effective Date Cash Payments to Lenders

The plan proponents fail to identify the amount of the expected cash payments to be made to the Lenders under the new secured notes nor whether the aggregate payments made to the Lenders following the commencement of these cases (including the $250 million adequate protection payment) exceed the payments that the Debtors would have made if they had continued to service their prepetition debt in the ordinary course. Accordingly, it is unclear if the Debtors could have pursued alternatives to the expedited bankruptcy filing and proposed Plan.

14. *Assumption of Executory Contracts*

The plan proponents fail to identify the cure amounts that would be due upon the assumption of those contracts. In addition, the proponents have not identified the magnitude of the unsecured claims that would arise from the rejection of such executory contracts nor whether the threat of rejection of such contracts could have allowed the Debtors to negotiate concessions from the counterparties. Accordingly, it cannot be determined whether Debtors' management and the plan proponents have exercised their business judgment in seeking to assuming these executory contracts.

15. *Indemnification Obligations assumed by the Debtors*

The plan proponents fail to explain the basis for assuming certain prepetition and postpetition indemnification obligations to their officers and directors, what the magnitude of those obligations may be, what consideration the officers and directors have provided for the assumption of these obligations, nor why the prepetition contingent obligations should be treated differently than general unsecured claims. Therefore, it cannot be determined whether the assumption of these obligations is appropriate in light of the Plan's proposed recoveries for general unsecured creditors.

16. *Tax Implications of Distributions*

The plan proponents fail to identify the specific tax implications of the proposed distributions under the Plan. Accordingly, it cannot be determined what effect those tax implications will have on the recipients of distributions under the Plan.

17. *Avoidance Actions and Other Litigation Rights*

The plan proponents fail to analyze the avoidance actions and are not providing an estimate of the potential recoveries under such avoidance actions. Accordingly, it cannot be determined if the avoidance actions present a material source of recovery for general unsecured creditors. In addition, the proponents are not explaining the basis for the retention by the Lenders, as the proposed majority owners of the Reorganized Debtors, of all other litigation rights given that the Lenders' prepetition liens do not attach to those rights. In addition, the Debtors are not identifying what those other litigation rights may be or the estimate of any recoveries on those actions. Therefore, it cannot be determined if the retention of those litigation rights by the Lenders is appropriate or whether they may present an additional source of recovery for general unsecured creditors.

18. *Third Party Releases and Investigation of Claims*

The proponents fail to identify the "good and valuable" consideration provided by the released parties. Accordingly, it cannot be determined if in fact such releases and exculpations are appropriate. In addition, the proponents do not explain how they reached the conclusion that the Debtors do not have any valid claims against any of their Debtors or former directors or officers, the Lenders, the Administrative Agent and various other third parties. Therefore, it cannot be determined if these conclusions are correct.

19. *Funding of Litigation Trust*

The plan proponents do not explain the basis for funding the Litigation Trust with $250,000 (or less) to prosecute the Avoidance Actions. Accordingly, it cannot be determined whether such funding is in fact sufficient to prosecute the Avoidance Actions.

20. *Intercompany Payables*

The amount of the intercompany payables that will be forgiven pursuant to the Plan is as follows [_____]. The Debtors, however, are not explaining why the intercompany payables will be forgiven nor what impact the forgiving has on general unsecured creditors. Therefore, it cannot be determined if the forgiving of the intercompany payables is appropriate.

21. *Subsidiary Equity Interests*

Proponents fail to explain why the retention of Debtors equity interests in various subsidiaries is appropriate given that the Debtors' creditors are not being paid in full. Accordingly, Sean Ryan cannot determine whether the retention of those equity interests is appropriate and not a violation of the absolute priority rule.

22. *Classes Presumed to Accept Plan*

The proponents fail to disclose why certain classes of creditors are not entitled to vote on the Plan but instead are presumed to accept the Plan. Accordingly, it cannot be determined if the Debtors' characterization of these classes as non-voting classes is appropriate.

23. *Recommendations Regarding Plan; Consents to Modification and Waivers*

Sean Ryan does not support the Plan and recommends that creditors vote to reject the Plan. In addition, the Plan Proponents fail to explain why it is appropriate to require the consent of the Administrative Agent to modify or waive any conditions to the effectiveness of the Plan.

24. *The Debtors' Unencumbered Assets*

Sean Ryan contends that the Lenders did not perfect their liens in the copyrights and the revenues that they generate, nor did the Lenders' liens attach to certain intellectual property licensed from Verizon. In addition, Sean Ryan contends that the Lenders liens do not attach to the proceeds of the postpetition advertising contracts. As of the date of the solicitation of this Plan, the Debtors have not identified the value of the aforementioned collateral nor what investigations the Debtors have undertaken to value these assets and other unencumbered assets. Sean Ryan contends that the value of the aforementioned assets and other unencumbered assets remains undetermined. In addition, the Plan Proponents do not explain whether there are other assets in which the Lenders' purport to have a lien but, in fact, the perfection of such lien is lacking, nor whether the Debtors have undertaken any investigations either prior to or subsequent to the filing of the Disclosure Statement to reach any such determination.

Accordingly, Sean Ryan contends that the allocation of the value of the aforementioned assets and any other unencumbered assets, and the resultant plan distributions to both the Lenders and the general unsecured creditors, cannot be determined at this time. In addition, Sean Ryan contends that any

allocation of the entire amount of the value of the aforementioned assets or any unencumbered assets solely to the Lenders on account of their allegedly secured claims is improper as it would violate the requirements of Bankruptcy Code section 506(a).

25.   *The Filing of these Cases was Premature and Could have been Avoided*

At the time of the filing of these bankruptcy cases, the only pending default under the Credit Agreement was the issuance of a going-concern qualification in the Debtors' most recent financial statements— which was based on the Debtors' concerns about possible future covenant defaults. That default carried a 30-day grace period for the Debtors to cure. There were no payment defaults at the time of the bankruptcy filing, and the Debtors had more than $668 million in cash to continue servicing the Debtors' existing debt obligations in the ordinary course of business. The Debtors have not identified whether they sought a forbearance from the Lenders or other restructuring alternatives besides commencing these cases.

26.   *The Debtors' Failure to Segregate $247 million Draw-Down*

The Debtors failed to segregate (i) the $247 million in funds drawn under the Credit Agreement in October 2008 and (ii) the proceeds from the dispositions of certain unencumbered assets, including, without limitation, certain real property owned by the Debtors as they had intended. The Debtors instead deposited such funds and proceeds into certain deposit and securities accounts that were encumbered by the Lenders' liens, thus encumbering such funds and proceeds with the Lenders' liens and thus greatly reducing the recoveries that may have been available to general unsecured creditors.

27.   *The Terms of the New Secured Debt and Comparison to RH Donnelley*

The Plan Proponents have not yet identified many of the material terms (such as financial covenants) of the new secured notes to be provided to the Lenders. Accordingly, it cannot be determined if these terms are appropriate or in line with current market terms.

In addition, the proponents are not including a comparison of the new secured notes under the Plan to the terms of the new secured debt proposed to be issued by its closest competitor, RH Donnelly, in its own bankruptcy case. Sean Ryan contends that the terms of the RH Donnelly secured debt is significantly more favorable to the borrower than the new secured notes proposed under the Plan. For example, the proposed interest rate on the Lenders' new secured notes—LIBOR plus 8.5%—ranges anywhere from 2.25% to 6% higher than the interest rate under the new note that RHD Donnelley's secured lenders will receive—LIBOR plus 2.5% to 6.25%, depending on the particular tranche of debt.

The Proponents fail to explain why their financial projections indicate continuing revenue declines while RH Donnelley's projections indicate revenue growth in the outer years, even though both companies contemplate a similar deleveraging of their balance sheets.

Furthermore, the terms of the new secured notes were negotiated by the Debtors in [_____]. As of the date of the solicitation of the Plan, and notwithstanding Sean Ryan's contentions regarding the deficiencies in the Lenders' liens and existing fluctuations in the market that may provide for better terms, the Debtors have not renegotiated the terms of the new secured debt.

28.    *The Failure to Address any Cost-Savings Measures*

The Debtors are not identifying what, if any, cost-savings measures they have implemented during these bankruptcy cases to reduce their operating costs and whether any such cost-savings measures have been effective and resulted in increased cash flows and debt capacity for the Debtors.

29.    *The Non-Bond Creditors Exclusion from the Plan Process*

The Debtors did not engage the effectively unrepresented non-bond unsecured creditors in any meaningful discussions or negotiations prior to the filing of the Plan and the Disclosure Statement. In addition, notwithstanding other parties in interest's identification of certain alleged infirmities in the Plan subsequent to the filing of the Plan, the Debtors have not modified the Plan in any way.

The Debtors disagree with the above statements by Mr. Ryan. The Debtors believe that this Disclosure Statement supports confirmation of the Plan.

## XIII.  THE SOLICITATION; VOTING PROCEDURES

### A.    Parties in Interest Entitled to Vote

In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the claim or interest is "allowed," which means generally that no party in interest has objected to such claim or interest and (ii) the claim or interest is "impaired" by the plan.

Under Section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan.

### B.    Classes Entitled to Vote to Accept or Reject the Plan

Holders of (i) Secured Credit Facility Claims in Class 3 and (ii) Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims in Class 4 voting as a single class are entitled to vote to accept or reject the Plan; *provided, however*, that by electing to have its General Unsecured Claims or Unsecured Note Claims, as applicable, reclassified as Convenience Claims, the holder thereof is deemed to have accepted the Plan with respect to such Class vote. By operation of law, each unimpaired Class of Claims or Interests is deemed to have accepted the Plan and each impaired Class of Claims or Interests that will receive nothing under the Plan is deemed to have rejected the Plan and, therefore, the holders of Claims or Interests in such Classes are not entitled to vote to accept or reject the Plan. Consequently, Classes 1 and 2 are deemed to have accepted the Plan and Classes 6 and

7 are deemed to have rejected the Plan; and, therefore, none of the holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan.

## C.    Solicitation Order

On [_____], 2009, the Bankruptcy Court entered an order that, among other things, determines the dates, procedures, and forms applicable to the process of soliciting votes on the Plan and establishes certain procedures with respect to the tabulation of such votes (the "Solicitation Order"). Parties in interest may obtain a copy of the Solicitation Order by making written request to the Debtors' counsel or by accessing https://ecf.txnb.uscourts.gov or at www.kccllc.net/idearc.

## D.    Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by the Voting Agent and the Debtors in their sole discretion, which determination will be final and binding.  As indicated under Article XIII.E, entitled "Withdrawal of Ballots; Revocation," effective withdrawals of ballots must be delivered to the Voting Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal.  The Debtors also reserve the right to reject any and all ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular ballot.    The interpretation (including the ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.    Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## E.    Withdrawal of Ballots; Revocation

Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline.  To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be received by the Voting Agent in a timely manner at:

> KURTZMAN CARSON CONSULTANTS LLC
> 2335 ALASKA AVENUE
> EL SEGUNDO, CALIFORNIA  90245
> FACSIMILE: (310) 751-1847
> ATTENTION: Idearc Inc.

The Debtors intend to consult with the Voting Agent to determine whether any withdrawals of ballots were received and whether the requisite acceptances of the Plan have been received.  As stated above,

the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of ballots which is not received in a timely manner by the Voting Agent will not be effective to withdraw a previously cast ballot.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change his or its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed ballot is received, only the ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

**F.      Further Information; Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or the Solicitation Order), please contact:

> KURTZMAN CARSON CONSULTANTS LLC
> 2335 ALASKA AVENUE
> EL SEGUNDO, CALIFORNIA  90245
> FACSIMILE:  (310) 751-1847
> TELEPHONE: (866) 967-0670
> EMAIL:  idearc@kccllc.com
> ATTENTION: Idearc Inc.

*[Signature Page Follows]*

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Secured Credit Facility Claims in Class 3 and Unsecured Note Claims, Unsecured Credit Facility Claims, and General Unsecured Claims in Class 4 to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before 4:00 p.m. Central Time on the Voting Deadline.

Dated: September [___], 2009

<div style="margin-left:40%">

Idearc Inc.
Idearc Information Services LLC
Idearc Media LLC
License Application Corporation
Second License Application Corporation
Idearc Media Sales-East Co.
Idearc Media Sales-East LLC
Idearc Media Sales-West Inc.
Idearc Media Services-East Inc.
Idearc Media Services-West Inc.


By:_____ */s/ Samuel D. Jones*_____
    Samuel D. Jones
    Executive Vice President, Chief Financial
    Officer and Treasurer, Idearc Inc.

</div>

Toby L. Gerber (SBT 07813700)
Kristian W. Gluck (SBT 24038921)
Ryan E. Manns (SBT 24041391)
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

and

Berry D. Spears (SBT 18893300)
Anna Maria Mendez (SBT 24055960)
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Avenue, Suite 2400
Austin, Texas 78701-3271
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

**Appendix A**

**First Proposed Joint Plan of Reorganization of Idearc Inc.,**
***et al.*, Debtors**

**[See attached]**

**Appendix B**

# Debtors' Corporate Structure



**Appendix C**

**FINANCIAL PROJECTIONS**

The following unaudited pro forma projected financial data (the "Projections") for the Debtors have been derived to show the effect of the consummation of the Plan and the projected financial performance the Reorganized Debtors following the effectiveness of the Plan, which for purposes of this analysis is assumed to occur on December 31, 2009. Other significant assumptions on which the pro forma adjustments and the Projections are based are set forth herein.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NOT REVIEWED THE ACCOMPANYING PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTORS DO NOT INTEND TO, AND DISCLAIM ANY OBLIGATION TO, (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF REORGANIZED IDEARC'S NEW COMMON STOCK OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE DEBTORS WILL BE REQUIRED TO ESTIMATE THE DEBTORS' REORGANIZATION VALUE, THE FAIR VALUE OF THEIR ASSETS, AND THEIR ACTUAL LIABILITIES AS OF THE EFFECTIVE DATE. SUCH DETERMINATION WILL BE BASED UPON THE FAIR VALUE AS OF THAT DATE, WHICH COULD BE MATERIALLY GREATER OR LESS THAN THE VALUE ASSUMED IN THE PROJECTIONS. ANY FRESH-START REPORTING ADJUSTMENTS THAT MAY BE REQUIRED IN ACCORDANCE WITH STATEMENT OF POSITION 90-7 – FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE, INCLUDING ANY ALLOCATION OF THE DEBTORS' REORGANIZATION VALUE TO THE DEBTORS' ASSETS IN ACCORDANCE WITH THE PROCEDURES SPECIFIED IN FINANCIAL ACCOUNTING STANDARDS BOARD STATEMENT 141 – BUSINESS COMBINATIONS WILL BE MADE WHEN THE DEBTORS EMERGE FROM BANKRUPTCY. THE PROJECTIONS DO NOT REFLECT ANY FRESH-START REPORTING ADJUSTMENTS THAT MAY BE REQUIRED TO BE MADE ON THE EFFECTIVE DATE.  THE PROJECTIONS ASSUME A PRO FORMA CASH BALANCE OF $150 MILLION AND A PRO FORMA SENIOR SECURED TERM LOAN BALANCE OF $2.75 BILLION PURSUANT TO THE TERMS OF THE PLAN, WITH ALL LIABILITIES SUBJECT TO COMPROMISE WRITTEN OFF.

THE PROJECTIONS PROVIDED IN THE DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS' MANAGEMENT. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, AFTER CONSULTATION WITH THE DEBTORS' FINANCIAL ADVISORS,

MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. FINALLY, THE FOLLOWING PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE DEBTORS AS OF THE EFFECTIVE DATE.

Moelis has estimated the approximate mid-point equity value for Reorganized Idearc at approximately $200.0 million. For the purpose of the following Projections, a reorganization value of approximately $200.0 million has been assigned and allocated to the post-chapter 11 equity. This estimated reorganization value, as well as its allocation to the specific assets and liabilities may be significantly different from the final amounts that will be determined upon the Debtors' emergence from chapter 11.

EBITDA ("EBITDA") is measured as earnings (defined as total operating revenue less total operating expenses of selling, cost of sales and general and administrative, as defined below) before interest, taxes, depreciation and amortization and excluding restructuring and other one-time charges. EBITDA is a metric used by the Debtors' management and is frequently used by the financial community to provide insight into an organization's operating trends and facilitate comparisons between peer companies, since interest, taxes, depreciation and amortization can differ greatly between organizations as a result of differing capital structures and tax strategies. EBITDA can also be a useful measure of a company's ability to service debt.

## A.     ACCOUNTING POLICIES

The Financial Projections have been prepared in good faith based upon assumptions believed to be reasonable. The Financial Projections include assumptions to various financial accounts of the Debtors, which are based upon the Debtors' estimates and market conditions.

## B.     PROJECTION ASSUMPTIONS

The Debtors, with the assistance of various professionals, prepared the Financial Projections for the five years ending December 31, 2009, 2010, 2011, 2012 and 2013, respectively. The Financial Projections are based on a number of assumptions, and while the Debtors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will ultimately be realized. The Financial Projections should be read in conjunction with the assumptions, qualifications and notes contained herein, the risk factors described in Section VII of the Disclosure Statement, and the historical financial statements filed by the Debtors. The following summarizes the underlying key assumptions upon which the Financial Projections were based.

Given the uncertainty related to the timing of an industry turnaround, the current economic conditions and other aspects relative to the forecast, management has prepared two cases for their forecasts: i) one

case assumes the current negative trendline with delayed stabilization in the out years (the "Current Case") and ii) the other is a more optimistic case which assumes a more robust recovery and more aggressive timing in implementation and realization of benefits from cost cutting initiatives (the "Opportunity Case"). Key Current Case assumptions include a gradually improving U.S. economy and new operating initiatives that mitigate the decline on both print and internet revenues, but generate limited growth. Key Opportunity Case assumptions include a more rapidly improving U.S. economy beginning in 2010, operating initiatives more significantly impact both print and internet revenues beginning in 2010, continued, but moderating decline in print revenue and accelerated timing of cost cutting initiatives in the forecast.

Management considers the Current Case a more likely scenario given the current operating environment.

The Financial Projections are based on the assumption that the Plan will be confirmed as stated in the Disclosure Statement and Plan of Reorganization and will become effective December 31, 2009.

The Debtors' management is implementing a strategic business plan that seeks to effect fundamental changes in how the Debtors' approach the traditional directories business. The business plan emphasizes several critical elements, including: a renewed focus on the consumer, supported by increased marketing and new programs, to increase awareness and usage of the Debtors' print and Internet products in an increasingly fragmented local search marketplace; the launch of innovative print and Internet products and performance-based pricing models, supported by an upgraded technology infrastructure, designed to improve the efficacy of the Debtors' offerings for advertising clients; and improved sales force productivity through enhanced training, greater use of technology and streamlined sales channels based on client profitability and product needs. In addition to these elements, the Debtors intend to continue a cost-reduction program launched in 2008 with the objective of reducing certain selling, operational and administrative expenses to address the revenue declines caused by the difficult operating and economic environment.

## C.    PROJECTED CONSOLIDATED STATEMENT OF OPERATIONS

### Operating Revenue

The Debtors derive operating revenue primarily from the sale of advertising in its print directories, which is referred to as Print Products revenue. Of the total 2008 amortized revenue of $2,973 million, $2,673 million, or approximately 90% came from the sale of advertising in print products. Revenue generated by Internet products, including Superpages.com and Switchboard.com, referred to as Internet revenue, was $300 million, or approximately 10% of total 2008 amortized revenue.

*Print Products* – Advertising in print directories is sold a number of months prior to the date each title is published and recognized ratably over the life of each directory, which is typically 12 months, using the amortization method of accounting, with revenue recognition commencing in the month of publication. A portion of the revenue reported in any given year represents sales activity and in some cases publication of directories that occurred in the prior year. Print advertising is sold to two customer bases: local advertisers, comprised of small- and medium-sized businesses that advertise in a limited geographical area, and national advertisers, comprised of larger businesses that advertise regionally or nationally. In addition to its print directories, the Debtors also sell direct mail advertising products to businesses seeking to reach consumers located in specific geographic areas.

*Internet* – Internet products, including Superpages.com and Switchboard.com, earn revenue from two primary sources: fixed-fee services and performance-based advertising products. Fixed-fee services

include advertisement placement on Idearc websites, and website development and hosting for the Debtors' advertisers. Revenue from fixed-fee services is recognized monthly over the life of the service. Performance-based advertising products revenue is earned when consumers connect with the Debtors' advertisers by a "click" on their Internet advertising or a phone call to their businesses. Performance-based advertising products revenue is recognized when there is evidence that qualifying transactions have occurred.

Growth in operating revenue can be affected by several factors, including changes in the number of advertising customers, changes in the pricing of advertising, changes in the quantity of advertising purchased per customer, changes in the size of the sales force and the introduction of new products. In addition, growth in operating revenue can be affected by the ongoing advertiser and consumer shift toward Internet-delivered local search information and direct mail products and away from the print directory. The projections reflect the Debtors' expectation for continued change in its overall operating revenue mix by forecasting a consistent decline in Print Products revenue that is partially offset by growth in Internet revenue.

The revenue projections are based on an analysis of the business prospects by product (Print Products and Internet) prepared by the Debtors' operating executives and financial management. The Debtors' corporate management reviewed the financial projections and made certain adjustments based on its views of the industry and potential new business prospects as well as potential business delays and other risks and contingencies related to the bankruptcy filing.

**Operating Expenses**

Operating expense (excluding depreciation and amortization) is comprised of three expense categories: selling, cost of sales and general and administrative.

*Selling* – Selling expense includes the sales and sales support organizations, including base salaries and sales commissions paid to the Debtors' local sales force, national sales commissions paid to independent certified marketing representatives, local marketing and promotional expenses, advertising and customer care expenses. Sales commissions are amortized over the average life of the directory or advertising service. All other selling costs are expensed as incurred.

*Cost of Sales* – Cost of sales includes the costs of producing and distributing both print yellow pages directories and Internet local search services, including publishing operations, paper, printing, directory distribution, website development and Internet traffic costs. Costs directly attributable to producing print directories are amortized over the average life of a directory. These costs include paper, printing and initial distribution. All other costs are expensed as incurred.

*General and Administrative* – General and administrative expense includes corporate management and governance functions, which are comprised of finance, human resources, real estate, marketing, legal, investor relations, billing and receivables management. In addition, general and administrative expense includes bad debt, operating taxes, insurance and other general expenses including restructuring costs and transition costs. All general and administrative costs are expensed as incurred.

The Debtors expect expenses to increase as a percentage of revenue principally due to the inability to completely offset the decline in Print Products revenue with incremental cost reductions. In addition, the Debtors expect to increase annual marketing expenditures to support the consumer awareness initiatives incorporated into the business plan. Furthermore, to achieve the forecasted growth in Internet revenue the Debtors will likely need to incur additional expense to generate sufficient Internet traffic to meet the

advertising objectives of its clients. Partially offsetting the reduction in Print Products revenue and other expense increases is an expectation for reduced bad debt expense as economic conditions improve.

**Post-Reorganization Debt**

The Projections assume that the Debtors complete the restructuring pursuant to the Plan, with a $2.75 billion new senior secured term loan.

**Capital Expenditures**

The capital expenditure requirements of the Debtors' business are modest and forecasted to represent between 2.0% and 3.4% of annual operating revenues.

## Projected Income Statement – Current Case

| | FYE December 31, | | | | |
|---|---|---|---|---|---|
| *(US$ millions)* | **2009E** | **2010E** | **2011E** | **2012E** | **2013E** |
| Operating Revenue | | | | | |
| Print | $2,248 | $1,810 | $1,546 | $1,414 | $1,332 |
| *% Growth* | *(15.9%)* | *(19.5%)* | *(14.6%)* | *(8.5%)* | *(5.8%)* |
| Internet | 290 | 308 | 341 | 381 | 434 |
| *% Growth* | *(3.3%)* | *6.1%* | *10.6%* | *11.7%* | *14.0%* |
| Total Operating Revenue | $2,538 | $2,118 | $1,886 | $1,795 | $1,765 |
| Operating Expenses (Excl. D&A) | | | | | |
| Selling | $670 | $613 | $579 | $547 | $535 |
| Cost of Sales | 616 | 600 | 561 | 538 | 540 |
| General and Administrative [2] | 447 | 383 | 329 | 297 | 275 |
| Total Operating Expenses (Excl. D&A) | $1,733 | $1,596 | $1,469 | $1,382 | $1,351 |
| EBITDA [3] | $805 | $522 | $417 | $413 | $414 |
| *% Margin* | *31.7%* | *24.6%* | *22.1%* | *23.0%* | *23.5%* |
| Bad Debt Expense [1] | $234 | $180 | $132 | $108 | $88 |
| Capital Expenditures | $52 | $55 | $58 | $60 | $60 |

## Projected Income Statement – Opportunity Case

| | FYE December 31, | | | | |
|---|---|---|---|---|---|
| *(US$ millions)* | **2009E** | **2010E** | **2011E** | **2012E** | **2013E** |
| Operating Revenue | | | | | |
| Print | $2,248 | $1,849 | $1,650 | $1,532 | $1,455 |
| *% Growth* | *(15.9%)* | *(17.7%)* | *(10.8%)* | *(7.1%)* | *(5.0%)* |
| Internet | 290 | 312 | 353 | 416 | 500 |
| *% Growth* | *(3.3%)* | *7.5%* | *13.3%* | *17.6%* | *20.2%* |
| Total Operating Revenue | $2,538 | $2,161 | $2,003 | $1,948 | $1,955 |
| Operating Expenses (Excl. D&A) | | | | | |
| Selling | $670 | $605 | $571 | $541 | $539 |
| Cost of Sales | 616 | 596 | 555 | 543 | 571 |
| General and Administrative [1] | 447 | 374 | 326 | 295 | 275 |
| Total Operating Expenses (Excl. D&A) | $1,733 | $1,575 | $1,452 | $1,379 | $1,385 |
| EBITDA [2] | $805 | $585 | $551 | $569 | $570 |
| *% Margin* | *31.7%* | *27.1%* | *27.5%* | *29.2%* | *29.2%* |
| Bad Debt Expense [1] | $234 | $184 | $140 | $117 | $98 |
| Capital Expenditures | $52 | $55 | $58 | $60 | $60 |

[2] General and administrative includes bad debt expense as set forth above in the Current Case and Opportunity Case projections.

[3] Excludes certain restructuring and other one-time charges.

Projected Pro Forma Condensed Consolidated Balance Sheet as of December 31, 2009 (unaudited)

| (US$ millions) | Projected December 31, 2009 | Net Estimated Effective Date Adjustments | Pro Forma December 31, 2009 |
|---|---|---|---|
| Current assets: | | | |
| Cash and cash equivalents | $791.7 | ($641.7) | $150.0 |
| Accounts receivable, net of allowances | 350.8 | | 350.8 |
| Deferred directory costs | 294.5 | | 294.5 |
| Prepaid expenses and other | 134.7 | | 134.7 |
| Total current assets | $1,571.8 | | $930.1 |
| | | | |
| Property, plant and equipment | $483.4 | | $483.4 |
| Less: accumulated depreciation | (395.1) | | (395.1) |
| Net PP&E | $88.3 | | $88.3 |
| | | | |
| Net goodwill | $75.6 | | $75.6 |
| Reorg. value in excess of identifiable assets | 0.0 | $2,783.9 | 2,783.9 |
| Other intangible assets, net | 53.1 | | 53.1 |
| | | | |
| Pension assets | $113.6 | | $113.6 |
| Deferred tax assets | 159.3 | | 159.3 |
| Other non-current assets | 84.4 | | 84.4 |
| Total assets | $2,146.1 | $2,142.2 | $4,288.3 |
| | | | |
| Current liabilities: | | | |
| Accounts payable and accrued liabilities | $192.2 | | $192.2 |
| Deferred revenue | 149.8 | | 149.8 |
| Other | 137.7 | | 137.7 |
| Total current liabilities | $479.6 | | $479.6 |
| | | | |
| Employee benefit obligations | $268.3 | | $268.3 |
| Long-term debt | 0.0 | $2,750.0 | 2,750.0 |
| Other liabilities | 590.4 | | 590.4 |
| Total liabilities not subject to compromise | $1,338.3 | | $4,088.3 |
| | | | |
| Liabilities subject to compromise | $9,079.5 | ($9,079.5) | $0.0 |
| | | | |
| Stockholders' equity (deficit) | ($8,271.7) | $8,471.7 | $200 |
| | | | |
| Total liabilities and stockholders' equity (deficit) | $2,146.1 | $2,142.2 | $4,288.3 |

## Appendix D

## Liquidation Analysis

This liquidation analysis (the "Liquidation Analysis") was prepared by the Debtors with assistance from its financial advisors and represents their best estimate of the proceeds that would be realized if the Debtors were liquidated in accordance with chapter 7 of the United States Bankruptcy Code. This Liquidation Analysis assumes that the Debtors' chapter 11 cases are converted into liquidations under chapter 7 in a "shut-the-door" liquidation as of July 31, 2009. Management of the Debtors does not believe that more historical information or projected information would cause the result of this analysis to vary significantly. However, this analysis is subject to any changes due to the Debtors' continued operation subsequent to the reference date.

The Liquidation Analysis is premised upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic and competitive uncertainties beyond the control of the Debtors, and upon assumptions which could be subject to change. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation. In addition, any liquidation ultimately undertaken would take place under future circumstances that cannot be predicted with certainty. Accordingly, although the analysis that follows is necessarily presented with numerical specificity, if the Debtors' estates were in fact liquidated as described herein, the actual liquidation proceeds could vary significantly from the amounts set forth in the Liquidation Analysis. Such actual liquidation proceeds could be materially higher or lower than the amounts set forth above, and no representation or warranty can be or is being made with respect to the actual proceeds that would be generated in the liquidation of the Debtors under chapter 7 of the United States Bankruptcy Code. The liquidation analysis has been prepared solely for the purposes of estimating the proceeds available in Chapter 7 and does not represent values that may be appropriate for any other purpose, including the values applicable in the context of the Plan. Nothing contained in this analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical liquidation analysis.

**Idearc Media**
**Chapter 7 Liquidation Analysis**
(US$000's)
Estimated as of 07/31/2009

| | Notes | Book Value as of 07/31/2009 (unaudited) | Estimated Recovery Percentage Low | High | Estimated Liquidation Low | High |
|---|---|---|---|---|---|---|
| Cash and Equivalents | 1 | 616,226 | 100% | 100% | 616,226 | 616,226 |
| Accounts Receivable, net | 2 | 315,175 | 54% | 66% | 170,022 | 209,177 |
| Deferred Directory Costs | 3 | 264,072 | 0% | 0% | 0 | 0 |
| Prepaid Expenses and Other | 4 | 169,970 | 0% | 0% | 13 | 13 |
| Property, Plant & Equipment, net | 5 | 96,047 | 28% | 49% | 26,638 | 47,465 |
| Goodwill and Other Intangibles, net | 6 | 135,251 | 0% | 0% | 0 | 0 |
| Pension Assets | 7 | 113,943 | 0% | 0% | 0 | 0 |
| Deferred Tax Assets | 8 | 133,874 | 0% | 0% | 0 | 0 |
| Other Non-Current Assets | 9 | 84,331 | 0% | 0% | 0 | 0 |
| Gross Proceeds Available for Distribution | | 1,928,888 | 42% | 45% | 812,898 | 872,881 |
| Less: | | | | | | |
| Trustee Fees | 10 | | 100% | 100% | (5,900) | (7,700) |
| Professional Fees | 11 | | 100% | 100% | (1,475) | (1,925) |
| Net Wind-down Costs | 12 | | 100% | 100% | (4,057) | 13,500 |
| Total Chapter 7 Administrative Claims | | | 100% | 100% | (11,432) | 3,876 |
| Net Proceeds Available for Distribution | | | | | 801,466 | 876,757 |
| Secured Claims | | | | | | |
| Sr. Secured Credit Facility | 13 | 6,483,191 | 11% | 12% | 736,861 | 806,083 |
| Swap Liability | 13 | 568,421 | 11% | 12% | 64,605 | 70,674 |
| Total Secured Claims | | 7,051,612 | 11% | 12% | 801,466 | 876,757 |
| Proceeds Available for Unsecured Claims | | | | | 0 | 0 |
| Unsecured Claims | | | | | | |
| 8% Senior Notes | 14 | 2,936,133 | 0% | 0% | 0 | 0 |
| Other Unsecured Creditors | 15 | 57,506 | 0% | 0% | 0 | 0 |
| Total Unsecured Claims | | 2,993,639 | 0% | 0% | 0 | 0 |
| Proceeds Available for Distribution to Common Stock | 16 | | 0% | 0% | 0 | 0 |

## General Assumptions

In chapter 7, a trustee (the "Chapter 7 Trustee") is appointed to manage the Debtors' affairs and conduct a liquidation. This Liquidation Analysis assumes that the Debtors would be forced to liquidate. The Debtors would be forced to cease substantially all operations almost immediately and use their cash position to liquidate their assets and pay priority claims. The likely consequences of the conversion to chapter 7 include the following:

- The Debtors' workforce consists of specialized employees, who are coveted by competitors. With the Debtors facing certain liquidation, those employees would quickly leave the Debtors and seek employment elsewhere. The loss of these employees would make an orderly wind down significantly more difficult and would render the possibility of continuing operations in an effort to complete a going concern sale highly remote, if not impossible.

- The Debtors' revenues are derived from advertising sales. The Debtors also operate in a highly competitive environment. It is highly unlikely that many customers could be maintained by a Chapter 7 Trustee for any period of time.

- The Debtors' customers are generally small-to-medium sized businesses who are being disproportionately affected by the economic downturn, affecting their ability to pay outstanding bills. The Debtors would, as a result, experience high levels of uncollectible accounts receivable.

- This liquidation analysis assumes that the Debtors would continue to bill for published but unamortized revenue. However, the Debtors' ability to collect such receivables is highly uncertain.

- A significant portion of the Debtors' property, plant and equipment ("PP&E") is depreciated hardware and/or software assets. These assets are of very limited value on the secondary market and it is unlikely that any meaningful value would be realized upon liquidation.

- This liquidation analysis assumes that the Lenders have perfected security interests in substantially all of the assets of the Debtors' estates.

**Specific Assumptions**

*Note 1*
The Debtors' actual cash balance as of July 31, 2009 was $616 million.

*Note 2*
Estimated proceeds realized from accounts receivable under a liquidation are based on management's estimate of collectability. An estimated recovery percentage has been applied to balances based on account aging as of July 31, 2009 and account type (i.e. Local vs. National accounts). An estimated recovery percentage has been assigned for each aging "bucket." Accounts aged over 120 days are assumed to have de minimis liquidation value. The estimated recovery range is 38 to 47% of gross A/R, or approximately 54 to 66% of net A/R.

*Note 3*
Deferred directory costs consist of deferred sales commissions, deferred paper costs, deferred printing costs and deferred distribution costs. Deferred directory costs would be amortized over the life of the directory in a going concern scenario. Deferred directory costs are assumed to have no value in a liquidation.

*Note 4*
Prepaid expenses and other consists primarily of interest receivable, prepaid insurance, prepaid rents, prepaid postage and other miscellaneous prepaid expenses. Prepaid expenses and other are assumed to have no value in a liquidation except interest receivable, which is assumed to be collected.

*Note 5*
PP&E primarily consists of owned assets such as land, land improvements, buildings, building improvements, furniture and fixtures, leasehold improvements, data processing equipment and personal computers. A majority of these items are significantly depreciated and may not result in any meaningful liquidation value. There is no recovery for leasehold improvements since such improvements will revert

to the lessor upon discontinuation of the leases. An estimated recovery percentage has been applied by asset categorization. Proceeds are estimated at 6%-10% on a gross basis, or approximately 28%-49% on a net basis.

### Note 6
Goodwill and other intangible assets primarily consist of goodwill and capitalized software. Goodwill and other intangible assets are assumed to have no realizable value in a liquidation. The capitalized software is specific to the Debtors and is estimated to have no realizable value in a liquidation.

### Note 7
The Debtors provide pension and post-employment benefits to most if its employees. Pension assets are held in trust. Pension assets are assumed to be turned over to the Pension Benefit Guaranty Corporation ("PBGC"). It is assumed that pension assets provide no residual value to the Debtors.

### Note 8
The deferred tax assets have no value in a liquidation.

### Note 9
Other non-current assets consist of debt issuance costs, interest rate swap assets and other non-current assets. Other non-current assets are assumed to have no value in a liquidation.

### Note 10
Trustee fees are estimated to be 3.0% of total liquidated proceeds net of cash on hand.

### Note 11
Counsel and Advisor to the Trustee are estimated to be 25% of the Trustee fees.

### Note 12
Wind-down costs include G&A, severance and retention and are net of revenue collection of published but unamortized revenue. Collection of published but unamortized revenue is highly uncertain. Management has assumed collection of 5%-10% for local accounts and 10%-15% for national accounts. SG&A costs mainly include the retention of the accounts receivable department and key management. G&A is estimated to be between 5%-10% of 2008 annual G&A. Severance costs are estimated to be between $40 million to $50 million.

### Note 13
As of the Petition Date, the Debtors had 4 outstanding secured debt obligations: (1) $247 million drawn under its revolving credit facility due 2011, $1,515 million under its Term Loan A due 2013, $4,655 million under its Term Loan B due 2014 and a swap liability of $530 million. Accrued interest was calculated from the period January 1, 2009 through the Petition Date for the purpose of this liquidation analysis.

### Note 14
As of the Petition Date, the Debtors had outstanding $2,850 million of 8% Senior Notes due 2016. The Debtors paid interest on the Notes through November 15, 2008 for holders of record on November 1, 2008. Accrued interest was calculated through the Petition Date.

***Note 15***

Pre-petition non-priority unsecured claims as of the Petition Date are estimated to approximate $30.9 million. The Debtors' estimate lease rejection claims of $26.6 million in a liquidation scenario. In addition, no assumption has been made around estimated contract rejection damages claims as they are unknown.

***Note 16***

Prepetition Common Equity holders are not estimated to receive any recoveries in the event of a liquidation.

**Exhibit A**

**Contracts And Leases Previously Rejected**

1.      Lease of non-residential real property with Chesterfield Stemme, Inc.

2.      Lease of non-residential real property with Water Saver Faucet Co.

3.      Lease of non-residential real property with Fourteenth Springhill Lake L.L.L.P.

4.      Lease of non-residential real property with Carr CARP Properties L.L.C.

5.      Lease of non-residential real property with Bay Plaza Community Center.

6.      Lease of non-residential real property with Muirfields, LLC.

[others to be determined]

**Exhibit B**

**Contracts And Leases To Be Rejected By Plan**

1.     Tax Sharing Agreement, dated November 17, 2006, between Verizon Communications Inc. and Idearc Inc.

[others to be determined]

**Exhibit C**

**Creditors Committee Letter**

[To come]