U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described**.

*Barbara J. Houser*

**Signed December 22, 2009**                    **United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 09-31828 (BJH)** |
| **IDEARC INC.** *et al.*, | § | |
| | § | **(Chapter 11)** |
| Debtors. | § | **(Jointly Administered)** |

## FINDINGS OF FACT AND CONCLUSIONS OF
## LAW IN SUPPORT OF FIRST AMENDED JOINT PLAN OF
## REORGANIZATION OF IDEARC INC., *ET AL.*, DEBTORS (AS MODIFIED)

On December 9 and 10, 2009, the Bankruptcy Court held hearings (collectively, the "Confirmation Hearing")[1] to consider confirmation of the *First Amended Joint Plan of Reorganization of Idearc Inc., et al., Debtors (As Modified)* [Docket No. 1392] (the "November 19 Plan," as amended by the Modifications,[2] the "Plan"), proposed by Idearc Inc. ("Idearc") and

---

[1]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement (defined below), as applicable.

[2]    The "Modifications" means the modifications to the November 19 Plan as set forth in (i) the First Amended Joint Plan of Reorganization of Idearc Inc., *et al.*, Debtors (As Modified on November 25, 2009) [Docket No. 1495] (the "November 25 Plan"), (ii) the modifications read into the record at the Confirmation Hearing and (iii) such other further modifications made in connection with entry of these Findings and Conclusions and the Confirmation Order or reflected in the final Plan attached as Exhibit 1 to the Confirmation Order.

---

its affiliated debtors and debtors-in-possession (together with Idearc, the "Debtors").[3] The Bankruptcy Court makes the following findings of fact and conclusions of law (the "Findings and Conclusions") in support of the Order confirming the Plan (the "Confirmation Order"):

1.    The following record (the "Record") was established to support confirmation of the Plan:

      (a)    All documents identified on the Debtors' Second Amended Witness and Exhibit List filed on December 9, 2009 [Docket No. 1560] (the "Exhibit List"),[4] including, without limitation, the September 10 Plan, the Disclosure Statement and all exhibits, schedules and attachments thereto and filed in connection therewith, and the Plan Supplement filed with the Bankruptcy Court on October 29, 2009 [Docket No. 1225] (as certain of those documents have been amended in the form attached as exhibits to the Standby Purchase Agreement [Docket No. 1391]), all of which were admitted into evidence without objection;

      (b)    The testimony at the Confirmation Hearing of (i) Scott Klein, Chief Executive Officer of the Debtors, (ii) Samuel D. Jones, Chief Financial Officer of the Debtors (Debtors' Ex. 175), (iii) Andrew Haber of Moelis & Company (Debtors' Ex. 174), (iv) Daniel Kamensky of Paulson & Co., Inc. (Debtors' Ex. 140), (v) John Bittner of Grant Thornton LLP (Debtors' Ex. 141) and (vi) Robert Q. Klamser of Kurtzman Carson Consultants LLC (Debtors' Ex. 173);

      (c)    The evidence in respect of the transmittal and service of the solicitation packages, all of which was filed with the Bankruptcy Court [Docket Nos. 1017, 1044] and admitted into evidence without objection;

      (d)    The evidence regarding tabulation of votes and supplemental Class 3 votes on the Plan which was filed with the Bankruptcy Court [Docket Nos. 1445, 1557] (the "Ballot Reports") and admitted into evidence without objection;

      (e)    The entire record of the Debtors' chapter 11 cases (the "Chapter 11 Cases") and the docket maintained by the Clerk of the Bankruptcy Court and/or Kurtzman Carson Consultants, LLC ("KCC"), its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before

---

[3]    In addition to Idearc Inc., the following entities are debtors in these related cases: Idearc Information Services LLC, Idearc Media LLC, Idearc Media Services – East Inc., Idearc Media Services – West Inc., Idearc Media Sales – West Inc., Idearc Media Sales – East LLC, Idearc Media Sales – East Co., License Application Corporation, and Second License Application Corporation.

[4]    All references herein to exhibits on the Exhibit List shall be to "Debtors' Ex. __".

the Bankruptcy Court during the pendency of these Chapter 11 Cases, as to all of which the Bankruptcy Court took judicial notice at the Confirmation Hearing;[5]

(f)     The entire record of the adversary proceeding styled *The Official Committee of Unsecured Creditors, on behalf of Idearc Inc. v. JPMorgan Chase Bank, N.A., as Administrative Agent for the Lenders*, Adv. Proc. No. 09-03248 (the "Adversary Proceeding") and the docket maintained by the Clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings and trial held before the Bankruptcy Court in connection with the Adversary Proceeding, as to all of which the Court took judicial notice at the Confirmation Hearing;

(g)     The statements and argument of counsel on the record at the Confirmation Hearing, and all papers and pleadings filed with the Bankruptcy Court in support of, in opposition to, or otherwise submitted in connection with, confirmation of the Plan.

2.     The evidence that was admitted into the Record in support of confirmation of the Plan and all related matters demonstrates, by a clear preponderance of the evidence, that the Plan is confirmable and should be confirmed.

3.     The Plan satisfies all applicable requirements under title 11 of the United States Code (the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Plan is in the best interests of the Debtors and their bankruptcy estates (the "Estates"), and supported by the Record, and therefore should be confirmed.

4.     As presented at the Confirmation Hearing and as provided for herein, the consensual resolution of certain Objections and the Modifications satisfy all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and are in the best interests of the Debtors and their Estates and supported by the Record, and therefore should be approved.

---

[5]     This Court takes judicial notice of the docket in these Chapter 11 Cases maintained by the clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during these Chapter 11 Cases, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing.

All objections to confirmation of the Plan, which were not withdrawn or resolved by agreement at or prior to the Confirmation Hearing should be overruled, or are otherwise disposed of, as set forth herein and in the Confirmation Order.

5.      The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and at the hearing conducted on December 21, 2009, at which the Bankruptcy Court announced its ruling on confirmation of the Plan, are hereby incorporated herein for all purposes to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6.      The Record amply supports confirmation of the Plan and the Bankruptcy Court will issue the Conformation Order confirming the Plan.

**A.      Jurisdiction and Venue**

7.      The Bankruptcy Court has subject matter jurisdiction to confirm the Plan pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(A), (L), (N) and (O).

**B.      Background**

8.      On March 31, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Chapter 11 Cases are being jointly administered under the above-styled case for procedural and administrative purposes only

pursuant to Bankruptcy Rule 1015(b).

9.      Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## C.      The Disclosure Statement and Plan

10.      On September 8, 2009, the Debtors filed their *Disclosure Statement With Respect to First Amended Joint Plan of Reorganization of Idearc Inc., et al., Debtors [As of September 8, 2009]* [Docket No. 915].

11.      On September 10, 2009, the Bankruptcy Court issued its *Order (I) Approving The Disclosure Statement With Respect To First Amended Joint Plan Of Reorganization Of Idearc Inc., Et Al., Debtors (II) Approving Form Of Ballots And Proposed Solicitation And Tabulation Procedures For The First Amended Joint Plan Of Reorganization Of Idearc Inc., Et Al., Debtors; (III) Prescribing The Form And Manner Of Notice Thereof; (IV) Establishing Procedures For (A) Voting In Connection With The Plan Confirmation Process And (B) Temporary Allowance Of Claims Related Thereto; (V) Establishing Deadline For Filing Objections To The First Amended Joint Plan Of Reorganization Of Idearc Inc., Et Al., Debtors; And (VI) Scheduling A Hearing To Consider Confirmation Of The First Amended Joint Plan Of Reorganization Of Idearc Inc., Et Al., Debtors* [Docket No. 940] (the "Disclosure Statement Order") approving the *Disclosure Statement With Respect to First Amended Joint Plan of Reorganization of Idearc Inc., et al., Debtors* [Docket No. 941] (the "Disclosure Statement") in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018, and establishing certain deadlines relating to confirmation of the Plan.

12.      On or before September 21, 2009, the Debtors mailed the Disclosure Statement

and related solicitation materials to solicit votes for the *First Amended Joint Plan of Reorganization of Idearc Inc., et al., Debtors* [Docket No. 942] (the "September 10 Plan").

13.     On November 18, 2009, the Bankruptcy Court approved the Debtors' entry into a Standby Purchase Agreement with Paulson & Co., Inc. ("Paulson"), pursuant to which Paulson agreed to provide a cash option to holders of Allowed Claims receiving shares of New Common Stock under the September 10 Plan [Docket No. 1386], and authorized the Debtors to make non-material modifications to the September 10 Plan to implement the Paulson cash option. Shortly thereafter, on November 19, 2009, the Debtors filed the November 19 Plan, which incorporated certain non-material modifications to implement the Paulson cash option for creditors.

14.     On August 4, 2009, the Official Committee of Unsecured Creditors (the "Committee") commenced the Adversary Proceeding against the Administrative Agent, seeking the following relief: (a) to avoid and preserve for the benefit of the Estates any liens on the Debtors' nearly 1200 copyrights and any receivables generated by the copyrights, (b) a declaration that the Administrative Agent does not have a lien on the Branding Agreement between the Debtors and Verizon Communications Inc. and that the Branding Agreement is preserved for the benefit of the Estates, or, alternatively, that the Administrative Agent's purported lien on the Branding Agreement is invalid and avoided, (c) a determination of the scope of the Administrative Agent's collateral, and (d) a valuation of the Administrative Agent's collateral as of the Petition Date.

15.     Following the commencement of the Adversary Proceeding, the parties engaged in an expedited discovery process involving the exchange of documents, answers to written interrogatories and requests for admission, more than 20 fact depositions, the exchange of expert reports, and the depositions of the five expert witnesses proposed by the parties. On November

2, 2009, each of the Committee, the Administrative Agent and the Debtors filed under seal pre-trial briefs setting forth their arguments in the Adversary Proceeding.

16.    Prior to the commencement of trial, the Committee stipulated to the dismissal with prejudice of Count 3 of its complaint seeking avoidance of the Administrative Agent's lien on the Verizon branding agreement.  On November 9 and 10, 2009, the Bankruptcy Court conducted two days of trial on the Adversary Proceeding.

17.    On November 19, 2009, the Debtors, along with the Committee, the Administrative Agent and MatlinPatterson Global Opportunities Partners III LP and MatlinPatterson Global Opportunities Parties (Cayman) III LLP (collectively, the "MatlinPatterson Entities") filed the *Joint Motion of Official Committee of Unsecured Creditors, Debtors, JPMorgan Chase Bank, N.A., as Agent, and Certain MatlinPatterson Entities, Pursuant to Sections 105(a), 1128 and 1129 of the Bankruptcy Code and Fed. R. Bankr. P. 9019(a), for an Order Approving Global Settlement in Support of Plan of Reorganization* [Docket No. 1393] (the "Global Settlement Motion").  (Debtors' Ex. 132).  The Global Settlement Motion described a global settlement agreed to among such parties (the "Global Settlement Agreement") setting forth the terms of proposed modifications of the November 19 Plan that would enable the Debtors to exit chapter 11 on a consensual basis with its major constituencies.

18.    The terms of the Global Settlement Agreement were incorporated into the November 25 Plan.

19.    The Plan, incorporating the Global Settlement Agreement, is the result of extensive arms' length negotiations among the Debtors, the Committee, the Administrative Agent and the MatlinPatterson Entities and is supported by each of these parties.  No evidence was submitted by any objecting party sufficient to rebut the Debtors' evidence concerning the

good faith, arms' length nature of negotiations regarding the Global Settlement Agreement and the Plan.

**D.  Notice**

20.    As set forth in the Record, the Debtors complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and all other applicable laws in connection with the solicitation of votes on the Plan and the provision of notice of the dates of the Confirmation Hearing and the Friday, November 13, 2009 (by 6:00 p.m. (Central Time)), deadline for filing and serving objections to confirmation and for voting on the Plan and all other relevant deadlines related to the Plan.

21.    On November 19, 2009, the Debtors filed a *Motion, Pursuant to 11 U.S.C. §§ 105, 1125, 1126 and 1127 and Fed. R. Bankr. P. 2002, 3003, 3018 and 3019 to Approve Supplemental Solicitation Procedures for Class 3 Secured Credit Facility Claims* [Docket No. 1394] (the "Supplemental Solicitation Motion").  On November 25, 2009, the Bankruptcy Court entered an *Order Granting Debtors' Motion, Pursuant to 11 U.S.C. §§ 105, 1125, 1126 and 1127 and Fed. R. Bankr. P. 2002, 3003, 3018 and 3019 to Approve Supplemental Solicitation Procedures for Class 3 Secured Credit Facility Claims* [Docket No. 1462] (the "Supplemental Solicitation Order").

22.    As set forth in the Record, the Debtors complied with the procedures described in the Supplemental Solicitation Motion, the Supplemental Solicitation Order, the Bankruptcy Code, the Bankruptcy Rules and all other applicable laws in connection with the supplemental solicitation of votes of holders of Class 3 Secured Credit Facility Claims on the November 25 Plan and the Tuesday, December 8, 2009 (by 6:00 p.m. (Central Time)), deadline for supplemental voting on the November 25 Plan.

23.     As such, the notice [Docket Nos. 1017, 1044] provided with respect to all matters relating to the solicitation of votes on, and the confirmation of, the Plan was adequate and proper and satisfied the requirements of due process with respect to all creditors, equity holders and parties-in-interest who were provided actual or constructive notice.

E.     **Modifications**

24.     The Modifications to the Plan are not material and therefore comply with section 1127 of the Bankruptcy Code.  As provided by section 1127(a) of the Bankruptcy Code, the Debtors are authorized to propose the Modifications, and the Plan and Modifications satisfy the requirements of sections 1122, 1123, and 1125 of the Bankruptcy Code.  The Modifications will not adversely change the treatment of any Claims or Idearc Interests of any parties-in-interest who have not accepted the Modifications.  Pursuant to section 1127(d) of the Bankruptcy Code and Bankruptcy Rule 3019, unless (in respect of the material modifications to the treatment of Class 3 Claims made to the November 19 Plan) superseded by timely delivery of a supplemental Class 3 ballot in the case of holders of Class 3 Secured Credit Facility Claim, as provided in the Supplemental Solicitation Order, all acceptances of the Plan prior to such Modifications are deemed acceptances of the Plan, as modified.

F.     **Voting**

25.     As set forth in the Record, each impaired Class of Claims and Idearc Interests, on a Debtor-by-Debtor basis, either (a) voted to accept the Plan under section 1126 of the Bankruptcy Code and for purposes of section 1129(a)(8)(A) of the Bankruptcy Code, (b) is not impaired under section 1124 of the Bankruptcy Code and for the purposes of section 1129(a)(8)(B) of the Bankruptcy Code, or (c) is impaired pursuant to section 1124 of the Bankruptcy Code and voted to reject the Plan under section 1126 of the Bankruptcy Code, but is

receiving treatment that satisfies the applicable requirements of section 1129(b) of the Bankruptcy Code. Voting on the Plan and treatment thereunder, including the supplemental Class 3 voting, are as reflected in the Ballot Reports.

## G. Settlement of Certain Inter-Debtor Issues

26. As described in Section IV.U.4 of the Disclosure Statement, and in the corroborating testimony of Samuel D. Jones at the Confirmation Hearing, the Debtors have historically operated their business as a single integrated enterprise, which gave rise to numerous intercompany relationships and transactions. For example, the Debtors utilize a centralized cash management system and certain essential functions, such as providing capital, personnel, human resources and administrative functions, and performing commercial activities, are performed or provided by particular Debtors for the benefit of other members of the enterprise, rather than on an entity-by-entity basis. These activities, in turn, gave rise to intercompany Claims both in terms of amount and number in these Chapter 11 Cases, the proper treatment of which could have been subject to substantial dispute and the resolution of which was uncertain.

27. Based upon the Record, the settlement of all intercompany Claims and related matters as set forth in Section 5.5 of the Plan, including without limitation, the releases set forth in the Plan, are fair and equitable and in the best interests of the Debtors, their Estates and all other parties-in-interest, including all creditors, and satisfies the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules. Accordingly, such settlement should be approved.

## H. Approval of Global Settlement Agreement

28. Prior to the Confirmation Hearing, the Debtors, the Committee, the Administrative Agent and the MatlinPatterson Entities filed the Global Settlement Motion,

[Docket No. 1393] seeking approval of the Global Settlement Agreement.[6] (Debtors' Ex. 132). The Global Settlement Agreement was incorporated into the Plan pursuant to a Modification, and is incorporated in the Confirmation Order for all purposes.

29. As evidenced by the certificate of service [Docket No. 1492] previously filed with this Bankruptcy Court, the Bankruptcy Court finds that notice of the Global Settlement Motion and Global Settlement Agreement was provided to all parties entitled to notice, is adequate, appropriate, reasonable and proper for all purposes and is hereby approved. Moreover, the disclosures made by the Debtors concerning the Global Settlement Agreement were complete and adequate and appropriate under the circumstances.

30. The negotiations surrounding the Global Settlement Agreement were conducted in good faith and at arms' length, and the Global Settlement Agreement is of benefit to the Debtors' Estates and represents, a fair and reasonable compromise of the issues in dispute in the Adversary Proceeding and related litigation, and resolves potential objections to confirmation of the Plan. The terms and conditions of the Global Settlement Agreement are embodied in the terms of the Plan, and are an integral part of the Plan. The Global Settlement Agreement represents a compromise of all issues related to the Adversary Proceeding and certain related issues, as set forth in the Global Settlement Agreement. All issues related to the Adversary Proceeding shall be deemed fully settled and compromised, and all proceedings related to the Adversary Proceedings, and related proceedings as set forth in the Global Settlement Agreement, shall be deemed dismissed with prejudice, in each case as of the Effective Date.

31. The Bankruptcy Court has considered the following with respect to the Global

---

[6] A true and correct copy of the Global Settlement Motion is attached hereto as Exhibit 1, and, by this reference, incorporated herein for all purposes.

Settlement Agreement: (a) the probability of success in the Adversary Proceeding, with due consideration for the uncertainty in fact and law, (b) the complexity and likely duration of the litigation involved and any attendant expense, inconvenience and delay regarding confirmation of the Plan, (c) that the Global Settlement Agreement resolves the objections to confirmation of the Committee and the MatlinPatterson Entities, the Debtors' largest bondholders, (d) significantly increases the consideration to be paid to Class 4 unsecured creditors, (e) provides further enhanced distributions to holders of Class 4 non-bank/non-bond unsecured claims, and (f) all other factors bearing on the reasonableness of the compromise embodied in the Global Settlement Agreement.

32.     As part of the overall compromise and settlement set forth in the Global Settlement Agreement, the Administrative Agent and the Lenders agreed to make (a) $120 million of Cash and 15% of the New Common Stock available for distribution to holders of Unsecured Note Claims and (b) $3 million of Cash available for distribution to holders of General Unsecured Claims, and the Debtors, the Administrative Agent, the Committee and the MatlinPatterson Entities agreed to share distributions from the Litigation Trust as set forth in Section 3.3(b)(1) of the Plan.  These arrangements are an essential component of the compromise, and absent these arrangements, it is uncertain whether the parties would have been able to finalize the Global Settlement Agreement.  In such case, the Debtors emergence from Chapter 11 would have been delayed, administrative expenses would have increased and the ultimate result would be uncertain, all to the detriment of the Debtors' Estates and their respective creditors and other parties-in-interest.

33.     After giving due consideration to the above factors and the testimony of Rebwar Berzinji [Docket No. 1562], the Bankruptcy Court finds that the Global Settlement Agreement

(a) is fair, equitable, reasonable and is within the range of potential outcomes of the litigation, (b) is in the best interest of the Debtors, their Estates and all other parties-in-interest in these Chapter 11 Cases, including all creditors and interest holders, and (c) except with respect to the supplemental solicitation procedures authorized by the Supplemental Solicitation Order with respect to Class 3 Secured Credit Facility Claims, does not require further solicitation or resolicitation of creditors entitled to vote on the Plan. Therefore, the Global Settlement Motion and Global Settlement Agreement satisfy the applicable standards of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and should be approved in their entirety.

## I.     Approval of the Ryan Settlement Agreement

34.     Prior to the Confirmation Hearing, the Debtors, the Committee and the Administrative Agent filed the *Joint Motion Of The Debtors And The Official Committee Of Unsecured Creditors Pursuant To Sections 105(a), 1128 And 1129 Of The Bankruptcy Code And Fed. R. Bankr. P. 9019(A), For An Order Approving Stipulation And Settlement Agreement Regarding (I) Amount And Allowance Of Sean Ryan's Claim, (II) Withdrawal Of Motions, Objections And Other Pleadings Filed By Sean Ryan, And (III) Dismissal Of Adversary Proceeding Initiated By Sean Ryan* [Docket No. 1489] (the "Sean Ryan Settlement Motion").[7] The Sean Ryan Settlement Motion described a settlement agreed to among such parties (the "Sean Ryan Settlement Agreement") setting forth the terms of a consensual resolution of various issues relating to the Plan, the Prepetition Actions, the Ryan Adversary Proceeding, the Ryan Pleadings and the Ryan Claims.

35.     As evidenced by the certificate of service attached to the Sean Ryan Settlement

---

[7]     A true and correct copy of the Sean Ryan Settlement Motion is attached hereto as Exhibit 2, and, by this reference, incorporated herein for all purposes.

Motion [Docket No. 1489], the Bankruptcy Court finds that notice of the Sean Ryan Settlement Motion and Sean Ryan Settlement Agreement was provided to all parties entitled to notice, is adequate, appropriate, reasonable and proper for all purposes and is hereby approved. Moreover, the disclosures made concerning the Sean Ryan Settlement Agreement were complete and adequate and appropriate under the circumstances.

36.     The Bankruptcy Court adopts the findings of fact and conclusions of law announced at the Confirmation Hearing with respect to the Ryan Settlement Agreement.

**J.     Modification of Treatment of Employee Claims for Accrued Vacation**

37.     On the Petition Date, the Debtors filed their Emergency Motion For Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 1107(a) And 1108 And Federal Rule Of Bankruptcy Procedure 6003 To Approve Payment Of Prepetition Wages, Salaries, Commissions, Reimbursable Employee Expenses And Benefits In The Ordinary Course Of Business [Docket No. 10] (the "Employment Benefits Motion"). Pursuant to the Employment Benefits Motion, the Debtors sought authority to pay, continue, or otherwise honor various prepetition employee-related obligations to or for the benefit of their current employees (collectively, the "Employees"), for compensation, benefits and expense reimbursements under all plans, programs and policies maintained or contributed to, and agreements entered into, by the Debtors prior to the Petition Date (as described below, the "Employee Programs"). Among the Employee Programs are the Debtors' plans, programs, policies and agreements providing for holiday and vacation pay.

38.     On April 2, 2009, the Bankruptcy Court entered an interim order granting the Employee Benefits Motion [Docket No. 54]. On April 29, 2009, the Bankruptcy Court entered an order granting the Employee Benefits Motion. No party appealed the order and the order

became final and non-appealable [Docket No. 195] (the "Employee Benefits Order"). Pursuant to the Employee Benefits Order, the "Debtors are authorized to continue each of the Employee Programs, including but not limited to maintaining the Employee Benefits in the ordinary course of business during the pendency of these cases in the manner and to the extent that such Employee Programs were in effect immediately prior to the filing of these cases and to make payments in connection with expenses in the administration of any Employee Program."

39. On April 15, 2009, the Debtors filed their Schedules of Assets and Liabilities [Docket Nos. 108-116, 121]. (Debtors' Ex. 99). On September 9, 2009, the Debtors filed their Amended Schedules of Assets and Liabilities [Docket Nos. 924-933] (and together with the Initial Schedules, the "Schedules"). (Debtors' Ex. 100). Pursuant to the Schedules, the Debtors listed Employee Claims for accrued holiday and vacation pay as of the Petition Date. In addition, certain Employees have filed Claims in the Debtors' Bankruptcy Cases.

40. Since the Petition Date, pursuant to the Employee Benefits Order, Employees have continued to take their vacation and holiday pay in the ordinary course of business and pursuant to the applicable benefit plans and related agreements. The Debtors have informed all Employees holding or asserting Claims (whether an Administrative Claim, Other Priority Claim or General Unsecured Claim) for accrued vacation and holiday pay that they are entitled to their respective benefits in accordance with all policies and procedures in place prior to the commencement of these Bankruptcy Cases, but that such Employees will not receive monetary distributions on account of such vacation and holiday pay Claims.

41. The Debtors thus seek non-material modifications to the Plan, consistent with the Employee Benefits Order, to provide that all Claims for accrued vacation and holiday pay shall be unaffected by the Plan. All Employees holding or asserting vacation of holiday pay Claims

(whether an Administrative Claim, Other Priority Claim or General Unsecured Claim) shall receive no monetary distributions on account of such Claims, and such Employees shall continue to be entitled to all vacation and holiday pay benefits in accordance with the terms and conditions of the applicable benefit plans and related agreements and the Employee Benefits Order.

42.     The Modification set forth in Paragraphs [37] through [41] of these Findings and Conclusions are not material and therefore comply with section 1127 of the Bankruptcy Code. These Modification do not adversely change the treatment of any Employee's Claim (whether an Administrative Claim, Other Priority Claim or General Unsecured Claim) for accrued vacation and holiday pay because (a) Employees shall be entitled to take their vacation and holiday time off in the ordinary course in accordance with the terms and conditions of the applicable benefit plans and related agreements and (b) any payments, if at all, on account of accrued holiday or vacation days shall be made in accordance with the terms of the applicable policies in the ordinary course of the Debtors' business in accordance with the terms of the Employee Benefits Order.

**K.     Implementation of the Plan**

43.     Section 5 of the Plan provides the means for implementing the Plan.   The provisions of Section 5 of the Plan and the transactions and transfers to be implemented pursuant thereto (the "Plan Transactions"), are consistent with and permissible under section 1123(a)(5) of the Bankruptcy Code and are consistent with the interests of creditors, equity holders and public policy.

44.     Each of the Plan Transactions is necessary and appropriate in order to facilitate and ensure the feasibility of the Plan, preserve tax attributes, facilitate the reorganization and

maximize value for the Debtors, their Estates, creditors and other parties-in-interest. Approval of the Plan Transactions is within the authority of the Bankruptcy Court pursuant to section 1123(a) of the Bankruptcy Code and otherwise in furtherance of the general principles of the Bankruptcy Code. The Plan Transactions represent the exercise of the sound business judgment of the Debtors, will benefit the Debtors' Estates and are proposed in good faith.

45. The entry of the Confirmation Order shall constitute authorization for the Debtors and their representatives to take or cause to be taken all actions necessary, reasonable or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date, including without limitation, the Plan Transactions. All such actions taken or caused to be taken consistent with the terms of the Confirmation Order and the Plan shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation.

**L.    New Board of Reorganized Idearc**

46. The New Board of Reorganized Idearc will consist of the following individuals: Edward Bayone, Robert C. Blattberg, Charles B. Carden, Robin Domeniconi, Thomas Gardner, David E. Hawthorne, Scott W. Klein and Thomas S. Rogers.

**M.    New Securities Under the Plan**

47. As a part of the consideration to be paid to certain holders of Allowed Claims, the following equity and rights will be issued under the Plan. Reorganized Idearc will issue New Common Stock on the Effective Date for distribution to (a) holders of Allowed Secured Credit Facility Claims, which number of shares shall represent eighty-five percent (85%) of the New Common Stock to be issued and outstanding on the Effective Date, and (b) holders of Allowed Unsecured Note Claims and certain Allowed General Unsecured Claims, which number of

shares shall represent fifteen percent (15%) of the New Common Stock to be issued and outstanding on the Effective Date. The New Common Stock, plus any other securities issued under the Plan, are referred to as the "New Securities".

48.     The Plan authorizes and directs Reorganized Idearc to establish and implement a New Equity Incentive Plan as of the Effective Date, pursuant to which awards granted may be in the form of stock options, stock appreciation rights, restricted stock, and other forms of equity-based awards. The New Equity Incentive Plan will be promulgated by the New Board for the benefit of such members of management, employees and directors of the Reorganized Debtors as are designated by the New Board, or a committee designated by the New Board, on such terms as to timing, issuance, manner and timing of vesting, duration, individual entitlement, and all other terms, as such terms are determined by the New Board in its sole and absolute discretion. The New Equity Incentive Plan may be modified or amended from time to time by the New Board, and all decisions as to entitlement to participate in any equity or equity-based plans will be within the sole and absolute discretion of the New Board or a committee designated by the New Board. Reorganized Idearc will reserve shares of the New Common Stock (excluding shares that may be issuable as a result of the anti-dilution provisions thereof) for distributions of equity incentive awards to be granted under the New Equity Incentive Plan, which number of shares will represent up to 10% of the New Common Stock to be issued and outstanding on the Effective Date.

49.     The offer, sale, issuance and/or distribution of each of the New Securities is duly authorized. Moreover, the New Securities are being offered, sold, issued or distributed (a) by the Debtors, which are not underwriters as defined in section 1145(b) of the Bankruptcy Code, (b) under the Plan and (c) in exchange for Claims against one or more of the Debtors, or principally

in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(l) of the Bankruptcy Code and, therefore the offer, sale, issuance and/or distribution of the New Securities by the Debtors, are exempt from the requirements of section 5 of the Securities Act of 1933 and any state or local law requiring registration prior to the offering, issuance, distribution or sale of a security on account of the applicability of section 1145(a)(l) of the Bankruptcy Code.

50.     Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any party pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) to the issuance, distribution, transfer, or exchange of the New Term Loans or the New Securities, or any other debt, equity security or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; (d) the grant of collateral under or in connection with the New Term Loan Agreement and ancillary documents related thereto and the New Term Loans; or (e) the making, delivery, or recording of any deed or other instrument of transfers under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be taxed under any law imposing a stamp tax or similar tax.

## N.     Claims for Payment of Taxes From Responsible Parties

51.     Certain current and former officers or directors of the Debtors that are alleged to be "responsible parties" for payment of certain taxes allegedly not paid by the Debtors have received demand letters stating that they are obligated to pay certain taxes (Debtors' Ex. 149).

52. Section 3.1(b) of the Plan provides that each holder of an Allowed Priority Tax Claim or an Allowed Secured Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim or an Allowed Secured Tax Claim, as shall have been determined by the Debtors, (i) regular installments payable in Cash, over a period not exceeding five years after the Petition Date, having a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (ii) such different treatment as to which the applicable Debtor and such holder have agreed in writing.

**O.  Notice of the Confirmation Hearing and Cure Amounts**

53. Actual written notice of the Confirmation Hearing [Docket Nos. 1017, 1044], and a reasonable opportunity to object or be heard with respect thereto was provided to: (a) the Office of the United States Trustee; (b) the Debtors' equity holders; (c) all entities known to have, or to have asserted, any lien, claim, encumbrance or other property interest in or upon any of the Debtors' assets; (d) all taxing authorities for those jurisdictions in which the Debtors' assets are located; (e) the Internal Revenue Service; (f) all counterparties to the Debtors' unexpired leases and executory contracts; (g) all parties that filed a notice of appearance and request for service of papers in these Chapter 11 Cases; (h) all relevant state and federal environmental authorities; and (i) all known creditors of the Debtors. Such notice was adequate, reasonable and proper notice of the time and place of the Confirmation Hearing and the opportunity to object and be heard with respect thereto.

54. The Debtors also gave notice [Docket Nos. 1017 and 1044] (the "Cure Notice") of the proposed cure amount (the "Cure Amount") to each non-debtor counterparty to an executory contract or unexpired lease that the Debtors seek to assume under the Plan (collectively, the "Assumed Contracts"). The service of such Cure Notice was good, sufficient and appropriate

under the circumstances and no further notice need be given to any party in respect of establishing a Cure Amount for the respective Assumed Contract.  Non-debtor counterparties to the Assumed Contracts have had a sufficient, reasonable and appropriate opportunity to object to the Cure Amount.

55.    As further evidenced by the certificates of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Confirmation Hearing and the assumption of the Assumed Contracts has been provided in accordance with Bankruptcy Rules 2002, 6006 and 9014 [Docket Nos. 1017, 1044].  The Debtors also have complied with all obligations to provide notice of the Confirmation Hearing and the assumption of the Assumed Contracts as required by the Disclosure Statement Order.  The foregoing notices described in paragraphs [53] through [54] were adequate, sufficient and proper under the circumstances, and no other or further notice of the Confirmation Hearing or the assumption of the Assumed Contracts is required.

56.    The disclosures made by the Debtors concerning the Confirmation Hearing and the assumption of the Assumed Contracts were reasonable, complete and adequate under the circumstances and such notices comply with the provisions of the Bankruptcy Rules, the Federal Rules of Civil Procedure and the Local Bankruptcy Rules for the Northern District of Texas.

**P.    Creation of the Litigation Trust**

57.    The Idearc Inc. *et al.* Litigation Trust (the "Litigation Trust") is approved and all necessary parties, including the Litigation Trustee (defined below), are hereby authorized to execute the Litigation Trust Agreement in substantially the form attached as Exhibit 2 to the Confirmation Order (the "Trust Agreement").

58.    The creation of the Litigation Trust is reasonable and appropriate and will be used

to prosecute the Litigation Trust Rights and conduct such other action as described in and authorized by the Plan, and to make timely and appropriate distributions to holders of Allowed Claims and to hold and manage all Litigation Trust Rights, and otherwise carry out the provisions of the Trust Agreement. The transactions to be consummated in connection with the transfer of assets to the Litigation Trust as set forth in the Plan are in the best interests of the Debtors, their Estates and all other parties-in-interest, including all creditors, and otherwise satisfies the requirements of the Bankruptcy Code and Bankruptcy Rules, and should be approved.

59.     The Litigation Trust will be administered by an initial trustee approved by the Bankruptcy Court (the "Litigation Trustee"). Pursuant to the terms of the Trust Agreement, U.S. Bank National Association is appointed as the initial Litigation Trustee.

**Q.     Releases, Exculpations and Injunctions**

60.     The Plan provides for various releases, exculpations and injunctions pursuant to Sections 10.6, 10.7, 10.8, 10.9 and 10.10 thereof.

61.     The releases, exculpations and injunctions provided for by the Plan (a) are within the proper jurisdiction and purview of the Bankruptcy Court under 28 U.S.C. § 1334; (b) are integral elements of the transactions incorporated into the Plan; (c) confer material benefit on, and are in the best interests of, the Debtors, their Estates and their creditors; (d) are important to the overall objectives of the Plan and resolve the Claims that are the subject of the releases, exculpations and injunctions; (e) to the extent they impact claims against certain non-Debtors (such as the Debtors' officers and directors), such claims are channeled to insurance proceeds; and (f) are consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.

R.      **Assumption of the Assumed Contracts**

62.     The Debtors have exercised reasonable business judgment in determining whether to assume or reject each of the Debtors' executory contracts and unexpired leases under the terms of the Plan and the Confirmation Order. The assumption of the Assumed Contracts pursuant to the terms of the Confirmation Order and the Plan is in the best interest of the Debtors and their Estates, creditors and other parties-in-interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

63.     Each pre- or post-confirmation assumption or rejection of an executory contract or unexpired lease pursuant to Section 6 of the Plan shall be legal, valid and binding upon the applicable Debtor, and all non-Debtor parties to such executory contract or unexpired lease, as applicable, all to the same extent as if such assumption or rejection had been effectuated pursuant to an appropriate order of the Bankruptcy Court entered before the Confirmation Date under section 365 of the Bankruptcy Code. Each of the executory contracts and unexpired leases to be assumed or rejected is deemed to be an executory contract or an unexpired lease, as applicable.

64.     As set forth in Section 6 of the Plan and the Confirmation Order, the Plan constitutes a motion to assume the Assumed Contracts. Except as otherwise provided in a separate order of the Bankruptcy Court, any non-Debtor party to an Assumed Contract was required to object to such assumption or to the cure amounts proposed by the Debtors in connection therewith by no later than November 13, 2009, notice of which this Bankruptcy Court finds was reasonable and appropriate, having been provided on or about September 21, 2009 [Docket Nos. 1017, 1044].

65.     All executory contracts and unexpired leases not rejected pursuant to the Plan shall be deemed assumed as of the Effective Date. Each executory contract or unexpired lease to

be rejected pursuant to the Plan is burdensome and the rejection thereof is in the best interests of the Estates.

66.     The respective Cure Amounts are the sole amounts necessary under sections 365(b)(1)(A) and (B) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assumed Contracts.

67.     The Debtors have (a) cured and/or provided adequate assurance of cure of any and all defaults existing prior to the Effective Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code; and (b) provided compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Effective Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code.

68.     The Debtors have provided adequate assurance of their future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(b)(3) (to the extent applicable) of the Bankruptcy Code.

69.     Upon the entry of the Confirmation Order, (a) all of the requirements of section 365(b) will have been satisfied with respect to each Assumed Contract for which no timely objection was filed; (b) all rights to object to the assumption of any such Assumed Contract will have been waived; (c) except as the Bankruptcy Court may hereafter determine is necessary and appropriate to effect the purpose of the Bankruptcy Code, all rights to object to the Cure Amounts with respect to any such Assumed Contracts will have been waived; and (d) the assumption of such Assumed Contracts are hereby approved.

**S.     Bankruptcy Rule 3020(e)**

70.     Good cause exists for waiving and eliminating the stay of the Confirmation Order

set forth in Bankruptcy Rule 3020(e).  In particular, the Plan represents a fair and equitable compromise by and among the major parties-in-interest in the Chapter 11 Cases and should be consummated as expeditiously as possible.  If the stay is not waived and eliminated, the ability of the Debtors to consummate the Plan by December 31, 2009, could be delayed.

**T.     Plan Supplement**

71.     The Plan Supplement, as amended or supplemented as contemplated and permitted by the Plan, is reasonable, necessary and appropriate to effectuate the Plan.

**U.     Certain Tax Consequences Under the Plan**

72.     The resolution of all intercompany Claims among the Debtors, as called for by the Plan, will occur, if at all, prior to, and independent from, the remainder of the means to implement the Plan and will be so treated under the Internal Revenue Code.

73.     Under the Plan, as proposed and confirmed, the Debtors will be restructured pursuant to the means for implementation set forth in Section 5 of the Plan.

74.     Pursuant to the Plan, Idearc will transfer to Reorganized Idearc more than fifty percent (50%) of the fair market value of the gross assets held by Idearc immediately prior to the transfer and more than seventy percent (70%) of the fair market value of the operating assets held by Idearc immediately prior to the transfer and, therefore, upon such transfer Reorganized Idearc will acquire "substantially all of the assets" of Idearc within the meaning of section 354(b)(l)(A) of the Internal Revenue Code.

75.     Giving effect to the cancellation of indebtedness occurring pursuant to the Plan, the fair market value of the property to be transferred by Idearc to Reorganized Idearc will exceed the sum of the amount of the liabilities of Idearc that are assumed by Reorganized Idearc in connection with the exchange and the amount of money and the fair market value of any other

property received by Idearc in connection with the exchange.

76. The principal purpose of the Plan, as proposed and confirmed, and of each transactions set forth therein, is not the avoidance or evasion of Federal income tax within the meaning of section 269 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and the Plan therefore complies with section 1129(d) of the Bankruptcy Code.

## V. The Plan Complies with Section 1129 of the Bankruptcy Code

77. To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence. *See Heartland Fed. Say. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II),* 994 F.2d 1160,1165 (5th Cir. 1993), *cert, denied,* 510 U.S. 992 (1993); *In re MCorp Fin, Inc.,* 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992); *In re Arnold,* 80 B.R. 806, 807 (Bankr. M.D. La. 1987); *see also In re JT Thorpe Co.,* 308 B.R. 782,785 (Bankr. S.D. Tex. 2003), *qff'd,* 2004 WL 720263 (S.D. Tex. Mar. 3, 2004); *In re Kent Terminal Corp.,* 166 B.R. 555,561 (Bankr. S.D.N.Y. 1994); 7 *Collier On Bankruptcy* 1129.02[4], at 1129-22 (15th rev. ed. 2005).

78. As demonstrated by the Record, the Plan complies with all relevant sections of the Bankruptcy Code, the Bankruptcy Rules and applicable non-bankruptcy law relating to the confirmation of the Plan. In particular, the Plan complies with all of the requirements of section 1129 of the Bankruptcy Code.

79. The Debtors have satisfied section 1121 of the Bankruptcy Code in that the Debtors have standing to file a plan. Furthermore, the Plan reflects the date it was filed with the Court and identifies the entities submitting it as Plan proponents, thereby satisfying Bankruptcy Rule 3016(a).

**W.      The Plan Complies with Section 1129(a)(l) of the Bankruptcy Code**

80.      Pursuant to section 1129(a)(l) of the Bankruptcy Code, a plan of reorganization must "compl[y] with the applicable provisions of [the Bankruptcy Code]."   11 U.S.C. § 1129(a)(l).  The legislative history of section 1129(a)(l) of the Bankruptcy Code indicates that a principal objective of this provision is to assure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.  *See* S. Rep. No. 95-989, at 126 (1978); H.R. Rep. No. 95-595, at 412 (1977); *see also J T Thorpe,* 308 B.R. at 785; *In re Gen. Homes Corp.,* 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).  As demonstrated below and in the findings contained herein, the Plan complies fully with the requirements of sections 1122 and 1123 of the Bankruptcy Code, as well as the other applicable provisions of the Bankruptcy Code.

81.      Under section 1122 of the Bankruptcy Code, a plan may provide for multiple classes of claims or interests so long as each claim or interest within a class is substantially similar to other claims or interests in that class.   Significantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar.  *See Phoenix Mut. Life Ins. Co.* v. *Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274,1278 (5th Cir. 1991), *cert. denied,* 506 U.S. 821 (1992); *Aetna Cas. & Sur. Co.* v. *Clerk (In re Chateaugay Corp.),* 89 F.3d 942, 949 (2d Cir. 1996); *In re Simmons,* 288 B.R. 737, 743 n.11 (Bankr. N.D. Tex. 2003); *In re Sentry Operating Co. of Tex., Inc* , 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001); *In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992); *In re Eagle Bus Mfg., Inc,* 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991), *aff'd,* 158 B.R. 421 (S.D. Tex. 1993).

82.     Section 1122 of the Bankruptcy Code does not require that all substantially similar claims be placed in the same class. *In re Meadow Glen, Ltd.,* 87 B.R. 421, 424 (Bankr. W.D. Tex. 1988).  Decisions interpreting section 1122(a) generally uphold separate classification of different groups of unsecured claims when a reasonable basis exists for the classification. *See Greystone III,* 995 F.2d at 1278; *see also Sentry Operating,* 264 B.R. at 860; 7 *Collier on Bankruptcy* § 1122.03[4][a], at 1122-11 (15th ed. rev. 2005).   The Bankruptcy Code only prohibits the identical classification of dissimilar claims and does not require the same classification for claims sharing some attributes. *See Chateaugay,* 155 B.R. at 630; *In re 499 W. Warren St Assocs., Ltd. P'ship,* 151 B.R. 307, 312 (Bankr. N.D.N.Y. 1992).  Classification of substantially similar claims in different classes is permitted for purposes of reorganization only and for reasons independent of debtor's motivation to secure the vote of an impaired, assenting class of claims; similar claims may not be classified differently to gerrymander affirmative votes on the reorganization plan. *Greystone III,* 995 F.2d at 1278-79.

83.     The Plan's classification scheme conforms to the statute, as the Plan separately classifies Claims based on valid business and legal reasons, particularly Classes 1, 2, 3, 4, 5, 6, and 7.  The Plan's classification scheme is rationally based because it is based on the respective legal rights of each holder of a Claim against or Idearc Interest in the applicable Debtor's Estate and the proposed classifications were not proposed to create a consenting impaired class or to manipulate class voting.

84.     Every chapter 11 plan must comply with the requirements set forth in section 1123(a) of the Bankruptcy Code.  The Plan complies fully with each such requirement:

    (i)     Under section 1123(a)(l), a plan must "designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(l), 507(a)(2), or 507(a)(8) of this title, and classes of

interest." Section 2 of the Plan designates classes of Claims and Idearc Interests that require classification.

(ii)    Under section 1123(a)(2), a plan must "specify any class of claims or interests that is not impaired." Section 3.2 of the Plan specifies which classes of Claims and Idearc Interests are not impaired under the Plan.

(iii)    Under section 1123(a)(3), a plan must "specify the treatment of any class of claims or interests that is impaired." Sections 3.3 and 3.4 of the Plan specify which classes of Claims and Idearc Interests are impaired, and their treatment, under the Plan.

(iv)    Under section 1123(a)(4), a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." As reflected in the treatment set forth in Section 3 of the Plan, the treatment of each of the Claims and Idearc Interests in each particular class is the same as the treatment of each of the other Claims or Idearc Interests in such class or the holder of a particular claim or interest has agreed to a less favorable treatment of such particular claim or interest; provided, however, to the extent (a) holders of Allowed Unsecured Note Claims in Class 4, Sub-Class 1 or electing Allowed General Unsecured Claims in Class 4, Sub-Class 1 receive better treatment than holders of Allowed Unsecured Credit Facility Claims in Class 4, Sub-Class 1, or (b) holders of Allowed General Unsecured Claims in Class 4, Sub-Class 2 receive better treatment than holders of Allowed Unsecured Note Claims in Class 4, Sub-Class 1, electing Allowed General Unsecured Claims in Class 4, Sub-Class 1 or Allowed Unsecured Credit Facility Claims in Class 4, Sub-Class 1, the Bankruptcy Court finds that such better treatment is approved on the basis of (x) the standards for compromise and settlement and this Court's approval of the Global Settlement Agreement, (y) the vote by 100% in number and 100% in dollar amount of Lenders voting on the Plan to accept the Plan and (z) the Committee's support for confirmation of the Plan.

(v)    Under section 1123(a)(5), a plan must "provide adequate means for the plan's implementation." Section 5 of the Plan provides adequate means for implementation of the Plan.

(vi)    Under section 1123(a)(6), a plan must "provide for the inclusion in the charter of the debtor, if the debtor is a corporation . . . , of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of such power among such classes, including, in the case of any class of equity securities having a preference over another class of equity securities with respect to dividends, adequate provisions for the

election of directors representing such preferred class in the event of default in the payment of such dividends." The charter documents for each Debtor contain language satisfying section 1123(a)(6).

(vii)     Under section 1123(a)(7), a plan must "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." Section 5.8 of the Plan provides for the selection of officers and directors for the Reorganized Debtors. The initial Litigation Trustee was identified in paragraph [59] above.

(viii)    Under section 1123(a)(8), where a debtor is an individual, a plan must provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan. The Debtors are not individuals. Therefore, the provisions of section 1123(a)(8) of the Bankruptcy Code are inapplicable and thus satisfied.

85.     The Plan provides for the assumption of certain of the Debtors' executory contracts and unexpired leases. Under section 365 of the Bankruptcy Code, a debtor may assume an executory contract or unexpired lease if (a) outstanding defaults under the contract or lease have been cured under section 365(b)(l) of the Bankruptcy Code, and (b) the debtor's decision to assume such executory contract or unexpired lease is supported by valid business justifications. Courts apply the "business judgment test," which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment. *Lubrizol Enters., Inc.* v. *Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046-47 (4th Cir. 1985) ("The issue . . . is whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice."), *cert, denied,* 475 U.S. 1057 (1986); *In re Constant Care Cmty. Health Or., Inc.,* 99 B.R. 697, 702 (Bankr. D. Md. 1989) (same); *Eagle Bus,* 134 B.R. at 597 (confirming plan in which decisions regarding the assumption or rejection

of executory contracts and unexpired leases were based on the debtors' sound business judgment and were in the best interests of the estate). In the absence of a showing of bad faith or an abuse of business discretion, the debtor's business judgment will not be altered. *NLRB* v. *Bildisco & Bildisco (In re Bildisco),* 682 F.2d 72, 79 (3d Cir. 1982), *aff'd,* 465 U.S. 513 (1984); *Lubrizol Enters.,* 756 F.2d at 1047. "Transposed to the bankruptcy context, the [business judgment] rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion." *Id*.

86.     The Debtors' decisions pursuant to the Plan regarding the rejection and assumption of executory contracts and unexpired leases are based on sound business judgment and are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, holders of Claims, and other parties-in-interest in the Debtors' Chapter 11 Cases. *See NLRB* v. *Bildisco & Bildisco,* 465 U.S. 513, 523 (1984); *Lubrizol Enters.,* 756 F.2d at 1047. Section 6.2 of the Plan states the means by which all monetary defaults under each executory contract and unexpired lease are to be satisfied pursuant to section 365 of the Bankruptcy Code. All Cure Payments which may be required by section 365(b)(1) of the Bankruptcy Code under any executory contract or unexpired lease that are assumed under the Plan shall be made by the Debtors. Accordingly, the requirements of sections 1123(b)(2) and 365 of the Bankruptcy Code have been satisfied.

## X.     The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code

87.     Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtors have complied with the applicable provisions of title 11, including, specifically, sections 1125 and

1126 of the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order governing notice, disclosure and solicitation in connection with the Plan, the Disclosure Statement, and all other matters considered by the Bankruptcy Court in connection with the Chapter 11 Cases.

88. On September 10, 2009, after due notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, which, *inter alia,* approved the Disclosure Statement, finding that it contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and established procedures for the Debtors' solicitation of votes on the Plan.

89. In accordance with section 1125 of the Bankruptcy Code and pursuant to the Disclosure Statement Order, the Debtors (through KCC) solicited acceptances or rejections of the Plan from holders of Claims in each class of impaired Claims that are to receive distributions under the Plan. Classes 1 and 2 of the Plan are unimpaired, and as a result, pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in those classes are conclusively presumed to have accepted the Plan. Classes 3, 4 and 5 are impaired, receive distributions under the Plan, and have been solicited to vote on the Plan. Classes 6 and 7 are impaired, receive no distributions under the Plan, and as a result, pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims in those classes are conclusively presumed to have rejected the Plan. The Debtors have complied with the applicable provisions of section 1126 of the Bankruptcy Code.

**Y. The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code**

90. Having examined the totality of the circumstances surrounding the Plan, the Bankruptcy Court has determined that the Plan was proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. The Plan achieves the rehabilitative and reorganizational goals of the Bankruptcy Code by restructuring

the Debtors' obligations and providing the means through which the Debtors may continue to operate as a viable enterprise. Attendant to the continued operation of the enterprise is the ability of the Debtors to preserve jobs and continue business operations. The Plan is the result of arm's length discussions and negotiations among the Debtors, the Administrative Agent, the Committee and other key and relevant stakeholders. Significantly, the Plan incorporates the Global Settlement Agreement, which resolved significant litigation pending among the parties, as well as related proceedings and potential objections to confirmation of the Plan. The Plan, with its compromises and proposed treatments, clearly promotes the objectives and purposes of the Bankruptcy Code.

**Z.     The Plan Complies With Section 1129(a)(4) of the Bankruptcy Code**

91.     Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, be subject to approval of the court as reasonable. Section 1129(a)(4) of the Bankruptcy Code has been construed to require that all payments of professional fees made from estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness. *See Heartland Fed Sav. & Loan Assoc.* v. *Briscoe Enters. Ltd, II (In re Briscoe Enters. Ltd, II),* 138 B.R. 795, 816-17 (N.D. Tex. 1992), *rev'd,* 994 F.2d at 1170 (court of appeals affirming bankruptcy court's ruling on payment of professional fees); *see also Mabey v. Sw. Elec Power Coop (In re Cajun Elec. Power Coop., Inc.),* 150 F.3d 503, 515 (5th Cir. 1998), *cert, denied,* 526 U.S. 1144 (1999); *see, e.g., In re Anderson Grain Corp.,* 222 B.R. 528 (Bankr. N.D. Tex. 1998).

92.     Section 10.1 of the Plan provides that each Professional who holds or asserts a Professional Fee Claim incurred prior to the Effective Date, shall be required to file with the

Bankruptcy Court and serve on all parties required to receive such notice, a request for payment no later than sixty (60) days after the Effective Date. Failure to file and serve such notice timely and properly results in the Professional Fee Claim being forever barred and discharged. A Professional Fee Claim that has been properly filed and served pursuant to Section 10.1 of the Plan shall become an Allowed Claim only to the extent allowed by Final Order.

93. The Bankruptcy Court previously approved interim application procedures under section 331 of the Bankruptcy Code, pursuant to which the Bankruptcy Court authorized and approved the interim and final payment of certain fees and expenses of professionals retained in the Chapter 11 Cases. All such fees and expenses, as well as all other accrued fees and expenses of Professionals through the Effective Date, remain subject to final review for reasonableness by the Bankruptcy Court under section 330 of the Bankruptcy Code. The foregoing procedures for the Bankruptcy Court's review and ultimate determination of fees and expenses paid satisfy the objectives of section 1129(a)(4) of the Bankruptcy Code.

## AA. The Plan Complies With Section 1129(a)(5) of the Bankruptcy Code

94. Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers, directors or voting trustee of the debtors after confirmation of the plan; that the appointment or continuance of such officers, directors or voting trustee be consistent with the interests of creditors and equity interest holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtors. Section 5.8(a) of the Plan describes the process pursuant to which the members of the New Board for Reorganized Idearc will be determined. The identification of the New Board was disclosed in the Plan Supplement. Section 5.8(b) provides that The New Board shall appoint the directors of the Reorganized

Subsidiaries to serve in their respective capacities after the Effective Date until replaced or removed in accordance with the Reorganized Subsidiary Governing Documents. Section 5.8(c) of the Plan provides that the officers of Idearc, who have previously been identified, shall continue to serve in their same respective capacities after the Effective Date. The officers of the Reorganized Subsidiaries, also previously described, shall continue to serve in their same respective capacities after the Effective Date and such officers were disclosed in the Disclosure Statement. The Disclosure Statement discloses the identity and compensation of any insiders to be retained or employed by the Reorganized Debtors. The identification of the proposed officers and directors of the Reorganized Debtors satisfies all requirements of section 1129(a)(5) of the Bankruptcy Code.

**BB.    The Plan Complies With Section 1129(a)(6) of the Bankruptcy Code**

95.    Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by the reorganized debtor in the operation of its businesses approve any rate change provided for in the plan. 11 U.S.C. § 1129(a)(6). The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date. Therefore, the provisions of section 1129(a)(6) of the Bankruptcy Code are inapplicable and thus satisfied.

**CC.    The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code**

96.    As set forth fully in the Debtors' liquidation analysis and by the evidence adduced in the Confirmation Hearing, the "best interests" test is satisfied as to all impaired classes of Claims and Idearc Interests which have not accepted the Plan. Furthermore, a liquidation under chapter 7 as set forth in the liquidation analysis would profoundly and adversely affect the ultimate proceeds available for distribution to all holders of Allowed Claims in the Chapter 11

Cases. Liquidation under chapter 7 would result in substantially smaller distributions being made to creditors than those provided for under the Plan due to, *inter alia*, (a) the value of the Debtors' real and personal property interests is small in comparison to the going concern value of the business; (b) the anticipated erosion in value of assets in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (c) the limitations of section 721 of the Bankruptcy Code; (d) loss of value through the passage of time; (e) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee for bankruptcy and other necessary professional advisors; (f) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; (g) the substantial increases in Claims which would have to be satisfied on an administrative or priority basis or on parity with creditors in the Chapter 11 Cases; and (h) the likelihood of contentious litigation by and between parties-in-interest and the high costs attendant thereto. Finally, consummation of the Debtors' Plan is not likely to be followed by liquidation or the need for further financial reorganization.

97.     In the context of the erosion of the asset values and the increased costs and delay associated with the administration of a chapter 7 case, confirmation of the Plan provides each rejecting creditor and interest holder with a recovery that is not less than such holder would receive in a chapter 7 liquidation of the Debtors.

98.     Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code. Therefore, the "best interests" test is satisfied with respect to Classes 4, 6 and 7.

**DD.     The Plan Complies with Sections 1129(a)(8) and (b)(1) of the Bankruptcy Code**

99.     Section 1129(a)(8) is satisfied with respect to the Claims in Classes 1 and 2 as

such Claims are not impaired under the Plan and are conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.

100.    Based on the Record and uncontroverted evidence, on an unconsolidated basis, Classes 3 and 5, both of which were impaired, accepted the Plan.

101.    Accordingly, other than Classes 4, 6 and 7 (each of which is subject to the "cram down" provisions of section 1129(b) of the Bankruptcy Code, as discussed below), section 1129(a)(8) of the Bankruptcy Code is satisfied.

**EE.    The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code**

102.    Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims entitled to priority under section 507(a) of the Bankruptcy Code receive specified cash payments under the plan. *See* 11 U.S.C. § 1129(a)(9).

103.    Consistent with section 1129(a)(9)(A), Section 3.1(a) of the Plan provides that each holder of an Allowed Administrative Claim shall receive (A) Cash equal to the unpaid portion of such Allowed Administrative Claim or (B) such different treatment as to which the applicable Debtor and such holder shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, on or before the Initial Distribution Date, or shall receive such other treatment as agreed upon in writing by the Debtors and such holder; provided, however, that an Administrative Claim representing a liability incurred in the ordinary course of business by the Debtors' Estates may be paid in the ordinary course of business by the Debtors' Estates.

104.    Consistent with section 1129(a)(9)(A), Section 10.1 of the Plan provides that all

Allowed Professional Fee Claims shall be paid by the Debtors.

105.    As required by section 1129(a)(9)(B) of the Bankruptcy Code, Section 3.2(a) of the Plan provides that, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights of each holder of an Allowed Other Priority Claim will be reinstated and retained, except as provided in section 1124(2)(A)-(C) of the Bankruptcy Code and the holders of such Claims will be paid in full.

106.    Consistent with section 1129(a)(9)(C) of the Bankruptcy Code, Section 3.1(b) of the Plan provides that each holder of an Allowed Priority Tax Claim or Allowed Secured Tax Claim shall receive (a) regular installments payable in Cash, over a period not exceeding five years after the Petition Date, having a total value, as of the Effective Date, equal to the Allowed amount of such Claim; (b) such different treatment as to which the applicable Debtor and such holder have agreed in writing; provided, that such treatment is on more favorable terms to the Debtors (or the Reorganized Debtors after the Effective Date), than the treatment set forth in clause (a) above; or (c) payment in full in Cash on the later of the Distribution Date or the date on which such Claim becomes an Allowed Claim.  Each holder of an Allowed Priority Tax Claim or Allowed Secured Tax Claim shall not receive any Cash or other distribution on account of a penalty on, with respect to, or arising in connection with, such Allowed Priority Tax Claims or Allowed Secured Tax Claims.  All penalties on, with respect to, or arising in connection with, any Priority Tax Claim or Secured Tax Claim shall be treated as Class 4 General Unsecured Claims.  Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**FF.    The Plan Complies with Section 1129(a)(10) of the Bankruptcy Code**

107.    Class 3 Secured Credit Facility Claims against each of the Debtors has voted as a

Class to accept the Plan. Class 5 Convenience Claims is deemed to have accepted the Plan. The holders of Class 3 Secured Credit Facility Claims are not "insiders" as such term is defined in the Bankruptcy Code. Thus, for each of the Debtors, at least one non-insider class of impaired creditors accepted the Plan.

**GG. The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code**

108. Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan. *See* 11 U.S.C. § 1129(a)(11). The Plan proposes a reorganization of the Debtors' assets.

109. The feasibility test set forth in section 1129(a)(1 1) requires the Bankruptcy Court to determine whether the Plan is workable and has a reasonable likelihood of success. *Fin. Sec. Assurance Inc* v. *T-H New Orleans Ltd., P'ship (In re T-H New Orleans Ltd P'ship),* 116 F.3d 790, 801 (5th Cir. 1997); *In re Cajun Elec. Power Coop., Inc.,* 230 B.R. 715,744-45 (Bankr. M.D. La. 1999); *In re M& S Assocs.,* 138 B.R. 845, 848-49 (Bankr. N.D. Tex. 1992); *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989); *see also In re Leslie Fay Cos., Inc.,* 207 B.R. 764, 788-89 (Bankr. S.D.N.Y. 1997). The Fifth Circuit has provided that "the [bankruptcy] court need not require a guarantee of success . . ., [o]nly a reasonable assurance of commercial viability is required.' All the bankruptcy court must find is that the plan offer 'a reasonable probability of success.'" *T-H New Orleans,* 116 F.3d at 801 (quoting *Briscoe Enters.,* 994 F.2d at 1165-66; *In re Landing Assocs., Ltd,* 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993)) (additional citations omitted); *see also Cajun Elec,* 230 B.R. at 745; *Landing Assocs.,* 157 B.R. at 819; *M& S Assocs,* 138 B.R. at 849; *Lakeside Global,* 116 B.R. at 506-07.

110. To establish the feasibility of a plan, the debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan. Such projections cannot be speculative, conjectural or unrealistic. *M & S Assocs.,* 138 B.R. at 849. A plan proponent, however, need only demonstrate that there exists a reasonable probability that the plan provisions can be performed. *T-H New Orleans,* 116 F.3d at 801 (quoting *Landing Assocs.,* 157 B.R. at 820). "However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility." *Cajun Elec,* 230 B.R. at 745. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required. *See id.; see also In re U.S. Truck Co., Inc.,* 47 B.R. 932, 944 (E.D. Mich. 1985), *affd,* 800 F.2d 581 (6th Cir. 1986).

111. For purposes of determining whether the Plan satisfies the feasibility standard, the Debtors, their professional advisors, as well as other parties-in-interest, have analyzed the ability of the Debtors to fulfill their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for each of the five fiscal years 2009-2013. Based on the Record, the Bankruptcy Court concludes that the Debtors will have sufficient means to meet all of their obligations under the Plan, including without limitation, obligations arising under or in connection with the New Term Loans to be issued under the Plan to holders of Class 3 Secured Credit Facility Claims. The Record provides ample support in order to determine that the Reorganized Debtors will emerge from bankruptcy as a viable, financially healthy business enterprise, unlikely to be in need of further financial reorganization.

112. Based on the foregoing, the Plan satisfies the feasibility standard of section 1129(a)(11).

**HH.    The Plan Complies with Section 1129(a)(12) of the Bankruptcy Code**

113.    Section 10.3 of the Plan provides that the Debtors or Reorganized Debtors, as the case may be, shall be responsible for timely payment of United States Trustee quarterly fees incurred pursuant to 28 U.S.C. §1930(a)(6).  Any fees due as of the date of confirmation of the Plan will be paid in full on the Effective Date.  After confirmation, the Reorganized Debtors shall pay United States Trustee quarterly fees as they accrue until these Chapter 11 Cases are closed by the Bankruptcy Court.  The Plan accordingly satisfies section 1129(a)(12) of the Bankruptcy Code.

**II.    The Plan Complies with Section 1129(a)(13) of the Bankruptcy Code**

114.    Section 1129(a)(13) of the Bankruptcy Code requires that the plan continue after its effective date all retiree benefits at the level established pursuant to section 1114(e)(1)(B) or (g) of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.  *See* 11 U.S.C. § 1129(a)(13). Pursuant to the Plan and the Confirmation Order, on or after the Effective Date, all retiree benefits,[8] if any, will continue to be paid in accordance with applicable law.  Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

**JJ.    The Plan Complies with Section 1129(a)(14) of the Bankruptcy Code**

115.    Section 1129(a)(14) of the Bankruptcy Code requires if the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor must have paid all amounts payable under such order or such statute for such obligation that first

---

[8]    As defined in section 1114 of the Bankruptcy Code, "Retiree Benefits" means payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependants, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under the Bankruptcy Code.

become payable after the date of the filing of the petition. *See* 11 U.S.C. § 1129(a)(14). The Debtors are not required by a judicial or administrative order, or by statute, to pay any domestic support obligation; accordingly, the Plan satisfies the requirements of section 1129(a)(14) of the Bankruptcy Code.

## KK.  The Plan Complies with Section 1129(a)(15) of the Bankruptcy Code

116.  Section 1129(a)(15) of the Bankruptcy Code requires that if the debtor is an individual, and the holder of an allowed unsecured claim has objected to confirmation of the plan, the property to be distributed to the holder must be not less than the value required by section 1129(a)(15). *See* 11 U.S.C. § 1129(a)(15). The Debtors are not individuals; accordingly, the Plan satisfies the requirements of section 1129(a)(15) of the Bankruptcy Code.

## LL.  The Plan Complies with Section 1129(a)(16) of the Bankruptcy Code

117.  Section 1129(a)(16) of the Bankruptcy Code requires that all transfers of property of the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust. *See* 11 U.S.C. § 1129(a)(16). All transfers of property under the Plan will be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust; accordingly, the Plan satisfies the requirements of section 1129(a)(16) of the Bankruptcy Code.

## MM.  The Plan Complies with Section 1129(b) of the Bankruptcy Code

118.  Certain classes of Claims and Idearc Interests did not vote to accept the Plan. Specifically, Class 4 voted to reject the Plan (although holders of a majority in number and dollar amount of claims in such Class voted to accept the Plan), and Classes 6 and 7 are impaired and

deemed to reject the Plan.[9]  Despite Class 4's rejection of the Plan, the Committee and the MatlinPatterson Entities support confirmation of the Plan, which incorporates the terms of the Global Settlement Agreement.  Additionally, no party has objected to the Plan's "cram down" of Class 4.  Accordingly, Classes 4, 6 and 7 are subject to "cram down" pursuant to section 1129(b) of the Bankruptcy Code.

119.    Section 1129(b) of the Bankruptcy Code provides that if all applicable requirements of section 1129(a) are met, save for section 1129(a)(8), a Plan may be confirmed so long as it does not discriminate unfairly and it is fair and equitable with respect to each class of claims and equity interests that is impaired and has not accepted the Plan.  *See* 11 U.S.C. § 1129(b)(1).  Thus, to confirm a plan that has not been accepted by all impaired classes (thereby failing section 1129(a)(8)), the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.  *See Sentry Operating,* 264 B.R. at 862; *Landing Assocs.,* 157 B.R. at 821; *Eagle Bus,* 134 B.R. at 601.

120.    The Bankruptcy Court finds, as set forth below, that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to Classes 4, 6 and 7.  Accordingly, the Debtors have satisfied the "cram down" requirements in section 1129(b) of the Bankruptcy Code to confirm the Plan over Classes 4, 6 and 7.

**(1)    The Plan Is Fair And Equitable With Respect To Classes 4, 6 And 7, Which Did Not Vote To Accept The Plan**

121.    Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) provide that a plan is fair and

---

[9]    Class 6 is comprised of Claims against any of the Debtors that are subordinated pursuant to either Section 510(b) or 510(c) of the Bankruptcy Code, which includes any Claim arising from the rescission of a purchase or sale of any Old Security, any Claim for damages arising from the purchase or sale of an Old Security, or any Claim for reimbursement, contribution, or indemnification on account of any such Claim.  No ballots were cast by Creditors asserting claims in Class 6 and the Debtors are unaware of any creditors in that Class at this time.

equitable with respect to a class of impaired unsecured claims or equity interests that has not voted to accept the plan if the plan provides that the holder of any claim or interest that is junior to the claims or equity interests of such class will not receive or retain under the plan on account of such junior claim or interest any property. *See* 11 U.S.C. §§ 1129(b)(2)(B)(ii) and (C)(ii).[10] This central tenet of bankruptcy law — the "absolute priority rule" — requires that if the holders of claims or interests in a particular class receive less than full value for their claims or interests, no holders of claims or equity interests in a junior class may receive property under the plan. *See 203 North LaSalle St. P'ship*, 526 U.S. at 441-42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is known as the 'absolute priority rule.'").

122. The corollary of the absolute priority rule is that senior classes cannot receive more than a one hundred percent (100%) recovery for their claims. *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claim, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Trans Max Techs., Inc.*, 349 B.R. 80, 89 (Bankr. D. Nev. 2006) ("One component of the fair and equitable treatment is that a plan may not pay a premium to a senior class."); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591,

---

[10]    Section 1129(b)(2)(A), which sets forth the absolute priority rule as to secured claims, is not applicable here because (i) Claims in Class 2 are not impaired under the Plan and thus deemed to accept the Plan and (ii) Class 3 voted to accept the Plan.

612 (Bankr. D. Del. 2001) ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."); *In re Victory Constr. Co.*, 42 B.R. 145, 155 (Bankr. C.D. Cal. 1984) ("It is clear that the drafters intended the court to deny confirmation where the plan proposes to pay more than 100 percent to a senior class without the consent of a junior.").

123.    The Plan satisfies the absolute priority rule with respect to unsecured claims in Classes 4 and 6 pursuant to section 1129(b)(2)(B)(ii) of the Bankruptcy Code.  No holder of a claim or interest that is junior to Classes 4 and 6 will receive any distribution on account of such junior claim or interest.  In particular, holders of Subordinated Claims in Class 6, which is junior to Class 4, will not receive or retain any property on account of such claims.  *See* Plan, § 3.4(a).[11] Similarly, holders of Idearc Interests in Class 7, which is junior to Classes 4 and 6, will not receive or retain any property on account of their Idearc Interests.  *See* Plan, § 3.4(b).  Further, no holder of a Claim that is senior to Class 4 or 6 will receive more than one hundred percent (100%) payment for its Claim.  The Plan provides that holders of Allowed Other Priority Claims in Class 1 will be paid in full in Cash.  *See* Plan, § 3.2(a).  The Plan provides that holders of Allowed Other Secured Claims in Class 2 will have their legal, equitable, and contractual rights Reinstated.  *See* Plan, § 3.2(b).  The Plan provides that holders of Allowed Secured Credit Facility Claims in Class 3 will receive distributions equal to the full amount of their Claims.  *See* Plan, § 3.3(a).  Finally, as applicable to Class 6, holders of Allowed unsecured Claims in Class 4 will receive less than the full amount of their Claims.  *See* Plan, § 3.3(b).  Accordingly, the

---

[11]    Holders of Convenience Claims in Class 5 will receive a Cash payment equal to 25% of their Allowed Convenience Claims, up to a maximum of $2,500.  However, for purposes of section 1129(b)(2)(B)(ii), Class 5 is not "junior" to Class 4 because claimants in both classes hold non-priority, unsecured Claims and are thus of equal priority with respect to distributions from the Debtors' Estates.

"cram down" of Classes 4 and 6 is appropriate under section 1129(b)(2)(B)(ii) of the Bankruptcy Code.

124.    The Plan also satisfies the absolute priority rule with respect to Idearc Interests in Class 7 pursuant to section 1129(b)(2)(C)(ii) of the Bankruptcy Code. The uncontroverted evidence demonstrates that the reorganization value of the Debtors is substantially less than the aggregate amount of Allowed Claims. Moreover, holders of Claims in Class 3 are not receiving more than 100% of their Allowed Claims. Because Class 7 represents the lowest priority of any interests in the Debtors, there are no holders of any interests that are junior to the interests of Class 7 that are receiving or retaining anything under the Plan. Moreover, as noted above, no holder of any claim in Classes 1 through 6, which are senior to Class 7, shall receive property under the Plan with a value of more than 100% of their Allowed Claims. Accordingly, the "cram down" of Class 7 is appropriate under section 1129(b)(2)(C)(ii) of the Bankruptcy Code. Therefore, the Plan satisfies the requirements of sections 1129(b)(2)(B) and 1129(b)(2)(C) for all Classes of Claims and Idearc Interests that did not vote to accept the Plan and is thus fair and equitable with respect to those Classes.

### (2)    The Plan Does Not Unfairly Discriminate With Respect To Classes 4, 6 and 7, Which Did Not Vote To Accept The Plan

125.    The Plan also does not discriminate unfairly with respect to Classes 4, 6 and 7, which rejected the Plan. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists. *See 203 N. LaSalle,* 190 B.R. at 585 (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a chapter 11 plan" and that "the limits of fairness in this context have not been established"). Rather, courts may examine the facts and circumstances of the particular case to determine whether unfair discrimination exists. *See In re Johns-Manville Corp.*, 68 B.R. 618,

636 (Bankr. S.D.N.Y. 1986) ("The language and legislative history of the statute provides little guidance in applying the 'unfair discrimination' standard."); *see, e.g.*, *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination"). At a minimum, however, the unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so. *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (segregating two similar claims into separate classes and providing disparate treatment for the classes is unfairly discriminatory); *see, e.g.*, *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 656 (9th Cir. 1997); *Aztec*, 107 B.R. at 589-91.

126. Here, the Plan's treatment of Claims in Classes 4 and 6 and Idearc Interests in Class 7, the only impaired Classes that rejected the Plan, is not unfairly discriminatory, for similarly situated holders of Claims or Idearc Interests will receive substantially similar treatment irrespective of Class.

127. As to Class 4, the differing treatment of Claims in each Sub-Class is not unfairly discriminatory. All holders of Allowed unsecured Claims will have the option of receiving the same treatment under the Plan on account of those Claims, by participating in Sub-Class 1 of Class 4. Holders of Allowed Unsecured Note Claims and Allowed Unsecured Credit Facility Claims are automatically in Sub-Class 1 of Class 4, and holders of Allowed General Unsecured Claims have the ability to opt out of Sub-Class 2 of Class 4 and elect to receive the treatment in

Sub-Class 1. *See* Plan, § 3.3(b). Furthermore, even if holders of Allowed General Unsecured Claims elect to stay in Sub-Class 2, the treatment afforded to Sub-Class 2 is not unfairly discriminatory to Sub-Class 1. The Bankruptcy Court recognizes that no holders of Allowed Unsecured Note Claims or Allowed Unsecured Credit Facility Claims in Sub-Class 1, nor the Committee (on behalf of all unsecured creditors), have objected to the Sub-Class 2 treatment. Moreover, the difference in treatment is insignificant since the fund from which distributions will be made for Sub-Class 2 is capped at $3.0 million, whereas the fund from which distributions will be made for Sub-Class 1 is $120.0 million.

128. Finally, because the $3.0 million fund from which distributions will be made for Sub-Class 2 is being gifted from the Lenders' collateral – and will not be made from the Debtors' assets - any slight discrimination that could exist against claimants in Sub-Class 1 in favor of claimants in Sub-Class 2 does not violate the Bankruptcy Code. *See In re Journal Register Co.*, Case No. 09-10769 (ALG) (Bankr. S.D.N.Y. July 7, 2009) (finding that gift plan did not unfairly discriminate under section 1123(a)(4) of the Bankruptcy Code because removing the gift from the plan would not change the recovery of the objecting creditors, and so the creditors that received the gift did not do so at the expense of other creditors in the same class). *See also, In re WorldCom Inc.,* No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving gift from class of creditors, instead of individual, where class voted in favor of gift); *In re Genesis Health Ventures Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001) (approving gift to subordinated debt-holders of a 14 percent recovery while certain holders of claims senior to the subordinated debt were to receive no distribution); *In re MCorp. Fin. Inc.*, 160 B.R. 941 (S.D. Tex. 1993) (senior creditor gave up portion of recovery to nonsubordinated unsecured creditor in connection with settlement of litigation); *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st

Cir. 1993) (approving secured creditor's gift of a portion of the property securing its lien to the creditors' committee for the benefit of unsecured creditors).

129. Similarly, to the extent the treatment of unsecured Convenience Claims in Class 5 could be more favorable than the treatment of unsecured claims in Class 4, it is not unfairly discriminatory. The creation of the Class 5 Convenience Class is reasonable and necessary for administrative convenience because it reduces the number and amount of electing Claims over $10,000 and separate review of electing Claims would consume the Debtors' resources with very little benefit. *See* 11 U.S.C. § 1122(b) (separate administrative convenience class permissible); *see also In re Leser*, 939 F.2d 669, 671 n. 4 (8th Cir. 1991) (stating that the purpose of section 1122(b) is "to allow special treatment for small claims, so that they [can] be eliminated early and reduce the number of claims that would have to be paid over time."); *Troy Sav. Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485, 489 (N.D.N.Y. 1997) (explaining that convenience classes are authorized under section 1122(b) so that unsecured creditors with relatively small claims can "receive their percentage immediately upon confirmation, rather than making tiny payments over a period of years like the bigger unsecured claims"); *In re Jartran, Inc.*, 44 B.R. 331, 397 (Bankr. N.D. Ill. 1984) (holding that "the purpose and intended goal of § 1122(b) is the reduction of administrative costs accomplished by reducing the number of claims to be dealt with postpetition"). Further, any Class 4 claimant has the option of electing to reduce its claim and receive treatment under Class 5. COLLIER ON BANKRUPTCY ¶ 1129.03[3][c][ii] (16th ed. 2009) (no unfair discrimination if members in dissident class have opportunity to become members of convenience class by reducing their claims to convenience threshold). Thus, any instances of differing treatment under the Plan in regards to the Convenience Claim treatment in Class 5, are justified and permitted under section 1122(b) of the Bankruptcy Code and applicable

law and do not unfairly discriminate against unsecured Claims in Class 4.

130.    Similarly, all claims in Class 6 are subordinated to the same priority as Idearc Interests in Class 7.  Because Classes 6 and 7 receive identical treatment under the Plan, i.e., no distributions to either Class, the Plan does not unfairly discriminate against Class 6.  *See, e.g., In re Dana Corp.*, No. 06-10354, 2007 WL 4589331, at *16 (Bankr. S.D.N.Y. Dec. 26, 2007) (plan does not "discriminate unfairly" when non-accepting class is treated substantially equally to similarly situated classes).

131.    As to Class 7, each holder of an Idearc Interest is receiving the same treatment, i.e., no distributions on account of such interest, as every other holder of an Idearc Interest will receive on account of such interest.  Further, because all Idearc Interests must be extinguished in order for the Plan to satisfy the absolute priority rule as to non-accepting Classes 4 and 6, the Plan does not unfairly discriminate against holders of Idearc Interests in Class 7.  *In re Leslie Fay Cos., Inc.*, 207 B.R. 764, 791 n.37 (Bankr. S.D.N.Y. 1997).

132.    Thus, the Bankruptcy Court finds that the Plan does not unfairly discriminate with respect to Classes 4, 6 and 7 and the "cram down" test is satisfied.

**NN.    The Plan Complies with Section 1125(e) of the Bankruptcy Code**

133.    Based on the Record in these Chapter 11 Cases, the Debtors and each of their respective current or former officers, directors, members, employees, agents, representatives, advisors, and attorneys have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances to the Plan.

134.    To the extent that there is a conflict between the terms and conditions of the

Confirmation Order and the Findings and, the terms and conditions of the Confirmation Order shall govern.

## SUMMARY

135.    The Plan meets the requirements of chapter 11 of the Bankruptcy Code and should be confirmed.  An order consistent with these Findings and Conclusions will be entered.

### END OF ORDER ###

Submitted by:

Toby L. Gerber (SBT 07813700)
Kristian W. Gluck (SBT 24038921)
Ryan E. Manns (SBT 24041391)
FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

Berry D. Spears (SBT 18893300)
Anna Maria Mendez (SBT 24055960)
FULBRIGHT & JAWORSKI L.L.P.
600 Congress Avenue, Suite 2400
Austin, Texas  78701-3271
Telephone: (512) 474-5201
Facsimile: (512) 536-4598

COUNSEL FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION

## Exhibit 1

**(Global Settlement Motion)**

**[Docket No. 1634]**

# Exhibit 2

## (Sean Ryan Settlement Motion)

### [Docket No. 1635]