U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*[signature]*

**United States Bankruptcy Judge**

**Signed December 14, 2010**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| IN RE: § | |
| § | CASE NO. 09-31828-BJH-11 |
| **IDEARC INC.** *et al.,* § | |
| § | (Chapter 11) |
| Debtors § | (Jointly Administered) |

### MEMORANDUM OPINION

Before the Court is the Debtors' Objection to Proof of Claim Number 1372, 1376, and 1464 filed by Sabrina Levy "and all similarly situated class members of *Levy v. Verizon Information Services, Inc., et al*, 06-CV-1583 (collectively, the "Levy Claimants"), which civil action number referred to an action pending in the Eastern District of New York (the "EDNY Litigation") prior to the Debtors' bankruptcy filings here. The Levy Claimants have responded (the "Response") to the

Debtors' claim objection (the "Claim Objection"), and briefs have also been filed. The Court has core jurisdiction over the parties and the issues raised in the Claim Objection and the Response in accordance with 28 U.S.C. §§ 1334 and 157(b). This Memorandum Opinion contains the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

While the relevant facts do not appear to be in substantial dispute here, a brief recitation of those facts will be helpful to an understanding of the Court's subsequent legal analysis.

On April 4, 2006, Sabrina Levy ("Levy") and nine other named plaintiffs (the "Named Plaintiffs") commenced the EDNY Litigation against, as relevant here, the Debtors. In the EDNY Litigation, the Named Plaintiffs sought to recover alleged unpaid "off the clock" overtime compensation and other wages for themselves and other similarly situated individuals under state and federal employment statutes (the "Unpaid Wages"). On June 13, 2007, the judge presiding over the EDNY Litigation conditionally certified the Named Plaintiffs' Fair Labor Standards Act claims as a collective action under 29 U.S.C. § 216(b). Approximately 171 individuals (the "Opt-In Plaintiffs") joined the Named Plaintiffs (collectively, the "Plaintiffs") in the action. The claims framed in the complaint in the EDNY Litigation were brought as putative Rule 23 class actions, but no motion for certification of those claims had been made before the Debtors filed for bankruptcy protection here.

In June 2008, the Debtors and the Plaintiffs began discussing a possible settlement of the EDNY Litigation. In early March 2009, the parties reached a tentative settlement and proceeded to draft a formal settlement agreement. On March 30, 2009, Debtors' counsel emailed Plaintiffs'

counsel the final execution copy of the proposed settlement agreement (the "Settlement Agreement") for signature. The same day, counsel for the Levy Claimants "executed the Settlement Agreement 'on behalf of each of the Counsel for Plaintiffs and their firms, each Named Plaintiff and Opt-Ins Individually and Collectively' and returned it via email." Pls.' Mem. in Opp'n to Reorganized Debtors' Objection to the Levy Claims ("Levy Claimants' Brief") at 4. However, the Named Plaintiff themselves never signed the Settlement Agreement, and neither did the Debtors. On March 31, 2009 (the "Petition Date"), one day after circulating the Settlement Agreement, the Debtors filed their voluntary petitions under chapter 11 in this Court.

As relevant here, the Settlement Agreement split a total of $2.6 million between two groups: (1) the Plaintiffs, who would receive $1.8 million as wage compensation ($1.7 million for overtime and $100,000 for wage deductions), and (2) the yet-to-be identified putative class members of the uncertified state law Rule 23 classes who would receive $700,000 for their overtime claims and $100,000 for their dismissed wage deduction claims. Levy Claimants' Brief at 3-4. The Settlement Agreement proposed a formula for apportioning the funds to the Plaintiffs that did not reflect when wages were actually deducted or unpaid. *Id*. at 4.

## II. CONTENTIONS OF THE PARTIES

By letter dated November 16, 2010, the parties asked the Court to resolve two threshold questions with respect to the Claim Objection. First, is the Settlement Agreement enforceable against the Debtors? Second, if the Settlement Agreement is enforceable against the Debtors, are the Plaintiffs' claims to $1.8 million under the Settlement Agreement entitled to § 507(a)(4) wage priority under the Bankruptcy Code? Although the Court may have to address other issues to finally decide the Claim Objection, the parties have asked that only these two issues be addressed at this time. The

Court will proceed as the parties have requested.

From the Debtors' perspective, the Settlement Agreement is not enforceable because: (i) neither they nor the Named Plaintiffs signed it; (ii) the conditions precedent to its effectiveness were not fulfilled; (iii) it is ineffective as an oral agreements contract; and (iv) precedent from New York's highest civil court precludes its enforcement.[1]  Alternatively, if the Court concludes that the Settlement Agreement is enforceable, the Debtors' deny that the Plaintiffs' claims to $1.8 million are entitled to wage priority under § 507(a)(4) because those wages were not "earned" within 180 days of the Petition Date as the statute requires.  *See* 11 U.S.C. § 507(a)(4).

In contrast, the Levy Claimants contend that the Settlement Agreement is effective and enforceable against the Debtors because (i) both parties intended to be bound by it, and (ii) fulfillment of the Settlement Agreement's conditions precedent is superfluous.  They also contend that their claim to $1.8 million under the Settlement Agreement is entitled to wage priority under § 507(a)(4) of the Bankruptcy Code because a settlement payment is "earned" on the date of the Settlement Agreement, which was within the 180-day period provided in the Bankruptcy Code for such priority.

### III.    LEGAL ANALYSIS

#### A.    Is the Settlement Agreement Enforceable against the Debtors?

The Court agrees with the Levy Claimants that to answer this question "[the] Court [] must determine, under New York law, whether a contract was formed, and if so, whether [it] is

---

[1] While the Debtors identified these as four separate reasons, they overlap and the Court will consolidate its analysis of them as appropriate.  *See infra* at pp. 4-9.

enforceable."[2] Levy Claimants' Brief at 9. Stating the issue in this way is helpful because it highlights the distinction between contract formation and enforcement – a distinction that, despite the above-quoted language, the Levy Claimants' arguments largely overlook. Of course, it is elemental that a contract is formed only if the parties mutually assent to it – *i.e.,* have a "meeting of the minds." Yet, parties frequently agree to enter into contracts that cannot be enforced for one reason or another – infancy, duress, and mutual mistake to name a few. While those defects typically arise at contract formation, others can appear later on so that even a properly formed contract may be rendered unenforceable.

Such is the fate of the Settlement Agreement here. It is undisputed that the parties agreed to the terms of a settlement and that the Settlement Agreement contains the agreed upon terms; indeed, the Debtors have admitted as much. *See* Levy Claimants' Brief at 11 & n.49. But, because the Settlement Agreement was not executed by the parties, it runs afoul of Rule 2104 of the New York Civil Practice Law and Rules ("CPLR 2104") and is unenforceable against the Debtors.[3]

CPLR 2104 provides that "[a]n agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing *subscribed by him or his attorney* or reduced to the form of an order and

---

[2] The Settlement Agreement provides that is governed by New York law. Settlement Agreement at § 9.6.

[3] The Levy Claimants argue that it is unclear whether CPLR 2104 applies to settlement agreements entered into by litigants in federal court in New York. *See* Levy Claimants' Brief at 13 (citing *Kaczmarczyk v. Acme Contracting LLC*, No. 06-CV-1005, 2009 WL 3739442, at *4 (E.D.N.Y. Nov. 3, 2009)). The case they cite is distinguishable, however, as it did not involve an agreement that expressly provided that it "shall be governed, construed, and interpreted and the rights of the parties . . . determined in accordance with New York law," as does the Settlement Agreement here. Settlement Agreement at § 9.6. *See also Sears, Roebuck and Co. v. Sears Realty Co., Inc.,* 932 F.Supp. 392, 403 (N.D.N.Y. 1996) (holding that New York "common law must be applied to determine whether the parties formed an oral settlement agreement *and* state statutory law must be applied to determine whether the agreement, if any, is enforceable." The Court will thus apply CPLR 2104 to the Settlement Agreement.

entered." N.Y. C.P.L.R. 2104 (McKinney 2003) (emphasis added). In *Bonnette v. Long Island College Hospital*, 3 N.Y.3d 281 (N.Y. 2004), New York's highest civil court held "that to be enforceable under CPLR 2104 an out-of-court settlement must be adequately described in a *signed* writing." *Id.* at 286 (emphasis added); *see In re Amendola v. Kendzia*, 850 N.Y.S.2d 777, 778 (N.Y. App. Div. 2008) ("It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by . . . them, they are not bound and may not be held liable until it has been written out and signed."); *Silas v. City of New York*, 536 F. Supp. 2d 353, 362 (S.D.N.Y. 2008) (refusing to enforce an alleged oral settlement based, in part, on *Bonnette*); *State Farm Mut. Auto. Ins. Co. v. Mamadou*, 844 N.Y.S.2d 680, 683 (N.Y. Sup. Ct. 2007) (calling the *Bonnette* holding a "strong statement that the formalities of CPLR § 2104 must be met as a prerequisite to judicial enforcement of out-of-court stipulations of settlement"). Because the Debtors did not execute the Settlement Agreement,[4] and because this Court cannot locate any post-*Bonnette* case in which a New York court made an exception to *Bonnette*'s strict adherence requirement, the Court concludes that the Settlement Agreement cannot be enforced against the Debtors.

In coming to its conclusion, the Court has carefully considered the Levy Claimants' arguments that CPLR 2104 is not the "exclusive means by which settlement agreements are examined" and that "'[t]he only essential prerequisite for a valid settlement agreement is that the parties assent to the terms and conditions of the settlement, and, where there is an oral settlement agreement, that the parties intend to be bound by it.'" Levy Claimants' Brief at 7-8 (citing *Delyanis v. Dyna-Empire,*

---

[4] Although the Debtors also argue that the failure of the Named Plaintiffs to sign the Settlement Agreement precludes its enforcement, the Court disagrees. The failure of the Named Plaintiffs to execute the Settlement Agreement is excused by CPLR 2104 itself, which provides that a settlement agreement is not binding unless it is "in a writing subscribed by him *or his attorney*." CPLR 2104 (emphasis added). Here, counsel for the Named Plaintiffs signed the Settlement Agreement on their behalf prior to the Petition Date.

*Inc.*, 465 F. Supp. 2d 170, 174 (E.D.N.Y. 2006)). Ultimately, the Court finds these arguments to be either unpersuasive or irrelevant.

The Levy Claimants devote several pages to an analysis of the so-called *Winston* test set forth by the Second Circuit in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985). They do so to prove that "the parties intended to be bound" by the Settlement Agreement. Levy Claimants' Brief at 8. But, as noted above, that point is not in dispute here; thus, the *Winston* test is of questionable relevance. Although the test adds much to a contract *formation* analysis, it adds little when the question is about contract *enforceability*. *See Sears, Roebuck and Co. v. Sears Realty Co., Inc.*, 932 F.Supp. 392, 401-5 (N.D.N.Y. 1996) (noting that both parties "confuse[d] the issue of contract formation with that of contract enforceability," and applying the *Winston* test to determine "whether the parties . . . actually formed an agreement" and CPLR 2104 to decide its enforceability); *see also Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005) (noting that the *Winston* test "guide[s] our inquiry into whether parties intend to be bound in the absence of an executed writing").

Because there is simply no dispute that the Settlement Agreement was properly formed, there is no need to apply the *Winston* test to it. The Court thus reiterates its conclusion that the Settlement Agreement is unenforceable against the Debtors under CPLR 2104.

There is another reason why the Settlement Agreement is unenforceable against the Debtors. Specifically, the conditions precedent to its effectiveness were never fulfilled, causing the Settlement Agreement to be "null and void" in accordance with its express terms. Settlement Agreement at §§ 3.1 & 8.6(A). The Settlement Agreement provides that it "is expressly contingent upon" the satisfaction of two "conditions precedent:" (1) the "[e]ntrance of an Order granting a Joint Stipulation

for Leave to file the Second Amended/Consolidated Class Action Complaint for the purpose of substituting the proper entities as defendants in the action and pleading a class claim for underpaid or unpaid overtime under Pennsylvania state law," and (2) "Preliminary and Final Court Approval." *Id.* at § 3.1. It is undisputed that the court presiding over the EDNY Litigation never entered such an order and never gave "Preliminary and Final" approval to the terms of the Settlement Agreement. Accordingly, in the absence of such acts by the court presiding over the EDNY Litigation, the Settlement Agreement provides that it "shall be considered null and void, ... [and] neither this settlement nor any of the related negotiations or proceedings shall be of any force or effect . . .." Settlement Agreement at § 8.6(A).

While the Levy Claimants argue that fulfillment of these conditions precedent is "superfluous" under the unique circumstances of this case, the Court cannot agree. Specifically, the Levy Claimants argue that the "original purpose for obtaining Court approval of the Settlement Agreement was only to effectuate class treatment under Rule 23 for claims that are now moot due to the bar date." Levy Claimants' Brief at 16-17. Moreover, according to the Levy Claimants, "there was never any need for the Court to approve the settlement of the Named Plaintiffs' claims – which is, in essence, a private settlement between parties." *Id*. at 17. And, according to the Levy Claimants, "the effect of the bankruptcy filing and passage of the bar date effectively extinguishes the claims for which a dismissal and judgment was sought by Debtors." *Id*. Finally, the Levy Claimants point to the Settlement Agreement's severability clause, "which provides that 'if any part of [the Agreement] is found to be unenforceable, the other paragraphs shall remain fully valid and fully enforceable." *Id*.

These arguments are unpersuasive. While (i) the Debtors' subsequent bankruptcy filings, (ii)

their creditors' obligation to file proofs of claim prior to the relevant bar date, and (iii) the discharge of prepetition claims once the Debtors' joint plan of reorganization was confirmed may bind third parties who otherwise had valid claims against them and failed to file such claims, the fact remains that the Debtors and the Plaintiffs negotiated the terms of their settlement and agreed that these conditions precedent had to be satisfied before their Settlement Agreement would become effective. Or stated another way, the parties agreed that the Settlement Agreement would be "null and void" without the required court approval. Settlement Agreement at § 8.6(A). If court approval of the Settlement Agreement was really unnecessary because it was a private settlement between the Debtors and the Named Plaintiffs, as the Levy Claimants now argue, the Named Plaintiffs should never have agreed to this term in the first place.

In essence, the Levy Claimants now ask this Court to sever out those terms of the Settlement Agreement that were never satisfied and enforce the balance of the Settlement Agreement's terms against the Debtors. However, that is not what the severability clause of the Settlement Agreement or the law permits. Rather, the severability clause allows terms of the agreement that are unenforceable to be severed such that the balance of the agreement can be fully enforced. Settlement Agreement § 9.8. The terms that the Levy Claimants ask this Court to ignore or sever out of the Settlement Agreement are not unenforceable terms – they are simply terms that were never fulfilled. To do as the Levy Claimants suggest would require the Court to rewrite the parties' agreement. This the Court cannot not do. *See Sklerov v. Sklerov*, 647 N.Y.S.2d 532, 533 (N.Y. App. Div. 1996) ("A court should construe a [settlement] in accordance with the intent of the parties . . . [and] should not, under the guise of interpretation, make a new contract for the parties."). In sum, from the Court's perspective, if the terms of the parties' settlement were negotiated, agreed to, and reduced to writing,

as the Levy Claimants' allege, they must be fully - not selectively - enforced.

Because the Court cannot find the Settlement Agreement effective while conditions precedent to its effectiveness remain unsatisfied, the Settlement Agreement is unenforceable against the Debtors.

### B. Alternatively, are the Plaintiffs' claims to $1.8 million under the Settlement Agreement entitled to § 507(a)(4) wage priority?

Because the Court has concluded that the Settlement Agreement is unenforceable against the Debtors, it is not necessary to address this issue. However, to facilitate appellate review of this Memorandum Opinion, the Court will provide its analysis of this issue. In short, even if the Settlement Agreement is enforceable against the Debtors, the Court concludes that the Plaintiffs' claims to $1.8 million under the Settlement Agreement are not entitled to § 507(a)(4) wage priority.

As relevant here, § 507(a)(4) of the Bankruptcy Code provides that allowed unsecured claims for wages, salaries, or commissions "earned" within 180 days prior to the petition date are entitled to priority above general unsecured creditors. 11 U.S.C. § 507(a)(4). Thus, the question becomes when did the Levy Claimants "earn" these wages? Did they "earn" them "when the claimant provided the services that gave rise to the claim," as the Debtors contend, Mem. in Supp. of the Reorganized Debtors' Objections to Levy Claims at 12, or did they "earn" them on the date of the Settlement Agreement, as the Levy Claimants contend? For the reasons explained more fully below, the Court rejects the Levy Claimants' arguments that

> [p]rior to the date of a settlement, there is no recognition, legal or otherwise, that any wages were earned or due. In addition, a settlement payment does not correspond to work performed at any particular point in time. Much like severance pay, which is "earned" on the date of termination, a settlement payment is earned on the date of the settlement agreement. Any alternative understanding of a settlement payment and the time at which it accrues would be inconsistent with the manner in which settlement payments are actually paid to (or, under the Bankruptcy Code, "earned"

by) employees.

Levy Claimants' Brief at 20.

The Court disagrees with the Levy Claimants' starting premise. The fact that an employer disputes an employee's legal entitlement to a wage does not mean that the wage was not yet "earned," or would only be "earned" when the employer finally acknowledged its obligation to pay the wage. While the Bankruptcy Code does not define the term "earn," Black's Law Dictionary defines it as "[t]o acquire by labor, service, or performance . . . [t]o do something that entitles one to a reward or result, whether it is received or not." Black's Law Dictionary 584 (9th ed. 2009). This definition accords with the general rule that an "employee earns wages within the meaning of Code § 507(a)(4) at the time that the services are performed, rather than at the time that the right to payment vests." 3 Norton Bankr. L. & Prac. 3d § 49:45 (2010); *see e.g. In re Cardinal Indus., Inc.*, 160 B.R. 327, 329 (Bankr. S.D. Ohio 1993) ("the time of payment" should not be the focus of Section 507; "[r]ather, the focus should be upon the time the individual performed the service . . ."). Put differently, if an employee's right to wages arises "at a particular point in time but payment is deferred until a later date, the [wages] are earned when the right to receive payment occurred," regardless of when, if ever, actual payment takes place. 4 Collier on Bankruptcy ¶ 507.06[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010). Thus, from the Court's perspective – and absent an employment contract to the contrary – the Levy Claimants "earned" the Unpaid Wages at issue here, if at all, when the work was performed, not on the settlement date.

Moreover, the Court is struck by the Levy Claimants' current position on this issue given that it is likely contrary to their position in the EDNY Litigation. If the Unpaid Wages had not yet been "earned," as the Levy Claimants assert here, on what basis did the Plaintiffs bring suit to recover

those wages in 2006 in the EDNY Litigation? In other words, under the Fair Labor Standards Act (the statute under which the Plaintiffs' overtime claims arose), to have a legally cognizable claim for unpaid overtime the Plaintiffs had to have already worked the overtime hours. In *Halferty v. Pulse Drug Co., Inc.*, 821 F.2d 261 (5th Cir.1987), the Fifth Circuit held that under the Fair Labor Standards Act, '[a] cause of action accrues at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed." *Id*. at 271 (citing *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1050-51 (5th Cir. 1973), *cert. denied*, 414 U.S. 822 (1973)); *see Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 199 (S.D.N.Y. 2006) ("'In FLSA cases involving overtime pay, a new cause of action accrues for purposes of § 255(a) at each regular payday immediately following the workweek during which services were rendered and for which overtime compensation is claimed'" (quoting *Acosta v. Yale Club*, 94 Civ. 0888, 1995 WL 600873, at *3 (S.D.N.Y. Oct. 12, 1995)); *see also* 29 C.F.R. § 790.21(b) ("The courts have held that a cause of action under the Fair Labor Standards Act for unpaid minimum wages or unpaid overtime compensation and for liquidated damages 'accrues' when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends.").

Finally, the Levy Claimants' argument conflicts with sound bankruptcy policy. Generally speaking, similarly situated creditors are to be treated similarly under the Bankruptcy Code. This principle is called "equality of distribution." Congress created certain specific exceptions to the general rule of "equality of distribution" with respect to unsecured claims. Specifically, Congress recognized that certain unsecured claims should be accorded priority status up to certain dollar amounts and paid prior to other unsecured non-priority claims. As relevant here, wage claims

"earned" within 180 days of the bankruptcy filing are entitled to a fourth priority. This priority was designed to protect employees of financially distressed companies who might find themselves continuing to work but unpaid during the 180 days prior to their employer's bankruptcy filing. *See generally* 4 Collier on Bankruptcy, *supra*, ¶ 507.06. By granting such wages priority, Congress was attempting to ensure that such employees would get paid for their work prior to their employer's general unsecured creditors. *Id*. Ruling that wages are not "earned" until a legal right to receive them is recognized – either by a court or an employer – distorts this sound policy choice. If the Levy Claimants' argument was accepted, unpaid wages arising from services provided years prior to a bankruptcy filing when no financial distress existed could be accorded priority status simply because the employer disputed the claimant's entitlement to the wages and the dispute happened to be settled within 180 days of the petition date. That is not what Congress intended in adopting its priority scheme.

For these reasons, the Court concludes that even assuming that the Settlement Agreement is enforceable against the Debtors, the $1.8 million was not "earned" within 180 days prior to the Petition Date as required by § 507(a)(4) of the Bankruptcy Code.

## IV. CONCLUSION

The Settlement Agreement is not enforceable against the Debtors for two reasons. First, it was not signed by the Debtors and is unenforceable under CPLR 2104. Second, conditions precedent to its effectiveness were not satisfied.

Alternatively, even assuming that the Settlement Agreement is enforceable against the Debtors, the $1.8 million was not "earned" within 180 days prior to the Petition Date as required by § 507(a)(4) of the Bankruptcy Code. It is therefore not entitled to a fourth priority in distribution

under the Debtors' joint plan of reorganization.

The Debtors are directed to prepare an Order consistent with this Memorandum Opinion, circulate it to counsel for the Levy Claimants for approval as to form, and submit it to the Court for entry within fourteen (14) days of the entry of this Memorandum Opinion on the docket.

### End of Memorandum Opinion ###